## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| Eugene Hudson, Jr., | ) |
| Plaintiff, | ) ) ) |
| v. | ) No. 1:17-cv-02094-JEB |
| American Federation of Government Employees, | ) ) ) ) |
| Defendant. | ) ) ) |

## MEMORANDUM OF POINTS AND AUTHORITIES IN
## SUPPORT OF DEFENDANT AFGE's MOTION TO DISMISS

Defendant American Federation of Government Employees ("AFGE") hereby submits

this Memorandum of Points and Authorities in support of AFGE's Rule 12(b)(6) motion to

dismiss Plaintiff's complaint in its entirety.

### INTRODUCTION

On September 12, 2017, Plaintiff Eugene Hudson, Jr. filed a prior complaint in this Court

challenging his August 8, 2017 removal from union office on the grounds that AFGE's action in

removing him was unlawful under the Labor Management Reporting and Disclosure Act

("LMRDA"), as well as in conflict with the AFGE Constitution.  See ECF No. 1 in 17-CV-1867

(hereinafter, "LMRDA Complaint or Cplt.").  Hudson's LMRDA claims are that AFGE's

decision to remove him from office was "in retaliation for [Hudson's] decision to oppose

National President Cox [in AFGE's upcoming officers election,] for [Hudson's] criticism of

expenditures by several National Vice Presidents, and to chill dissent by AFGE members."

LMRDA Cplt. ¶ 79; see also id. ¶¶ 72-73.  Hudson's LMRDA Complaint does not claim (or

even hint at the possibility) that his removal from office was motivated in whole or in part by discriminatory animus (Hudson is African-American), or that AFGE's decision to remove him was in retaliation for Hudson's opposition to alleged race discrimination within AFGE.

More than three months later, on December 21, 2017, AFGE was served with the complaint here at issue, which unbeknownst to AFGE, had been filed in this Court on October 10, 2017. This subsequent complaint *also* claims that Hudson's removal from office was unlawful. See ECF No. 1 in 17-CV-2094 (hereinafter, "Discrimination Complaint or Cplt."). But on this occasion, Hudson claims that his removal was unlawful because the reasons stated by AFGE for that removal "were pretext to hide" AFGE's racially "discriminatory animus," Discrimination Cplt. ¶¶ 46, 51, and "retaliatory animus," id. ¶ 48. Hudson's Discrimination Complaint also claims that certain other *pre*-removal "conduct" adverse to him was motivated by racially "discriminatory animus," id. ¶ 46, and "retaliatory animus," id. ¶ 48, and further claims that AFGE has subjected him to a racially "hostile work environment," id. ¶¶ 20, 49.[1]

For the reasons set out in detail infra pp. 5-18, *all* of Hudson's claims in this discrimination case are legally deficient and should be dismissed under the by-now-familiar Twombly-Iqbal plausibility standard. At a minimum, Hudson's claims pertaining to his removal from office should be dismissed based on the prudential rule against claims splitting.

---

[1] Although Hudson's two complaints plainly are "related" under Local Civil Rule 40.5 insofar as both challenge the legality of Hudson's removal, Hudson's separate attorney in this discrimination case did not file a related case designation as required by that Rule. AFGE therefore brought the relationship between the two cases to the Court's attention, and this discrimination case was reassigned to the Judge presiding over the earlier-filed LMRDA case.

## FACTUAL BACKGROUND[2]

Hudson was elected National Secretary-Treasurer of AFGE in 2012, and again in 2015, for consecutive three-year terms.  LMRDA Cplt. ¶ 6; Discrimination Cplt ¶ 14.  On November 15, 2016, Hudson directed his subordinate Willie Hope to send an email to AFGE members with Hudson's views concerning the election of Donald J. Trump as President of the United States (hereinafter, "the Trump email").  LMRDA Cplt. ¶¶ 9, 11.  On November 22, 2016, AFGE General Counsel David Borer sent a Memorandum to AFGE National President J. David Cox, expressing Borer's concern that in directing the distribution of the Trump email to AFGE members, Hudson may have violated AFGE policy.  Id. ¶ 12.  Borer also expressed concern that Hudson's action imprudently exposed AFGE members to stiff penalties for possible Hatch Act violations, and also exposed AFGE itself to liability arising out of the possible imposition of such penalties.  Id., Exh. 2, pp. 3-5.  On December 21, 2016, National Vice President Keith Hill filed internal charges against Hudson alleging that Hudson had violated the AFGE Constitution as a result of this and other actions.  Id. ¶ 13.

In response to the filing of these internal charges against Hudson, a three-member Committee of Investigation was appointed on February 7, 2017, allegedly by National President Cox.  Id. ¶ 20.  The Committee met on July 10, 2017 to consider the matter.  Id. ¶ 28.  The Committee concluded that certain internal charges made against Hudson should be dismissed,

---

[2] The facts set out herein are drawn from Hudson's Complaint in this discrimination case, as well as his Complaint and other record materials in his previously-filed LMRDA case.  In the latter regard, it is well established that courts "may take judicial notice of other cases involving the same subject matter or questions of a related nature between the same parties."  Veg–Mix, Inc. v. U.S. Dept. of Agric., 832 F.2d 601, 607 (D.C. Cir. 1987); see also Covad Commc'ns v. Bell Atl. Corp., 407 F.3d 1220, 1222 (D.C. Cir. 2005) (court may take judicial notice of relevant opinions and records in related proceedings in considering a motion to dismiss); Atchison v. U.S. Dist. Courts, 190 F. Supp. 3d 78, 93 (D.D.C. 2016) ("In deciding a motion to dismiss under Rule 12(b)(6), the Court may also take judicial notice of facts litigated in a prior related case.").

but that there was probable cause for the charge of malfeasance of office relating to the Trump email. Id. ¶¶ 29–30; Discrimination Cplt. ¶ 39. Accordingly, on July 19, 2017, Cox forwarded the matter to AFGE's National Executive Council ("NEC") for decision in accordance with the AFGE Constitution. LMRDA Cplt. ¶¶ 19, 32–33 & Exh. 13; Discrimination Cplt. ¶ 40.

On July 28, 2017, Hudson submitted a Position Statement to the NEC contesting the Committee of Investigation's findings. LMRDA Cplt. ¶ 34. In that Position Statement, Hudson asserted that several NEC members, including National President Cox, were "biased" against him for certain highly-specific reasons, but did not accuse any NEC member, including Cox, of harboring any *racial* bias towards him. Id. ¶ 35.[3]

On August 8, 2017, the NEC met and voted to remove Hudson from office as National Secretary-Treasurer. LMRDA Cplt. ¶ 49; Discrimination Cplt. ¶ 41. The vote to remove Hudson was 12-1, and in line with AFGE policy, National President Cox abstained from that vote. ECF No. 13 in 17-CV-1867, at 6 (hereinafter, "Memorandum Opinion"); ECF No. 8-1, NEC Hearing Transcript, at 84:1–14; 99:5–9; 114:16.[4]

During the period between June 2016 and January 2017, National President Cox is alleged to have "unilaterally," Discrimination Cplt. ¶¶ 24-25, taken certain other adverse employment actions against Hudson, purportedly with racially "discriminatory animus," id. ¶ 46,

---

[3] In National President Cox's case, the specific reason given for Cox's alleged "bias" against Hudson was "[i]t is no secret that I plan to oppose Cox" in AFGE's upcoming officers election. LMRDA Cplt. ¶ 35. In the case of several other NEC members, the specific reason given was Hudson's critique of their expense account practices. Id.

[4] On January 12, 2018, this Court vacated the above-cited Memorandum Opinion on the stated ground that the preliminary injunction granted thereby was based on an LMRDA claim subsequently withdrawn by Hudson. However, this stated ground for vacatur does not undermine the validity of the factual recitation in the Memorandum Opinion, which rests on facts that the Court noted were "largely undisputed." In any event, this Court may independently take judicial notice of the fact that Hudson was removed from office by a 12-to-1 vote (with National President Cox abstaining) from the NEC Hearing Transcript made part of the LMRDA case record by Hudson himself on October 24, 2017. See supra p. 3 n.2.

4

and "retaliatory animus," id. ¶ 48.  These other adverse employment actions allegedly taken

"unilaterally" by Cox for racially discriminatory/retaliatory reasons include taking away certain

"key [job] responsibilities" and "chairmanships" from Hudson, including his responsibility to

review NEC member expense accounts, id. ¶¶ 24, 34-35; denying Hudson's request that Cox

promote an African-American member of Hudson's staff, id. ¶¶ 28–29; and giving Cox himself

and another Caucasian AFGE employee a "full" 2.88% Cost of Living Adjustment ("COLA"),

while giving Hudson "only a 2.48%" COLA, id. ¶¶ 26-27.

## ARGUMENT

**I.    The Twombly-Iqbal Plausibility Standard**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the

"complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that

is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009); accord Bell Atlantic Corp.

v. Twombly, 550 U.S. 544 (2007).  "The plausibility standard is not akin to a 'probability

requirement,' but it asks for more than a sheer possibility that a defendant has acted

unlawfully." Iqbal, 556 U.S. at 678.

In applying the Twombly-Iqbal plausibility standard, the court must "assume the truth of

all well-pleaded factual allegations and construe reasonable inferences from those allegations in

a plaintiff's favor." Nuruddin v. Bolden, 818 F.3d 751, 756 (D.C. Cir. 2016).  Importantly for

present purposes, however, the court need not and should not accept those inferences a plaintiff

seeks to draw that are "unsupported by the facts set out in the complaint," id., or even

affirmatively "undermine[d]" by those facts, see Easaw v. Newport, 253 F. Supp. 3d 22, 31-32

(D.D.C. 2017).  Moreover, the court need not and should not accept as true "a legal conclusion

couched as a factual allegation." Trudeau v. Fed. Trade Comm'n, 456 F.3d 178, 193 (D.C. Cir.

2006) (quoting Papasan v. Allain, 478 U.S. 265, 286 (1986)) (internal quotation marks omitted).

In the same vein, "[t]hreadbare recitals of the elements of a cause of action . . . do not suffice." Iqbal, 556 U.S. at 678.

## II.    The Court Should Dismiss the Complaint in its Entirety for Failure to State a Claim

Hudson claims that the adverse employment actions taken against him by AFGE (including his removal from office on August 8, 2017) constituted both intentional "racial discrimination" and "retaliation" in violation of Title VII of the Civil Rights Act, 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. § 1981, see Discrimination Cplt. ¶¶ 44-48, 50-51, and further claims that AFGE has subjected him to a "hostile and abusive work environment," also in violation of Title VII and § 1981, see id. ¶¶ 20, 49.[5]  As we now show, each of these three claims is legally deficient and should be dismissed under the Twombly-Iqbal plausibility standard.

### A.    Plaintiff Has Failed to State a Claim of Intentional "Racial Discrimination" in Violation of Title VII and § 1981[6]

To establish a *prima facie* claim of intentional discrimination (often referred to as a "disparate treatment" claim) under Title VII and § 1981, Hudson must show that "(1) [he] is a member of a protected class; (2) [he] suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination."  Chappell–Johnson v. Powell, 440 F.3d 484, 488 (D.C. Cir. 2006) (quotation omitted).  While Hudson is not required to plead "every fact necessary to establish a *prima facie* case to survive a motion to dismiss," Jones v. Air

---

[5] The "overlap" between Title VII and § 1981 is virtually complete in cases involving alleged race discrimination and retaliation in the employment setting, so employees making such race-based allegations commonly sue under both statutes, as here.  See generally CBOCS West, Inc. v. Humphries, 553 U.S. 442, 454-55 (2008).  Hudson's Discrimination Complaint also invokes 42 U.S.C. § 1983, but Hudson has not stated a § 1983 claim by any stretch.  To state a § 1983 claim, a plaintiff must allege, as a threshold matter, that the misconduct complained of was taken "'under color of' the law of a state, territory or the District of Columbia," Hoai v. Vo, 935 F.2d 308, 312 (D.C. Cir. 1991), and Hudson has made no such threshold allegation here.

[6] Inexplicably, Hudson's claim of intentional "racial discrimination" is set out in two separate Counts (One and Four) that contain nearly verbatim allegations and are, on their face, wholly duplicative.  The discussion that follows thus fully disposes of both Counts.

Line Pilots Ass'n, Int'l, 642 F.3d 1100, 1104 (D.C. Cir. 2011), he must "still allege sufficient

facts 'to draw the reasonable inference that the defendant is liable for the misconduct alleged.'"

Easaw, 253 F. Supp. 3d at 27 (quoting Iqbal, 556 U.S. at 678). See also Easaw, 253 F. Supp. 3d

at 29-30 & n.4; Bray v. RHT, Inc., 748 F. Supp. 3, 5 (D.D.C. 1990) ("In order to pursue a cause

of action under § 1981 [or Title VII], plaintiff cannot merely invoke his race in the course of a

claim's narrative and automatically be entitled to pursue relief. . . .  Rather, plaintiff must allege

some facts that demonstrate that his race was the reason for defendant's actions.") (citation

omitted); Mesumbe v. Howard Univ., 706 F. Supp. 2d 86, 93 (D.D.C. 2010) (dismissing

complaint where, even "[g]iving Plaintiff the benefit of all reasonable inferences, the facts

alleged do not state a racially discriminatory motive"); Ndondji v. InterPark Inc., 768 F. Supp. 2d

263, 274 (D.D.C. 2011) (finding that "occasional reference to [Plaintiff's] race in his . . .

complaint is also insufficient to make out a section 1981 [or Title VII] action").

 Here, Hudson makes the far-reaching, conclusory claim that all of the adverse "conduct"

allegedly taken against him by AFGE was infected by racially "discriminatory animus." See

Discrimination Complaint ¶¶ 46, 51.  But that claim is not backed up by alleged *facts* sufficient

to give rise to a plausible inference of such racial animus, as the Twombly-Iqbal plausibility

standard demands.  To the contrary, like the situation presented in Easaw, supra, the facts alleged

by Hudson in this case and in his previously-filed LMRDA case affirmatively undermine the

plausibility of such an inference.

 As previously noted, the adverse "conduct" complained of by Hudson in this case falls

neatly into one of two discrete categories:  (1) adverse employment actions taken "unilaterally"

by National President Cox during the period between June 2016 and January 2017; and (2) the

NEC's August 8, 2017 decision to remove Hudson from office by a 12-to-1 vote (with President Cox abstaining).  We address each category in turn.

### 1.    Actions Taken "Unilaterally" by National President Cox

Hudson's claim that the adverse employment actions taken "unilaterally" by National President Cox were motivated by racial animus is wholly unsupported by allegations that would constitute direct evidence that Cox harbors animus towards African-Americans—such as, for example, allegations that Cox has made racially hostile or insensitive remarks inside or outside the workplace.  Rather, insofar as we can tell based on Hudson's Discrimination Complaint, Hudson seeks to raise a plausible inference that Cox harbors animus towards African-Americans based entirely on the following alleged circumstances:  (a) at some unspecified point in time, Cox rejected Hudson's request that he promote an African-American member of Hudson's staff named Willie Hope, see Discrimination Cplt. ¶¶ 28–29; and (b) at some point after the issuance of an executive branch order in or around January 2017, Cox granted himself and another Caucasian AFGE officer (Joseph Flynn) a "full" 2.88% COLA, but gave Hudson "only a 2.48%" COLA, see id. ¶¶ 26-27.  Neither allegation comes close to raising such a plausible inference.

With respect to the non-promotion of Willie Hope, Hudson alleges nothing more than the fact of Hope's race (African-American).  He does not identify a similarly-situated employee outside the protected class who was treated differently by Cox; he pleads nothing concerning Hope's qualifications for the promotion; and—most strikingly perhaps—fails even to identify the position that Hudson wanted Hope promoted into.  Nor does Hudson plead any facts pertaining to Cox's track record in promoting African Americans within AFGE.  Such a bare-bones allegation invoking nothing more than Hope's race plainly affords no basis for drawing a plausible inference of racial animus on Cox's part.  See supra p. 7 and cited cases.

Hudson's allegation that Cox gave him only a 2.48% COLA, while giving himself and another Caucasian AFGE officer (Joseph Flynn) a "full" 2.88% COLA, fares no better in raising such a plausible inference of racial animus. This allegation is not a model of clarity, but Hudson's theory as to how it raises such a plausible inference appears to rest on the asserted fact that an executive branch order issued in or around January 2017, to which AFGE salaries are "pegged," mandated that "all federal employees" be given a 2.88% COLA, justifying the inference that Hudson's receipt of only a 2.48% COLA must have been the product of something nefarious such as race discrimination. The problem for Hudson is that this asserted fact respecting the executive branch order is untrue.[7]

Contrary to Hudson's assertion, no executive branch order was issued in or around January of 2017 mandating that "all federal employees" be given a 2.88% COLA. COLAs for 2017 were set by Executive Order 13756, "Adjustment of Certain Rates of Pay," 81 Fed. Reg. 97099, 2016 WL 7487746 (Dec. 27, 2016) (relevant excerpts attached as Exhibit A). Executive Order 13756 does not purport to provide "all federal employees" with a 2.88% COLA. Rather, it provides an across-the-board 1% COLA (Schedule 1), combined with an adjustment to the "locality-based comparability payment" which varies depending on the geographic "locality pay area" where the federal employee is employed (Schedule 9).

Taken together, the 1% COLA and the locality-based comparability payment for the Washington D.C. area where Hudson was employed in 2017 yields a total COLA of 2.88% for

---

[7] Because the executive branch order and the OPM salary tables implementing it are matters of public record, this Court may properly take judicial notice of those matters in ruling on AFGE's motion to dismiss. See Covad Commc'ns v. Bell Atl. Corp., 407 F.3d 1220, 1222 (D.C. Cir. 2005); Strumsky v. Washington Post Co., 842 F. Supp. 2d 215, 217–18 (D.D.C. 2012). And, unsurprisingly, courts are not required to "accept as true the complaint's factual allegations insofar as they contradict . . . matters subject to judicial notice." Kaempe v. Myers, 367 F.3d 958, 963 (D.C. Cir. 2004).

most, *but not all*, D.C. area federal employees.  See OPM Salary Table 2017-DCB,

www.opm.gov/policy-data-oversight/pay-leave/salaries-wages/salary-tables/pdf/2017/DCB.pdf

(attached as Exhibit B).  Specifically, the OPM Salary Table for the D.C. statistical area notes

that the salaries for federal employees in Steps 8 through 10 of the GS-15 salary grade are

capped at a certain level that can yield a COLA of less than 2.88%.  Id.   And, under the AFGE

Constitution, Hudson, as AFGE's National Secretary-Treasurer, is compensated at the GS-15

salary grade.  See LMRDA Cplt., Exh. 4, p.2.

The upshot of all this is that, contrary to what he alleges, Hudson was not necessarily

entitled to receive a "full" 2.88% COLA—he was entitled to less if, at the relevant time, he fell

within Steps 8 through 10 of the GS-15 salary grade.  On the other hand, National Vice President

Flynn, to whom Hudson seeks to compare himself, unquestionably was entitled to receive a

"full" 2.88% COLA. That is so because under the AFGE Constitution, National Vice Presidents

are compensated at the GS-14 salary grade, see LMRDA Compl., Exh. 4, p. 2, and the OPM

Salary Table clearly indicates that all D.C. area federal employees at the GS-14 salary grade

were entitled to receive a 2.88% COLA.  The salary grade difference between Hudson and Flynn

(GS-15 vs. GS-14) is a plausible (indeed, likely) explanation for why Hudson received a slightly

lower COLA than Flynn.  In the absence of any other factual allegations remotely suggestive of

racial animus on Cox's part, racial animus most certainly is *not* a plausible explanation.

Hudson's allegation that National President Cox gave himself a "full" 2.88% COLA is

equally unavailing.  To begin with, Hudson is not similarly situated to Cox for salary purposes—

and thus not "an appropriate comparator" for such purposes, Burley v. National Passenger Rail

Corp., 801 F.3d 290, 301 (D.C. Cir. 2015)—because Cox is an Executive Level IV employee

whose salary is set on different, non-GS-salary-grade terms than all other NEC members

including Hudson.  See LMRDA Cplt., Exh. 4, p.2.  Moreover, an allegation that a Caucasian

official has treated *himself* slightly more favorably for salary purposes than a lower-level

African-American official, without more, hardly raises a plausible inference of racial animus.

Although the foregoing is sufficient standing alone to defeat Hudson's claim that the

adverse employment actions taken "unilaterally" by Cox were motivated by racial animus, there

are additional factors that drive a stake through that claim.  In Easaw, supra, 253 F. Supp. 3d at

31, another Judge in this District, in dismissing a disparate treatment claim brought under the

DCHRA, aptly observed that a plaintiff can affirmatively "undermine[ ] the plausibility" of an

allegation that an employment decision was motivated by racial animus "by alleging other facts

that suggest race was not a factor in [that] decision."  Hudson has done precisely that.

Hudson alleges that he and Cox were elected as National Secretary-Treasurer and

National President, respectively, in August of 2012, Discrimination Cplt. ¶¶ 14, 22, and that Cox

first started taking specified adverse employment actions against him "[i]n the summer of 2016,"

when "Hudson presented an extensive memorandum explaining his questions about expenses

claimed by NEC members on the[ir] travel vouchers," id. ¶ 31.  Thus, insofar as Hudson's

Discrimination Complaint reads, he and Cox had a perfectly fine working relationship unmarred

by any employment-related problems for their first four years together at AFGE headquarters.[8]

Hudson also alleges in his previously-filed LMRDA Complaint that his working

relationship with Cox began to sour in the summer of 2016, for wholly *non*-racial reasons

---

[8] Hudson does allege in wholly conclusory terms that Cox has "discriminated against" him and
"harassed" him because of his race "since 2012," without offering *any* factual details regarding
what racially discriminatory and harassing actions Cox purportedly took against Hudson between
August of 2012 and the summer of 2016.  See Discrimination Cplt. ¶¶ 2, 20.  But of course, this
is precisely the sort of "[t]hreadbare recital[] of the elements of a cause of action, supported by
mere conclusory statements" that gets a plaintiff nowhere under the Twombly-Iqbal plausibility
standard.  Iqbal, 556 U.S. at 678; accord Easaw, 253 F. Supp. 3d at 32.

leading directly to one of the adverse employment actions (the taking away of his authority to review expense accounts, see Discrimination Cplt. ¶ 34) that Hudson now seeks to attribute to racial animus on Cox's part.  Specifically, echoing the statements he made in his July 28, 2017 Position Statement to the NEC, Hudson alleges in his LMRDA Complaint that Cox was angered by Hudson's criticism of the expense account practices of certain NEC members and took away Hudson's authority to review expense accounts "as a result of" that criticism.  See LMRDA Cplt. ¶¶ 35, 39.  And, Hudson further alleges in his LMRDA Complaint that his working relationship with Cox turned sourer still when, in December of 2016, Hudson announced that he would run against Cox for National President, leading to a request from Hudson that Cox recuse himself from the NEC's deliberations over his removal from office.  See id. ¶¶ 8, 35.

AFGE denies that Hudson's critique of certain expense account practices, or Hudson's announced decision to run against Cox for National President, had anything to do with any of the adverse employment actions taken "unilaterally" by Cox starting in the summer of 2016.  Be that as it may, the plausibility of Hudson's claim that those actions were motivated by racial animus is affirmatively undermined by:  (a) Hudson's failure to allege any employment-related problems between him and Cox during the first four years they worked together at AFGE; (b) his prior allegations in the LMRDA case that their working relationship began to sour in the summer of 2016 for wholly *non*-racial reasons; and (c) his prior allegation in the LMRDA case that at least one of the actions that he now seeks to attribute to racial animus on Cox's part was motivated by considerations of an entirely different kind.

2.    **Hudson's Removal from Office by the NEC**

Hudson's claim that the NEC's August 8, 2017 decision to remove him from office was motivated by racial animus likewise fails under the Twombly-Iqbal plausibility standard—for similar reasons.

First and foremost, neither Hudson's Discrimination Complaint nor his previously-filed LMRDA Complaint allege *any* facts suggestive of racial animus as a motivating factor in the NEC's decision to remove Hudson from office. As Hudson himself has pointed out, the NEC's decision was taken by an overwhelming margin, with 12 NEC members voting in favor of removal and only one NEC member voting against removal. Supra p. 4 & n.4. Yet Hudson fails to allege that *any* of the 12 NEC members who voted in favor of removal harbored racial animus towards him, rendering inexplicable on its face his claim that the NEC's decision was the product of race discrimination. Plainly, if none of the persons responsible for making an adverse employment decision stand accused of harboring racial animus towards the aggrieved employee, there is no colorable basis on which to claim that the decision itself was racially discriminatory.[9]

Although we safely could stop here, in this instance as well, there are additional factors that drive a stake through Hudson's claim. In his previously-filed LMRDA Complaint, Hudson alleged that the NEC's decision to remove him was the product of several *other* bad motives—

---

[9] The Supreme Court has recognized a narrow exception to this principle where a "biased" supervisor engages in discriminatory acts that influence an adverse employment decision made by other, unbiased supervisors. See Staub v. Proctor Hosp., 562 U.S. 411, 422 (2011). But Hudson has alleged no facts that might bring this case within this "cats-paw," id., liability theory. Specifically, Hudson has alleged no facts indicating that Cox is a "biased" supervisor who engaged in racially discriminatory acts that influenced the NEC's decision to remove Hudson from office. Rather, the only acts that Cox is alleged to have taken in connection with Hudson's removal were the appointment of a Committee of Investigation to consider the internal charges against him, and the forwarding of the matter to the NEC for its disposition. See LMRDA Cplt. ¶¶ 20, 32-33; Discrimination Cplt. ¶¶ 37, 40. Both of these were entirely proper acts of a ministerial nature mandated by the AFGE Constitution. See LMRDA Cplt. ¶¶ 18-19, 32-33.

but *not* Hudson's race. Specifically, Hudson previously alleged that the NEC's decision to remove him was "in retaliation for [Hudson's] decision to oppose National President Cox [in AFGE's upcoming officers election,] for [Hudson's] criticism of expenditures by several National Vice Presidents, and to chill dissent by AFGE members." Supra p. 1. Although AFGE denies these prior "bad motive" allegations, they plainly "undermine[ ] the plausibility," Easaw, 253 F. Supp. 3d at 31, of Hudson's subsequent claim in this case that the NEC's decision was motivated by racial animus.

### B.    Plaintiff Has Failed to State a Claim that AFGE's Conduct Constituted Retaliation in Violation of Title VII and § 1981

To prove unlawful retaliation under Title VII and 42 U.S.C. § 1981, Hudson must show: "(1) that he opposed a practice made unlawful by Title VII [and § 1981]; (2) that [AFGE] took a materially adverse action against him; and (3) that [AFGE] took the action 'because' [Hudson] opposed the practice." McGrath v. Clinton, 666 F.3d 1377, 1380 (D.C. Cir. 2012); see also McFadden v. Ballard Spahr Andrews & Ingersoll, LLP, 611 F.3d 1, 6 (D.C. Cir. 2010) (frameworks applicable to claims of retaliation under Title VII and § 1981 are "essentially the same"). In other words, Hudson must plead facts that raise a plausible inference of a "causal connection" between his alleged protected activity and the adverse employment action he allegedly suffered. Carney v. Am. Univ., 151 F.3d 1090, 1095 (D.C. Cir. 1998).

Hudson's retaliation claim fails under the Twombly-Iqbal plausibility standard because he has not pled any facts establishing the requisite "causal connection" between his alleged protected activity and the adverse employment actions of which he complains.

Hudson's Discrimination Complaint alleges one—and only one—activity on Hudson's part that would qualify as "protected activity" under Title VII and § 1981: his filing of an EEOC charge against AFGE *on July 10, 2017.* See Discrimination Cplt. ¶ 8 & Exh. 1. Except for the

NEC's August 8, 2017 decision to remove Hudson from office, which we discuss below, *all* of the adverse employment actions complained of by Hudson *pre-dated* the filing of that charge. Accordingly, none of those adverse employment actions could plausibly have been "caused by" the filing of that charge, so as to support a claim of retaliation with respect to those actions.

Hudson's retaliation claim fares no better with respect to the NEC's August 8, 2017 decision to remove him from office, albeit for different causation-based reasons. Although the NEC's decision post-dated Hudson's filing of the EEOC charge against AFGE by nearly one month, Hudson fails to plead that AFGE had notice (actual or constructive) of that EEOC charge prior to Hudson's removal. To be sure, Title VII mandates that an EEOC charge be served on the respondent "within ten days" of its filing. See 42 U.S.C. § 2000e-5(e)(1). But Hudson conspicuously fails to allege that this statutory mandate was complied with here, and it is quite reasonable to assume that it was not, in light of Hudson's allegation that the EEOC *summarily dismissed his charge* and issued him a right-to-sue letter *on July 11, 2017*—a mere one day after the charge had come through the EEOC's doors. See Discrimination Cplt. ¶ 9 & Exh. 2. Nor can notice on AFGE of the EEOC charge plausibly be inferred from the fact that the right-to-sue letter contains a "cc" line listing AFGE's street address as "807 F Street, N.W.," see id., inasmuch as AFGE's correct street address is 80 F Street, N.W.

Absent an allegation that anyone at AFGE had knowledge of Hudson's July 10, 2017 EEOC charge prior to the NEC's August 8, 2017 decision to remove Hudson from office—much less an allegation that one or more of the 12 NEC members who voted in favor of Hudson's removal had such knowledge—Hudson's Discrimination Complaint fails to allege the requisite "causal relationship" between the July 10, 2017 EEOC charge and the August 8, 2017 removal decision. See Mitchell v. Baldrige, 759 F.2d 80, 86 (D.C. Cir. 1985) (the "casual connection

15

component" of a retaliation claim requires a showing "that the employer had knowledge of the employee's protected activity").

Although the foregoing is dispositive of all facets of Hudson's retaliation claim, we would be remiss if we failed to show that Hudson's claim that his August 8, 2017 removal was in retaliation for the filing of his July 10, 2017 EEOC charge fails on independent grounds as well.

As discussed supra pp. 13-14, in his previously-filed LMRDA lawsuit, Hudson alleged two separate "retaliatory" motives for his August 8, 2017 removal, neither of which involved his filing of an EEOC charge on July 10, 2017. Although AFGE denies these prior "retaliatory motive" allegations, they plainly "undermine[ ] the plausibility," Easaw, 253 F. Supp. 3d at 31, of Hudson's subsequent claim in this case that his removal was in retaliation for the filing of his EEOC charge—even assuming *arguendo* that AFGE had knowledge of that charge. See also Lewis v. District of Columbia, 653 F. Supp. 2d 64, 80 (D.D.C. 2009) (dismissing retaliation claim despite temporal proximity of protected activity and adverse employment action because "any inference of a retaliatory motive is substantially undermined by the fact that [the employer] declined to hire the plaintiff for the [supervisory] position on three separate occasions before the plaintiff engaged in any protected activity.").

It also is telling that the investigation ultimately leading to Hudson's removal on August 8, 2017 substantially preceded the filing of his EEOC charge on July 10, 2017. Supra pp. 3-4. Indeed, Hudson filed his EEOC charge on the very same day that the Committee of Investigation met and concluded that there was probable cause for the charge of malfeasance of office relating to the Trump email. Id. Thus, by the earliest date that AFGE could possibly have learned of Hudson's EEOC charge, a long-pending investigation into Hudson's conduct had already substantiated one of the key internal charges against him. While in some cases "a close temporal

relationship [between protected activity and adverse employment action] may alone establish the required causal connection" for a retaliation claim, Singletary v. District of Columbia, 351 F.3d 519, 525 (D.C. Cir. 2003), such a finding would defy logic in a factual scenario where, as here, an already-existing disciplinary investigation is nearing its conclusion when an EEOC charge is filed, and no other indicia of racial animus has been alleged.  Moreover, such a finding would have the perverse result of encouraging the strategic filing of unfounded discrimination charges by employees who fear that disciplinary action under active consideration is imminent.

### C.    Plaintiff Has Failed to State a Claim that AFGE's Conduct Created a Hostile Work Environment in Violation of Title VII and § 1981

To prevail on a hostile work environment claim, Hudson must show that he was subjected to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to . . . create an abusive working environment." Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 577 (D.C. Cir. 2013) (citing Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993)).  Such hostile work environment claims are evaluated based on "the totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008).  Because Title VII does not establish a "general civility code for the American workplace," the "crucial" requirement is that the workplace behavior complained of is "so objectively offensive as to alter the conditions of the victim's employment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80–81 (1998).

Hudson has pled no facts indicating that his work environment at AFGE was racially hostile or offensive.  Specifically, he has not made even a single allegation of intimidation, insults, humiliation, or derogatory remarks—of any severity or level of offensiveness—that is tied to his protected status as an African-American (or to any other status for that matter).

Against this background, Hudson may be claiming that a hostile work environment existed by reason of the fact that National President Cox allegedly took a series of discriminatory and retaliatory adverse employment actions against him prior to his removal from office, including the elimination of "key [job] responsibilities" and the denial of a "full" COLA.  But if that is Hudson's claim, it is doubly flawed.  First, as we have shown, Hudson has not asserted a plausible claim that any of the adverse employment actions taken by Cox were discriminatory or retaliatory.  Second, even if he had, the law is clear that Hudson cannot "bootstrap" his claims of discrete discriminatory/retaliatory adverse employment actions "into a broader hostile work environment claim."  Franklin v. Potter, 600 F. Supp. 2d 38, 76 (D.D.C. 2009); accord e.g. Hampton v. Vilsack, 760 F. Supp. 2d 38, 57 (D.D.C. 2011) ("Plaintiff cannot . . . rely on the discrete acts upon which he bases his discrimination and retaliation claims to support a hostile work environment claim"); Wade v. District of Columbia, 780 F. Supp. 2d 1, 19 (D.D.C. 2011) (rejecting hostile work environment claim as "essentially an amalgamation of disparate treatment claims"); Rattigan v. Gonzales, 503 F. Supp. 2d 56, 82 (D.D.C. 2007) ("[C]obbling together a number of distinct, disparate acts will not create a hostile work environment.  For example, if an employee is discriminatorily denied ten promotions over a period of time, that pattern of conduct may give rise to ten separate claims under Title VII, but it would not create a hostile work environment claim based on pervasive intimidation, insult and ridicule.").

In short, from any vantage point, Hudson has failed to make out a plausible hostile work environment claim in this case.

**III.    At A Minimum, The Court Should Dismiss Plaintiff's Claims Pertaining to His Removal From Office Based on the Prudential Rule Against Claims Splitting**

"[T]he prudential rule against claims splitting," <u>Plummer v. District of Columbia</u>, No. 07-CV-1161, 2008 WL 3972183, at *1 (D.D.C. Aug. 27, 2008), recognizes that "'[a] plaintiff has no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant,'" <u>Sweeney v. United States Parole Comm'n</u>, 197 F. Supp. 3d 78, 80 (D.D.C. 2016) (quoting <u>Baird v. Gotbaum</u>, 92 F.3d 166, 171 (D.C. Cir. 2015)); <u>Clayton v. District of Columbia</u>, 36 F. Supp. 3d 91, 94 (D.D.C. 2014) (same).  The purposes behind this prudential rule are straightforward and compelling:  "to promote judicial economy and shield parties from vexatious and duplicative litigation while empowering the district court to manage its docket."  <u>Vanover v. NCO Fin. Servs., Inc.</u>, 857 F.3d 833, 843 (11th Cir. 2017).

"To determine whether a plaintiff is claim-splitting, '[t]he proper question is whether, assuming the first suit was already final, the second suit would be precluded under res judicata analysis.'"  <u>Clayton</u>, 36 F. Supp. 3d at 94 (quoting <u>Katz v. Gerardi</u>, 655 F.3d 1212, 1219 (10th Cir. 2011)).  Here, the answer to this question undeniably is "yes," at least insofar as Hudson's first-filed LMRDA lawsuit and this second-filed Title VII/§ 1981 lawsuit *both* challenge the legality of the NEC's August 8, 2017 decision to remove Hudson from office.

"Under the doctrine of res judicata, or claim preclusion, a subsequent lawsuit will be barred if there has been prior litigation (1) involving the same claims or cause of action, (2) between the same parties or their privies, and (3) there has been a final, valid judgment on the merits, (4) by a court of competent jurisdiction."  <u>Smalls v. United States</u>, 471 F.3d 186, 192 (D.C. Cir. 2006).  "Whether two cases implicate the same cause of action turns on whether they share the same 'nucleus of facts.'  <u>Drake v. FAA</u>, 291 F.3d 59, 66 (D.C. Cir. 2002) (citation omitted).  That the plaintiff seeks relief on different legal theories in the two cases is immaterial,

because the whole point of the res judicata doctrine is to force plaintiffs to assert any and all claims that they may have against a defendant based on an incident of alleged wrongdoing in a single lawsuit rather than in multiple lawsuits.  See NextWave Personal Comm'cns, Inc. v. FCC, 254 F.3d 130, 143 (D.C. Cir. 2001) ("Claim preclusion prevents parties from relitigating issues they raised or could have raised in a prior action on the same claim."); Apotex, Inc. v. Food & Drug Admin., 393 F.3d 210, 217–18 (D.C. Cir. 2004) ("simply raising a new legal theory" of relief for a defendant's alleged wrongdoing that could have been raised in the plaintiff's earlier lawsuit "is precisely what is barred by *res judicata*"); Sczygelski v. U.S. Customs & Border Patrol Agency, 48 F. Supp. 3d 80, 87 (D.D.C. 2014) (dismissing claim on res judicata grounds where plaintiff relied on "new legal theories" which could and should have been raised in a prior lawsuit arising out of the same nucleus of facts).

To the extent that Hudson's first-filed LMRDA lawsuit and this second-filed Title VII/§ 1981 lawsuit both challenge the legality of the NEC's decision to remove Hudson from office, the two lawsuits plainly arise out of the same nucleus of facts.  That being so, "assuming [Hudson's first-filed LMRDA lawsuit] was already final, [this second-filed Title VII/§ 1981 lawsuit] would be precluded under res judicata analysis,'" Clayton, 36 F. Supp. 3d at 94, notwithstanding the fact that Hudson challenges the legality of his removal on different legal theories in the two lawsuits.  Hudson therefore is engaged in improper claims splitting insofar as he challenges the legality of his removal on Title VII/§ 1981 grounds in this second-filed lawsuit. Id.  Such a challenge should have been brought, if at all, in his first-filed LMRDA lawsuit.

In Vanover, the district court dismissed the plaintiff's second-filed lawsuit "for improper claim-splitting" in circumstances indistinguishable from those presented here, and the Eleventh Circuit affirmed, noting that the district court's dismissal furthered the salutary purposes of the

claims-splitting doctrine.  See 857 F.3d at 843.  Although such a dismissal concededly is

discretionary, Sweeney, 197 F. Supp. 3d at 80, it is entirely warranted here for the reasons

cogently stated by the district court and the Eleventh Circuit in Vanover.

**CONCLUSION**

For the foregoing reasons, AFGE's Motion to Dismiss should be granted.

Respectfully submitted,

 /s/ Andrew D. Roth
Andrew D. Roth (D.C. Bar # 414038)
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street N.W., Suite 1000
Washington, D.C.  20005
(202) 842-2600
aroth@bredhoff.com

Counsel for Defendant AFGE

Dated:  February 1, 2018