**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

——————————————————————

EUGENE HUDSON, JR.,        )

                           )

           Plaintiff,    )

                           )

v.                     )     No. 1:17-cv-02094-JEB

                           )

AMERICAN FEDERATION OF    )

GOVERNMENT EMPLOYEES,    )

                           )

           Defendant.   )

——————————————————————

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANT AFGE'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION AND SUMMARY OF ARGUMENT**

In its April 10, 2018 Motion to Dismiss ruling, the Court dismissed several of Plaintiff

Eugene Hudson's claims, leaving intact only those claims that Defendant AFGE's National

President ("NP") J. David Cox "unilaterally" took five discrete adverse employment actions

against Hudson during his tenure as AFGE's National Secretary Treasurer ("NST") based on his

race (African American), each action in violation of Title VII and 42 U.S.C. § 1981.  See Dkt.

No. 14.  Specifically, the Court left intact five separate race discrimination claims against AFGE

alleging that, for impermissible race-based reasons, NP Cox, a Caucasian American:

    1.      "denied [Hudson's] request" that an African American member of Hudson's staff
named Willie Hope be promoted to the position of Hudson's Special Assistant, see Compl.
¶¶ 28-29[1];

    2.      "removed" Hudson as the Chair of the Non-appropriated Fund Instrumentalities
Committee ("NAFI"), see Compl. ¶ 35;

———————————————

[1] As we show infra p. 6, Hudson attempts through his deposition testimony (rather than through a
motion for leave to amend) to convert this claim in his Complaint into a new and distinctly
different claim relating to Hope.

3.      "gave himself" and a Caucasian American AFGE National Vice President ("NVP") a 2.88% Cost of Living Adjustment ("COLA"), but "gave" Hudson only a 2.48% COLA, <u>see</u> Compl. ¶¶ 26-27;

4.      took from Hudson, and gave to himself, the authority to approve all National Executive Committee ("NEC") expense vouchers except for his own, <u>see</u> Compl. ¶¶ 30-34;

and

5.      took from Hudson, and gave to himself, supervisory authority over AFGE's Human Resources and Information Services Departments, <u>see</u> Compl. ¶¶ 23-25.[2]

In leaving intact these five separate race discrimination claims, the Court observed that "[a]t the motion-to-dismiss stage, the pleading standards for discrimination cases are quite lenient," it being sufficient to withstand a motion to dismiss for the plaintiff to allege in the complaint "that an adverse employment action occurred because of race." <u>See</u> Dkt. No. 14, at 6-7 (internal quotation marks, citations, and alteration omitted). To survive the instant motion for summary judgment, however, Hudson must be able to point the Court to *admissible evidence of record* that would permit a reasonable jury to conclude that he has suffered legally cognizable adverse employment actions and that those actions did in fact occur "because of race." <u>Infra</u> pp. 4-5 ("**LEGAL STANDARD**"). As we show herein, that is a much higher hurdle that Hudson cannot come close to clearing.

Given certain particulars of Hudson's five separate race discrimination claims, and the different approaches taken by Hudson in pressing those claims, our showing in this regard proceeds as follows.

First, in Part I of our **ARGUMENT**, we deal on an individual basis with the three race discrimination claims (Claims 1-3 above) asserted in Hudson's Complaint that rest on false or highly misleading allegations and material omissions regarding the adverse employment actions

---

[2] We number these claims 1-5 and address them in that order to facilitate analysis, although Hudson's Complaint sets them out in a different order.

that he allegedly suffered.  We also deal in this Part with Hudson's attempted new Claim 1.  In each instance, we set out the true undisputed facts relating to the alleged adverse employment action at issue.  And, in each instance, those undisputed facts show that Hudson's claim fails as a matter of law—in two instances on multiple grounds.  Infra pp. 5-13.

Second, in Part II of our **ARGUMENT**, we deal together with the two remaining race discrimination claims (Claims 4-5 above) asserted by Hudson, in which he seeks relief under Title VII/§ 1981 for alleged adverse employment actions that, a*ccording to Hudson's own deposition testimony*, were taken against him by Cox for reasons *wholly apart from race*.  Under controlling D.C. Circuit authority, these claims fail as a matter of law and "there is no point in sending [them] to [a] jury."  Carpenter v. FNMA, 165 F.3d 69, 72 (D.C. Cir. 1999) (internal quotation marks omitted).  Infra pp. 13-17.

Finally, in Part III of our **ARGUMENT,** we address Hudson's effort to avert summary judgment by seeking to portray Cox as someone who harbors a general bias against African Americans.  As we show, this effort fails on two independent grounds.  First, the interrogatory answers and deposition testimony that Hudson relies on in support of this effort plainly would not allow a reasonable jury to conclude that Cox harbors a general bias against African Americans.  Second, even assuming otherwise for argument's sake, the D.C. Circuit's decision in Morris v. McCarthy, 825 F.3d 658, 670 (D.C. Cir. 2016) makes it abundantly clear that in order to avert summary judgment, Hudson must be able to point to record evidence that would allow a reasonable jury to find that he has suffered legally cognizable adverse employment actions and that Cox's alleged bias seeped into and infected those legally cognizable adverse employment actions.  There is no such record evidence with respect to *any* of the claims asserted by Hudson in this case.  Infra pp. 17-25.

## LEGAL STANDARD

Summary judgment is proper when there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To defeat a summary judgment motion, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Rather, the non-moving party must "set forth specific facts showing that there [are] genuine issue[s] for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. If the non-moving party will bear the burden of proof on an issue at trial, the non-moving party must respond to a properly supported summary judgment motion by "mak[ing] a showing sufficient to establish the existence of [the] element essential to that party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

In order to survive a motion for summary judgment in a Title VII and/or § 1981 case, the plaintiff must, as a threshold matter, be able to point to record evidence that would allow a reasonable jury to find that he/she has suffered a legally cognizable adverse employment action—unless that issue is uncontested, as is often true but *not* true with respect to two of Hudson's claims here. See Baloch v. Kempthorne, 550 F.3d 1191, 1196 (D.C. Cir. 2008) ("In most employment discrimination cases that reach federal court, there is no dispute that the employee has suffered an adverse employment action, and the sole question is whether the action occurred because of discrimination," but the court must resolve this threshold issue to the extent that it is contested); Dorns v. Geithner, 692 F. Supp. 2d 119, 131 (D.D.C. 2010) (same).

Assuming that the plaintiff has met this threshold legal requirement, "once the employer has claimed a nondiscriminatory reason for its [adverse employment] actions, [the McDonnell-

4

Douglas] burden-shifting framework disappears, . . . [and] [t]he 'one central inquiry' that

remains is whether a reasonable jury could infer retaliation or discrimination from all the

evidence." Nurriddin v. Bolden, 818 F.3d 751, 758 (D.C. Cir. 2016). This question is evaluated

"in light of the total circumstances of the case," asking "whether the jury could infer

discrimination from the combination of (1) the plaintiff's prima facie case; (2) any evidence the

plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any

further evidence of discrimination that may be available to the plaintiff . . . or any contrary

evidence that may be available to the employer." Id. at 759 (internal quotation marks and

citation omitted). If a plaintiff attempts to defeat summary judgment by showing that the

proffered reasons for the employment decisions were a pretext for discrimination, the plaintiff

must demonstrate that a "reasonable jury not only could disbelieve the employer's reasons, but

also could conclude that the employer acted, at least in part, for a prohibited [discriminatory]

reason." Walker v. Johnson, 798 F.3d 1085, 1096 (D.C. Cir. 2015).

## ARGUMENT

**I.    THE UNDISPUTED FACTS SHOW THAT THE ADVERSE EMPLOYMENT ACTION ALLEGED IN CLAIM 1 DID NOT HAPPEN; THAT THERE IS A FATAL THRESHOLD LEGAL FLAW IN ATTEMPTED NEW CLAIM 1 & CLAIM 2 (NO LEGALLY COGNIZABLE ADVERSE EMPLOYMENT ACTION); AND THAT AFGE HAD UNASSAILABLE NON-DISCRIMINATORY REASONS FOR THE EMPLOYMENT ACTIONS ALLEGED IN ATTEMPTED NEW CLAIM 1 AND CLAIMS 2-3, UTTERLY BELYING HUDSON'S CLAIM THAT THOSE ACTIONS WERE TAKEN "BECAUSE OF [HIS] RACE."**

### A.    Claim 1 Regarding Willie Hope's Promotion

Claim 1 asserted by Hudson alleges that Cox "denied [Hudson's] request" that an African

American member of Hudson's staff named Willie Hope be promoted to the position of

Hudson's Special Assistant. Compl. ¶¶ 28-29. But the undisputed facts conclusively show that

this allegation is false. On February 16, 2017, Cox wrote Hudson a memorandum *approving*

5

(not denying) Hudson's request that Hope be promoted to serve as Hudson's Special Assistant, and Hope assumed his new position that same month.  See Statement of Material Facts as to Which There Is No Genuine Issue ("SMF") ¶¶ 1-2.  On this basis alone, summary judgment should be granted on Claim 1.

Recognizing that Claim 1 as stated in his Complaint is baseless, Hudson has attempted through his deposition testimony to substitute a new and distinctly different claim relating to Hope:  namely, that Cox gave Hudson reason to believe that he could fill the Special Assistant position at issue at a "G-13/14" salary grade under which the Special Assistant would begin at a "G-13" but advance to a "G-14," but had a change of heart once Hudson selected an African American (Hope) for the position and made that position a pure "G-13" with no prospect of salary grade advancement because of Hope's race.  See Decl. of Andrew D. Roth, Exh. 1 (Tr. of Eugene Hudson Deposition (Mar. 18, 2019) ("Hudson Tr.")) at 206:17-207:1.

This new and distinctly different claim should be disallowed on procedural grounds. Needless to say, the proper procedural method for adding a new and distinctly different claim to a complaint is through a motion for leave to amend, not through deposition testimony.  See, e.g., Kangethe v. District of Columbia, 281 F. Supp. 3d 37, 42 (D.D.C. 2017); Sloan ex rel. Juergens v. Urban Title Servs., 652 F. Supp. 2d 51, 62 (D.D.C. 2009).[3]

In any event, summary judgment is proper on Hudson's new claim (if it is allowed) for two independent reasons.  First, on the undisputed facts of record pertaining to this new claim, Hudson cannot be deemed to have suffered the "objectively tangible [workplace] harm"

---

[3] Hudson previously attempted a similar tactic (using a brief in opposition to AFGE's motion to dismiss to advance new allegations not included in his Complaint in an effort to bolster his hostile work environment claim against AFGE), but that attempt was rebuffed by the Court in its Motion to Dismiss ruling.  See Dkt. No. 14, at 11.

necessary to support a jury finding that he has suffered a legally cognizable adverse employment action.  Turner v. Shinseki, 824 F. Supp. 2d 99, 116 (D.D.C. 2011) (quoting Forkkio v. Powell, 306 F.3d 1127, 1131 (D.C. Cir. 2002)).  Had Cox's alleged racially-discriminatory change of heart with respect to Hope's salary led Hope to turn down the promotion or leave his job for a higher paying one after accepting the promotion, Hudson arguably would have suffered the requisite "objectively tangible [workplace] harm" in the form of losing out on his hand-picked Special Assistant.  But the undisputed facts show that Hope accepted the promotion, and that since his promotion he has continued uninterrupted in the Special Assistant position to this day. SMF ¶¶ 2-3.  On these undisputed facts, Hudson himself (as opposed to Hope) plainly suffered no "objective tangible [workplace] harm" on account of the racially discriminatory act alleged in Hudson's new claim.

Second, as the D.C. Circuit made abundantly clear in Lash v. Lemke, 786 F.3d 1, 6 (D.C. Cir. 2015), when a plaintiff tells a "story" in support of a claim "which is blatantly contradicted by the record," he has not thereby succeeded in creating a *genuine* dispute of fact precluding summary judgment on that claim.  Yet that is precisely what Hudson has done with respect to his new claim:  his "story" that Cox had a change of heart regarding the appropriate salary grade for the Special Assistant position at issue once Hudson selected an African American (Hope) for that position "is blatantly contradicted by the record."

As Hudson himself testified, and as Cox corroborates, Cox told Hudson sometime in 2012 (after they both had been elected to their respective NP and NST positions) that, for budgetary reasons, only one of the two assistant positions in the NST office (Special Assistant and Executive Assistant) could be a G-13/14 position, while the other would be a G-13 position.

SMF ¶ 4.[4]  This had been the practice while Cox himself served as NST from 2006 to 2012.

SMF ¶ 5.  *Hudson agreed to this arrangement* and hired a Special Assistant, Yvonne Wheeler, as

a G-13/14, and an Executive Assistant, Arla Bentley, as a G-12/13.  SMF ¶ 6.

Less than a year later, Hudson decided that his Executive Assistant (Bentley) should be

eligible to become a G-14, and he persuaded the National Executive Council ("NEC"), over

Cox's objection, to approve a budget in which her position was made a G-13/14 position.  SMF ¶

7.  Several months later, Bentley became a G-14.  SMF ¶ 8.  In October of 2016, while Bentley

was still serving as an Executive Assistant as a G-14, a vacancy arose in the Special Assistant

position.  SMF ¶¶ 9-10.  *Consistent with his 2012 agreement with Hudson*, Cox directed that the

vacant Special Assistant position be posted as a pure G-13 position, with no possibility of

advancement to the G-14 salary grade, which it was on October 19, 2016.  SMF ¶¶ 11-12.  When

Cox directed that the position be posted as a G-13, he had no idea that Hudson would select

Willie Hope, an African American, for the position, which Hudson eventually did in January of

2017.  SMF ¶¶ 13-14.  Indeed, Hope's immediate predecessor in the Special Assistant position,

Randy Stewart, was a Caucasian American.  SMF ¶ 15.

These undisputed facts blatantly contradict Hudson's "story" that Cox had a change of

heart about the appropriate salary grade for the Special Assistant position at issue once Hudson

selected an African American (Hope) for that position.  What those undisputed facts show

instead is that Cox directed the posting of that Special Assistant position at the G-13 level before

knowing who Hudson would select for that position, and did so for budgetary reasons that had

---

[4] As discussed further in Section C below, the salaries of AFGE officers are pegged to the Office
of Personnel Management's "general schedule."  However, AFGE uses the abbreviation "G"
instead of "GS" to denote different pay grades.

concerned him since 2012 and that Hudson himself had acquiesced in in 2012 by agreeing to

employ only one of his two Assistants at the higher G-13/14 level.

**B.    Claim 2 Regarding Hudson's So-Called "Remov[al]" From A Committee Chairmanship**

Claim 2 asserted by Hudson alleges that Cox "removed" Hudson as Chair of an AFGE

Committee ("NAFI").  Compl. ¶ 35.  This allegation is highly misleading in two respects.

First, the use of the word "removed" in this context implies—and obviously was intended

to imply—that Cox made an affirmative decision to sack Hudson as Chair of the NAFI

Committee and replace him with another person more to Cox's liking.  But that is not what

happened at all.  Rather, what happened is that, in November of 2014, Cox abolished the NAFI

Committee and transferred its functions to another AFGE Committee known as the DEFCON

Committee.  SMF ¶ 16.

Second, in making this allegation, Hudson neglects to mention that at the very same time

that he lost his chairmanship of the NAFI Committee as an incident of Cox's reorganization of

existing committees, Cox awarded Hudson the chairmanship of a newly-established

committee—the Information Technology/Information Services Committee—as Hudson himself

had requested.  SMF ¶ 17.

On these undisputed (and corrected) facts, summary judgment undoubtedly is proper on

Claim 2.  To begin with, this claim has the same fatal threshold legal flaw as attempted new

Claim 1:  an employee who has lost a committee chairmanship as an incident of a reorganization

of existing committees—but who simultaneously has been awarded the chairmanship of a new

committee at his request—cannot be deemed to have suffered the "objectively tangible

[workplace] harm" necessary to support a jury finding that he has suffered a legally actionable

"adverse employment action."  Turner, 824 F. Supp. 2d at 116.

9

Second, even assuming otherwise, the undisputed facts of record show that Cox had an

unassailable nondiscriminatory reason for undertaking the reorganization of existing committees

that resulted in Hudson's loss of the chairmanship of the NAFI Committee:  he had concluded

that the NAFI committee and the DEFCON Committee did overlapping work, such that the

NAFI Committee was redundant.  SMF ¶ 18.  Given these undisputed facts, and the undisputed

fact that Cox honored Hudson's request and awarded him the chairmanship of the newly-

established Information Technology/Information Services Committee at the very same time that

he undertook the reorganization of existing committees, no reasonably jury could find that Cox's

so-called "removal" of Hudson as Chair of the NAFI committee was motivated by Hudson's

race.[5]

A.    **Claim 3 Regarding Hudson's COLA**

Claim 3 asserted by Hudson has two factual components, both of which are misstated in

the Complaint.

1.    According to ¶¶ 26-27 of the Complaint, in January of 2017, Cox "gave"

Joseph Flynn, a Caucasian American NVP, a 2.88% COLA, but "gave" Hudson, an African

American NST, only a 2.48% COLA.  The use of the word "gave" in this context implies—and

obviously was intended to imply—that NP Cox exercises discretionary authority in calculating

---

[5] Although this legal conclusion is amply supported by these undisputed facts standing alone, it
is buttressed and driven home by the additional undisputed fact that, of the ten committee chairs
named by Cox in November of 2014 when Hudson's so-called "removal" as chair of the NAFI
committee took place, five (i.e., 50%) were African Americans.  SMF ¶ 19.  Compare Jenkins v.
District of Columbia, 281 F. Supp. 3d 77, 85 (D.D.C. 2017) ("[T]he fact that a contested position
was filled by members of the same race 'cuts strongly against any inference of discrimination.'")
(quoting Murray v. Gilmore, 406 F.3d 708, 715 (D.C. Cir. 2005)); Walker, supra, 798 F.3d at
1092 ("[T]he fact that three-quarters of a plaintiff's fellow employees were older than him
tend[s] to refute any implication of age discrimination.") (internal quotation marks, citation and
alteration omitted).

and setting the COLAs provided from time to time to his fellow AFGE officers. But that simply is untrue.

Under Article VII Section 3 of the AFGE Constitution, the salaries of all AFGE officers are pegged to—and thus calculated and set in accordance with—the Office of Personnel Management ("OPM") general schedule. SMF ¶ 20. Although Cox, in his capacity as NP, reviews and "signs off on" officer salary increases, the responsibility for calculating the individual officer salary amounts that result from the constitutionally-mandated application of the OPM schedule—including in particular the constitutionally-mandated application of COLA increases provided for under periodic OPM directives—resides in AFGE's Human Resources Department. SMF ¶¶ 21-22.

In 2017, AFGE's Human Resources Department implemented COLA increases based on Executive Order No. 13756, "Adjustment of Certain Rates of Pay," 81 Fed. Reg. 97099, 2016 WL 7487746 (Dec. 27, 2016), which appears to be the "order" referenced by Hudson in ¶ 26 of his Complaint. SMF ¶ 23. Executive Order 13756 does not purport to provide "all federal employees" with a 2.88% COLA, as alleged in this paragraph of the Complaint. Rather, it provides an across-the-board 1% COLA, combined with an adjustment to the federal employee's "locality-based comparability payment," which varies depending on that employee's work location. Taken together, the 1% COLA and the locality-based comparability payment for the Washington D.C. statistical area—where NST Hudson, NVP Flynn and two other NVPs (Augusta Thomas and Eric Bunn) who happen to be African American were employed—yielded a total COLA of 2.88% for most *but not all* federal employees. SMF ¶ 24. In particular, the OPM Salary Table for the D.C. statistical area provides that the salaries for federal employees in

Steps 8 through 10 of the GS-15 salary grade are capped at a certain level (i.e., "the rate for level IV of the Executive Schedule") that can yield a COLA of less than 2.88%.  SMF ¶ 25.

As required by AFGE's Constitution, NST Hudson was paid at the GS-15 salary grade level, and as of 2017, he was at Step 8 of that GS-15 salary grade.  SMF ¶¶ 26-27.  *Thus, Hudson properly was given the highest possible COLA that would not move him over the OPM schedule cap, which turned out to be a 2.48% COLA*.  SMF ¶ 28.

AFGE's NVPs, on the other hand, are paid at the lower, GS-14 salary grade level under AFGE's Constitution.  SMF ¶ 29.  Under the OPM salary table, all D.C. area GS-14 employees are entitled to receive a 2.88% COLA; unlike GS-15 employees like Hudson, their salaries are not subject to a cap that could operate to limit their COLAs in certain circumstances (as it did in Hudson's case).  SMF ¶ 30.  Thus, all three AFGE NVPs in the D.C. area—including the Caucasian American NVP Flynn and the two African American NVPs Thomas and Bunn— received the 2.88% COLA provided for under Executive Order 13756 and the terms of the AFGE Constitution pegging officer salaries to the OPM general schedule.  SMF ¶¶ 31-32.

The upshot of all this is that, on the undisputed facts of record, Caucasian American NVP Flynn received a slightly higher 2.88% COLA than Hudson, *not* due to any form of racial animus against Hudson as alleged in the Complaint, but for unassailable non-discriminatory reasons dictated by the terms of the AFGE Constitution pegging officer salaries to the OPM schedule. Indeed, Hudson's claim of racially discriminatory "disparate treatment" vis-à-vis Flynn is undermined further by the highly probative undisputed fact that AFGE's two other D.C. area NVPs (Thomas and Bunn), both of whom are African American, also received a slightly higher 2.88% COLA than Hudson.  See cases cited supra p. 10 n.5.

2.    According to ¶¶ 26-27 of the Complaint, in January of 2017, Cox also "gave himself" a 2.88% COLA that exceeded Hudson's 2.48% COLA.  The use of the words "gave himself" in this context implies—and obviously was intended to imply—that NP Cox unilaterally determines his own salary and periodic salary increases, but that also is an untruth.

As is true of all other AFGE officers, the NP's salary and entitlement to periodic salary increases is determined by the provisions of the AFGE Constitution.  Under the Constitution, the NP's salary is pegged to Executive Level IV.  SMF ¶ 33.  In August of 2009, three years before Cox's election to his first term as NP, the NEC (which is composed of all AFGE officers) voted in favor of an interpretation and application of the AFGE Constitution under which the NP is entitled to receive the full COLA increases provided for under OPM directives, notwithstanding any cap that might otherwise apply under the Executive Level IV schedule to which the NP's salary is pegged.  SMF ¶ 34.  And, in December of 2015, near the outset of Cox's second term, the NEC—which by that time included Hudson himself as a member—voted *unanimously* to reaffirm the interpretation and application of the AFGE Constitution under which the NP is entitled to receive the full COLA increases provided for under OPM directives.  SMF ¶ 35.

Given these undisputed facts of record pertaining to Cox's receipt of a 2.88% COLA, and the previously-set-out undisputed facts of record pertaining to Hudson's receipt of a 2.48% COLA, no reasonable jury could find that the "disparate treatment" of Cox and Hudson in relation to the COLA was the product of unlawful race discrimination against Hudson.

## II.    CLAIMS 4-5 FAIL AS A MATTER OF LAW AND "THERE IS NO POINT IN SENDING [THEM] TO [A] JURY" GIVEN HUDSON'S OWN DEPOSITION TESTIMONY THAT THE ADVERSE EMPLOYMENT ACTIONS ALLEGED IN THOSE CLAIMS WERE TAKEN AGAINST HIM BY COX FOR REASONS WHOLLY APART FROM RACE

In his deposition, Hudson gave extensive sworn testimony regarding the reasons why, in his view, Cox took the three adverse employment actions alleged in Claims 4 & 5.  And, in each

instance, Hudson's testimony is that Cox took the adverse employment action alleged for reasons *wholly apart from race*.  Under controlling D.C. Circuit authority, these claims fail as a matter of law and "there is no point in sending [them] to [a] jury."  Carpenter, supra,165 F.3d at 72 (internal quotation marks omitted).

A.    **Hudson's Deposition Testimony**

1.    In his earlier-filed lawsuit before this Court challenging his removal as NST, Hudson alleged that the reason behind Cox's decision to take away his authority to approve NEC expense vouchers and give that authority to himself (the adverse employment action alleged in Claim 4) was that "Hudson's questioning of [those expense] vouchers" ruffled too many feathers.  See Case No. 17-1867, Dkt No. 1, Compl. ¶ 39.  And, in his later deposition testimony in this case, Hudson "doubled down" on this allegation in the clearest possible terms, leaving no room for doubt of his views on the matter.

Specifically, at the outset of his deposition testimony on this subject, and in direct response to the question whether this challenged employment action by Cox was "racially motivated," Hudson stated unequivocally that, in his view, Cox took away his "jurisdiction" to approve NEC expense vouchers and gave that jurisdiction to himself "*because* I was pretty -- I required that the officers, the national executive council, provide their data and expenses information in a timely manner," which so infuriated those NEC members who had become accustomed to "doing things untimely" and "wasting a lot of money" that they "conspired" with Cox to get Hudson off their backs.  See Hudson Tr. 174:22-175:18 (emphasis added); see also id. 181:16-182:10 (same).

To drive this point home, Hudson went on to testify at length about his long campaign to eliminate what he saw as wasteful, improper, or insufficiently documented spending by certain

NEC members.  Hudson Tr. 175:13-200:7.  He testified that this campaign sparked intense

opposition from the affected NEC members; that those NEC members tried (through both

persuasion and threats) to get Hudson to "change[ ] [his] behavior" vis-à-vis the review of

expense vouchers, Hudson Tr. 176:17-178:5; and that when this effort to get Hudson to change

his behavior failed, and Hudson proved not to be "a team player" on the expense voucher front,

Hudson Tr. 181:4-5, those NEC members were able to persuade Cox to take action to get

Hudson off their backs because Cox wanted those NEC members "to be on his side" from a

political standpoint, Hudson Tr. 186:5-20.

      2.     Hudson's deposition testimony respecting the reasons why Cox took away his

"jurisdiction" over the Human Resources ("HR") and Information Services ("IS") Departments

and gave that jurisdiction to himself (the adverse employment actions alleged in Claim 5) is not

as lengthy or colorful, but it is just as clear and unequivocal.

      According to Hudson, the jurisdictional transfer of the HR Department "was *just*

*punishment* for me not being one of [Cox's] supporters about his Big Enough to Win

[campaign]"—an organizing initiative near and dear to Cox's heart.  Hudson Tr. 168:6-170:7

(emphasis added).  And, according to Hudson, the jurisdictional transfer of the IS Department

was a pure power play by Cox to enhance his control over AFGE's finances.  As Hudson

explained his view of the matter, the NEC had recently voted to put more money into the IS

Department.  Thus, Hudson testified, "[t]hat was my feeling for him transferring the department

to his jurisdiction was really because of money.  *It wasn't because of anything else* because he

spends money like water."  Hudson Tr. 170:15-172:9 (emphasis added); see also id. 172:10-16

(gaining the "authority to expend those resources that had been committed to information

services" was "[m]ost definitely" the reasons for Cox's challenged employment action).

### B.     The Controlling D.C. Circuit Authority and Its Application Here

For the record, AFGE disputes Hudson's deposition testimony respecting Cox's purported political reasons for taking the adverse employment actions alleged by Hudson in Claims 4 & 5.  Decl. of J. David Cox ("Cox Decl.") ¶¶ 33-50.  However, under controlling D.C. Circuit authority, Claims 4 & 5 fail as a matter of law notwithstanding the existence of that factual dispute, inasmuch as a resolution of that dispute in Hudson's favor would not make out a claim of race discrimination in violation of Title VII and 42 U.S.C. § 1981.  In other words, in standard Rule 56 terms, that factual dispute between the parties is not a "material" one the existence of which precludes summary judgment in AFGE's favor on Claims 4 & 5.

As the D.C. Circuit has explained, where an anti-discrimination-law plaintiff's "entire theory" or "stance" is that the employer had an arguably "unsavory reason" for a challenged adverse employment action "that is not illegal under the antidiscrimination laws," the plaintiff's discrimination claim fails as a matter of law and he/she "cannot get to the jury" on that claim. Carpenter, supra, 165 F.3d at 72; see also e.g. Aka v. Wash. Hosp. Ctr.,156 F.3d 1284, 1291 (D.C. Cir. 1998) (a Title VII plaintiff "shoots himself in the foot" by advancing the claim "that the real explanation for the employer's behavior is not discrimination, but some other motivation"; in such a case, "there is no point in sending the case to the jury").  This is so because "[e]ven if true," actions driven by motives that "are not proscribed by the federal anti-discrimination statutes" are not actionable under those statutes and "thus fail to present a triable issue" in a case brought thereunder.  Turner v. Enzler, 236 F. Supp. 3d 121, 129 n.7 (D.D.C. 2017); accord e.g. Moses v. Kerry, 110 F. Supp. 3d 204, 214-15 (D.D.C. 2015) ("Neither Title VII nor the ADEA protects Mr. Moses from a co-worker's personnel vendetta that is motivated by neither race nor age. . . .  At bottom, because [the co-worker's] alleged plot represents simply

another theory that Mr. Moses's termination stemmed not from unlawful discrimination, but some other motivation, there is no point in sending the case to the jury.") (internal citations and quotation marks omitted).

The application of this controlling Circuit authority to Claims 4 & 5 is straightforward— and fatal from Hudson's perspective.  Hudson's "entire theory" and "stance" in this case is that the adverse employment actions alleged in Claims 4-5 were taken by Cox for political reasons that are "not illegal under the antidiscrimination laws."  Carpenter, 165 F.3d at 72.  Hudson therefore cannot maintain Claims 4 & 5 under the antidiscrimination laws (Title VII and 42 U.S.C. § 1981) that he invokes.

## III.    HUDSON'S EFFORT TO AVERT SUMMARYJUDGMENT BY SEEKING TO PORTRAY COX AS SOMEONE WHO HARBORS A GENERAL BIAS AGAINST AFRICAN AMERICANS FAILS

In the face of the foregoing, Hudson tries to avert summary judgment by seeking to portray Cox as someone who harbors a general bias against African Americans.  This effort fails on two independent grounds.  First, as we show in **Part A** below, the interrogatory answers and deposition testimony that Hudson relies on in support of this effort plainly would not allow a reasonable jury to conclude that Cox harbors a general bias against African Americans.  Second, even assuming otherwise for argument's sake, the D.C. Circuit's decision in Morris, supra, 825 F.3d 658, makes it abundantly clear that in order to avert summary judgment, Hudson must be able to point to record evidence that would allow a reasonable jury to find that he has suffered legally cognizable adverse employment actions and that Cox's alleged bias seeped into and infected those legally cognizable adverse employment actions.  There is no such record evidence with respect to *any* of the claims asserted by Hudson in this case.

A.    **Hudson's "Case" That Cox Harbors a General Bias Against African Americans**

1.    Harkening back to a claim (not set forth in his Complaint) that formed the centerpiece of Hudson's Brief in Opposition to AFGE's Motion to Dismiss, see Dkt No. 11, at pp. 4-8 & Exhs. 1-5, Hudson claims in his interrogatory answers that Cox's actions in connection with a 2011 altercation between Hudson and AFGE Council 220 President Witold Skwierczynski occurring during a break in an NEC meeting show that Cox harbors a general bias against African Americans, see Roth Decl., Exh. 2 (Interrog. Resp. No. 1) at 3-4.  However, like Claims 1-3 in his Complaint, this claim rests on false and highly misleading statements and material omissions.  Below, we set the record straight regarding Cox's actions in connection with this 2011 incident, and in doing so, show that Cox's actions do not bespeak a general bias against African Americans in any way, shape or form.

Hudson filed internal union "Article XXIII" charges against Skwierczynski (who is Caucasian) based on the 2011 incident, but contrary to Hudson's interrogatory answer, it was not Cox who "convened a Committee on Investigation ('COI') to consider" Hudson's charges "[o]n February 22, 2013."  Rather, as stated by the COI in its Report on the matter, the COI was convened by then-NP John Gage on November 22, 2011, nearly a year before Cox was elected to his first term as NP.  See Dkt. No. 11, Exh. 3.  Indeed, although Cox was NST at the time the COI was convened, he had no involvement in appointing the COI's members and did not participate in any way in the COI's factual investigation of the charges.  SMF ¶ 36.

The COI issued its Report dealing with Hudson's charges on January 30, 2013; and, contrary to Hudson's interrogatory answer, the COI did not "dismiss" those charges "on the grounds" that "Witold's actions toward me constituted 'protected free speech.'"  Rather, the COI found that, while "probable cause" was lacking on Hudson's charge that Skwierczynski was

guilty of conduct unbecoming a union member, Skwierczynski had engaged in "inappropriate behavior" towards Hudson that "may" have included calling Hudson inappropriate names. Accordingly, the Report included a "recommendation" that Skwierczynski "write a letter to NVP Hudson apologizing for his actions of that day," and that Skwierczynski also "pledge that he will not engage in similar conduct in the future towards NVP Hudson during NEC meetings (including breaks)."  Dkt. No. 11, Exh. 3.

Consistent with the AFGE Constitution and AFGE's normal practice with regard to Article XXIII charges, the COI's Report went to the National President for his review and consideration of the COI's recommendations.  SMF ¶ 37.  Hudson states in his interrogatory answer that Cox, who by that point had been elected NP and therefore reviewed the COI's recommendations, "did not remove Witold from office, suspend him or even issue a written reprimand.  Instead, Cox directed Witold to write a letter of apology to me."  Roth Decl., Exh. 2 (Interrog. Resp. No. 1) at 3-4.  This statement is highly misleading, because it implies that Cox made an independent de novo determination of the appropriate remedy for the "inappropriate behavior" that the COI had found Skwierczynski guilty of.  But that simply is not how Cox operates with respect to his review and consideration of COI recommendations.

It is undisputed that, since becoming NP in 2012, and for the reasons detailed in his accompanying Declaration, Cox has consistently maintained and followed a strong practice of deferring to a duly-appointed COI's factual findings and recommended disposition of a charge based on those factual findings.  SMF ¶ 38.  In accordance with this consistent practice of deference towards COI findings and recommendations, Cox wrote Skwierczynski a letter dated February 22, 2013 stating that "I accept the findings of the [COI]," and further stating that Hudson's charges against Skwierczynski would be dismissed "if"—*as recommended by the COI*

*based on those findings*—"you issue a written apology to NST Hudson, with a copy to the NEC, and pledge not to engage in similar conduct at NEC meetings." <u>See</u> Cox Decl. ¶ 55; Dkt. No. 11, Exh. 4. Cox also added—*again as recommended by the COI*—that Hudson and Skwierczynski pursue mediation "to help settle the longstanding differences between the two of you." <u>Id.</u>

Cox's adherence to his consistent practice of deferring to COI findings and recommendations in connection with the 2011 altercation between Hudson and Skwierczynski plainly does not bespeak a general bias against African Americans. <u>See</u> <u>Antrum v. Washington Metro. Area Transit Auth.</u>, 710 F. Supp. 2d 112, 119-20 (D.D.C. 2010) (granting summary judgment to employer where complained-of action was taken pursuant to consistent agency policy); <u>compare</u> <u>Brady v. Office of the Sergeant at Arms</u>, 520 F.3d 490, 495 n.3 (noting that "the employer's failure to follow established procedures or criteria" can create doubt as to whether challenged actions are a pretext for race discrimination).

2.      That being so, Hudson's "case" that Cox harbors such a general bias rests on Hudson's deposition testimony that, on certain occasions, Cox has addressed or referred to Hudson, other African American AFGE officers or employees, and even former President Obama, as "son" or "boy." <u>See</u> Hudson Tr. 63:17-74:5, 81:21-100:5, 101:2-119:10 (asserting, with minimal or no details although pressed for those, that Cox referred to Hudson or others as "son" or "boy"); <u>see also</u> Roth Decl., Exh. 2 (Interrog. Resp. No. 1) at 3 (recounting Cox's purported statement, in reference to President Obama, that "that boy hasn't done anything for us"). Hudson has not at any point in this case claimed that Cox ever used any unambiguously racist terms. And Hudson's testimony, taken in context, plainly would not allow a reasonably jury to find racial animus based solely on Cox's use of the terms "son" and "boy."

Preliminarily, Cox's testimony on this issue is inconsistent with Hudson's in several respects—including, in particular, that Cox denies making anything like the alleged remark about President Obama.  See Cox Decl. ¶ 56.  But that inconsistency is immaterial in Rule 56 terms because it is dwarfed and rendered trivial by the areas of consistency and agreement in Cox and Hudson's testimony.

In Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006), the Supreme Court stated that whether a speaker's use of a term such as "boy" is probative evidence of racially discriminatory animus "may depend on various factors including context, inflection, tone of voice, local custom, and historical usage."  Here, Cox testified that he was raised in a place and in an environment in which terms such as "son" or "boy" were commonly used to address or refer to persons of *all* races, and that in fact he uses such terms to address or refer to persons of *all* races.  Roth Decl., Exh. 3 (Tr. of J. David Cox Deposition (Mar. 18, 2019)) at 247:7-249:1.  Most importantly for present purposes, Cox's testimony on this point stands entirely undisputed on the summary judgment record.  Indeed, Hudson's own testimony on this point essentially is in harmony with Cox's.  With respect to Cox's use of the terms "son" and "boy," Hudson pointedly testified that "I think that's just normally how he talks."  Hudson Tr. 103:4-5, 14-19.  And, like Cox himself, Hudson attributed Cox's asserted speech patterns in this regard to Cox's upbringing:  "[H]e called me a boy.  He had called me son.  He considered himself to be, I guess, a Baptist minister in the sense of Billy Graham or somebody.  I think they're from the same area of the country."  Id. 102:1-4; see also id. 101:18-19 ("[Cox] considered himself to be a minister and would call people son"); id. 82:10-14 ("Cox considers himself to be a black minister even though he's of European descent.  He's a white male.  He's said on many occasions that – I think he's even a member of some organization, 100 black men or something.").  This undisputed contextual

evidence regarding Cox's use of the terms "son" and "boy" fatally undermines Hudson's effort to portray Cox as a racist based on that usage.

Although we submit that this undisputed contextual evidence should be treated as dispositive, Hudson's effort to portray Cox as a racist based on the use of the terms "son" and "boy" also flies in the face of his past sworn testimony.  While Hudson's deposition testimony on this issue hardly is a model of clarity, it appears that Hudson is claiming that Cox used terms like "son" or "boy" on a regular basis from 2006-2015, thereby offending Hudson and evincing in Hudson's mind a racially discriminatory attitude on Cox's part.  Hudson Tr. 82:22-83:8, 104:12-15.  Yet in December of 2015, Hudson gave deposition testimony in an employment discrimination lawsuit against AFGE that, since he had moved to Washington D.C. in 2012 to assume the NST position, he had not heard *anybody* working at AFGE make *any* statements that could be taken as racially discriminatory.  See Roth Decl., Exh. 4.  This prior deposition testimony stands in direct conflict with Hudson's testimony here that he was offended by Cox calling him "son" and "boy" and took Cox's usage of those terms as evidence of racial animus.

Equally to the point, if Hudson had taken Cox's purportedly regular references to him as "son" or "boy," which he testified dated back as far as 2006, as evidence of racial animus, one would have expected to see serious fissures or tensions in the working relationship between them during the 2012-2015 time frame when they served side-by-side in Washington D.C. as AFGE's two highest ranking officials.  Yet insofar as Hudson's testimony and allegations in this case and the related case before this Court (No. 17-1867) involving Hudson's August of 2017 removal from union office show, their working relationship was perfectly fine and cordial until the 2016-2017 time frame when, among other things, Cox purportedly entered into a "conspiracy" to stop Hudson from questioning NEC member expense vouchers and Hudson announced that he would

be running against Cox for the NP position at AFGE's 2018 Convention.  See supra pp. 14-15; Case No. 17-1867, Dkt. No. 1, Compl. ¶¶ 8, 73, 79.

Against all of this, no reasonable jury could find that Hudson's effort to portray Cox as a racist based on his usage of terms such as "son" and "boy" is a genuine effort deserving of credence.  Rather, *on its face*, it is an effort aimed at smearing Cox, a political rival and perceived nemesis, and propping up his otherwise moribund claims that, in the 2016-17 time frame immediately preceding his removal, Cox took other adverse employment actions against him because of his race.

### B.        The Controlling D.C. Circuit Authority and Its Application Here

In Morris, supra, 825 F.3d 658, the D.C. Circuit reversed the grant of summary judgment on a white employee's Title VII claim alleging that her suspension (an indisputably legally cognizable adverse employment action) was motivated by her African American supervisor's "general bias" against white employees.  In doing so, the Court began by concluding that the supervisor had made numerous "racially charged statements" of a "tenor" that would permit a reasonable jury to find that the supervisor did in fact "harbor[ ] a discriminatory attitude toward white employees." Id. at 670.  But on the immediate heels of this conclusion, the Court went on to state:  "Of course, [the plaintiff] must show more than a general bias against white employees [to avert summary judgment on her claim]; she must also introduce enough evidence for a reasonable jury to find that her suspension was motivated by that bias." Id.  The Court went on to find that the plaintiff had met this latter evidentiary burden by showing that her supervisor's explanation for her suspension—that she was guilty of insubordination—was "feeble," "unpersuasive" and lacking in "sincerity." Id. at 671-72.

The D.C. Circuit's decision in <u>Morris</u> makes it abundantly clear that in order to avert summary judgment in this case, Hudson must be able to clear two separate and independent evidentiary hurdles.  <u>First</u>, he must be able to point to record evidence that would allow a reasonable jury to find that Cox does in fact harbor a general bias against African Americans.  <u>Second</u>, and independently, he must be able to point to record evidence that would allow a reasonable jury to find that he has suffered legally cognizable adverse employment actions and that Cox's alleged bias seeped into and infected those actions.  Assuming for argument's sake (and contrary to our showing in **Part A** above) that Hudson has cleared the first hurdle, he plainly has not cleared the second hurdle with respect to *any* of his claims in this case.  A brief, Claim-by-Claim synopsis of our prior showing with respect to each of Hudson's claims suffices to make the point:

As to Claim 1, the undisputed facts show that Cox did not even take the adverse employment action (denial of Hudson's request to promote Willie Hope as his Special Assistant) alleged in Hudson's Complaint.  If the Court permits Hudson to substitute a new and distinctly different claim that Hope was underpaid upon his promotion for racially discriminatory reasons, that new claim fails on the threshold legal ground that this asserted underpayment of Hope does not constitute a legally cognizable "adverse employment action" vis-à-vis Hudson.  In any event, the undisputed facts show that Cox had an unassailable nondiscriminatory reason for directing that the Special Assistant position to which Hope was promoted be posted at a G-13 salary grade.

As to Claim 2, Cox's committee assignment actions vis-à-vis Hudson in November of 2014, taken together and in context, plainly do not amount to a legally cognizable "adverse employment action."  In any event, here again the undisputed facts show that Cox had unassailable nondiscriminatory reasons for his actions.

As to Claim 3, the undisputed facts of record show that Cox was not the true decisionmaker behind the setting of Hudson's COLA at 2.48%; the framers of the AFGE Constitution effectively were.  That being so, any bias on Cox's part could not have impacted the setting of Hudson's COLA at that level.  In any event, the undisputed facts show that AFGE had unassailable nondiscriminatory reasons for setting Hudson's COLA at 2.48% while providing four other officers (including two African American NVPs) a slightly higher 2.88% COLA.

Finally, as to Claims 4 & 5, Hudson does not even contend that Cox's alleged bias seeped into and infected the adverse employment actions alleged in these Claims.  To the contrary, his entire theory and stance is that those actions were taken by Cox for reasons *wholly apart from race*.

## CONCLUSION

For the foregoing reasons, AFGE's Motion for Summary Judgment should be granted.

Respectfully submitted,

 /s/  Andrew D. Roth
Andrew D. Roth (D.C. Bar No. 414038)
Devki K. Virk (D.C. Bar No. 459418)
Elisabeth Oppenheimer (D.C. Bar. No. 888230912)
BREDHOFF & KAISER, P.L.L.C.
805 Fifteenth Street N.W., Suite 1000
Washington, D.C.  20005
(202) 842-2600
aroth@bredhoff.com
dvirk@bredhoff.com
eoppenheimer@bredhoff.com

*Counsel for Defendant AFGE*

Dated:  June 21, 2019