**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

EUGENE HUDSON, JR.,                )
                                   )
                Plaintiff,         )
                                   )
v.                                 )          No. 1:17-cv-02094-JEB
                                   )
AMERICAN FEDERATION OF             )
GOVERNMENT EMPLOYEES,              )
                                   )
                Defendant.         )
_____)

**DECLARATION OF ANDREW D. ROTH**

I, Andrew D. Roth, being over 18 and competent to testify, declare as follows based on my personal knowledge:

1. I am a counsel for Defendant AFGE in this matter.

2. Exhibit 1 hereto is a true and correct copy of excerpts of the transcript of Eugene Hudson's deposition in this matter. Because AFGE has withdrawn its designation of the deposition as confidential, the confidential designation on the first page of the deposition transcript has been removed.

3. Exhibit 2 hereto is a true and correct copy of Plaintiff Eugene Hudson's Responses and Objections to Defendant's Interrogatories.

4. Exhibit 3 hereto is a true and correct copy of excerpts of the transcript of J. David Cox's deposition in this matter. Because AFGE has withdrawn its designation of the deposition as confidential, the confidential designation on the first page of the deposition transcript has been removed.

5. Exhibit 4 hereto is a true and correct copy of an excerpt of the transcript of Eugene Hudson's December 2, 2015 deposition in the case <u>Burnett, et al. v. American Federation of Government Employees of D.C.</u> (D.D.C. Case No. 13-2047).

I declare under penalty of perjury that the foregoing is true and correct.

Andrew D. Roth

Dated: June 21, 2019 at Washington, D.C.

# Roth Decl. Exhibit 1

Page 1

1              IN THE UNITED STATES DISTRICT COURT

2                 FOR THE DISTRICT OF COLUMBIA

3

4    EUGENE HUDSON, JR.,              ) No. 1:17-CV-02094-JEB
                                      )
5              Plaintiff,             )
                                      )
6         v.                          )
                                      )
7    AMERICAN FEDERATION OF           )
     GOVERNMENT EMPLOYEES,            )
8                                     )
               Defendant.             )
9    -----------------------------)

10

11                        - - -

12                Monday, March 18, 2019

13                        - - -

14

15

16       Videotaped Deposition of EUGENE HUDSON, JR.,

17   taken at the offices of Bredhoff & Kaiser, PLLC,

18   805 15th Street NW, Suite 1000, Washington, D.C.,

19   beginning at 9:05 a.m., before Nancy J. Martin, a

20   Registered Merit Reporter, Certified Shorthand

21   Reporter.

22

Page 22

1       Q.  Well, in fact, Willie Hope was promoted as
2   special assistant to the NST, wasn't he?
3       A.  No.
4       Q.  Willie Hope -- is it your testimony that
5   Willie Hope did not --
6           MS. MORTEN:  Objection.  Asked and answered.
7   BY MS. VIRK:
8       Q.  Is it your testimony that Willie Hope never
9   received a promotion to the position of special
10  assistant to the NST?
11      A.  Correct.
12      Q.  So it is your testimony that Mr. Hope simply
13  stayed in his previous position as a field
14  accountant/trainer in the finance department?  Is that
15  your testimony?
16      A.  No.
17      Q.  Well, you requested that Willie Hope be
18  promoted from that field accountant position; correct?
19      A.  Yes.
20      Q.  And you requested -- and he was, in fact --
21  he did, in fact, become the special assistant to the
22  NST, didn't he?

1       A.  Yes.

2       Q.  And, in fact, he became a special assistant

3   to the NST in or around February of 2017.  Isn't that

4   correct?

5       A.  I don't know the dates, but yes, he became

6   national -- special assistant.

7       Q.  Right.  But if you look at Paragraph 29 of

8   the Complaint, sir, you wrote here "Mr. Cox denied

9   Plaintiff's request for Willie Hope's promotion."

10          MS. MORTEN:  Objection.  Asked and answered.

11  BY MS. VIRK:

12      Q.  But Willie Hope was, in fact, promoted to the

13  special assistant position?

14      A.  No.

15          MS. MORTEN:  Objection.  Asked and answered.

16  BY MS. VIRK:

17      Q.  He moved to the special assistant position,

18  didn't he?

19      A.  Yes.

20      Q.  And that move was approved by President Cox,

21  wasn't it?

22      A.  I believe so.

1   second paragraph of that memorandum where

2   President Cox writes, "AFGE's standard hiring policy

3   and procedure has been that employees promoted from

4   within shall advance no more than two steps above

5   current salary within the higher grade."  Let me stop

6   there.

7           Willie Hope was already employed by AFGE at

8   the time that he was selected by you for the special

9   assistant to the NST position; is that correct?

10      A.  Yes.

11      Q.  In fact, he was a field accountant; is that

12  right?

13      A.  I think that was the title, yeah.

14      Q.  And when President Cox writes, "AFGE's

15  standard hiring policy and procedure is that for

16  employees promoted from within shall advance no more

17  than two steps above current salary within the higher

18  grade," that was, in fact, AFGE's standard policy for

19  promotions from within; correct?

20      A.  For some people, yes.

21      Q.  Well, what do you mean by that?

22      A.  Cox did whatever he wanted to.  He was

Page 57

1    2003 or something.

2        Q.  And what was the grade to which they were

3    promoted?

4        A.  I forgot the title, but there was -- it was a

5    higher grade than the 14.

6        Q.  It was executive level; is that correct?

7        A.  I don't remember the title.

8        Q.  But it was higher than a 14?

9        A.  Correct.

10       Q.  At the time that Mr. Hope was selected for

11   the assistant -- special assistant position, the grade

12   of the special assistant position was a 13.  Isn't

13   that correct?

14       A.  No.

15       Q.  The grade -- are we having this discussion

16   again because you believe it should have been a

17   Grade 14 but it was, in fact, a 13?

18       A.  I don't believe it should have been.  I knew

19   it was a 14.

20       Q.  Well, it was posted as a 13.  Isn't that

21   correct?

22       A.  I believe so.

1      A.   Yes.

2      Q.   And then Eric Young declined the position?

3      A.   Yes.

4      Q.   And at the time that the vacancy announcement

5  went up on October 19, 2016, you did not know that you

6  would ultimately select Willie Hope for the position,

7  did you, Mr. Hudson?

8           MS. MORTEN:  Objection.  Asked and answered.

9           MS. VIRK:  It has not been asked, and it has

10  not been answered, Ms. Morten.

11           THE WITNESS:  Would you say it again, please.

12  Repeat the question.

13  BY MS. VIRK:

14      Q.   Sure.  At the time that the vacancy

15  announcement went up on October 19, 2016, you did not

16  know that you would ultimately select Willie Hope for

17  the position of special assistant, did you?

18      A.   Yes, I knew I would eventually select him.

19      Q.   You knew that on October 19?

20      A.   Yes.

21      Q.   And how did you know that on October 19 when

22  you offered the job and had somebody else in mind for

1    that job, meaning Mr. Young?

2        A.   Because I knew Eric would decline because he

3    was in a -- he was collaborating with Cox and a few

4    other high-level AFGE officers, and there was no doubt

5    in my mind that he was going to reject the position.

6    It was a conspiracy within the organization against

7    me, pretty obviously now.  I was aware of it.

8        Q.   And did you in fact share the fact that you

9    planned on selecting, ultimately, Mr. Hope for the

10   position after Mr. Young declined with anybody?

11       A.   Did I share with anybody?

12       Q.   Yes.

13       A.   Probably Janet.

14       Q.   Anybody else?

15       A.   Like I said, probably Janet.  It may have

16   been Arla, but I don't know about Arla.  I know Janet.

17       Q.   Has President Cox ever made any racially

18   derogatory comments regarding Willie Hope to you?

19       A.   I heard him use the term "boy" in reference

20   to Willie.

21       Q.   In reference to Willie?

22       A.   Uh-huh.

Page 64

1      Q.  And is that one time or more than one time?

2      A.  Cox usually would use words like that around

3  his cronies or to try and incite some kind of response

4  from people like myself.

5      Q.  I'm not sure you answered my question.

6          Was that one time or more than one time?

7      A.  Oh, he used the word more than once.

8      Q.  With respect to Willie Hope?

9      A.  I don't know whether it was 1 or 10.  I just

10  know he used it at least once.

11     Q.  So that one time that you are recalling, when

12  was it?

13     A.  Probably -- I can't remember exactly when.  I

14  don't remember when Willie was hired, but it was

15  sometime during the time Willie had become an

16  employee.

17     Q.  And what was the context for that statement?

18  Was it in person?  Were you and Mr. Cox,

19  President Cox, in the same room?

20     A.  We may have been talking face to face.  I

21  don't remember exactly where it was or when it was.  I

22  think it might have been in New Orleans or Las Vegas

1  or -- I don't know.  I don't know where it was at.

2      Q.  And what year was it?

3      A.  I don't remember when Willie was hired.  I

4  just know Willie was an employee at the time.

5      Q.  Well, is there -- was it shortly after he was

6  hired into AFGE, or was it after he was hired as your

7  special assistant?

8      A.  I think he was in the field account position.

9      Q.  And what was the discussion that was taking

10 place when you say you heard President Cox use the

11 term "boy" in reference to Willie?

12     A.  I think he said something like "That boy is

13 always joking around" or something like that.  Willie

14 is -- likes to joke, at least when I was there.  I

15 heard the morale is pretty bad over there.  So I don't

16 know if they still joke around or not.  But somewhere

17 in that time frame.  Maybe we were at a training or

18 something.  Maybe it was in the national office

19 building.

20          I established training for

21 secretary-treasurers at the national headquarters when

22 I became secretary-treasurer.  It was a very

1    successful training.  We got a lot of participants.  A

2    lot of people applauded the fact that I took the

3    initiative to do it.  And somewhere during the course

4    of the training at the headquarters, I think that --

5    I'm trying to recall.

6          I think that Willie -- we had normally used

7    the 11th floor conference room, and Cox had another

8    need for the 11th floor, even though we had scheduled

9    it in advance, and he told us that we were going to

10   have to move it to the basement, which is another area

11   where training is done, or the second floor.

12   Somewhere other than the 11th floor.  And I think I

13   mentioned to Cox that -- or Willie may have mentioned

14   it to Cox and Willie may have told me that he had

15   mentioned it to Cox that we had that room scheduled.

16          And I think Cox said something to me about

17   "That boy is always" -- I asked him who he was

18   referring to, and he was like, "Hope."  So that's the

19   best I can remember.

20   Q.  You said the exact words that President Cox

21   used were "That boy's always joking around"?  That's

22   your recollection; is that correct?

1      A.   I know that Willie joked around a lot.   I

2   think Willie had approached Cox or saw Cox and said

3   that we had his room scheduled.

4      Q.   Well, hold on a second.   Were you present for

5   that conversation?

6           MS. MORTEN:   Let him answer the question.

7   Objection.   Let him answer the question.   You're

8   interrupting him.

9           MS. VIRK:   I am interrupting him so that I

10   can get clarification.

11          MS. MORTEN:   No.   Let him answer the question

12   or withdraw the question.

13          MS. VIRK:   Ms. Morten --

14          MS. MORTEN:   Objection.

15          MS. VIRK:   -- are you instructing your client

16   not to answer?   If you're not instructing your client

17   not to answer, then you're --

18          MS. MORTEN:   I'm objecting that you're not

19   allowing him to answer.   You've asked the question.

20   You should allow him to answer.   That's my objection.

21   BY MS. VIRK:

22      Q.   Mr. Hudson, were you present for any

Page 68

1    conversation between Mr. Hope and Mr. Cox regarding

2    the reservation or non-reservation?

3         A.   Reservations or non-reservations.

4         Q.   Were you present for any conversation between

5    Mr. Hope and President Cox?

6         A.   I probably was present for some conversations

7    between the two of them.  I don't know if it was

8    pertaining to that particular subject, but I know that

9    Cox has said to me, "That boy is always joking around"

10   or something to that effect.  And I asked him who, and

11   he said, "Hope."

12        Q.   Okay.  And the context, again, was a training

13   that took place at headquarters?  Is that your

14   testimony?

15             MS. MORTEN:  Objection.  Asked and answered.

16             MS. VIRK:  It has not been answered,

17   Ms. Morten.

18             THE WITNESS:  The -- we had -- and they

19   probably still do, have financial offices training in

20   the building, and there was -- the 11th floor

21   conference room was scheduled by my office, the

22   secretary-treasurer of AFG's office when I was there.

Page 69

```
 1    And we had reserved I believe the 11th floor for that
 2    training months in advance, or even weeks in advance.
 3    Probably months that we put out a schedule annually
 4    for the training -- the officers training.
 5              And I don't know if something came up or Cox
 6    was just on one of his tangents, but he wanted to use
 7    the room, and he was the president, CEO.  So he would
 8    just unilaterally make changes whenever he wanted to,
 9    whether I objected or not.  It may have been one of
10    those occasions.
11    BY MS. VIRK:
12         Q.  Sitting here, though, you're not sure where
13    this statement was made that you attributed to Cox --
14         A.  Probably on the 12th floor.  We both -- both
15    our offices were on the 12th floor.
16         Q.  Okay.  And who else, if anyone, was present
17    for that?
18         A.  I don't think anybody else was present.
19         Q.  And what was the rest of the communication
20    between you and President Cox at that time?
21         A.  You know, Cox rarely would entertain anything
22    I wanted to talk about.  I had requested on multiple
```

Page 70

1   occasions with Cox that we have monthly meetings so he

2   could brief me on what was going on.  He had a habit

3   of only speaking and meeting with his staff, or

4   meeting with Augusta Thomas, who was the national vice

5   president for women's fair practice, and I was

6   excluded from many of his meetings.  I don't know what

7   they were talking about because I was excluded --

8       Q.  Mr. Hudson, you're not actually answering the

9   question.

10          The question is in the interaction where you

11  claim that Cox said, with reference to Willie Hope,

12  that "That boy is always joking around," I'm asking

13  you was there anything more to that conversation,

14  communication with Cox, that particular conversation

15  or communication with Cox?

16      A.  I probably was talking to Cox about the size

17  of the class.

18      Q.  When you say, "probably," sir, are you -- is

19  it something that, sitting here today, you're

20  testifying under oath that you're sure about?  That's

21  what I'm asking.

22      A.  I can't be certain because many of the

1  documents that I requested were never provided to help

2  me recall what had transpired over the last several

3  years that I worked with AFGE.  So I can't say for

4  certain exactly when it was.  I know I made a request

5  for information from -- through my counsel to you, and

6  we never were provided documents.

7          So I don't recall whether or not it was --

8  when it occurred.  But I do know that on I believe one

9  or two occasions, there was a conflict with the 11th

10  floor conference room, and I had scheduled it in

11  advance and I wanted to use the conference room.  And

12  I went to Cox and I said something to the effect that

13  "That room is the only room that can accommodate the

14  number of participants in the class" because it was

15  the largest room in the building.

16          And he needed the room.  So since he was the

17  president, he pretty much just took the room, and we

18  had to move somewhere else.

19      Q.  So you've spent five minutes explaining to me

20  how the room was scheduled and then Cox wanted the

21  room, and then you had not actually answered the

22  question what, if any other communication, did you and

Page 72

1    Cox have in the interaction in which you claim Cox

2    said, in reference to Willie Hope, "That boy is always

3    joking around"?

4           If the answer, Mr. Hudson, is "I don't

5    remember anything else about that interaction," that's

6    totally fine.  I want to make sure that I have a full

7    understanding of what you, sitting here today,

8    remember about that interaction with Cox other than

9    the line that you are attributing to him.

10        A.  I believe I've already answered that

11   question.  I said he said it to me.

12        Q.  And what words did you say back to him, if

13   any?

14        A.  Well, I had become used to -- I was sort of

15   inoculated by Cox's comments and the fact that he

16   always reacted to me as though I was somehow inferior

17   to him.  So it wasn't really a surprise to me for Cox

18   to use a term like that.

19        Q.  So my question was what, if any words, did

20   you say back to President Cox?

21        A.  I probably said, "boy"?  I looked at him.

22        Q.  Well, is that something you're remembering

1   now, or is that something you're assuming that you

2   said?

3       A.   It's probably something I said to Cox more

4   than once.  So it's not an assumption.  I just don't

5   remember exactly when.

6       Q.   So as you sit here today, you can't remember

7   what, if any, response you made to Cox in the specific

8   interaction that you've testified about where he said

9   of Willie Hope, "That boy is always joking around"; is

10  that correct?

11      A.   I think I already answered that question.

12      Q.   Is that correct?

13      A.   No.

14      Q.   Okay.  What about it is not correct?

15      A.   That I already answered.  You asked me a

16  different question.  I already answered your question

17  like three times.

18      Q.   Actually, with respect, Mr. Hudson, the

19  record is not going to show that.

20           What I'm asking you is as you sit here today,

21  my understanding is that you're saying you don't

22  remember what words you actually said back, if any, to

Page 74

1    President Cox during this interaction; is that

2    correct?

3              MS. MORTEN:  Objection.

4              THE WITNESS:  I think I said, "boy" and

5    looked at him.  I think the record will reflect that.

6    BY MS. VIRK:

7         Q.  Okay.  You said that President Cox met

8    regularly with Augusta Thomas; is that correct?

9         A.  When I say, "regularly," for him, regularly

10   would be whenever she was in the office.  She was out

11   of the office a lot at her residence, from what I

12   understand, in Kentucky.  There was no objection to

13   her absence.  I mean they were just paying her for

14   doing nothing as far as I was concerned.

15        Q.  So, Mr. Hudson, this is going to go a lot

16   quicker if you actually listen to the question and

17   answer the question that I'm asking you.

18        A.  Please don't assume that I'm not listening to

19   the question.

20        Q.  Well, it's hard to assume anything else when

21   you don't actually answer the question that I'm

22   asking.

Page 81

1    BY MS. VIRK:

2         Q.  You never told Ms. Thomas that either, did

3    you?

4         A.  I don't think I ever told her that.

5         Q.  But you believed that there was something

6    wrong with AFGE holding her out as an African

7    American?

8         A.  No, I didn't believe that either.  I was just

9    going, based on how she looked and what she had said

10   to me, that other people believed that she could have

11   been something other than African American.  I think

12   she had told other people as well.  I think she may

13   have even given a speech with that in it at least once

14   or twice.

15        Q.  So you said that President Cox stated of

16   Willie Hope that "Boy likes to joke around" --

17            MS. MORTEN:  Objection.  Asked and answered.

18            MS. VIRK:  I haven't finished the question,

19   Ms. Morten.  I would appreciate you not prolonging by

20   interrupting my question.

21        Q.  You suggested in your answer that that was

22   not the only time that you heard President Cox say the

1    word "boy" in reference to an African American.  Is

2    that in fact; correct?

3         A.  Yes.

4         Q.  Okay.  With regard to those other -- any

5    other instance, let's just take them in order.  What

6    is the first time that President Cox in your presence

7    referred to any African American person, or you

8    understood him to refer to an African American person

9    with that term?

10        A.  Well, Cox considers himself to be a black

11   minister even though he's of European descent.  He's a

12   white male.  He's said on many occasions that -- I

13   think he's even a member of some organization, 100

14   black men or something.

15             That he was -- I lost my train of thought.

16             MS. VIRK:  Yeah.  So maybe the court reporter

17   can read the question back, and that will help you

18   with the question.

19             (Record read.)

20   BY MS. VIRK:

21        Q.  And the term is "boy."

22        A.  Yeah.  I probably heard him say it three to

1    four times over the course of time that I had been

2    around him.  I think the first time I may have heard

3    him say it when he was national secretary-treasurer

4    between the years 2006 and 2012, and he referenced

5    to -- who was he talking about?

6            It might have been -- it seems to me that it

7    may have occurred during black history month in

8    February, one of those years.  I don't recall what

9    year it was, but somehow we were talking about some

10   black person in history, and he said, you know, "That

11   boy wasn't all that," or something to that effect.

12           Then on another occasion --

13      Q.  Let me stop you there so we take them one by

14   one.

15           On that first occasion you don't, as you sit

16   here today, remember who precisely President Cox was

17   referring to, but it was a black figure in history?

18      A.  Correct.

19      Q.  And who else was present, if anyone, for that

20   interaction?

21      A.  Well, it wasn't something he would just come

22   out and say around a lot of people.  I think he was

1   very conscious of when he was saying that.  I think

2   that was strategic on his part.  Cox had deemed

3   himself as being of a psychological or -- I think his

4   training as a nurse was in psychiatry.  So I think

5   that he --

6       Q.  Mr. Hudson, my question was who else, if

7   anyone, was present?

8       A.  Oh, I don't know.  I don't recall.  I don't

9   remember if it was around anybody else.

10      Q.  Okay.  And you also cannot recall what year;

11  is that correct?

12      A.  I just know it was between 2006 and 2012.  He

13  was elected in 20- -- August of 2006.  So it probably

14  would have been -- I think it was in February because

15  I think it was a black history month.  So the first

16  month he would have been secretary-treasurer would

17  have been, probably, February of 2007.

18      Q.  And where were you two when you allege

19  this --

20      A.  Probably at the national headquarters, or

21  maybe he was in my district.

22      Q.  You don't remember where, in other words?

1      A.   No.   No, I don't remember where.

2      Q.   And do you remember anything else about the

3  event or context on which that comment was made?

4      A.   I just remember him using the word pretty

5  loosely, and I remember that I didn't like it, but I

6  wasn't going to fall on my sword for it because the

7  perception was that I tended to be -- could be

8  confrontational, verbally confrontational regarding

9  things that I thought were wrong.

10      Q.   So after that incident that you've just

11  described, when is the next time -- you said three or

12  four instances total.   So I'm going to go through each

13  time.   When is the next time --

14      A.   Well, I remember when President Obama was the

15  president of the United States.   He said about

16  President Obama on more than one occasion that "That

17  boy hasn't done anything for us."   And then I can

18  remember being at the Congressional black caucus

19  dinner, which is an annual event in August.   I don't

20  know if it was August 2015 or August 2016, or maybe

21  even '14.   I think this might have been -- Obama left

22  office in what, 2016?   So it might have been in August

Page 86

1    2016 because I can remember we were at the Washington

2    convention center, Metropolitan convention center,

3    whatever they call it, and we had a table for the

4    Congressional black caucus dinner.

5            And Cox's wife and myself were sitting at the

6    table together, and President Obama was introduced and

7    came out on the stage, him and his wife, Michelle.

8    And so people got up to applaud the president and his

9    wife's introduction, and Cox's wife got up and I got

10   up, and Cox sat there.  And I looked at him, and he

11   looked at me and he said, "That boy hasn't done

12   anything for us."  And I looked at him, and I just

13   continued to applaud.  I was sort of stunned by the

14   fact that he didn't stand up for the president.  I

15   found that unusual.

16           A couple of nights later the Hispanic caucus

17   and the black caucus had a joint dinner.  I mean the

18   same week.  They had them on different nights.  I

19   think the black dinner -- black caucus dinner was on a

20   Tuesday night, and the Hispanic was on a Thursday

21   night or vice versa.  I don't remember which one went

22   first now.  But he didn't attend the one with the

Page 87

1    Hispanic.  I think the Hispanic caucus was the second

2    one, and the reason I say that is because I was there.

3    His wife was there, but he wasn't there because he was

4    ill.

5            And the reason I remember so distinctly is

6    because he didn't attend the Hispanic caucus because

7    he had the flu or something.  So he didn't come.  But

8    he said at the Hispanic -- I mean at the black caucus,

9    I believe in 2016, I think that's the year that Obama,

10   last year in office.

11           (Deposition Exhibit 5 was marked for

12           identification.)

13   BY MS. VIRK:

14       Q.  I'm going to hand you a document that's been

15   marked as Hudson Exhibit No. 5.  I'll represent to you

16   that this is a copy of your responses to our

17   interrogatories.  And if you go to the final page, if

18   you just flip it right over.

19       A.  Page 23?

20       Q.  No.  In the middle of Page 24 there's a

21   verification.  It says, "I, Eugene Hudson, Jr.,

22   declare under penalty of perjury, that my responses to

Page 88

```
1    the foregoing interrogatories are true and correct."

2    That is your signature underneath those words; is that

3    correct?

4         A.  Yes.

5         Q.  It's dated November 28, 2018?

6         A.  Yes.

7         Q.  If you'll go to Page 2 going over to Page 3,

8    you'll see Interrogatory No. 1 is set out here, and it

9    states -- just simply cuts and pastes the question

10   that AFGE asked, which says, "You allege that the

11   decision by President Cox in or around June 2016 to

12   'strip' you of 'supervision of Information Services

13   and Human Resources' was racially discriminatory."

14   Then it asks you to provide the full factual basis for

15   that allegation.

16         Do you generally see where I'm reading on

17   Page 2, sir?

18         A.  Uh-huh.

19         Q.  You have to say, "yes" or "no" for the court

20   reporter.

21         A.  Yes.

22         Q.  And underneath that in bold letters is the
```

1   word "RESPONSE," and what follows from there is your

2   response to this interrogatory; is that correct?  The

3   "I" referred to in that response is you, Mr. Hudson;

4   correct?

5        A.  I'm sorry.  I lost where you were reading

6   from.  Are you reading from the response?

7        Q.  Yes.  That response generally, the section

8   that appears in bold type there under the word

9   "RESPONSE," it goes on for several pages.  That is, in

10  fact, your response to this interrogatory; correct?

11       A.  Yes.

12       Q.  The "I" referred to in that response is you,

13  Mr. Hudson; correct?

14       A.  Yes.

15       Q.  And on Page 3, third paragraph down it says,

16  "I witnessed Cox reference to President Obama as a

17  'boy' and refused to stand when Obama was introduced

18  at the 2015 Annual Congressional Black Caucus dinner

19  to which both Cox and I attended"; correct?

20       A.  Yes.

21       Q.  And it was the 2015 dinner; right?

22       A.  I don't know if it's '15 or '16 or '14.  I

Page 90

```
 1    don't know if I went to all of them or just some of
 2    them.
 3         Q.  Okay.  Well, you wrote these interrogatory
 4    responses; correct?
 5         A.  Yes.
 6         Q.  And you signed them on the back; correct?
 7         A.  Yes, that's correct.
 8         Q.  And under penalty of perjury you said it's
 9    the 2015 Congressional black caucus dinner is the one
10    that you are currently testifying about where
11    President Cox said of Obama, "That boy hasn't done
12    anything for us" was the 2015 dinner; correct?
13         A.  I don't know whether it's the '14, '15, or
14    '16.  I was guesstimating that it was the '15, 2015.
15    It may have been the '16.  It may have been 2014.  I
16    just know he made it at a Congressional black caucus
17    dinner.
18         Q.  What else do you remember about that dinner?
19         A.  Is that he didn't stand up when the president
20    came out for introduction.
21         Q.  Okay.  I'm going to show you a flyer from the
22    Congressional black caucus dinner from 2015, and maybe
```

1    that will help to refresh your recollection.

2            Who were the honorees at the dinner that you

3    recall?

4        A.  I don't remember who were the honorees.

5        Q.  Well, the Congressional black caucus dinner

6    usually, the dinners are or actually honorees who

7    received various awards --

8            MS. MORTEN:  Objection.  Is there a question?

9    BY MS. VIRK:

10       Q.  Is that correct?

11       A.  Is what correct?

12       Q.  The dinner you're referring to is a dinner in

13   which awards are given to various people.  Isn't that

14   the case?

15       A.  I don't know.  I don't recall whether there

16   is or not.  Probably, but I don't know.

17       Q.  How many years have you attended the

18   Congressional black caucus dinner?

19       A.  I don't know how many years I've attended.

20       Q.  It's more than one; right?

21       A.  Yes.

22       Q.  This is the dinner at the Walter Reed

Page 92

1    Washington convention center?

2         A.   Yes.  Well, I attend a lot of -- I had

3    attended a lot of events where people received awards.

4    So I don't remember who received the award.  It's like

5    the Superbowl.  Whoever finishes second, you never

6    remember who finishes second.  At least, I don't.  I

7    don't remember who got awards.  I may have not been

8    familiar with them.

9         Q.   Who else was at your table?

10        A.   I just remembered the three of us being at

11   the table.  I know my wife wasn't there because she

12   had to work.  There may have been some staff there,

13   but I don't remember for certain.  I do remember -- I

14   don't know if this is the same year.  I might be

15   confusing the years, but I remember there were some

16   other union officials from other labor organizations

17   that were at the event.  It was probably thousands of

18   people there.  So I don't know.

19        Q.   I'm talking about at your table, Mr. Hudson.

20        A.   I don't remember who was at the table other

21   than himself, his wife, and me.  There may have been

22   some staff there.  I remember having sat with staff at

1   the dinner.  I don't know if it was that dinner.  I

2   know that Washington central labor council has an

3   annual dinner, and I sort of like get those --

4       Q.  That annual dinner is not at the convention

5   center, is it, sir?

6       A.  I don't know if it was at -- I knew it was

7   somewhere in D.C. at a big hotel or somewhere.

8       Q.  I'm sorry.  You're saying that the dinner,

9   the Congressional black caucus dinner might have been

10  at a hotel?

11      A.  No.  I'm saying that I've attended multiple

12  events where people may have received awards, and I

13  couldn't -- I would maybe get them mixed up.

14          MS. VIRK:  Okay.  So I'm going to hand you a

15  document that has been marked as Hudson Exhibit No. 6.

16          (Deposition Exhibit 6 was marked for

17          identification.)

18  BY MS. VIRK:

19      Q.  This is a press release from the

20  Congressional Black Caucus Foundation announcing that

21  President Obama was going to deliver the keynote at

22  the CBCF dinner.  It says, "The event is scheduled for

Page 94

1    6 p.m., Saturday, September 19, 2015."

2            And then on the second page it lists the

3    people and organizations that would be giving the

4    awards, including the Reverend Dr. William Barber.

5    I'm just trying to fix the year, Mr. Hudson.

6            MS. MORTEN:  Objection.  He's already

7    answered that question, and I'm directing my client

8    not to answer it again.

9            MS. VIRK:  What are you directing your client

10   not to answer?

11           MS. MORTEN:  He said he didn't know what the

12   year was.  It could have been 2014, '15, '16.  I am

13   objecting to him -- you're asking the same question

14   over and over again.  I'm directing him not to answer

15   the question.

16   BY MS. VIRK:

17       Q.  Does reviewing Hudson Exhibit 6 refresh your

18   recollection as to whether your interrogatory answer

19   identifying the dinner as the 2015 annual

20   Congressional black caucus dinner is, in fact,

21   correct?

22           MS. MORTEN:  Objection.  He's answered the

Page 95

1    question.

2            I'm directing my client not to answer.  He's

3    answered the question that he doesn't know the date.

4            MS. VIRK:  Ms. Morten, you're obstructing at

5    this point.  I'm attempting to refresh your client's

6    recollection, and he's testified that he does not know

7    exactly which year this incident occurred.  His

8    interrogatory answers say it's September 2015.  I have

9    handed him a flyer that may refresh his recollection,

10   and I am asking him if that flyer has refreshed his

11   recollection as to whether his interrogatory answer is

12   correct and --

13           MS. MORTEN:  And I'm objecting because you

14   have not produced a flyer from the caucus dinner for

15   2014 and '16, which he has testified it could have

16   been one of those dates as well.  So I'm directing my

17   client not to answer.

18           MS. VIRK:  Well, you're not only directing

19   your client not to answer.  You are coaching him to

20   find that he doesn't know the year, Ms. Morten.

21           MS. MORTEN:  Mr. Hudson has already testified

22   that he does not recall the exact year.  He answered

1   your question.  I'm directing him not to answer this

2   one.

3   BY MS. VIRK:

4        Q.  Is your recollection refreshed, sir?

5        A.  I'm following the advice of my counsel.

6        Q.  Is there anything that would refresh your

7   recollection with respect to the Congressional black

8   caucus dinner that you have testified about here?

9        A.  What I can say is that I've gone to multiple

10  or several of these things, and President Obama was at

11  more than one.

12       Q.  You're sure that he was the keynote speaker;

13  is that correct?

14       A.  I --

15           MS. MORTEN:  Objection.  He never

16  testified --

17           THE WITNESS:  I never said he was the keynote

18  speaker.  I said he came on the stage with his wife,

19  which I had seen him do -- you know, he got elected in

20  2008, and between 2000 -- I guess he got elected in

21  November 2008.  So from 2009 to 2016, I may have seen

22  him multiple times, but I remember Cox was president.

Page 97

1    He became president in 2012.  So I'm assuming that

2    happened between 2012 or 2013 and 2016.  I really

3    answered the best I know how to answer.  The best I

4    can recall.

5              MS. MORTEN:  Okay.  I need to take a break.

6              MS. VIRK:  Okay.  Fair enough.

7              THE VIDEOGRAPHER:  The time is 11:03 a.m.

8    This ends Unit No. 1.  We're off the record.

9              (A recess was taken from 11:03 a.m.

10             to 11:20 a.m.)

11             THE VIDEOGRAPHER:  The time is 11:20 a.m.

12   This begins unit No. 2.  Back on the record.

13   BY MS. VIRK:

14      Q.  Mr. Hudson, before we broke, we were talking

15   about an incident at a Congressional black caucus

16   dinner that you and Mr. Cox and Mr. Cox's wife

17   attended at which President Obama was introduced.

18             Looking at Hudson Exhibit 5, your

19   interrogatory answers, is the Congressional black

20   caucus dinner that you've testified about today the

21   same Congressional black caucus dinner incident that

22   is described in your interrogatory answers?

Page 98

1        A.   Could you rephrase that, please.

2        Q.   Yeah.   I'm just asking.   You mentioned in

3   your interrogatory answers, which you claim that "Cox

4   referred to President Obama as a 'boy' and refused to

5   stand when Obama was introduced."   In your

6   interrogatories you peg that as the 2015 dinner.

7   You've testified here today that you don't remember

8   what year it was.

9        I just want to make sure we're only talking

10  about one Congressional black caucus dinner at which

11  you claim to have witnessed Cox refer to

12  President Obama by the term "boy," and as you put it,

13  refused to stand when he was introduced.

14       A.   Like I stated earlier, I don't recall exactly

15  which year it was.   I do know it happened, but I've

16  requested on multiple occasions the records from AFGE

17  that fell under my jurisdiction, E-mails, faxes,

18  letter correspondence that probably would have helped

19  me to remember this information, but I haven't

20  received it.   So I can't remember without having

21  something as a memory jar.

22       This is just my statement to questions that

1    were asked in an interrogatory, and I tried to recall

2    to the best of my recollection without any records

3    that I requested from AFGE to help me give better

4    or -- better answers.  So it's hard for me to remember

5    exactly when.  I'm not exactly even --

6         Q.  That's not my question, though, Mr. Hudson.

7              My question is are we talking about one

8    incident in which you claim President Cox at a

9    Congressional black caucus dinner "refused to stand

10   when Obama was introduced" and referred "to President

11   Obama as a 'boy,'" did that happen one time, or were

12   there multiple Congressional black caucus dinners --

13        A.  No.  That particular situation to my -- that

14   happened in front of me was only once.

15        Q.  Okay.  So what we're discussing now is which

16   year that actually occurred; is that correct?

17        A.  No, not necessarily.  I just told you it

18   happened once.  I don't know what year it was.

19        Q.  Right.  But when you signed these

20   interrogatories under oath, as you wrote here, your

21   responses were true and correct to the best of your

22   knowledge as you signed them on November 28, 2018;

Page 100

1   correct?

2           MS. MORTEN:  Objection.  Asked and answered.

3           THE WITNESS:  To the best of my knowledge --

4           MS. MORTEN:  When I object, hold on.

5           Objection.  Asked and answered.

6   BY MS. VIRK:

7       Q.  Going back to Willie Hope for a moment, you

8   claimed that Randy Stewart, who was your special

9   assistant prior to the selection process that resulted

10  in Willie Hope's hiring, you claim that Randy Stewart

11  was a 14.  Are you certain of that?

12      A.  The job series, the personnel action allowed

13  for him to go to a 14.

14      Q.  Was he a 14?  Not would it allow him to go

15  to.  Was he a 14?

16      A.  Well, I don't think there's a distinction.  I

17  think if he could have gone to a 14, if he met the

18  time and grade, then he would have been a 14.  I don't

19  remember whether he was a 14 or not.  I remember that

20  the job was announced -- the highest grade would be a

21  14 for Randy Stewart.  That's what I remember.

22      Q.  That was true for Yvonne also, wasn't it?

1     A.   Yes.

2     Q.   Okay.  Going back to your claim that

3   President Cox referred -- or used the term "boy,"

4   we've talked about an incident in which you claim that

5   he said of Willie Hope, "That boy is always joking

6   around."  We've talked about the Congressional black

7   caucus dinner.  Are there any other occasions in which

8   you heard President Cox use the term "boy"?

9     A.   Oh, yeah.  Many times.

10    Q.   Okay.  Well, you said three or four.  So

11  we're going to go through every single one of them to

12  the extent that you remember.

13    A.   That's fine with me.

14    Q.   Okay.  So when is the next time after the

15  Congressional caucus?

16    A.   I don't know.  Probably -- I think Cox used

17  that term in my presence since 2007 or so.  He called

18  me a boy.  Called me a son.  He considered himself to

19  be a minister and he would call people son.  And I had

20  asked him on multiple occasions -- I'm sure his staff,

21  they wouldn't admit to us, I won't give you any names,

22  but they about scared us.

1        Anyway, he called me a boy.  He had called me

2   son.  He considered himself to be, I guess, a Baptist

3   minister in the sense of Billy Graham or somebody.  I

4   think they're from the same area of the country.  And

5   I told him to stop calling me "son," and I definitely

6   told him not to call me a "boy" again.

7        Q.  Okay.  And when did you tell him not to call

8   you a boy?

9        A.  Probably as soon as he said it.  Same thing

10  about son.  I told him I didn't like the term.  I told

11  him it was insulting and condescending and racist, and

12  I didn't like it.

13       Q.  So just to be clear, you considered

14  President Cox's use of the term or the word "boy" or

15  the word "son" to be a racially discriminatory

16  comment; is that correct?

17       A.  Oh, most definitely, yes.

18       Q.  And you're saying he referred to you

19  personally as "boy" --

20       A.  Yes.

21       Q.  -- on one occasion or more than one occasion?

22       A.  More than one occasion.

1      Q.   And this was from 2006 onwards?  Is that what

2   you're saying?

3      A.   I'm saying the first time I probably heard

4   him say it was in 2006.  I think that's just normally

5   how he talks.  When he gets a little inebriated, he

6   gets a little loose by the tongue.  I heard him say

7   things about one of my colleagues, about her breasts,

8   how small they were.  It was witnessed by her and

9   other individuals, and we told him it was

10  inappropriate.  He just tried to laugh it off.  But

11  Cox would say anything.  His staff is intimidated by

12  him.  They won't say anything.  Maybe they'll say

13  something to him in private but --

14     Q.   Is it your contention that President Cox only

15  used the words "boy" or "son" to refer to African

16  American men?

17     A.   I don't know who else he may have referred it

18  to.  He may have said it to other people.  I don't

19  know.  I just know what I heard.  And I confronted him

20  about it.

21     Q.   Okay.

22     A.   But I stopped confronting him because he

1  seemed like he was -- it seemed like it irritated him

2  to the point where he didn't want to speak with me,

3  and I needed to speak to him because I had to get work

4  done.  I couldn't sit around and not do my job

5  because, you know, the president was either agitated

6  by me or had some feeling towards me that I don't

7  know.  I don't know what his feelings were.

8      Q.  So when is it that you, as you're describing

9  now, confronted Cox?

10     A.  Immediately upon it happening.

11     Q.  When was that?

12     A.  Probably the last time it may have happened,

13 I think was -- or the last time I can remember it

14 happening, right now that I can remember, was in 2015.

15 I think it was 2015.  It may have been some other

16 year.  You know, you guys won't give me any records.

17 So it's sort of hard for me to remember.

18     Q.  Let me just stop you there for a moment.  Are

19 you saying that you wrote down details of this

20 incident in which you claimed to have confronted Cox

21 in some record that you kept in the national

22 secretary-treasurer's office?  Is that what you're

Page 105

1    saying?

2        A.   I may have, yeah.

3        Q.   Well, did you?

4        A.   I believe so.

5        Q.   And in what form did you keep that record?

6        A.   It probably was handwritten, or it might have

7    been written in my cell phone, in the notes.

8        Q.   Okay.  That's the same cell phone that you

9    returned to AFGE with the factory reset and not

10   knowing the password?

11       A.   That's the same one that they manipulated

12   once I returned it.  Just like they took the -- my

13   computers that I was told by a staffer that's still

14   there, that they -- what's the term?  They scrubbed

15   the records, supposedly.

16            All I know is that when I got back there,

17   everything that I had was gone.  When they terminated

18   my employment, they gave me one hour to get out of the

19   building.  So I wasn't able to take anything other

20   than, you know, a few personal items.  I was escorted

21   by three officers, two from the hearing room.  You

22   know, I sort of expected what they were going to do is

1  what they did.  You know, it wasn't a surprise to me.

2      Q.  The officers that you're referring to are

3  officers of the AFGE; correct?

4      A.  Correct.  I'm talking about NEC members.  And

5  I could tell you who it was.

6      Q.  I'm not asking that question actually.

7          I want to go back to the time that you were

8  claiming that you confronted President Cox about his

9  use of the term --

10     A.  You know, I don't like the word "confronted."

11 Maybe I said that word, but I spoke to President Cox,

12 you know, and --

13     Q.  And what did he say, first of all, to prompt

14 you to say anything at all?

15     A.  He just looked at me and smiled.

16     Q.  Well, what did you say?

17     A.  I told him it was inappropriate for him to be

18 using that term towards me or anybody else because I

19 wasn't his son.  I was nearly as old as he was.

20     Q.  Was this an incident in which he called you

21 "son," or is this an incident in which he called

22 you "boy"?

1      A.   When he called me "son," I'm referring to

2  now.

3           REPORTER MARTIN:   When he called you what?

4           THE WITNESS:   I'm referring to when he called

5  me "son."   He called me "son" on more than one

6  occasion.   He probably called me "son" several times.

7  I would say at least three to five times.

8  BY MR. VIRK:

9      Q.   Okay.

10     A.   And as far as "boy" is concerned, I told him,

11 using sort of street language, I wasn't his boy

12 because it sort of pissed me off, and I wanted him to

13 know that I was pissed off and I didn't appreciate the

14 term "boy" because of the racial animosity and the

15 racial history in this country.

16     Q.   You considered that to be a racially

17 discriminatory remark?

18     A.   Oh, most definitely.

19     Q.   And when was that conversation in which you

20 advised President Cox that he should not call you

21 "boy"?

22     A.   I don't remember what day or year it

1    occurred.  I just know it occurred, and it occurred on

2    more than one occasion.  It was something that he

3    probably had been doing all his life.  He didn't

4    consider it to be out of line, and a lot of the

5    African Americans on that board are very subservient

6    to Cox -- I wasn't one of them -- and they go along

7    with whatever he wants to do, and they go along with

8    the program.

9           They'll probably testify on his behalf,

10   saying he didn't do it, but they know he does it and I

11   know he does it.  I know he did it, and he probably

12   still does it.

13        Q.  Okay.  So if I'm understanding you correctly,

14   President Cox has referred to you or called you "son"

15   and/or referred to you as "boy" on several occasions

16   during the time that you've been a national officer at

17   AFG?

18        A.  That is correct.

19        Q.  And if I'm understanding you correctly, some

20   of those occasions were -- well, let me ask you, were

21   all of those occasions when you were national

22   secretary-treasurer, or were some of those when you

1    were an NVP?

2        A.   I think at least once or twice when I was

3    NVP.  I do also know -- or recall where I was told by

4    a local -- a person within one of our locals who said

5    he was at an event and he was videoed recording it,

6    and that President Cox --

7        Q.   Let me stop you for a second.

8            MS. MORTEN:  Let him answer the question.

9            MS. VIRK:  I want to make sure that I have

10   Mr. Hudson's answer from his own personal knowledge.

11       Q.   Were you at this event?

12       A.   No.  I said I was told.

13       Q.   Okay.  So for right now, I want to stick --

14       A.   Well, let me --

15           MS. MORTEN:  Let him answer his question.

16   Objection.  Let him answer his question.

17           MS. VIRK:  Well, I don't want him to answer

18   his question.

19           MS. MORTEN:  Let him answer your question

20   then.  Objection.  Let him finish his answer.

21           THE WITNESS:  I'd like to finish my answer.

22   BY MS. VIRK:

1      Q.   Okay.  So, Mr. Hudson, I want to make sure.

2   You may get an opportunity to actually describe what

3   you heard someone --

4      A.   No, someone told me.  He told me that they

5   videotaped --

6      Q.   Hold on a second.  There's no question

7   pending.

8      A.   -- at an event calling President Obama a

9   "boy."

10     Q.   But you've never seen that videotape, have

11  you?

12     A.   No.

13     Q.   Okay.  So when you -- you don't have a copy

14  of that videotape, assuming that it even exists, do

15  you?

16     A.   No.

17     Q.   Okay.

18     A.   I think it does exist.  I asked the guy to

19  memorialize the record.

20     Q.   Okay.  I'm sorry.  What did you say?

21     A.   I wanted him to keep a copy of the record.

22     Q.   Who?

1        A.  The person that told me.

2        Q.  And who was that?

3        A.  I didn't give his name.

4        Q.  I'm asking you who was that?

5        A.  No,  I'm not giving his name.  I didn't give

6   his name.

7        Q.  So you're not going to tell us who that was

8   who told you that --

9        A.  He was --

10       Q.  -- such a videotape exists?

11       A.  Yes, that's correct.

12       Q.  Okay.  So --

13       A.  They retaliate against these people.  It's

14  prevalent in the organization.  People are scared to

15  death.

16       Q.  So what other occasions, if any, did you hear

17  President -- and, again, I'm talking about personally

18  witness -- President Cox using the term "boy" or

19  another term that you considered to be racially

20  discriminatory?

21       A.  Well, either it was racial or sexist.

22       Q.  Okay.  Well, I'm only asking about racial --

Page 112

1      A.  And what I saw was him call Jane Nygaard, a

2  former officer of AFG who's now retired, talking about

3  the size of her breasts and making a joke out of it.

4  She was very offended.  She tried to defend herself.

5  And I believe she mentioned it to her husband, and she

6  didn't want them to do anything about it.  That's my

7  recollection from which she told me.  So Cox --

8      Q.  Hold on.  Hold on for one second.  Every time

9  you do this, it's going to prolong the deposition

10  because you need to listen to the question and answer

11  that question.

12          You may want to talk about a whole lot of

13  things, and I'm sure you do, and your counsel may have

14  an opportunity and will have an opportunity to examine

15  you after I'm done.  But I am interested in hearing

16  the answer to my specific questions.

17          And my specific question here is whether,

18  besides the occasions we've talked about, you

19  personally witnessed President Cox use the term "boy"

20  or any other racially -- any other term that you

21  considered to be racially discriminatory.  That is the

22  question that I'm asking.

1    A.   And I think I've answered that question on

2    multiple occasions.  I haven't refused to answer any

3    of your questions.  You've asked me the same question

4    four or five different ways.  I've said I heard him

5    say the word "boy," the word "son" to myself in

6    describing other people of color.  I'm talking about

7    African Americans in particular.

8    Q.   Okay.  Besides the incidents that you have

9    already described, are there any other specific

10   incidents in which you claim that President Cox used

11   the term "boy" or used any other term that you

12   consider to be racially discriminatory?  That is my

13   question.

14   A.   Well, I heard him use the word "girl."

15   Q.   Okay.  Well, I'm talking about racially

16   discriminatory.

17   A.   Well, I consider it to be racially

18   discriminating because he was talking about a 60- or

19   70-year-old black woman, and, you know, that was the

20   term that was used by certain people to keep blacks in

21   their place during the slave era and even afterwards.

22   Q.   And when President Cox used the term, to whom

Page 114

1    did you understand him to be referring?

2            A.   Dorothy James.

3            Q.   And when did that incident take place?

4            A.   I don't know.  I just know he did it.  He was

5    agitated with her about something.

6            Q.   How about a year?

7            A.   I don't know.  I just know it happened.

8            Q.   How about what position you were holding at

9    the time that you claim this took place?

10           A.   I don't know.  I just know it happened.

11           Q.   Okay.  How about the location where you claim

12   that this statement was made?

13           A.   I don't know.  I just know it happened.  I've

14   been in a lot of places with Cox over the years.  So I

15   couldn't tell you if it was in the continuous 48

16   states or Hawaii, Puerto Rico, or somewhere else.  I

17   don't know.

18           Q.   Is there anything else at all about that

19   incident in which you claim that President Cox

20   referred to NVP James as a girl that you can remember

21   sitting here today?

22           A.   No.

Page 115

1         Q.   What was the full statement that
2    President Cox said that made you believe that he was
3    referring to NVP James as a girl?
4         A.   I think she was too friendly with me or
5    something.  I think they had been conspiring to try to
6    do something to me, and I just think he was agitated
7    by her behavior.
8         Q.   And what were the words that he used?
9         A.   "That girl is always doing something."
10   Something to that effect.  I don't remember exactly
11   what -- how he said it or even why he said it.  I just
12   know he --
13        Q.   Or where he said it; right?
14        A.   I just know when Cox gets a little
15   intoxicated, anything that comes up, comes out.  So to
16   get the truth out of him, I need to get him drunk, and
17   then I'll get the full truth.  He's smart otherwise.
18        Q.   And who else was present, if anyone?
19        A.   Just me.
20        Q.   Okay.  Have you ever -- other than that
21   incident and the ones that you've previously testified
22   to, are there any other specific incidents that you

1    can recall in which you claim President Cox used the

2    term "boy" or any other term that you consider to be

3    racially discriminatory?

4         A.   Well, you know, I think he called Nygaard

5    "girl" also, because Nygaard tended to defend me when

6    she felt as though I was being treated indifferent or

7    mistreated.

8         Q.   And what was the context of that incident?

9         A.   I think there may have been -- I think she

10   left the board in 2- -- let me think.  2019.  2017, I

11   think, is when she left as an officer.  So -- and I

12   think she came on the board in 2013 -- I mean 2003.  I

13   correct myself.  2003.  I think I got elected one term

14   before her.  And over the course of the years, after

15   she had become -- when she first came on the board she

16   told me that she had heard some things about me, and

17   she wanted to --

18        Q.   Mr. Hudson, I think we're getting a little

19   far afield from the question.

20        A.   Okay.

21        Q.   So besides referring to Jane Nygaard and

22   Dorothy James by the term "girl," which you understood

Page 117

1  to be racially discriminatory; correct?

2      A.  Well, I thought it was most women above 18

3  don't like being called a girl.  Particularly, Jane

4  was like 70 years old or something, and Dorothy is 85.

5  I thought it was a little inappropriate to call these

6  old women, old enough to be my mother, at least

7  Dorothy is.

8      Q.  Okay.  And besides those statements and the

9  other incidents to which you've testified --

10     A.  I think those are enough.  They should have

11  never been said.

12     Q.  My question is are there any other specific

13  incidents in which you claim that President Cox used

14  any term that you believe to be racially derogatory or

15  made a racially derogatory remark?

16     A.  There may have been.  There was a guy that

17  used to work in the building.  I think they terminated

18  his employment.  His name was Derek Davis.  I think

19  that Derek had had some problems, but I'm not really

20  certain.

21     Q.  You did not hear -- you did not witness

22  Cox --

Page 118

1         A.   I think he may have mentioned something to me

2    because we were sort of friendly, and he felt as

3    though a lot of his problems were racially motivated.

4    I didn't agree with him.  I thought some of it was

5    just conduct.  But anyway...

6         Q.   But, again, I'm speaking about what you

7    personally observed or witnessed.

8         A.   No, I never observed him say that --

9         Q.   Okay.  So other than --

10        A.   -- regarding Davis.

11        Q.   Okay.  Other than what you've already

12   testified to, the 20- -- whichever year it was, the

13   CBC dinner, the interactions with you, the reference

14   to Willie Hope, and the references to Ms. Nygaard and

15   Ms. James, are there any other specific incidents in

16   which you claim President Cox used racially

17   discriminatory language --

18        A.   Racially insensitive, racially motivated.

19   Racially -- I can't really say for certain.  It's sort

20   of hard for me to remember everything that has

21   occurred in the last -- you know, I was on the board

22   nearly 20 years.  So I know he was on the board with

1    me probably close to 13 or 14 years.  So it's hard for

2    me to say.

3         Q.  Sitting here today, you don't recall any

4    other specific incidents in which you claim that

5    President Cox used terms or language that you believe

6    to be racially discriminatory other than what you just

7    testified?

8         A.  Asked and answered multiple times.

9         Q.  Other than what you've testified to.

10        A.  Yes.

11        Q.  I want you to go back to Hudson No. 5, which

12   is the interrogatory responses.  Nowhere in these

13   interrogatory responses do you ever say that

14   President Cox referred to you as "boy" or as "son" or

15   any other term that you consider to be racially

16   discriminatory, do you?

17        A.  I don't know.  I have to read the whole

18   thing, but I don't know.

19        Q.  Okay.  We'll go off the record and you can

20   read it.

21        A.  Whether it's in this document or not, he

22   still did it.

                                        Page 124

1        Q.  You're aware, aren't you, that you received a

2    2.48 percent increase -- well, let me put it this way.

3    As national secretary-treasurer, your salary is at a

4    GS-15 level; correct?

5        A.  Yes.

6        Q.  And that's by the constitution.  Isn't that

7    right?

8        A.  And that's what now?

9        Q.  That's under the constitution of AFGE.  Isn't

10   that correct?

11       A.  Yes.

12       Q.  And under the constitution of AFGE, national

13   vice president salaries are set at GS-14.  Isn't that

14   correct?

15       A.  Yes.

16       Q.  And that is a different grade than GS-15,

17   isn't it?

18       A.  The numbers are different, yes.

19       Q.  That's a different grade, isn't it?

20       A.  I said, "yes."

21       Q.  And under GS-15, once you get to a certain

22   level, the salary is capped, isn't it, to Executive

Page 126

1    BY MS. VIRK:

2        Q.  I'm handing you a document that's been marked

3    as Hudson Exhibit No. 7.  On the upper left-hand

4    corner -- it's a two-page document.  On the upper

5    left-hand corner of the first page, it says, "NST

6    EUGENE HUDSON, JR." --

7        A.  Uh-huh.

8        Q.  -- and the title of the document is the

9    "SALARY TABLE" for 2017.

10           MS. MORTEN:  I'm going to object to this

11    exhibit.  I don't know who created it, the genesis of

12    it.  I don't know whether it's authentic.  I'm going

13    to object.

14           MS. VIRK:  Objection is noted.

15           MS. MORTEN:   Okay.

16    BY MS. VIRK:

17        Q.  Mr. Hudson, if you look at the first page of

18    this, the one that has your name in the upper

19    left-hand corner --

20        A.  Uh-huh.

21        Q.  -- you were a -- and go down to the GS-15

22    line.

1     A.  Yes.

2     Q.  Do you see little asterisks starting at

3  Step 8 and then Step 9 and Step 10?

4     A.  Yes.

5     Q.  And the asterisk means that the weight for

6  those steps at GS-15, Step 8, Step 9, Step 10 is

7  limited to the rate for Executive Level IV, doesn't

8  it?

9     A.  Yes.

10     Q.  And in fact -- that cap is $161,900 per

11  annum; correct?  That's what's shown at Step 8,

12  Step 9, and Step 10 because of application of the cap

13  of the Executive Level IV; correct?

14     A.  Yes.

15     Q.  And you in fact received, in 2017, a salary

16  increase that got you to $161,900.18 a year.  Isn't

17  that correct?

18     A.  Yes.

19     Q.  That was the maximum amount allowed for a

20  GS-15, Step 8, Step 9, or Step 10.  Isn't that

21  correct?

22     A.  Pursuant to the general schedule pay, that's

Page 128

1    correct.  However, that wasn't the scale that AFGE was

2    using for Cox or Flynn.

3        Q.  Well, we've already established that Flynn,

4    as national vice president, was a GS-14.  Isn't that

5    correct?

6        A.  Yes.

7        Q.  And President Cox was at Executive Level IV

8    with the locality pay.  Isn't that correct?

9        A.  I don't know about --

10        MS. MORTEN:  Objection.  Sorry.  Where is

11    President Cox's scale?

12        MS. VIRK:  Your question is not well taken,

13    Ms. Morten.  I'm asking your witness a question, and

14    you are interrupting and obstructing.  If your witness

15    does not know the answer, he can tell me.  But you and

16    whether you are confused about the question or you

17    don't understand the question is not an objectionable

18    basis.

19        MS. MORTEN:  I am objecting.  I have already

20    objected to this exhibit for the record.  It is a

21    partial exhibit.  You're questioning him about this

22    exhibit, but yet, you're referring to a pay schedule

1  sir?

2       A.  Whatever committees it shows me being

3  assigned to is -- I was assigned to.

4       Q.  And, again, looking at Hudson Exhibit 11, if

5  that helps to refresh your recollection, did you have

6  any conversations with President Cox as to why he was

7  abolishing the NAF/AAFES committee?

8       A.  Yes.

9       Q.  Okay.  And what was the substance of those

10  conversations?

11       A.  "I'm the president and the CEO, and I do what

12  I want to do."

13       Q.  Did he provide you with any reason as to why

14  he had chosen to abolish the NAF/AAFES committee?

15       A.  He never said anything other than he was the

16  president and it was his prerogative, and he felt like

17  he wanted to do that.

18       Q.  And did he provide you with any reason as to

19  why he'd established an information

20  technology/information services committee and named

21  you as the chair of that committee?

22       A.  Because I requested there be a committee such

1    as the information services committee.  And I was the

2    supervisor of the information services department

3    until he took it away as punitive punishment for me

4    not agreeing with some of his outrageous -- just his

5    outrageous behavior.

6        Q.  What "outrageous behavior" are you referring

7    to?

8        A.  "I'm the president.  It's my prerogative.

9    I'm the CEO.  I don't have to answer any of your

10   questions.  I just do what I want to do."

11       Q.  Are there specific behaviors that you

12   disagreed with with respect to President Cox that you

13   believed led to him taking away the information

14   services component?

15       A.  There was an event -- well, it was a holiday

16   or something, and AFGE would release their stuff for

17   half a day.  Like if it was, let's say, Thanksgiving,

18   usually -- Thanksgiving is on a Thursday.  That Friday

19   they'd probably get the whole day or half a day off.

20   I was new to the -- as a general 1 or 3, and Cox nor

21   Augusta was there.  I don't know if it was

22   Thanksgiving.  I'm just using that as an example.  It

Page 168

1    BY MS. VIRK:

2        Q.  Well, the general counsel's office does

3    report and did at this time report directly to the

4    president; correct?

5        A.  Yes.  They always have, to my knowledge.

6        Q.  And, again, sticking with the human resources

7    portion of this memo, other than what's written in

8    here, are there any additional reasons or information

9    that President Cox gave to you about why he was

10   revoking the delegation of authority over human

11   resources and returning it to the president?

12       A.  I asked him a bunch of questions because if I

13   recall correctly, he and David Borer came to my office

14   unannounced and asked me to come to the conference

15   room.  There used to be a conference room right next

16   to the NST suite.  I went into the room, and Cox and

17   Borer started basically telling me what they were

18   going to do and why they were going to do it.  And I

19   just felt as though it was totally out of line for

20   them to sort of like come in there and start bashing

21   me.  That was my impression.

22       Q.  And that conversation, to your recollection,

Page 169

1    it took place before this memo or was it after this

2    memo?

3        A.  If I recall correctly, they came into -- they

4    came and got me out of my office.  Went to the

5    conference room, or somebody came and asked me to go

6    to the conference room.  It might have been one on my

7    staff who worked in my suite.  There was a reception

8    area, and they may have told the reception.  But I

9    sort of remember David Borer came to my door and asked

10   me to come into the conference room.

11            And they gave me the memo and I started

12   reading it, and then they started telling me -- I

13   started asking questions, and that's when Cox started

14   telling me.  He was very matter of fact.  "This is

15   what we're going to do, and we're going to do it right

16   away."  And started telling me about why he wanted to

17   do it.

18       Q.  And what did he say about that?

19       A.  That it would function better under him, that

20   people have been complaining about the slow processing

21   of personnel actions and things that he was the root

22   cause of.  He was unorganized, would hire a bunch of

1   people under what he called "Big Enough to Win," which

2   was a failure from Day 1.  I tried to tell him that we

3   were spending too much money on Big Enough to Win.  It

4   didn't make any difference to Cox because this was his

5   vision.  So, anyway, I think it was just punishment

6   for me not being one of his supporters about his Big

7   Enough to Win.

8       Q.  Your Complaint also claims that Cox

9   transferred the supervision of the information

10  services department from the NST to the president's

11  office.  This same memo, Hudson No. 13, is the memo by

12  which that transfer was communicated to you; is that

13  correct?

14      A.  I believe so.

15      Q.  Okay.  And in the conversation that you've

16  described that took place in the conference room when

17  you were handed the memo with President Cox and the

18  general counsel there, did that conversation address

19  information services?  I'm not asking you for the

20  content for the moment.  I just want to know did it

21  address the information services transfer as well?

22      A.  The memo says information services and the HR

Page 171

 1    department.

 2        Q.  Yes.  So I'm asking did the conversation that

 3    occurred when this memo was --

 4        A.  I most certainly brought up the information

 5    services and the HR because I was pissed.

 6        Q.  And what reasons were provided by

 7    President Cox in that meeting as to why it is that

 8    information services --

 9        A.  The same reason, that they were working more

10    closely with other departments.  He couldn't even

11    supervise the departments that came under him.  There

12    was a lot of disarray in some of the other

13    departments, particularly the field service education

14    departments.  Morale problems in those departments,

15    and I know some of the stuff was attributed to me by

16    one of his general counsel, but really, he was the one

17    that had the morale problems.

18            But, yeah.  It came up during the

19    conversation.  July 15.  If the date is the same date

20    they gave it to me, it came up during our discussion.

21    But one of the things that had happened with respect

22    to the information services department is that there

Page 172

1    was -- it was not an infusion of millions of dollars.

2    It was something, some reason that the NEC had voted

3    to put money into.  I think it was at a convention

4    action or something, but we had voted some months

5    earlier, and it was the money put in that department.

6           That was my feeling for him transferring the

7    department to his jurisdiction was really because of

8    money.  It wasn't because of anything else because he

9    spends money like water.

10       Q.  And so when he transferred -- your

11   understanding was when he transferred information

12   services under the office of the national president

13   that he would essentially have authority to expend

14   those resources that had been committed to information

15   services?

16       A.  Most definitely.

17       Q.  And, again, in terms of the decision to

18   transfer information services, that was a decision

19   that was made by President Cox; correct?

20       A.  Yes.

21       Q.  If you look back at Hudson Exhibit 3, which

22   is your Complaint, Paragraph 34, Page 5 --

Page 174

1    BY MS. VIRK:

2        Q.  I'm handing you a document, sir, that I've

3    just marked as Hudson Exhibit No. 14.  It's a memo

4    dated August 4, 2016 from President Cox to

5    Ms. Beardsley, the director of finance and information

6    services.

7            Is Hudson Exhibit 14 the memo that is

8    referenced in Paragraph 34 of your Complaint?

9        A.  I believe so.

10       Q.  What was your understanding of the effect of

11   this memorandum, Hudson 14?

12       A.  There is an auditing firm.  I can't remember

13   the auditing firm, but they had made a recommendation

14   in one of our annual reports that we should be

15   consistent with our constitution, and they said that

16   the constitution said that the president approves the

17   expenses and not the national secretary-treasurer.

18   And in order for us to be consistent, they recommended

19   that the national executive council adopt their

20   recommendation.  And that was the genesis as far as I

21   know.

22       Q.  And is that a decision that you believe was

Page 175

1    racially motivated?  Is that what your claim is?

2         A.   I believe that Cox went to them and told them

3    to put it in their report.  He was -- Cox was the

4    national secretary-treasurer prior to me.  It never

5    came up as an issue.  It only came up after I became

6    national secretary-treasurer.  So, yeah, I believe Cox

7    determined that he wanted, along with some of the

8    national vice presidents, to take the jurisdiction

9    away from him because I was pretty -- I required that

10   the officers, the national executive council, provide

11   their data and expenses information in a timely

12   manner.

13        A lot of them had been doing things untimely,

14   and they were wasting a lot of money, and I raised

15   issue with them.  And I think they conspired to take

16   it away from me.  There was a conspiracy against me in

17   the organization because what happened to me never

18   happened to anybody else in the organization.  And

19   because it was less than a year, I don't know why they

20   couldn't wait until the convention and just vote me

21   out.  Probably because they didn't think they could

22   beat me, but that's another story.

1      Q.   Okay.  I'm just trying to unpack your answer

2  there.  National vice president, Everett Kelley, is he

3  one of the people whose expenses you had questioned?

4      A.   George McCubbin, Everett Kelley, Eric Bunn,

5  Mike Kelly.  It was several of them.  The most abusive

6  characters were McCubbin and Kelly, who were both

7  white males.  I'm talking about Mike Kelly.  And

8  Everett Kelley and Eric Bunn had some issues as well

9  as maybe one or two of the rest of them.

10     Q.   It's true, isn't it, that Everett Kelley

11  actually requested that President Cox take over

12  approval of NEC expense vouchers?

13     A.   That's correct.

14     Q.   It was after he made that request that

15  President Cox actually did take over approval of NEC

16  expense vouchers.  Isn't that correct?

17     A.   There was a meeting in Philadelphia right

18  after -- I think they had some kind of futures meeting

19  in Philadelphia.  Maybe a couple of weeks after that

20  meeting, they convened a secret meeting in

21  Philadelphia with, I think, 12 of -- maybe 10 or 11 of

22  the NEC members there.  And Kelley made an accusation

1    that I had alleged -- sorry.  It's just causing me to

2    lose my concentration.

3          But, anyway, Kelley had alleged that I had

4    disclosed some information about his expense vouchers.

5    And so I had prepared a rebuttal to what he had put in

6    his memo.  I presented it to him.  It was only NEC

7    members there.  They went around the table, and they

8    threatened me and told me that unless I changed my

9    behavior, I wouldn't be there much longer.

10         Q.  The "Kelley" that you're referring to there,

11   that's Everett Kelley?

12         A.  Everett Kelley, the current

13   secretary-treasurer.  National secretary-treasurer.

14         Q.  So Mr. Everett Kelley has now been elected in

15   your old position of national secretary-treasurer; is

16   that correct?

17         A.  I just said that he's the current national

18   secretary-treasurer.

19         But, anyway, Kelley had made these

20   allegations that I had put his business out to some of

21   the people in his district.  So they convened a

22   meeting at Kelley's request, and they sent a memo to

1    the national executive council.  And then so McCubbin

2    and a few of them chimed in on the E-mail saying,

3    "Yeah, I need to meet with you guys too because Hudson

4    is out of control," or whatever they said, "and we

5    need to have this meeting."

6            So they convened the meeting.  We get to

7    Philadelphia.  I present my evidence, and after I

8    present my evidence, Kelley says, "Well, now that

9    we've had this talk, there's no need for us to go

10   further with the investigation."  He had demanded an

11   investigation.  So when I presented my documentation

12   to him, all of a sudden he didn't want to do the

13   investigation anymore.

14           So I wrote a memo via E-mail to General

15   Counsel Borer and the NEC requesting and demanding

16   that they go forward with this investigation that

17   Kelley had demanded, and which they had convened this

18   meeting in Philadelphia to address.  And then all of a

19   sudden they didn't want to do it anymore.

20       Q.  So what would have been the point of going

21   forward with the investigation?  I guess I'm losing

22   the thread there.

1      A.   The purpose would have been to prove that

2  Kelley was a liar, and what he had said was not true.

3  And he didn't want to go forward with it because the

4  documents I presented to them pretty much showed that

5  he had misrepresented what had occurred.  He accused

6  me of providing information to people in his district

7  to undermine him and to adversely affect his ability

8  to get re-elected or something to that effect.

9           I said it wasn't true.  I could prove it

10  wasn't true.  I demanded that they do an

11  investigation -- go forward with the investigation.

12  Kelley came -- I reiterated the fact that I -- after

13  Kelley said, "Well, there's no need to do it because

14  we addressed it," I reiterated the fact that I thought

15  the investigation needed to go forward.  Kelly wrote

16  back saying he reiterated saying he was the initiator

17  of the investigation, that he no longer wanted it, and

18  because he didn't want it anymore, that he should not

19  go forward.

20           So President Cox said since Kelley was the

21  one that initiated it and he didn't want to go forward

22  anymore, we wasn't going to go forward anymore.  And

Page 180

1   that goes to my relationship with Cox.  Technically,

2   based on our constitution, I was the second highest

3   ranking officer in the organization.  Allegations had

4   been made against me.  I go to the president and the

5   rest of the board, I send everybody a copy, saying,

6   "Well, let's just go ahead and investigate this since

7   he demanded that we do this investigation.  He

8   demanded that we had this meeting.  So let's just get

9   to the root of it."

10         So the general counsel and J. David said,

11  "No, we're not going to investigate it anymore.  Let's

12  just move on."  I could have cleared my name.  My

13  staff was very upset because it implied that the staff

14  had somehow released confidential information.  The

15  director was upset.  Some of the managers in the

16  office was upset.  My executive assistant was upset.

17  They didn't like it, the implication that somehow they

18  had been releasing confidential information to people

19  who had no need to know.

20         And Cox nor Kelley or any of the rest of that

21  board wanted to get to the bottom of it because it was

22  sort of like a punitive.  You know, they brought me

Page 181

1    there to put me in check and to tell me how bad I had

2    been, and then when it turns out that the evidence

3    showed that I hadn't done much of the stuff that they

4    said I had done.  It was a personality thing, and I

5    wasn't a team player.  I didn't go along with the

6    program simply because the president said he wanted

7    something done.

8          If I didn't agree with it, I would say I

9    didn't agree with it.  Most of the votes around the

10   board, if you look at them historically, if the

11   president presented it, most of the board would go

12   along with it.  Not always me.  I agree with a lot of

13   stuff, but a lot of stuff, if I didn't agree with it,

14   I would just tell them.  I would tell them why.

15        Q.  All right.

16        A.  And, additionally, with respect to the report

17   from the -- I think they were called Caliber.  I just

18   remembered the name.  Caliber Auditing Firm or company

19   or something.  There were other recommendations that

20   they had made also.  We never enforced any of the rest

21   of the recommendations or made any changes based upon

22   the other recommendations.

1          We only selected the one that affected me,

2    but there are other recommendations that had been

3    presented in previous years in their report that Cox

4    nor -- ever made any changes or enforced it.  So I'm

5    like why did they do that one?  Because they didn't

6    want me saying -- like McCubbin used to travel all

7    over the country, just zigzagging the country, get his

8    vouchers -- they're required to file their vouchers

9    within 30 days.  He would not do his vouchers for

10   five, six months at a time.

11        Q.  You suspended his credit card because of

12   that?

13        A.  I suspended his credit card for like two

14   days.  But I sent him memos and met with him on two or

15   three different occasions.  I was his predecessor.  I

16   helped him to get elected.  I helped a lot of them,

17   actually.  But anyway, he got very upset, started

18   making allegations.  I remember we were in Atlanta,

19   and he was telling me about something I had done, and

20   I remember Benny Bridges telling him, "No, you didn't

21   do that.  That was not true, George."  He still put it

22   on Facebook and started telling people I did it.

1    So --

2        Q.  Did what?

3        A.  We were having a luncheon, and people had

4    wanted me to pay for it, and I said I wasn't going to

5    do it.  So it was a bunch of NEC members.  We were in

6    Atlanta, Georgia.  So I decided -- I changed my mind.

7    I said, "I'm going to do it."  So anyway, I had people

8    who I saw --

9        Q.  I'm sorry.  You started off saying you

10   weren't going to pay for the lunch, but then you

11   changed your mind and agreed.  And when you say you

12   would pay for it, do you mean you personally or do you

13   mean AFGE?

14       A.  Using my AFGE credit card.

15       Q.  Okay.

16       A.  So the only way they could use my AFGE credit

17   card is that I approve it.  So, yeah, me.

18          So McCubbin started telling people that I

19   invited everybody except for him and his wife, which

20   wasn't true.  I had people call him and call them, the

21   people that were in the hotel, that they saw him.  I

22   said, "Invite the people to come."  I think it might

Page 184

1    have been a Martin Luther King, Jr. event where they

2    celebrate his birthday or something, and it was in

3    Atlanta.  That's his hometown.  Atlanta, Georgia.

4            And, anyway, McCubbin started telling people

5    that I didn't invite him.  He actually put it on

6    Facebook, and it turns out that the reason he wasn't

7    invited is because he was staying at another hotel.

8    And the reason that he was staying at another hotel is

9    because prior to him becoming an officer of AFGE, he

10   was getting points from another -- the hotel we were

11   staying at, he didn't get points.  He had a long,

12   established history of staying at some hotel.  I don't

13   know what chain it was, but it wasn't -- I think we

14   were at the Hilton or Marriott or something.

15           But whatever hotel it was, it wasn't the

16   hotel where he got his points.  So he was staying at a

17   different hotel.  So when we reached out to the

18   people, nobody knew he was staying at another hotel.

19   So we had the luncheon.  So he confronts me later on

20   that day, saying, "You didn't invite me and my wife to

21   the luncheon, but you invited everybody else."

22           I'm like, "Well, that's not true.  I didn't

1    call anybody.  I just told people as I saw them, and I

2    asked them to tell other people if they saw them."  So

3    these were the kind of things that were happening with

4    me and some of the NEC members because I'm not the

5    most -- I won't say that I go out of my way to not get

6    along with people, but it was my job.

7          They want to be a fraternity or something.

8    I'm like it's all good for us to get along as long as

9    we're doing the members' work, but when you start

10   spending money crisscrossing the country, like I was

11   his predecessor, as I mentioned in California.  Ron

12   was never a part of our district.  He went out and

13   went to Swanke and said, "I want Guam."  Went to Guam

14   and recruited four or five members so he could get the

15   per diem.

16         And the word in his district -- or in our

17   district was that he was trying to buy a house, and he

18   needed to raise $30,000, and guess what?  His voucher

19   came out to about $30,000.

20         Q.  So you're claiming that George McCubbin stole

21   money from -- to buy a house?

22         A.  No.  I didn't claim he stole anything.  I

Page 186

1    never said that.

2         Q.  It sounded like you just did though.

3              MS. MORTEN:  Objection.  He did not say,

4    "stole."  He did not use the term "stole."

5              THE WITNESS:  I said he was traveling.  I

6    said he went to Mr. Swanke, asked for the -- the Guam

7    territory, which is thousands of miles from the

8    mainland, and it's a different per diem rate because

9    it's outside of the continental USA, in order to get

10   the per diem.  He was required to file his vouchers

11   within 30 days.  McCubbin would file his vouchers

12   five, six, seven, eight months after the fact.

13              I went to the president and told him what was

14   happening.  The president wasn't -- apparently he

15   wasn't concerned about it.  He never did anything

16   about it.  I asked him to assist me with trying to get

17   them to comply with the constitution, but no, he

18   wanted them to be on his side.  So like I said, he

19   threw money at them in order to try to encourage them

20   to be supportive of his position.

21              So it was -- these guys were not doing what

22   they were supposed to do.  The same thing with Kelley

Page 187

 1   and some of the other guys.  Kelley --

 2   BY MS. VIRK:

 3        Q.  The Kelley, again you're referring to is

 4   Everett Kelley?

 5        A.  Everett Kelley.  Kelley and Bunn went to

 6   Puerto Rico, said they were going there for some kind

 7   of site visit.  Site visit generally are visits where

 8   we're invited, when we express interest in a hotel,

 9   and the hotel says, "Well, okay.  Come to us, and

10   we'll give you a complimentary room and we'll give you

11   a meal or something so that you can view our

12   premises."

13            Well, in this particular instance, these guys

14   paid for all the expenses including the hotel

15   personnel who was going to show them the premises, and

16   they were talking about having a -- what they call --

17   what do they call that?  For lack of a better term, I

18   call it multi district.  I think they call it

19   something else.

20        Q.  What is that?

21        A.  That's when more than one district, several

22   districts come together.  Several districts come

1   together, and they'll do a joint training.

2       Q.  So it's a training that's conducted on behalf

3   of members in multiple districts.  Is that --

4       A.  I guess that would be --

5       Q.  I'm just trying to understand --

6       A.  Yeah, that's correct.  So they were having a

7   training in Puerto Rico.  So a week before the

8   Puerto Rico training, they went to the Virgin Islands,

9   which the accommodations at the Virgin Islands could

10  not have accommodated the number of districts that

11  they normally have at that regional training.  I think

12  they called it PORT training.  P-O-R-T.  The PORT

13  stands for something.

14      Q.  It's an acronym?

15      A.  Yeah, it's an acronym.

16      Q.  Do you question why they were going to the

17  Virgin Islands?

18      A.  No, I didn't question why they were going.  I

19  questioned their expenditures on some items that they

20  purchased while they were over there.

21      Q.  This is, again, just so I'm keeping my people

22  straight here, this is Eric Bunn from the national

Page 189

1   capital area district; right?

2       A.  Correct.

3       Q.  And Everett Kelley from District --

4       A.  5.

5       Q.  -- 5?  Okay.

6       A.  So they went over there with their spouses

7   and with some staff.  They spent a whole bunch of

8   money, and the CPAs in my department said, and my

9   executive assistant, "We bounced their vouchers back"

10  because according to the CPAs any time you spend more

11  than $25 on an employee, it has to count as income.

12      Q.  You mean $25 on an employee gift.  Is that

13  what you mean?

14      A.  Employee gift.  So what they had spent was

15  closer to $200 or something.  So we needed the names

16  of the individuals that he had purchased these gifts

17  for, both of them.  He started telling people that I

18  didn't -- never asked him about it, but we had

19  documentation showing that I did because I didn't

20  write the memo.  It was written by the CPAs and by the

21  executive assistant.  I just signed them, asking him

22  for the information.

1          He started telling people that I was

2     harassing him and all this nonsensical stuff.  I knew

3     he wanted to be secretary-treasurer.  He wanted to be

4     president because in 2012, after the convention was

5     over, I had just become secretary-treasurer, he told

6     me not to get too comfortable because he was going to

7     run for president in 2018 --

8          Q.  The "he" we're referring to here is

9     Mr. Kelley?

10         A.  Everett Kelly.  Everett Kelley.

11         Q.  And that he and J. David had reached an

12    agreement and that J. David had said he was only going

13    to be president for six years.  And it was witnessed

14    by several people at the convention.  I was surprised.

15    I'm like this guy was a pretty new NVP, and he's

16    talking about being president in six years and telling

17    me not to get comfortable.  And I'm the kind of guy

18    that I take on all comers.

19              If you want to run, I don't have a problem

20    with it.  So he was telling people that I had a

21    problem with him, that I thought he was going to run

22    for national secretary-treasurer and that was the

Page 191

1    reason I was going around telling people that he had

2    been wasting money and all this stuff.  I never did

3    it.  I never was intimidated by any of them.  I would

4    run against any of them if I wanted to, any position I

5    wanted to run for.  I didn't care who encumbered the

6    position.  I figured it was fair game for anybody who

7    wanted to run as long as they wanted to run.

8              So, anyway, he made all these allegations,

9    and we were asking for the names of the individuals.

10   He would not give us the names.  So we would call his

11   staff.  My staff would call his staff.  And this memo

12   is to back it up, back up what I'm saying.

13             They wouldn't -- they only gave us like two

14   names.  So we were like "Who was the third and fourth

15   person."  Then we got a third name.  So it happened to

16   be there's a holiday or some kind of clerical day

17   where they call it "clerical appreciation day" or

18   something.  And so he said that he had bought his

19   clerical staff some gifts, and he brought it back to

20   us.  So he gave us like three names or something.

21   Tracy was his secretary.

22             And so while we were at this training in

Page 192

1    Philadelphia, Ward Vinnick, who was one of my

2    subordinate managers, contacted Faye Beardsley, who

3    was the director of finance, and said, "Since NST

4    Hudson is in Philadelphia with Mr. Kelley, maybe we

5    could get the other name of this individual who he

6    bought the gift for."

7         So I went to Kelley and told him I needed to

8    talk to him.  Augusta was at the table when I told him

9    that because they had invited me over.

10        Q.  This is all before your expense authority is

11   curtailed as part of the memo?

12        A.  This is the reason that Kelley wrote the memo

13   leading up to my expense voucher.  I mean my expense

14   approval being removed.  And so I told him I needed to

15   speak with him about it, and I told him why.  He got

16   very agitated and started telling me how I was

17   harassing him and was it because he was going to run

18   for secretary-treasurer, or it was a rumor, and that

19   he wasn't really interested in running, but this was

20   the rumor.  I knew he was lying.  He's a big liar.

21   But anyway --

22        Q.  You knew he was lying because you knew that

Page 193

1    he wanted to run; is that right?

2        A.  Oh, yeah.  Yeah.  These positions -- you

3    know, Cox wanted to be president when Gage was

4    president.  He wanted to move up.  And prior to that

5    Bobby -- so it's just sort of like an ascension.

6    Probably Kelley would be the next favorite person to

7    become president of AFGE because of his position.

8            Anyway, Kelley was telling people at this

9    training in Philadelphia that -- and he told Cheryl

10   Illiano because she wanted to know why I was talking

11   to Kelley because they were good friends, and why I

12   was --

13       Q.  "They" meaning Ms. Illiano and Everett Kelley

14   are good friends?

15       A.  And Everett Kelley.  So I told Kelley I

16   wanted him to speak to Faye and Arla because maybe I

17   wasn't being clear as to why we needed the names of

18   the individuals who had been given gifts exceeding $25

19   in value.  "Individuals" meaning staff.

20           Well, he told me he didn't remember and that

21   he told me that we were harassing him.  And he said it

22   in front of Faye and Arla.  Arla and Faye both ducked

Page 194

1    their head down because the staff don't like getting

2    mixed up between officers, and they made it clear to

3    me they weren't comfortable getting caught between

4    officers because you never know who's going to be your

5    boss.  As it turns out, Kelley ends up being their

6    boss.  So they didn't want to get in the middle of it.

7              Anyway, as Kelley was leaving, I said, "Well,

8    Kelley, you can either give me the name, or I'm going

9    to take the money out of my voucher."  He got angry.

10             "You're not taking nothing out of my

11   vouchers."

12             So I said, "Well, you know, watch."  They

13   know me.  They know I wasn't going to back down.  I

14   didn't care if I was outnumbered 13 to 1 or 15 to 1.

15   It wasn't going to change my mind if I was right, and

16   it was the members' money.

17             So as he was getting ready to leave out the

18   door, just the four of us, he tells me, "Oh, I

19   remember."

20        Q.   Sorry.  "Four of us" meaning?

21        A.   Faye Beardsley, Arla Johnson, Arla Bentley.

22        Q.   You, and Everett Kelley?

Page 195

1      A.   Me, Everett Kelley, Faye Beardsley.  I think

2  Arla may have been married by then.  She was married

3  during my first term, I think.  Maybe the second term,

4  but she was married to a guy named Bentley.  So her

5  name changed from Johnson to Bentley.

6           So we're in the room and we were getting

7  ready to leave, and I told him, "I'm taking the money

8  out of the expenses.  You need to give me a name or

9  the money is coming out."

10          He got angry, said, "You're not taking

11  nothing out of my damn voucher.  I'll go to Cox."

12          I said, "We can go to whoever you want to.

13  I'm taking it."

14          So as we were leaving the room, he says, "Oh,

15  I remember who it was."  The person who he remembered

16  it was was not a clerical.  It was a lawyer.  Her name

17  is Chaniel something -- I forgot her first name.  A

18  young women half his age, which didn't matter to me.

19  Men and women mess around all the time.  I didn't care

20  nothing about that kind of stuff.

21      Q.   So you're suggesting they had an intimate

22  relationship?

Page 196

1      A.  Well, that was the implication because he had

2  told people that I had been putting rumors out about

3  him that almost caused him to be divorced.  I was

4  like, "This rumor is in your district long before

5  then."  I never -- and plus, I never said anything

6  about it one way or the other, but the woman was out

7  there.

8      Q.  You believed it though; right?

9      A.  No, I didn't believe it.  I mean whether I

10  believed it or not was not important to me.  I just

11  needed the vouchers because the vouchers came under my

12  jurisdiction, and I was intent on doing my job.  The

13  HR people, the people in the building, the people in

14  my office, and the people in finance knew that if I

15  asked them to do something, they better have a good

16  reason why they didn't do it because I wasn't one -- I

17  like getting along with people, but I more like for

18  them to do their jobs than anything else.

19      Q.  So the fact that you just mentioned that she

20  was half his age --

21      A.  Because that came up as an issue.  People

22  were telling me, this woman that was over there with

 1   him -- and she happened to be in the Virgin Islands

 2   with him.  And there was another person with the same

 3   last -- surname as her name that I found out later on.

 4   But when he tells me who the person was, he calls her

 5   on the telephone, gives me -- he tells her to tell

 6   me -- now, he didn't put it on speaker.  He tells her

 7   to tell me that she was the fourth whatever.  I think

 8   we had three or four names.  We needed one more name,

 9   that she was the other person in the Virgin Islands

10   along with him and that he had given her this jewelry,

11   and he wanted her to give me a memo.  Now, he didn't

12   go through his secretary.

13        Now, the fact that Kelley had had three or

14   four previous secretaries who had -- I don't know if

15   there was a settlement or anything, but I knew there

16   was some bad blood with these secretaries that worked

17   for him because one of them told me that he had

18   treated her badly and that she was a person of mixed

19   race.  I think she was African American and white.  I

20   think her name was -- I forgot her name.  But she

21   considered herself to be white.  She didn't consider

22   the black side of her.

1       But in any case, Chaniel gets on the phone

2   and tells me, "Well, I am the other person that

3   Mr. Kelley gave the gift to."

4       And I said, "Cool."  He told her to send me a

5   memo.  It didn't go through his office.  It bypassed

6   his office and came directly to me.  I forwarded the

7   memo to Faye, who was the director of finance, and to

8   Arla.  They gave it to Roy so we could close out those

9   expense vouchers.

10      Q.  So you got the information that you --

11      A.  I got the information months or weeks after

12  the fact, but he pretended as though -- it was some

13  kind of ploy to undermine me so he could run for

14  office or something.  It was a way of tearing me down.

15  But I mean I could fight, but I can't fight everybody.

16  It just was an impossible situation.

17      But in any case, the record will clearly

18  show, if it ever comes up in some kind of legal

19  proceeding, that the dude lied, and I could prove he

20  lied.  He knows he lied.  So I never -- when Kelley

21  made those requests to get stuff removed from me, it's

22  because I wouldn't -- he could come to me.  He was an

Page 199

1    African American guy too.

2            They can't come to me and dab and hand shake

3    and pet me on the rump and say, "You know, we're

4    brothers, and let me have this," or "I'll take care of

5    it later."  That ain't the way they operate.  Race,

6    gender does not matter to me.  Everybody gets treated

7    the same.

8        Q.  Well, he didn't do that, did he?

9        A.  Yeah.  He wanted me to basically just accept

10   his vouchers the way that they were.

11       Q.  But he told you, "I feel like you should

12   accept them because we're brothers"?

13       A.  He told me he felt like I should accept him

14   because of who he was.  He's also a minister, and his

15   religious beliefs are -- you know, we have Jewish

16   people and people who have different -- you know, Arab

17   type people.  All different types of Indian, all

18   different types of people who worked in AFGE, and they

19   all got different beliefs.  So I don't believe one

20   religion is any better than another one, and because

21   he was black didn't give me any incentive to give him

22   any exception.

Page 200

1        So it was definitely retaliation, and that's

2    when they wouldn't let the investigation go forward

3    because the guy lied, and he's the one -- he would go

4    to Cox and brown nose Cox and try to get along with

5    him, but that wasn't me.  And it's still not me.  I

6    mean it really messed me up, but, you know, I sleep

7    pretty good every night.

8             MS. VIRK:  We're going to take a quick break

9    I think.

10            MS. MORTEN:  How much longer do you think

11   this is going to go?

12            MS. VIRK:  I don't know.  That's one of the

13   reasons for the break.

14            THE VIDEOGRAPHER:  The time is 2:39 p.m.

15            THE WITNESS:  Can I ask a question?

16            MS. VIRK:  Off the record.

17            (Brief discussion held off the record.)

18            THE VIDEOGRAPHER:  The time is 2:40 p.m.

19   This ends Unit No. 3.  We're off the record.

20            (A recess was taken from 2:40 p.m.

21            to 2:55 p.m.)

22            THE VIDEOGRAPHER:  The time is 2:55 p.m.

1    position to," and I probably told it to Jan and

2    probably told it to Arla too.  "I'm going to offer the

3    position to Eric, but he's not going to accept the

4    position."

5            And they were like, "Well, how can you be so

6    sure?"

7            "It's human nature.  I'm an old man.  I've

8    been around, and I know this guy is not going to

9    accept it."

10           So he didn't accept it, like I predicted.

11    Offered the position to Willie who was already a CPA,

12    which is part of what -- Eric didn't have those

13    credentials, but I knew he could be trained and he

14    could be -- maybe be beneficial other than Eric.  Eric

15    was a good trainer, but he just didn't have the

16    education like Willie did.

17           So once Willie accepted the position, I told

18    him that everybody else had been hired at 14, and I

19    expected that eventually he would become a 13 and then

20    a 14.  And then once I offered him the position, Cox

21    changed it, made it a 13 and told me he wasn't going

22    to -- he started telling me about something that

Page 207

1    happened in 2012.  I'm talking about Cox now.

2         He started telling me about that he had

3    wanted me to -- one of those two positions, executive

4    assistant or special assistant, to be a 14 because I

5    think when Sandy Williams, who was the predecessor to

6    me being there, being in that special assistant

7    position, I think she was a 13.  She's an African

8    American women.  And anyway --

9         Q.  She was in a special assistant position?

10        A.  Yes, she was.

11        Q.  Okay.

12        A.  And she had been a 13.  So I wanted to offer

13   Arla and Yvonne both 14.  Arla had a Ph.D.  Yvonne

14   didn't.  Yvonne didn't have a formal education that

15   Arla did.  So J. David had wanted me to leave one of

16   the positions at 13.  I told him, "Cool."  You know, I

17   told him, "Okay.  That's fine."  But then subsequently

18   I changed my mind.  I went to the board, told the

19   board what I wanted to do --

20        Q.  When you say, "the board," who do you mean?

21        A.  The national executive council.  They voted

22   to give that position a 14.  This was different.  NEC

Page 208

1    members then were the ones who removed me from office.

2        Q.   And what time period are we talking about

3    here?

4        A.   Probably 2012, 2013 time frame.

5        Q.   So it was a 13, and then you agreed that one

6    of them could be a 13 and one could be a 14, but then

7    you changed your mind and went to the NEC.  And what

8    happened?

9        A.   And both became 14s.

10           So when Cox decided to revert the position

11   back to a 13, he said, "Well, you agree that one of

12   the two positions would be a 13."

13       Q.   That was true?

14       A.   Yeah, it was true.  But I also told him I

15   changed my mind.  And I went to the board, and the

16   president presides over the board meetings and when

17   the vote was taken, he was presiding over a meeting.

18   So he knew that that had been changed some years

19   earlier.  So if he wanted to revert it back to the way

20   he thought it should be, he should have done a formal

21   process, which he didn't do.

22           He just unilaterally violated the

Page 342

1                    C E R T I F I C A T E

2          I do hereby certify that the aforesaid testimony

3     was taken before me, pursuant to notice, at the time

4     and place indicated; that said deponent was by me duly

5     sworn to tell the truth, the whole truth, and nothing

6     but the truth; that the testimony of said deponent was

7     correctly recorded in machine shorthand by me and

8     thereafter transcribed under my supervision with

9     computer-aided transcription; that the deposition is a

10    true and correct record of the testimony given by the

11    witness; and that I am neither of counsel nor kin to

12    any party in said action, nor interested in the

13    outcome thereof.

14

15    _____

      Nancy J. Martin, RMR, CSR

16

17    Dated:  March 24, 2019

18

19    (The foregoing certification of this transcript does

20    not apply to any reproduction of the same by any

21    means, unless under the direct control and/or

22    supervision of the certifying shorthand reporter.)

# Roth Decl. Exhibit 2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EUGENE HUDSON, JR.,                    )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )        Civil Action No. 17-2094 -JEB
                                       )
AMERICAN FEDERATION OF                 )
GOVERNMENT EMPLOYEES,                  )
                                       )
            Defendant                  )
                                       )
_____)

## PLAINTIFF'S RESPONSES TO
## DEFENDANT'S INTERROGATORIES AND OBJECTIONS

Pursuant to Rule 33 of the Federal Rules of Civil Procedure, Plaintiff Eugene Hudson, Jr.,

hereby submits the following responses and objections to Defendant American Federation of

Government Employees' First Set of Interrogatories.

### GENERAL OBJECTIONS

1.    Plaintiff objects to Defendant's First Set of Interrogatories to the extent that they

call for Plaintiff to produce documents, emails, reports, or other materials that Plaintiff

generated, received or was copied on while he was employed by AFGE that are in the

possession of Defendant because AFGE terminated Plaintiff and escorted him out of his office

on one hour's notice; did not allow him to take with him his AFGE computer or copy any files

from the AFGE computer or any AFGE files or copy any AFGE files.   Plaintiff has served

Defendant with a Request for Production of Documents in order to obtain these documents,

emails, reports and other materials that Plaintiff generated, received or was copied on while he

was employed by AFGE that are in the possession of AFGE; however, to date, AFGE has refused to produce them.

2.    Plaintiff objects to Defendant's First Set of Interrogatories to the extent that they call for information protected by attorney-client privilege, the work product doctrine or any other doctrine, privilege, or protection against disclosure.  No information so protected will be disclosed, and the inadvertent disclosure of protected information shall not be deemed to constitute a waiver of any privilege.

**INTERROGATORY NO. 1:**

You allege that the decision by AFGE President J. David Cox in or around June 2016 to "strip[]" You of Your "supervision of the Information Services and Human Resources Departments" was racially discriminatory. *See* Complaint ¶¶ 24, 46.  Please provide the full factual basis for this allegation, including but not limited to the following information:  (a) the reason(s) for this employment action that You were given or are otherwise aware of; (b) the factual basis for Your allegation that these stated reasons were not the "true reasons, but instead were pretext to hide . . . discriminatory animus and actions"; (c) the identity of any person(s) with personal knowledge concerning this allegation; (d) for each person identified in subsection (c), a description of such personal knowledge; and (e) the identity of any documents relating to this allegation.

**RESPONSE:**

**1(a)    Under the leadership of AFGE President J. David Cox ("Cox"), AFGE has been a racially biased, hostile workplace.  A number of African American AFGE employees have charged Cox with racial discrimination.    Cox has also been charged with sexual harassment.**

2

I understand that Cox entered into a number of Confidential Nondisclosure Agreements ("NDA") with former AFGE employees, consultants and officials without informing the NEC (or myself as NST) in an effort to quietly resolve racial discrimination and sexual harassment charges without informing the general membership.

I submitted a Request for Production of Documents asking AFGE to produce those NDA's.  To date, AFGE refuses to produce them.

I witnessed Cox refer to President Obama as a "boy" and refused to stand when Obama was introduced at the 2015 Annual Congressional Black Caucus dinner to which both Cox and I attended.  I viewed Cox's use of the term "boy" in referring to the nation's first African American President and Cox's refusal to stand as racially discriminatory actions.

During a July 27, 2011 NEC meeting, AFGE President Council 220 Witold Skwierczynski, who is Caucasian, used the "N" word, cursed, threatened and lunged at me in the presence of a number of witnesses.  I filed formal charges, and Witold admitted that he threatened and lunged at me, but he denied using the "N" word.

At the time, I was not yet NST.  The AFGE President was John Gage, and Cox was the NST.  David Borer was AFGE General Counsel, and I was National Vice President ("NVP") for AFGE District 12 in California.

A year later, Gage chose not to run for re-election.  Cox ran for President and was elected. I was elected NST in the same 2012 election.

On February 22, 2013, Cox convened a Committee on Investigations ("COI") to consider my charges filed against Witold.

3

The COI voted by a margin of 2:1 to dismiss all charges against Witold on the grounds that Witold was engaging in free speech (except for the alleged racial remark and physical threat) that was protected under the LMRDA.

Cox did not remove Witold from office, suspend him or even issue a written reprimand. Instead, Cox directed Witold to write a letter of apology to me.

The documents related to Witold's use of the "N" word were previously provided to Defendant as Exhibits in Plaintiff's March 8, 2018 Opposition to Motion to Dismiss.

The charges against Witold Skwierczynski were far more egregious than the single charge filed against me for sending out an email discussing the implications of the Trump election.

Yet, under Cox's leadership, AFGE slapped the wrists of Witold, who is Caucasian, and concluded that Witold's actions toward me constituted "protected free speech".

It is against this backdrop that I assumed my duties as NST in 2012. Immediately upon my election in 2012 Cox excluded me from important meetings, refused to have meetings with me unless other officers requested a meeting and insisted that he be included in those meetings.

Cox's action became more irrational, hostile and pretentious as my term continued. It got worse after I was reelected by acclamation in 2015.

As NST, I was the highest ranking African American official and the only duly elected AFGE official against whom Cox discriminated.

However, Cox, his General Counsel David Borer and other Caucasian AFGE officials exhibited racial bias and discrimination toward the following former AFGE

4

employees:  Janet Crawford, Jocelyn Johnson, Derrick Davis, Bill Fletcher and Pat Randall.

1(b)   Traditionally, four departments have always fallen under the jurisdiction of the AFGE NST – i.  Information Services ("IS") with 12 staff and a budget of approximately $20 million;  ii.  Human Resources )("HR") with four staff and a budget of approximately $200,000;  iii. the Finance Department with 15 or 16 and a budget of approximately $2,000,000; and iv.  the Building Staff and Building Maintenance with three (3) employees and a staff of approximately $2,000,000; and three employees on the NST personal staff with budget of approximately $200,000.  My personal staff consisted of the Executive Assistant to the NST: the Special Assistant to the NST and  the Executive Secretary to the NST for a total of approximately 38 people and a total budget of approximately $25 million annually.

Cox, who identifies as Caucasian, served as NST prior to my election and all four departments fell under his jurisdiction during his tenure.

On July 2016, Cox told me that he had made a unilateral decision to strip me of budgetary authority and staff supervision of IS and HR because those two departments had "interaction with" departments that came under his jurisdiction.

Cox unilaterally cut my staff by 16 from 38 staff to 22 and cut my budget from $25 million annually to approximately $5,000,000.

The reason Cox cited for stripping me of authority over the IT and HR Departments was a pretext to hide his discriminatory animus and actions.

The NST, like the National President are elected positions.  I am African American, and I am the only NST in the history of AFGE who, to my knowledge, has ever been unilaterally stripped of authority over departments without a vote by the full NEC.

I objected to Cox that he did not have authority to unilaterally strip me of my authority over the two departments.

I objected that his recommendation to strip me of my authority over the two departments required a vote of the full National Executive Committee ("NEC") vote.

Cox refused to bring the matter up for a vote.  I filed Article XXIII charges against Cox for taking those departments.  They assigned a COI.  The Chair was Arnold Scott and Eric Young and Mary Jane were on the COI.  I was never interviewed by the COI.

1(c)    All NEC members have personal knowledge about this allegation.

1(d)    NEC Members Jane Nygaard and Dorothy James objected that consideration and/or vote of the entire NEC was required prior to removing the two departments from my authority as the duly elected NST.  Keith Wright, Arla Bentley, Faye Beardsley, and Terrence Johns have personal knowledge about this allegation.

1(e)    I have documents in my files and emails at AFGE that would refresh my recollection in responding to this Interrogatory.  However, AFGE took my files and emails when I was terminated.  AFGE has possession of all these documents.  I submitted a Request for Production of Documents asking AFGE to produce the documents.  To date, AFGE refuses to produce them.

6

**INTERROGATORY NO. 2:**

You allege that AFGE President Cox discriminated against You on the basis of race by, in or around January 2017, "g[iving] himself and Joseph P. Flynn, the NVP for District 4, who is Caucasian American, the full Cost of Living Adjustment [of] 2.88%" while giving You "over [Your] objections" a "2.48% increase." Complaint ¶¶ 26-27, 46.  Please provide the full factual basis for this allegation, including but not limited to the following information:  (a) the reason(s) for this employment action that You were given or are otherwise aware of; (b) the factual basis for Your allegation that these stated reasons were not the "true reasons, but instead were pretext to hide . . . discriminatory animus and actions"; (c) the identity of any person(s) with personal knowledge relating to this allegation; (d) for each person identified in subsection (c), a description of such personal knowledge; and (e) the identity of any documents relating to this allegation.

**RESPONSE:**

**The AFGE Constitution requires that NEC members receive the same pay as the general schedule employees in the federal government, including that they must receive the same Cost of Living Adjustments ("COLA").**

**The NVPs would be GS-14, the NST would be a GS-15 and the National President would be an Executive Level 4.  It is my understanding that in 2017, under federal law, Cox, NVP Joseph Flynn and I should have been capped from receiving the COLA.  All other NEC members were entitled to receive the full COLA under federal law.**

**In January 2017,  Cox gave himself and  Joseph Flynn (both of whom are Caucasian) a COLA of 2.88%, but he capped my COLA at 2.48%.**

7

I was the only NEC member who did not receive the full COLA in 2017. Cox made the decision not to approve the full 2.88% COLA for me, claiming that my position was capped by law. Under federal law, because Cox is President and Executive Level 4, Cox was not entitled to get the COLA. I objected that NVP Flynn's position was also capped by law. Yet, Cox gave Flynn the 2.88% COLA.

This is important because in August 2012, when he first became President, Cox told me he was abolishing the COLA that former President Gage had received because it was illegal.

In approximately 2015, when he was re-elected President he asked the NEC to give him the same COLA (that he had previously stated to me was illegal) retroactive to 2012. After obtaining approval from the NEC, in approximately 2016 Cox gave himself a COLA retroactive to 2012. As a result, Cox received $40,000 in 2016 due to the retroactive COLA payments that included years 2012-2015.

I had received the COLA's I was due up until 2017, but I complained to HR director Keith Wright that I had not been given the full COLA for 2017. In mid-2016 Cox had taken the HR Department away from me, and Wright no longer reported to me. Wright said he would take my COLA complaint to Cox at my request. I never received the full COLA for 2017.

I have documents in my files and emails at AFGE that would refresh my recollection in responding to this Interrogatory. However, AFGE took my files and emails when I was terminated. AFGE has possession of all these documents. I submitted a Request for Production of Documents asking AFGE to produce the documents. To date, AFGE refuses to produce them.

8

**INTERROGATORY NO. 3:**

Please provide the full factual basis for Your allegation that you "objected" to the amount of the cost-of-living-adjustment ("COLA") increase given to You in or around January 2017, as described in Paragraph 27 of the Complaint, including, for each such "objection" alleged, (a) when and by what manner or method You expressed the objection; (b) to whom You expressed the objection; (c) the content of Your alleged objection; (d) the response, if any, to such objection by AFGE (including the content of the response, the person who made the response, the date of the response, and the manner or method in which the response was provided to You); and (e) whether and in what fashion the objection was consistent with the GS-15 wage schedule for the Washington, DC statistical area and AFGE's practice of pegging its salaries to the Office of Personnel Management ("OPM") schedule

**RESPONSE:**

**SEE ANSWER TO NUMBER 2**

**INTERROGATORY NO. 4:**

You allege that You "recommended a promotion for Willie Hope, an African American member of his staff and Special Assistant to the NST," but that "over [Your] objection, [AFGE National President] Cox denied [Your] request for Willie Hope's promotion," and that his denial constituted a racially discriminatory employment action against You. Complaint ¶¶ 28-29, 46. Please provide the full factual basis for this allegation. Specifically, with regard to Your alleged request and President Cox's alleged denial of that request, please provide (a) the position that Willie Hope occupied before You requested his promotion; (b) the position to which You recommended that Willie Hope be promoted; (c) the date on which You made this request; (d) the method or manner by which You made his request; (e) the content of Your request; (f) the

date on which You received a response to Your request; (g) the content of that response, and the method and manner in which it was communicated to You; and (h) AFGE's ultimate personnel action with respect to Willie Hope. With regard to Your allegation that the denial of this request constituted a racially discriminatory act against You, please state (a) the reason(s) for this action that You were given or are otherwise aware of; (b) the factual basis for Your allegation that these stated reasons were not the "true reasons, but instead were pretext to hide . . . discriminatory animus and actions"; (c) the identity of any person(s) with personal knowledge relating to this allegation; (d) for each person identified in subsection (c), a description of such personal knowledge; and (e) the identity of any documents relating to this allegation.

**RESPONSE:**

**NEC voted that the Special Assistant to the NST position would be G-13/14 in 2012 or 2013 approximately.**

**In 2014, I offered the position of Special Assistant to the NST at G-13/14 to Randy Stewart who is Caucasian American. Cox approved my decision and Stewart accepted the position. He resigned after 8-10 months in 2015.**

**In early 2016 I made an offer to Eric Young (who was then the Council President for the Federal Bureau of Prisons) to be my Special Assistant at the pay of G-13 ($120,000) for the first year with eligibility to be promoted to G-14 in the second year. Cox approved the appointment, but Young never accepted the position.**

**There is a memo regarding this matter contained in AFGE's files which I cannot access for the reasons stated above.**

10

When I chose Willie Hope, who is African American, as my Special Assistant, Cox refused to approve the position at the G13/14 level, forcing me to hire Mr. Hope at a G13 due to the urgency of my department needs.

Cox's actions in refusing to approve my recommendation for the same pay scale for Hope that was previously enjoyed by his Caucasian predecessor, Randy Stewart, was another example of Cox's discrimination towards African Americans.

I have documents in my files and emails at AFGE that would refresh my recollection in responding to this Interrogatory. However, AFGE took my files and emails when I was terminated. AFGE has possession of all these documents. I submitted a Request for Production of Documents asking AFGE to produce the documents. To date, AFGE refuses to produce them.

**INTERROGATORY NO. 5:**

You allege that President Cox took away Your "authority to question expenses on the expense vouchers for NEC members," and did so for racially discriminatory reasons. Complaint ¶¶ 34, 46. Please provide the full factual basis for this allegation, including, but not limited to: (a) the reason(s) for this action that You were given or are otherwise aware of; (b) the factual basis for Your allegation that these stated reasons were not the "true reasons, but instead were pretext to hide . . . discriminatory animus and actions"; (c) the identity of any person(s) with personal knowledge relating to this allegation; (d) for each person identified in subsection (c), a description of such personal knowledge; and (e) the identity of any documents relating to this allegation.

11

**RESPONSE:**

I observed a culture of corruption, fiscal malfeasance, sexual harassment and racial discrimination at AFGE under Cox's leadership.

While I have not seen them, it is my understanding that AFGE President Cox, with assistance from General Counsel David Borer (and in some cases outside counsel) entered into Confidential Nondisclosure Agreements with AFGE officials, consultants and employees to settle claims related to corruption , fiscal malfeasance, sexual harassment and discrimination filed against Cox.

The President is the highest position in AFGE.  The NST holds AFGE's second highest position.  The NEC is composed of the President, NST and all National Vice Presidents.

AFGE reimburses NEC members for their reasonable, allowable expenses incurred when they travel on union-related business.

I believe there was a vote many years ago by the NEC to give the responsibility to review expense vouchers submitted by NEC members to the NST and his Finance Department staff to ensure checks and balances.

Cox and his predecessors had this responsibility when they were NST.  I had this authority when I was elected NST in 2012, and I also had this responsibility when I was reelected NST in 2015.

To ensure financial integrity, the NST also had supervisory responsibility over the Human Services and IT Departments' budget and staff.

The Finance Department, under the purview of the NST, would review expenses for officers and the Executive Assistant for the NST would review the expenses and approve

12

the vouchers sign off for the NST and forward them for review to Finance Department official Roy Vinnck's Accounts Payable Division which was composed of about 4 to 5 employees.

Vinnck's staff would review the expenses and make sure they were valid. If Vinnck and his staff had questions regarding the expenses, Vinnck would return them and require the requester to provide additional documentation.

In early 2016 AFGE National Vice Presidents ("NVP") and NEC members Everett Kelley and Eric Bunn took their wives and some of their staff to the Virgin Islands. They each spent over $10,000 on the trip and requested reimbursement.

Once their vouchers were submitted, my staff reviewed the expenses and determined that we needed the names of the staff who received gifts in excess of $25 from both Kelley and Bunn.

Faye Beardsley, Arla Bentley and I met with Kelley at the leadership meeting in Philadelphia in June 2016 to explain that the IRS required a limit of $25 for staff gifts.

Kelley objected, but I insisted. He provided three names. He said he bought the gifts for them for National Secretary's Day. Kelley initially said he could not remember the fourth person. He became agitated, and I told him he had to remember or repay the funds. Kelly then said he remembered that there was a fourth employee who was not a secretary – she was a lawyer. Kelly got her on the phone right then, and I spoke to the employee to clear the matter, and the voucher was paid.

Kelley later falsely accused me of starting the rumor that he had taken his girlfriend to the Virgin Islands and bought her expensive gifts.

13

Kelley wrote a letter to the NEC demanding that he wanted an investigation to be conducted immediately because I was out of control regarding his authority to spend District 5's money.

Kelley demanded a meeting be held as soon as possible and asked that my authority to review vouchers be removed effective immediately.

Cox convened a meeting in Philadelphia on or about July 8, 2016, in which the entire NEC was invited to participate.

During this meeting Kelley was the first to state that the reason he wanted the meeting was to correct my behavior and to make certain that I understood the ramifications of what could happen to me if continued to scrutinize the expenses claimed by NEC members.

Four NEC members did not attend: Joseph Flynn, Mike Kelly, Jane Nygaard and Dorothy James. In an email to NEC members, Jane Nygaard described the meeting in Philadelphia as a "witch hunt" against Hudson.

The attending NEC members surrounded me in the middle of the table and Cox sat directly across from me. They took turns telling me what my flaws were and that they were giving me my final warning.

I had prepared documents disproving NVP Kelley's allegations and confirming that I was following protocol required by the IRS.

After I made my statement and presented my documents, Kelley said he no longer wanted an investigation. I demanded an investigation in writing because Kelley had made false allegations against me and my staff. Cox ruled that there would be no investigation conducted – and no investigation occurred.

14

A short time later Cox sent an email to Finance Director Faye Beardsley, of my staff, stating that from now on he would now be reviewing all NEC vouchers, effective immediately, with the exception of his own.

At  Cox's request, the auditors gave a report to the NEC stating that the Constitution gave the National President the authority to approve expense vouchers.

Although this had never been the practice with my predecessors, at Cox's recommendation the NEC voted to strip me of my authority to review expense vouchers submitted by NEC members.

This occurred around the same time that Cox took away HR and IT from me.  This was a coordinated effort by Cox.  I strongly objected.

I pointed out that NEC had not enforced or acted on other policies that the auditors had pointed out in their reports.  I noted that Cox had, without notice to the NEC or the NST, unilaterally entered into nondisclosure agreements/confidentiality agreements and settlements with terminated AFGE employees.

I pointed out that since I was the second highest ranking AFGE officer and because my signature was required on all of the checks made payable to the terminated employees, I should have been able to review the NDA agreements entered into by Cox before he cut the checks and I signed them.  I raised strong objections, but many of the NEC members would not support me.

Of the 14 NEC members other than myself, two supported me – Dorothy James and Jane Nygaard.  Six definitely held racially discriminatory motives against me; namely, Cox, Swanke, Castellano, Joseph Flynn,  George McCubben and Keith Hill.

Of the remaining six members (five of whom are African American) Cheryl Eliano, Everett Kelly, Eric Bunn, Augusta Thomas, Arnold Scott and Mike Kelly, who is Caucasian, were either over budget or concerned about me questioning their first class travel or their improper purchase of personal items and gifts with union money.

For example, the policy was that NEC members would fly coach at all times. If there was a difference in the cost of first-class travel and coach the member would pay the difference out of their pocket. Everett Kelly often went around me directly to Cox and got him to approve his first class travel expenses.

These six all expressed to me that they disliked the fact that I was implementing cost-saving measures which adversely affected them. McCubben also expressed concern that I was implementing cost-saving measures that adversely affected him.

Cox was aware of these sentiments among the NEC members, and he manipulated them to take adverse actions against me as a means of getting to his end; namely, pushing me out for racially discriminatory reasons.

In 2015, District 14's lease was expiring, and they needed to move. The rent was $250,000 a year in their current location. District 14 has a small staff, so I advised District 14 NVP Eric Bunn, who is African American, that as a cost-saving measure, he should move into the main AFGE headquarters building on North Capitol Street.

Bunn went around me as NST to Cox who subsequently signed the lease approving rent for Bunn to move into a space near the Washington Nationals baseball park for $296,000 a year. All of the rent is paid by the AFGE National except for $20,000 and neither AFGE nor District 14 had the budget to support this move.

Other NST's who are Caucasian introduced cost-saving measures.   However, when I tried to eliminate fiscal waste, Cox harassed and humiliated me by stripping me of two important departments, significantly reducing my staff, taking away my authority to review expense vouchers, overruling my personnel pay and administrative decisions, and denying me the same COLA adjustments routinely given to other NEC members.  These actions by Cox seriously undermined my ability to carry out my constitutional responsibilities as NST.

I have documents in my files and emails at AFGE that would refresh my recollection in responding to this Interrogatory.  However, AFGE took my files and emails when I was terminated.  AFGE has possession of all these documents.  I submitted a Request for Production of Documents asking AFGE to produce the documents.  To date, AFGE refuses to produce them.

**INTERROGATORY NO. 6:**

Your Complaint of racial discrimination contains allegations that You "conducted investigations into improper expenditures by certain AFGE employees, including J. David Cox" as part of Your "constitutional duties" as National Secretary Treasurer, and produced one or more reports concerning those "investigations."  Complaint ¶¶ 30-33.  Please provide the full factual basis for these allegations that Plaintiff conducted an investigation into improper expenditures by J. David Cox, including but not limited to: (a) the date(s) of any such investigation(s); (b) the names of any and all individuals with whom Plaintiff discussed any such investigation; (c) the nature, findings, and conclusions of any such investigation; and (d) any documents, memoranda, or reports produced as a result of such investigation.

**RESPONSE:**

SEE ANSWER TO NUMBER 5.

**INTERROGATORY NO. 7:**

You allege that "in approximately 2016," AFGE President Cox removed You "from all chairmanships," including chairmanship of the Non-appropriated Fund Instrumentalities Committee, and that his decisions in this regard were racially discriminatory. Complaint ¶¶ 35, 46. Please provide the full factual basis for this allegation, including a listing of all chairmanship(s) from which You claim Your removal was racially discriminatory, and, for each such chairmanship, (a) the dates of Your tenure as chairman, (b) a description of Your duties and authority as chairman, (c) the reason(s) for the removal that You were given or are otherwise aware of; (d) the factual basis for Your allegation that these stated reasons were not the true reasons, but instead were pretext to hide discriminatory animus and actions; (e) the identity of any person(s) with personal knowledge relating to Your service as chairman and/or Your removal from the chairmanship; (f) for each person identified in subsection (e), a description of such personal knowledge; and (g) the identity of any documents relating to Your service as chairman and/or Your removal from the chairmanship.

**RESPONSE:**

**During my tenure as NST, as I recall, I asked AFGE President John Gage to create the Non-appropriated Fund Instrumentalities Committee and appoint me as Chair. He did, and I served as Chair of the Committee but I cannot recall the dates.**

**For over a decade under various Presidents, I also served as a member of the Insurance Committee, the Legislative Committee, the DEFCON Committee and the Organizing Committee.**

18

After the 2015 convention Cox refused to appoint me as Chair of Non-appropriated Fund Instrumentalities Committee.  I asked him numerous times to reinstate me as Chairman of the Non-appropriated Fund Instrumentalities Committee.  He never responded.

After removing me as Chair of that Committee, Cox refused to appoint me to any other chairmanships.

I have documents in my files and emails at AFGE that would refresh my recollection in responding to this Interrogatory.  However, AFGE took my files and emails when I was terminated.  AFGE has possession of all these documents.  I submitted a Request for Production of Documents asking AFGE to produce the documents.  To date, AFGE refuses to produce them.

**INTERROGATORY NO. 8:**

You generally allege in Paragraph 2 of the Complaint that "AFGE President J. David Cox and other AFGE officials discriminated against [You] . . . because of [Your] race (African-American)." To the extent that You have not already done so in response to Interrogatories 1 through 7 above, please provide the full factual basis for this allegation, including (a) a listing of any such action(s) you claim are or were racially discriminatory, and (b) for each such action listed, the date, time, and location of the action; a full description of such action, including a description of the adverse consequence(s) You claim to have resulted from such action; the identity of any person(s) with personal knowledge related to such action, and a description of such knowledge; the identity of any person(s) with whom Plaintiff has discussed any such action(s); and the identity of all documents referring or relating in any manner to any such

action(s) or incident(s); and (c) the factual basis for Your allegation that the action was racially discriminatory.

**RESPONSE:**

SEE ANSWERS TO NUMBERS 1-7

**INTERROGATORY NO. 9:**

For each of the following alleged adverse personnel actions claimed by You, please identify all person(s) whom You claim to be "similarly situated" to You with respect to that claim: (a) Your claim that President Cox "strip[ped]" You of "key responsibilities," including oversight of AFGE's Human Resources and Information Systems Departments (Complaint ¶ 24); (b) Your claim that in or around January 2017, President Cox "gave himself and Joseph P. Flynn, the NVP for District 4, who is Caucasian American, the full Cost of Living Adjustment [of] 2.88%" while giving You "over [Your] objections" a "2.48% increase" (Complaint ¶¶ 26-27); (c) Your claim that President Cox denied Your recommendation to promote Willie Hope (Complaint ¶¶ 28-29); (d) Your claim that President Cox took away Your "authority to question expenses on the expense vouchers for NEC members" (Complaint ¶¶ 34); (e) Your claim that AFGE President Cox removed You "from all chairmanships," including chairmanship of the Non-appropriated Fund Instrumentalities Committee (Complaint ¶ 36); and (f) any additional claims of racially discriminatory actions, as identified by You in response to Interrogatory No. 8

**RESPONSE:**

PREVIOUSLY ANSWERED

**INTERROGATORY NO. 10:**

For each of the following alleged adverse personnel actions claimed by You, please provide the full factual basis for Your claim of damages with respect to that claim, including, but

20

not limited to the specific monetary amount being claimed, the identity of any person(s) with
knowledge relating to such damages, and the identity of any and all documents relating to such
damages: (a) Your claim that President Cox "strip[ped]" You of "key responsibilities,"
including oversight of AFGE's Human Resources and Information Systems Departments
(Complaint ¶ 24); (b) Your claim that in or around January 2017, President Cox "gave himself
and Joseph P. Flynn, the NVP for District 4, who is Caucasian American, the full Cost of Living
Adjustment [of] 2.88%" while giving You "over [Your] objections" a "2.48% increase"
(Complaint ¶¶ 26-27); (c) Your claim that President Cox denied Your recommendation to
promote Willie Hope (Complaint ¶¶ 28-29); (d) Your claim that President Cox took away Your
"authority to question expenses on the expense vouchers for NEC members" (Complaint ¶¶ 34);
(e) Your claim that AFGE President Cox removed You "from all chairmanships," including
chairmanship of the Non-appropriated Fund Instrumentalities Committee (Complaint ¶ 35); and
(f) any additional claims of racially discriminatory actions, as identified by You in response to
Interrogatory No. 8.

**RESPONSE:**

PREVIOUSLY ANSWERED

**INTERROGATORY NO. 11:**

State whether, prior to initiating EEOC Charge No. 570-2017-01702, You communicated
to AFGE any report or complaint, whether formal or informal, of racial discrimination with
regard to any of the following alleged adverse personnel actions claimed by You, and, if so,
describe in detail such report or complaint, including but not limited to the date on which such
report or complaint was made, to whom it was made, the manner or method by which it was
made, the content of such report or complaint, and the response by AFGE regarding such report

21

or complaint:  (a) Your claim that President Cox "strip[ped]" You of "key responsibilities," including oversight of AFGE's Human Resources and Information Systems Departments (Complaint ¶ 24); (b) Your claim that in or around January 2017, President Cox "gave himself and Joseph P. Flynn, the NVP for District 4, who is Caucasian American, the full Cost of Living Adjustment [of] 2.88%" while giving You "over [Your] objections" a "2.48% increase" (Complaint ¶¶ 26-27); (c) Your claim that President Cox denied Your recommendation to promote Willie Hope (Complaint ¶¶ 28-29); (d) Your claim  that President Cox took away Your "authority to question expenses on the expense vouchers for NEC members" (Complaint ¶¶ 34); (e) Your claim that AFGE President Cox removed You "from all chairmanships," including chairmanship of the Non-appropriated Fund Instrumentalities Committee (Complaint ¶ 35); and (f) any additional claims of racially discriminatory actions, as identified by You in response to Interrogatory No. 8.

**RESPONSE:**

**In 2016 I went to the U. S. Department of Labor with the intent of filing a formal complaint alleging racial discrimination,  retaliation and general harassment by Cox because of my intent to run for National President.  I met with the Director who told me DOL could not take the complaint because there had not yet been an election and it was premature.  He said if I wanted to file after the 2018 AFGE Convention, that I could.   I did not file the complaint.**

**I have documents in my files and emails at AFGE that would refresh my recollection in responding to this Interrogatory.  However, AFGE took my files and emails when I was terminated.  AFGE has possession of all these documents.   I submitted a Request for**

22

Production of Documents asking AFGE to produce the documents.  To date, AFGE refuses to produce them.

## INTERROGATORY NO. 12:

For each of the persons listed in Section A of Plaintiff's Supplement to Initial Disclosures (dated May 29, 2018), please describe in detail each communication You have had with that person relating to the Complaint (including but not limited to any allegation in the Complaint, Your decision to file or prosecute the Complaint, and/or any involvement or testimony by that person in connection with the Complaint), including the date of the communication, the method or manner of the communication, the parties to the communication, and the nature and content of the communication.

## RESPONSE:

**I have documents in my files and emails at AFGE that would refresh my recollection in responding to this Interrogatory.  However, AFGE took my files and emails when I was terminated.  AFGE has possession of all these documents.  I submitted a Request for Production of Documents asking AFGE to produce the documents.  To date, AFGE refuses to produce them.**

## INTERROGATORY NO. 13:

Identify any and all Documents that you are aware of that support, negate, or otherwise bear on the allegations in Paragraphs 2, 24, 26, 27, 28, 29, 34, 35, and 46 in your Complaint, that President Cox took adverse employment actions against you on the basis of your race.

## RESPONSE:

**I have documents in my files and emails at AFGE that would refresh my recollection in responding to this Interrogatory.  However, AFGE took my files and emails when I was**

terminated. AFGE has possession of all these documents. I submitted a Request for Production of Documents asking AFGE to produce the documents. To date, AFGE refuses to produce them.

Respectfully submitted,

*/s/ Marlene (Kemi) Morten*
Kemi Morten
Counsel for Plaintiff
D.C. Bar No. 272575
3825 South Capitol Street, S. W.
Washington, D. C. 20032
*kemimorten@gmail.com*

Dated: November 28, 2018


## VERIFICATION

I, Eugene Hudson , Jr., declare under penalty of perjury, that my responses to the foregoing interrogatories are true and correct.

Eugene Hudson, Jr.

Dated November 28, 2018


## CERTIFICATE OF SERVICE

I, Kemi Morten, hereby certify that on this 28th day of November 2018, a true and correct copy of Plaintiff's Response to Defendant's First Set of Interrogatories Directed to Plaintiff was served via electronic mail and by first class U. S. mail, postage prepaid, upon the following counsel for Defendant:

Devki K. Virk, Esq.
Bredhoff & Kaiser, PLLC

24

# Roth Decl. Exhibit 3

```
                                                          1
 1              UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF COLUMBIA
 3      ------------------------------x
        EUGENE HUDSON,
 4
                        Plaintiff,
 5
          v.                           Civil Action No.
 6                                     1:17-cv-2094 (JEB)
        AMERICAN FEDERATION OF
 7      GOVERNMENT EMPLOYEES ("AFGE"),
 8                      Defendant.
        ------------------------------x
 9

10

11        30(b)(6) DIGITAL AUDIOVISUAL DEPOSITION

12                     of Defendant

13    American Federation of Government Employees

14            by JEFFERY DAVID COX, SR.

15                 Washington, D.C.

16            Wednesday, March 29, 2019

17                   10:35 a.m.

18
19    Assignment No.: 39668
20    Pages: 1 - 312
21    Reported by:  Amy E. Sikora, BS, RPR, CRR, CLR,
22                  Former CSR NY
```

**Jeffrey David Cox**

**Eugene Hudson v. AFGE**                                    3/20/2019

247

1         A.    I can't say that I've heard that

2    being used in that term.

3         **Q.    And what about the term "son"**

4    **being used to describe an adult African-American**

5    **man?**

6         A.    I can't say that I've heard that.

7         **Q.    You haven't heard that in your**

8    **whole life?**

9         A.    No.  I -- there's a lot of people

10   that call people "son" and "boy" and "girl" and

11   "man" and "woman."  And "daughter."  I've heard

12   those terms used all my life.

13        **Q.    Oh, so you have heard people refer**

14   **to folks as "son" and "boy" and "girl"; right?**

15        A.    Yeah.  And I would say that's for

16   everyone, not to one particular race or one

17   particular group of people.

18        **Q.    And you've used those terms**

19   **yourself; right?  "Son" and "boy"?**

20        A.    I refer to a lot of people as

21   "son."  It's probably a southern thing, and I've

22   done it probably most of my life.  And I would

**Jeffrey David Cox**

**Eugene Hudson v. AFGE**                                     3/20/2019

248

1    say that a -- national vice president Keith Hill

2    used to laugh that I would refer to him as

3    "son."  He'd say, but I'm only just a little

4    younger than you, but it always makes me feel

5    younger.

6              **Q.    Oh, is that what he said.**

7                    **And he's African-American, isn't**

8    **it?**

9              A.    No, ma'am.  He's white.

10             **Q.    Who?**

11             A.    Keith Hill.

12             **Q.    Oh, he is.  Okay.  All right.**

13                   **Have you ever referred to Everett**

14   **Kelley as son?**

15             A.    I probably have.

16             **Q.    And he's African-American?**

17             A.    Yes, ma'am.

18             **Q.    Have you ever referred to NST**

19   **Hudson as son?**

20             A.    I probably have.

21             **Q.    Okay.  And he's African-American?**

22             A.    As I've done to lots and lots of

**Jeffrey David Cox**

**Eugene Hudson v. AFGE**                                              **3/20/2019**

249

1    people.

2              **Q.    And he's African-American?**

3              A.    Yes, ma'am.

4              **Q.    And he's not much younger than**

5    **you, is he?**

6              A.    No.  And I've probably referred to

7    people as son that's older than me.

8              **Q.    Okay.  And have you ever referred**

9    **to Augusta Thomas as girl?**

10             A.    I probably have.

11             **Q.    And she's older than you, isn't**

12   **she?**

13             A.    Yes.

14             **Q.    How much older than you is she?**

15             A.    I have no idea how old

16   Ms. Augusta, because her age was a moving

17   target.

18             **Q.    Uh-huh.  But she's**

19   **African-American, isn't she?**

20             A.    Yes, ma'am.  She is.

21             **Q.    Are you aware that**

22   **African-Americans -- most African-Americans feel**

310

```
 1              CERTIFICATE OF SHORTHAND REPORTER

 2         I, AMY E. SIKORA-TRAPP, RPR, CRR, CLR, and

 3    Notary Public in and for the District of

 4    Columbia, hereby certify that the foregoing

 5    deposition of JEFFERY DAVID COX, SR. was taken

 6    before me on the 20th day of March, 2019.

 7         That the said witness was duly sworn before

 8    the commencement of the testimony; that the said

 9    testimony was taken stenographically by me and

10    then transcribed.

11         I further certify that I am not kin to any

12    of the parties to this action nor am I interested

13    directly or indirectly in the matter in

14    controversy; nor am I in the employ of any of the

15    counsel in this action.

16         IN WITNESS WHEREOF, I have hereunto set my

17    hand this 27th day of March, 2019.

18

19    _____

                 AMY E. SIKORA-TRAPP
20        BS, RPR, CRR, FORMER CSR NY, CLR
                     Notary Public
21        in and for the District of Columbia

22    My Commission expires: 7/31/19
```

# Roth Decl. Exhibit 4



Transcript of **Eugene Hudson, Jr.**

**Date:** December 2, 2015

**Case:** Burnett, et al -v- American Federation of Government Employees of D.C.

Planet Depos, LLC
Phone: 888-433-3767
Fax: 888-503-3767
Email: transcripts@planetdepos.com
Internet: www.planetdepos.com

Worldwide Court Reporting | Interpretation | Trial Services

AFGE_00000383

1

```
1              IN THE UNITED STATES DISTRICT COURT

2                FOR THE DISTRICT OF COLUMBIA

3    - - - - - - - - - - - - - - x

4    LARRY BURNETT & STATUS           :

5    CONTROL, INC.,                   :

6              Plaintiffs,            :    Case No.

7       v.                           :    13-2047(CKK)

8    AMERICAN FEDERATION OF           :

9    GOVERNMENT EMPLOYEES OF D.C.,    :

10             Defendant.             :

11   - - - - - - - - - - - - - - X

12

13       Videotaped Deposition of EUGENE HUDSON, JR.

14                  Washington, DC

15            Wednesday, December 2, 2015

16                   1:14 p.m.

17

18

19

20   Job No.:  95078

21   Pages 1 - 114

22   Reported by:  Debra A. Whitehead
```

AFGE_00000384

Videotaped Deposition of Eugene Hudson, Jr.
Conducted on December 2, 2015

46

| | | |
|---|---|---|
| 1 | her, you know -- she's an older white lady, you know, | 13:57:06 |
| 2 | and sometimes different generations have different | 13:57:11 |
| 3 | attitudes towards people of color. | 13:57:14 |
| 4 | Q   And aside from that, were there any other | 13:57:15 |
| 5 | instances that you had that made you believe that | 13:57:20 |
| 6 | sometimes people of color are accused of things? | 13:57:23 |
| 7 | A   Well, I've been stopped a thousand times by | 13:57:26 |
| 8 | the police just for driving or being in the wrong | 13:57:29 |
| 9 | neighborhood, I guess. | 13:57:33 |
| 10 | Q   How about during your work at AFGE? | 13:57:34 |
| 11 | A   No.  Not that I can think of right now. | 13:57:42 |
| 12 | Q   Did you ever have any interactions or did | 13:57:46 |
| 13 | you ever overhear anybody while working at AFGE make | 13:57:53 |
| 14 | any racially discriminatory comments? | 13:57:58 |
| 15 | MS. GOLDBERG:  I'm going to object and ask | 13:58:00 |
| 16 | you to define the time period or the building you're | 13:58:02 |
| 17 | referring to, because he's worked in multiple | 13:58:06 |
| 18 | capacities. | 13:58:08 |
| 19 | MS. WEISZ:  I understand that.  But I think | 13:58:10 |
| 20 | at AFGE I don't have to limit the time period.  I want | 13:58:11 |
| 21 | to know for the entire time he's worked at AFGE. | 13:58:16 |
| 22 | MS. GOLDBERG:  I'm going to object. | 13:58:19 |

AFGE_00000429

Videotaped Deposition of Eugene Hudson, Jr.
Conducted on December 2, 2015

47

| | | |
|---|---|---|
| 1 | MS. WEISZ:  Okay. | 13:58:20 |
| 2 | MS. GOLDBERG:  You can answer the question. | 13:58:20 |
| 3 | A   Could you repeat the question, please? | 13:58:22 |
| 4 | MS. WEISZ:  Madam court reporter. | 13:58:25 |
| 5 | (The reporter read the question as follows: | 13:58:42 |
| 6 | "QUESTION:  Did you ever have any | 13:58:42 |
| 7 | interactions or did you ever overhear anybody while | 13:58:42 |
| 8 | working at AFGE make any racially discriminatory | 13:58:42 |
| 9 | comments?") | 13:58:42 |
| 10 | A   Yes. | 13:58:43 |
| 11 | Q   More than one time? | 13:58:43 |
| 12 | A   Yes. | 13:58:46 |
| 13 | Q   Can you tell me about the first time. | 13:58:46 |
| 14 | MS. GOLDBERG:  Running objection. | 13:58:48 |
| 15 | MS. WEISZ:  Okay. | 13:58:49 |
| 16 | A   While -- when -- could I ask a question? | 13:58:54 |
| 17 | Q   You can answer unless she tells you not to. | 13:58:57 |
| 18 | MS. GOLDBERG:  If -- | 13:58:59 |
| 19 | Q   Do you want to ask a question? | 13:59:00 |
| 20 | A   We're talking about employees that worked | 13:59:02 |
| 21 | directly for AFGE, or employees that are affiliated | 13:59:04 |
| 22 | with AFGE? | 13:59:06 |

AFGE_00000430

Videotaped Deposition of Eugene Hudson, Jr.
Conducted on December 2, 2015

48

| | | |
|---|---|---|
| 1 | Q    Anybody affiliated with AFGE. | 13:59:08 |
| 2 | MS. GOLDBERG:  I'm going to object and I'm | 13:59:10 |
| 3 | going to direct you not to -- | 13:59:12 |
| 4 | MS. WEISZ:  Have a running -- you're going | 13:59:16 |
| 5 | to -- | 13:59:17 |
| 6 | MS. GOLDBERG:  Yes.  Because we have | 13:59:17 |
| 7 | 600,000 bargaining unit employees. | 13:59:17 |
| 8 | MS. WEISZ:  Okay. | 13:59:17 |
| 9 | MS. GOLDBERG:  And they are affiliated with | 13:59:18 |
| 10 | AFGE, but they are not in the national office. | 13:59:20 |
| 11 | They -- you know, we are a 75-year-old organization, | 13:59:23 |
| 12 | if not older.  And that is -- it's too broad. | 13:59:26 |
| 13 | I'm going to direct you not to answer that | 13:59:30 |
| 14 | question. | 13:59:32 |
| 15 | MS. WEISZ:  Okay.  That's absolutely -- | 13:59:32 |
| 16 | because I will take this up to court.  This is | 13:59:35 |
| 17 | absolutely relevant.  If you are going to direct him, | 13:59:37 |
| 18 | then we are going to have to call him back, because I | 13:59:39 |
| 19 | will take this issue up to court. | 13:59:42 |
| 20 | MS. GOLDBERG:  With the way you phrased the | 13:59:43 |
| 21 | question, any affiliated person with AFGE, I'm going | 13:59:45 |
| 22 | to object and direct him not to answer. | 13:59:49 |

AFGE_00000431

Videotaped Deposition of Eugene Hudson, Jr.
Conducted on December 2, 2015

49

| | | |
|---|---|---|
| 1 | Q    Okay.  Any employees with AFGE during the | 13:59:50 |
| 2 | entire time you've worked there, have you experienced | 13:59:53 |
| 3 | or heard any racially discriminatory comments made? | 13:59:56 |
| 4 | A    I heard discriminatory comments made.  I | 14:00:08 |
| 5 | don't think they were employees that were employed by | 14:00:11 |
| 6 | AFGE. | 14:00:14 |
| 7 | Q    Who were they employed by? | 14:00:16 |
| 8 | A    By a governmental agency.  We represent | 14:00:19 |
| 9 | dozens of government agencies, and -- and we have | 14:00:22 |
| 10 | affiliates from different agencies, like the VA, | 14:00:27 |
| 11 | Social Security, border patrol, bureau of prisons. | 14:00:32 |
| 12 | Q    As you sit here today, do you know for a | 14:00:35 |
| 13 | fact that these people that you heard, or these | 14:00:37 |
| 14 | comments that you heard made, were not made by AFGE | 14:00:39 |
| 15 | employees? | 14:00:43 |
| 16 | A    Well, the one I have in mind in particular | 14:00:45 |
| 17 | is not an AFGE employee. | 14:00:47 |
| 18 | Q    You know that to be true? | 14:00:49 |
| 19 | A    I know that to be true. | 14:00:50 |
| 20 | Q    Okay.  What about any other ones?  Because | 14:00:51 |
| 21 | you indicated there was more than one. | 14:00:53 |
| 22 | A    Yeah, there were more than one, but they | 14:00:56 |

AFGE_00000432

Videotaped Deposition of Eugene Hudson, Jr.
Conducted on December 2, 2015

50

| | | |
|---|---|---|
| 1 | would fall into the same category as this particular | 14:00:58 |
| 2 | individual I'm thinking of. | 14:01:00 |
| 3 | Q    Not employees of AFGE. | 14:01:02 |
| 4 | A    You know, sometimes when you're in a casual | 14:01:04 |
| 5 | setting and you're maybe having a drink people might | 14:01:13 |
| 6 | say some things, but I don't really take it seriously. | 14:01:15 |
| 7 | So something like that may have occurred in | 14:01:20 |
| 8 | the last 20 or 30 years, but not any racial -- blatant | 14:01:22 |
| 9 | racial overtones towards any individuals that I'm | 14:01:28 |
| 10 | aware of that work -- for employees that work directly | 14:01:32 |
| 11 | for AFGE. | 14:01:35 |
| 12 | Q    Okay.  What about since the time you've | 14:01:36 |
| 13 | been working in the AFGE office here in Washington, | 14:01:38 |
| 14 | DC; have you heard any racial discriminatory | 14:01:42 |
| 15 | statements made by anybody working at AFGE? | 14:01:46 |
| 16 | A    I can't think of any.  Not since I've been | 14:02:00 |
| 17 | there since 2012. | 14:02:03 |
| 18 | Q    Did you ever make any statements to | 14:02:04 |
| 19 | Mr. Burnett about him or employees at Status Control | 14:02:11 |
| 20 | being black and them not being liked by anybody at | 14:02:16 |
| 21 | AFGE because they were black? | 14:02:20 |
| 22 | A    No, I don't think so. | 14:02:24 |

AFGE_00000433

Videotaped Deposition of Eugene Hudson, Jr.
Conducted on December 2, 2015

113

1        ACKNOWLEDGMENT OF DEPONENT

2        I, EUGENE HUDSON, JR., do hereby acknowledge that I

3    have read and examined the foregoing testimony, and

4    the same is a true, correct and complete transcription

5    of the testimony given by me and any corrections

6    appear on the attached Errata sheet signed by me.

7

8

9    _____        _____

10   (DATE)                         (SIGNATURE)

11

12

13

14

15

16

17

18

19

20

21

22

AFGE_00000496

Videotaped Deposition of Eugene Hudson, Jr.
Conducted on December 2, 2015

114

1    CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

2        I, Debra Ann Whitehead, the officer before whom the

3    foregoing deposition was taken, do hereby certify that

4    the foregoing transcript is a true and correct record

5    of the testimony given; that said testimony was taken

6    by me stenographically and thereafter reduced to

7    typewriting under my direction; that reading and

8    signing was requested; and that I am neither counsel

9    for, related to, nor employed by any of the parties to

10   this case and have no interest, financial or

11   otherwise, in its outcome.

12       IN WITNESS WHEREOF, I have hereunto set my hand and

13   affixed my notarial seal this 9th day of December,

14   2015.

15

16   My commission expires:

17   September 14, 2018

18

19   ---------------------------

20   NOTARY PUBLIC IN AND FOR THE

21   DISTRICT OF COLUMBIA

22

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

AFGE_00000497