**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

EUGENE HUDSON, JR.
                    Plaintiff

                                        JURY DEMAND
v.                                      Civil Action No. 17-2094 (JEB)

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES
                    Defendant

_____

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO THE MOTION FOR**
**SUMMARY JUDGMENT AND PLAINTIFF'S CROSS MOTION FOR SUMMARY**
**JUDGMENT**

Plaintiff, Eugene Hudson, Jr., an African American male, files this opposition and cross

motion for summary judgment pursuant to Title VII of the Civil Rights Act of 1964, as amended,

42 U.S.C. §2000e et seq.; and 42 U.S.C. § 1981;to remedy acts of employment discrimination,

harassment, and retaliation.

**Statement of Material Facts Not in Dispute**

1.       AFGE is the largest federal sector union in the nation with approximately 700,000

members.

2.       The AFGE National Executive Council ("NEC") is composed of the National

President, the National Secretary-Treasurer, the National Vice President for Women and Fair

Practices, and the National Vice Presidents for the 12 AFGE Districts.

3.       Article 9, Section 1 of the AFGE National Constitution states: "The National

President shall function as the CEO... subject to the approval of the NEC."    J. David Cox, Sr.

("Cox") is the National President of AFGE. Mr. Cox, who is Caucasian American, has served as AFGE President since 2012.

4.      Article X Section 7 of the AFGE National Constitution states that "The National Secretary Treasurer ("NST") "shall appoint, direct and have supervision of <u>all employees of the Federation employed in the office of the NST</u>, **such action to be subject to the approval of the NEC."** *(Emphasis Added)*

5.      Eugene Hudson, Jr. ("Hudson") was elected as the first African-American National Secretary Treasurer in 2012; and reelected in 2015 without opposition – by acclamation.

6.       Prior to his election as AFGE President, J. David Cox, Sr.,  was the elected National Secretary Treasurer from August 2006 through August 2012.  As part of his responsibilities as NST, Mr. Cox supervised Information Services ("IT") with a budget of several million dollars and approximately 12-15 employees) and Human Services with a smaller staff of approximately two (2) employees.

7.       When Mr. Hudson assumed the position of NST in 2012, his responsibilities included the supervision of the same departments that Mr. Cox previously supervised; namely, Information Services ("IT") with a budget of several million dollars and approximately 12-15 employees) and Human Services with a smaller staff of approximately two (2) employees.

8.      AFGE Emeritus Officer Jane Nygaard testified that Mr. Hudson did a great job as NST and improved the operations of both departments during his tenure. *(Affidavit of Jane Nygaard)*

9.       Mr. Hudson testified that over his objections, AFGE President Jeffrey David Cox often used the racially pejorative terms "boy" and "son"  when addressing him.

10.     During his deposition, J. David Cox did not deny calling Mr. Hudson "boy" and testified that he was not aware that NST Hudson objected to Cox referring to him as "boy".

11.     President Cox testified that he saw the words "boy" and "girl" on bathroom doors in schools and saw no problem with using the terms to describe adults. *[Exh. ___, Cox Deposition Transcript at p. 248, lines 18-21]*

12.     Mr. Cox testified that he used the term "son" in addressing NST Hudson, a father, grandfather and the second highest ranking AFGE official and first African American elected to the position, but claimed he was not aware that Mr. Hudson objected to the pejorative. *[ Cox Deposition Transcript at p. 248, lines 18-21]*

13.     In its motion to dismiss, AFGE claims that Cox is from the South and simply talks that way; that Cox calls everyone "boy" and means no offense by it.

14.     President Cox testified that he used the terms "boy" and "son" as terms of endearment and that he also used the term "son" to address people who are white, like National Vice President Mike Kelly, and that Mr. Kelly took no offense.

15.     Mr. Hudson testified that he found Cox's reference to him as "boy" and "son" deeply offensive and racist; that he told Cox so and repeatedly asked Cox to stop doing it.

16.     Mr. Hudson testified that he and his wife attended a Congressional Black Caucus dinner and sat at the AFGE table with Cox and his wife.

17.     Mr. Hudson testified that Cox refused to stand when President Obama was introduced, and that he heard Cox say "that 'boy' hasn't done nothing for us".

18.     Cox testified that he did not refer to President Obama as a "boy". *Plaintiff's April 25, 2019 Motion for Leave to Amend Complaint at page 17, ¶5 [ Cox Deposition Transcript at p. 250, lines 13-15]*

19.     Although Cox testified that he clearly recalls that he did not call President Obama a "boy" and that he did not say that Obama hasn't done nothing for us, Cox repeatedly testified during his deposition that he could not recall the answers to many questions posed during the deposition.

20.     Cox's attorney, Devki Virk, directed Mr. Cox not to answer a number of questions during the deposition.

21.     In a January 7, 2020 declaration, Rocky Kabir testified that he worked as President J. David Cox's Confidential Secretary from December 2016 until August 2018.

22.     Mr. Kabir testified that he traveled with President Cox and was on the road with him 80% of the time.  Mr. Kabir testified that he usually referred to the AFGE President by his nickname, "J. David."

>   "On average, J. David and I traveled together three weeks out of every month to meet with local AFGE leaders, AFGE Councils and AFGE locals, attend organizational meetings, speak at events held all across the United States and attend to other AFGE-related business." *(Exh. 1:  Affidavit of Rocky Kabir, dated January 21, 2020)*

23.     Mr. Kabir testified that "President Cox firmly controls most of the National Vice Presidents who sit on the AFGE National Executive Council through a combination of financial incentives, political support and fear. I know this because I was often in J. David's presence when he spoke with his National Vice Presidents on his cell phone or in person.  Additionally, if I was not present at the time, J. David often shared with me his conversations with them." *(Ibid.)*

24.     Mr. Kabir  testified:  "Cox often told me I was like "a son" to him.  He regularly said, 'I treat you like my son.'  I told him to cut it out, but Cox would continually say I was like his kid.  I am a grown man with my own children.  I found Cox's references to me in this way to be manipulative and a way of gaining emotional leverage over me because I initially looked up to him.  Despite my repeated objections, he did not stop calling me "son". *(Ibid.)*

25.     Mr. Kabir also testified that J. David Cox "regularly called me 'boy'.  I am not a boy.  As a person who grew up in New York in a predominantly African-American neighborhood, many of my friends are African-American.   As a person of color, I found Cox's use of the term "boy" and "son" when referring to me extremely offensive, racist and demeaning, and I told him so.  Cox knew I strongly objected, but he did not stop calling me "boy".  Cox's repeated references to me as "boy" and "son" over my objections were demeaning and racist and created a racially hostile work environment for me." *(Ibid.)*

26.     Mr. Kabir  testified that he "heard Cox make crude statements about Jewish people.  I understand that sometimes people joke around about others' ethnicities.  However, when Cox made these derogatory statements about Jewish people, he was not kidding around or making a joke.  Cox was definitely not trying to be funny.  His use of such derogatory statements never came off as humorous.  Cox used these offensive, anti-Semitic references toward others and called me "boy" in a mean and derogatory way I found to be extremely offensive." *(Ibid.)*

27.     AFGE Emeritus Officer Jane Nygaard testified that Cox made sexist remarks about her. *(Exh. 1a: Affidavit of Jane Nygaard)*.  Mr. Kabir corroborated Ms. Nygaard's testimony on that point.

> "Cox seemed to have a real problem with women.  When we traveled together, I often observed Cox make crude statements about the female flight attendants.  He regularly discussed women's body parts.  Cox also made derogatory statements to me about lesbians, including statements about his Executive Staff member, Shannon Harvey, who is African American.  I often heard Cox use the germ "Goddamned lesbians." *(Ibid., p. 5.)*

Mr. Kabir also testified that Cox made derogatory remarks about his religion.

> "I often heard Cox tell other AFGE staffers, "I love you." Initially, I thought Cox was being genuine.  I soon realized Cox did not care about me.  Cox was hot and cold.  One minute he would say he "loved me like a son," and the next minute he spoke to me in a derogatory way and spoke down to me, saying: "You Goddamn Muslim" or "You're the best Muslim I ever knew."  Cox often made negative comments about Muslims in my

presence.  Cox once asked for my membership card as a Muslim, and I told him it didn't work that way." *(Ibid. p. 5-6)*

28.     AFGE has a history of allowing its Caucasian officials to address African American employees in racially derogatory terms, without suffering any adverse employment actions.

29.     In 2001 Ulander Stone, an African American woman, filed suit against AFGE and AFGE Council 220.

30.     In the lawsuit, Ms. Stone asserted that she had filed a complaint with Council 220 President Witold Skwierczynski that a member of his staff had called her a "Nigger" on numerous occasions.

31.     Instead of taking disciplinary action against the offending staff member, Skwierczynski terminated Ms. Stone, who then filed a lawsuit against AFGE and Council 220 in federal court.

32.     AFGE  helped pay Council 220's legal fees in defending Stone's racial discrimination lawsuit and took no adverse employment action against the Council 220 official who repeatedly called Ms. Stone a "Nigger."

33.     AFGE took no adverse employment action against Skwierczynski for terminating Ms. Stone after she complained to him that his Council 220 staffer had repeatedly called her a "Nigger."

34.     AFGE National was dismissed as a defendant, and Council 220 ultimately settled with Ms. Stone monetarily.  However, AFGE did not reinstate Ms. Stone to her position..

35.     Ten years after firing Ms. Stone, in 2001 the same Council 220 President Witold Skwierczynski angrily rushed up to then-National Vice President Eugene Hudson, shouted in his face, invited him to fight and called him a "Nigger" at an AFGE event.  President J. David Cox,

6

AFGE General Counsel David Borer,  Chief of Staff Brian DeWyngaert, and National Vice President Everett Kelley, among others, were present when the incident occurred.

36.        Mr. Hudson calmly walked away and filed Article XXIII charges against Skwierczynski.  Then-President John Gage appointed a COI to investigate the charges.

37.        Everett Kelley, (who at the time was National Vice President and is currently the Acting AFGE President), witnessed the event and gave a written statement confirming that  he observed Skwierczynski angrily initiate the confrontation, challenge Mr. Hudson to a fight and call Mr. Hudson a "Nigger".  Mr. Kelley is African American.

38.         John Gage,  J. David Cox was NST, General Counsel David Borer, and Chief of Staff Brian DeWyngaert,  all of whom are Caucasian American, claimed they did not hear Skwierczynski call Mr. Hudson a "Nigger".

39.        AFGE officials, including Gage,  Cox, Borer and DeWyngaert,  knew (or certainly should have known) that ten years earlier, Skwierczynski had fired Ms. Stone after she complained to him that his staff member repeatedly called her a "Nigger."  These same AFGE executives also knew that  Skwierczynski was now charged with hurling the same racist epithet at NVP Hudson -- an AFGE officer and NEC member.

40.        Yet, Gage, Cox, General Counsel David Borer and Chief of Staff Brian DeWyngaert refused to take any disciplinary action against Skwierczynski for calling Mr. Hudson a "Nigger."

41.        By the time the Skwierczynski charges reached the desk of the AFGE President in 2012,  Gage had retired.  J. David Cox was National President and Mr. Hudson was National Secretary Treasurer.

42.        President Cox dismissed all charges against Skwierczynski on the condition that he write a letter of apology to Mr. Hudson.

43.        Insinuating that Mr. Hudson somehow contributed to Skwierczynski's racist misconduct, (which he clearly did not), in his dismissal letter to Skwierczynski, Cox suggested that he and NST Hudson enter into mediation based on their "longstanding history".

44.        In June 19, 2015, Jocelynn Johnson, an African-American AFGE employee, filed a charge with the United States Equal Employment Opportunity Commission charging AFGE with discriminating against her on the basis of her race, sex, religion, and age. *(Exh. 2: Jocelynn Johnson Charge No. 870-2015-01506)*

45.        The EEOC found probable cause for Ms. Johnson's charge, and AFGE entered into a Mediation Settlement Agreement with Ms. Johnson. President Cox signed the agreement on behalf of AFGE. In the agreement, AFGE agreed to "provide EEO training to all of its managers at the National Office [including J. David Cox and the NEC members] no later than December 31, 2015, and to advise the EEO ADR Coordinator by email of its completion.

46.        The EEO mandated that the AFGE training will include discrimination covered by Title VII (race, sex, color, religion, national origin and retaliation), ADA and ADEA. *(Exh. 3: Mediation Settlement Agreement between AFGE and Jocelynn Johnson, dated August 27, 2015)*

47.        In the settlement, AFGE further agreed that there shall be "no discrimination or retaliation of any kind against the Charging Party, Jocelynn Johnson, as a result of filing the charge or against any other person because of opposition to any practice deemed illegal under Title VII and other federal anti-discrimination statutes." *(ibid.)*

48.       J. David Cox signed the Mediation Settlement Agreement with Jocelynn Johnson on August 27, 2015.  The same month, Cox was present when, for the second time in four years, AFGE Council 220 President Witold Skwierczynski angrily confronted now-National Secretary Treasurer Eugene Hudson and called him a "Nigger."

49.       This time, however, Skwierczynski called Mr. Hudson a "Nigger" when the two men were alone and outside the presence of witnesses.  As before, Mr. Hudson walked away, but he verbally complained to Cox about the incident.

50.       Shortly thereafter, J. David Cox called a meeting of the NEC to discuss Skwierczynski's concerns about Mr. Hudson; however, he did not tell Hudson the reason for the meeting.

51.       When NST Hudson arrived and learned that Cox had called the NEC meeting to discuss Skwierczynski's concerns about him, he angrily shouted:  why are you calling a meeting about me? Witold just called me a "Nigger." Witold reacted, and both men leapt to their feet and had to be restrained.

52.       Council 220 official Pam Baca (at the time, a close associate of Skwierczynski and a close and trusted confidante of District 11 NVP Gerald Swanke) was present during the meeting and describes what happened:

> "I do not recall what statements led to the confrontation between Witold and Mr. Hudson, but a confrontation arose between the two of them.  Both men were standing up and were yelling at one another with several other people trying to calm them both down.  I was sitting one person over from Witold and two people over from Mr. Hudson…. As both men stood up, their chairs hit the wall behind them.  This was due more to the small size of the room than the force with which the chairs were pushed.  Mr. Hudson stood up before Witold did, but Witold did stand soon after Mr. Hudson did.   The men were moving closer to one another and were on the verge of touching one another, when members of the NEC jumped up and began to make their way to M. Hudson to restrain him.

"Mr. Hudson was then led out of the room by NVP Everett Kelley and NVP George McCubbin. NVP Cheryl Eliano followed them out. NST Hudson left the room, and the meeting resumed. Upon Mr. Hudson's departure, NP Cox turned to all of us and said, "Now you see what we all go through on the NEC. This is constant with him. Now you see what we all put up with from NST Hudson. This behavior is common from him, and we all have to endure it."

"Several members of Council 220 asked why the NEC put up with it and NP Cox shrugged his shoulders and shook his head. It was then that NVP Swanke stated that he was not putting up with Mr. Hudson's behavior any longer and that he was filing charges against him. Swanke stated that if any member of Council 220 was inclined to file charges, he would join with them on the charges and provide witness testimony. I agreed to do so because I am also from District 11. …Approximately a week after the convention ended, Swanke contacted me to coordinate on the charges. He did not have much confidence in the charges being successful against Mr. Hudson… but said that … this was a "start." *(Exh. 3: Baca Affidavit, dated May 29, 2019, pp. 6-8)*

53.    Pam Baca testified that for years she was a close confident and ally of District 11 NVP Gerald Swanke.

54.    Swanke and Pam Baca did not file charges against Witold for calling Mr. Hudson a "Nigger."

55.    After Cox made the false statement: "this is what we have to endure with Hudson", Swanke and Baca filed charges against NST Hudson for "conduct unbecoming an AFGE member" based on Mr. Hudson's understandably angry reaction to being called a "Nigger".

56.    After a full investigation, the COI dismissed the Swanke/Baca charges as baseless and issued a February 2016 report:

"After interviewing all the witnesses who were present during the incident, the Committee concluded: "all agreed that no one from Council 220 felt threatened, and **NST Hudson "did not lay a hand on the Council 220 President."** *(Exh. 4: February 2016 COI Report)*

57.    President Cox and the other NEC members read, voted and approved the COI report before voting to dismiss the charges filed by Swanke and Baca against Mr. Hudson.

58.     In its motion for summary judgment, AFGE asserts that President Cox has a policy of following the COI recommendations.

59.     Yet, during his deposition, Cox gave testimony that sharply contradicts the February 2016 COI Report.

60.     Cox's deposition testimony is also contradicted by Pam Baca's affidavit testimony and the testimony of all other witnesses to the incident.

61.     J. David Cox testified that he did **not** hear Hudson angrily announce to the group that Witold had called him a "Nigger" earlier that day.

62.     Cox also testified that he observed "an altercation" between Hudson and Witold and "it looked like Mr. Hudson was trying to assault" Mr. Skwiercyzynski.  *[Exh. 5: Cox Deposition at p. 88, 10-12]*

63.     Cox testified that he saw Hudson  "touch" Witold "in an aggressive mannerism". *[Exh. 5:  Cox Deposition, p. 101, 17 to 102, 2]*

64.     Former AFGE NVP and NEC Emeritus Officer Jane Nygaard chaired the Committee on Investigations that investigated the 2015 Article XXII charges filed by Swanke and Baca against former NST Eugene Hudson for conduct unbecoming a member during the 2015 incident.

65.     Ms. Nygaard testified that the COI interviewed **all** of the witnesses who were present at the August 2015 AFGE convention when NST Hudson accused [Witold] of calling him the N-word for a second time just before the meeting when they were alone. *[Exh. 6: Affidavit of Jane Nygaard, dated May 31, 2019, p. 5, ¶3]*

66.     Nygaard testified that all the witnesses testified that Eugene did not lay a hand on Witold. *[Exh. 6:  Affidavit of Jane Nygaard, dated May 31, 2019, p. 5, ¶3]*

67.     The COI report concluded by faulting President Cox for convening the 2015 meeting to discuss Witold's complaint against NST Hudson because Cox knew such a meeting could be potentially explosive since Witold had previously called Mr. Hudson the "N" word." *[Exh. 6:  Affidavit of Jane Nygaard, dated May 31, 2019, p. 5, ¶3]*

68.     For the most part, during his deposition Mr. Cox either refused to answer questions on the advice of his counsel, Devki Virk,  or he claimed that could not recall other events that occurred as recently as 2017.

69.     Yet, AFGE President Cox testified that four years earlier, in 2015, he specifically recalled that he saw Mr. Hudson "touch Witold in an aggressive manner."  Mr. Cox testified that he did **not** recall Hudson complaining to him that Witold had called him a "Nigger".  *(Exh. 5: Transcript of J. David Cox)*

70.     Cox's testimony contradicts that of all other eyewitnesses  to the incident, according to the COI report.  *(Exh. 4:  February 2016 COI Report)*

71.     As President and a member of the NEC that received the COI report on the Swanke/Baca charges, Mr. Cox was aware of the COI's findings.

72.     He knew or should have known that his deposition testimony that Mr. Hudson "aggressively touched" Witold during the AFGE 2015 convention was contradicted by the eyewitnesses testimony contained in the COI report.

73.     Cox's selective, false memory that he observed Mr. Hudson aggressively touch Witold  -- an allegation directly contracted by multiple eyewitnesses, proves that Cox lied during his deposition and constitutes further evidence of his racial animus toward Mr. Hudson.

74.     In 2016, Pam Baca was the President of AFGE Local 1801 and Council 220 Third Vice President.  National Vice President for District 11 Gerald Swanke governs her district.  For

years, Ms. Baca, who is Hispanic,  was a close ally and confidante of Gerald Swanke.  At

Swanke's request, Baca joined him in filing the baseless 2015 Article XXIII charges against

NST Hudson in the Witold name calling incident.

75.    A few months before President Cox stripped NST Hudson of his responsibility for

the Human Resources and IT Departments and responsibility for approving NEC expense

vouchers, Ms. Baca testified that in February 2016, J. David Cox told her that he was afraid that

if anything happened to him, NST Hudson would become President of AFGE.  *(Baca Affidavit)*

76.    Ms. Baca testified that she attended the AFGE  February 2016 Annual Legislative

Conference at the Hyatt Hotel on Capitol Hill in Washington, D. C. in her capacity the President

of AFGE Local 1801 and Council 220 Third Vice President.  *(Baca Affidavit)*

77.    Ms. Baca testified that this was consistent with her practice and that each year in

February, she and other AFGE officials came from around the country to help AFGE President

Cox and the NEC members lobby Congress on issues that affect federal workers and AFGE

members.

> "I stopped to say hello to NP Cox after a day of legislative meetings…NP Cox, after
> making polite conversation, told me to keep him in my prayers.  When I asked why he
> stated that if the good Lord didn't keep him alive, AFGE would be left to Eugene
> Hudson, and the good Lord's wishes were all that was keeping Eugene Hudson from the
> President's office*." (Baca Affidavit, p.8, ¶4-p.9,¶1)*

78.    About four months after Cox shared these concerns about NST Hudson with Ms.

Baca, without prior notice to NST Hudson, in  June 2016, J. David Cox unilaterally stripped Mr.

Hudson of key areas of responsibilities; specifically, supervision of Information Services ("IT")

with a budget of several million dollars and approximately 12-15 employees) and Human

Services with a smaller staff of approximately four (4) employees.  President Cox assigned both

departments to himself.

79.    Before unilaterally transferring the two departments from NST Hudson's area of responsibility to his own, Mr. Cox did **not** obtain approval from the NEC which has supervisory authority over the Office of the NST under the express terms of the AFGE Constitution.

*80.*    Article X Section 7 of the AFGE National Constitution states that "The National Secretary Treasurer ("NST") "shall appoint, direct and have supervision of <u>all employees of the Federation employed in the office of the NST</u>, **such action to be subject to the approval of the NEC.**" *(Emphasis Added)*

81.    As part of his constitutional duties as National Secretary Treasurer, and on the recommendation of his staff,  Plaintiff Eugene Hudson, Jr. had conducted investigations into improper expenditures, including travel to the Caribbean and the purchase of expensive jewelry, clocks, pens and other gifts billed to their AFGE expense accounts by certain AFGE employees, including National Vice Presidents Everett Kelley, Eric Bunn and George McCubbin.

82.    NST Hudson presented an extensive memorandum prepared by his staff raising questions about expenses claimed by these NEC members on their travel vouchers.

83.    About a month after Cox stripped NST Hudson of this two departments, in July 2016, at NVP Everett Kelley's request, President Cox convened a secret NEC meeting in Philadelphia, Pennsylvania.

84.    The secret NEC meeting was not publicly announced to AFGE members as required by the AFGE Constitution.

85.    The secret NEC meeting turned into a discussion of the NEC members' objections to NST Hudson's investigations into improper expenditures for spousal benefits, gifts and first class travel engaged in by certain NVP's.

86.    During the July 2016 meeting NVP Kelley accused Mr. Hudson and his staff of wrongfully accusing him of misconduct.  Kelley demanded that the NEC investigate NST Hudson.

87.    NST Hudson responded by producing a detailed memorandum prepared by his staff justifying their questions regarding certain expenditures contained in the AFGE expense vouchers that Kelley and other NEC members had submitted to his Office for his review and approval.   After reviewing Mr. Hudson's documentation, Mr. Kelley withdrew his demand for an investigation.

88.    Shortly after returning from the secret Philadelphia meeting and about two or three months after Cox stripped NST Hudson of his two key departments, on August 4, 2016, Cox issued a memorandum stating that he was taking away NST Hudson's responsibility for reviewing all NEC expense vouchers, except the President's.

89.    Mr. Cox stated that he would be the sole authority for all NEC members' travel vouchers.

90.    President Cox did not seek approval from the NEC before stripping NST Hudson of his  authority to review and approve the expense vouchers of NEC members.

91.    Around this time. Baca testified that she attended the Federal Mediation Conciliation Service Conference in Chicago, Illinois.  President Cox invited her and another colleague from Council 220  to have a drink with him in the bar at the Hyatt Regency hotel.

"NP Cox drank heavily during the time we were with him.   NP Cox stated several times that he was in fear of his life from Mr. Hudson.  He stated that he was scared to be alone in the building with Mr. Hudson and that he took steps to ensure his safety because he didn't trust Mr. Hudson.

"NP Cox also stated that he had a plan for AFGE if he were to die. He stated Chief of Staff Brian DeWyngaert was privy to the plan and that Brian would tell the NEC NP Cox had to go back to North Carolina for health reasons.  Then all communications from NP

Cox would be in the form of email from other people so Mr. Hudson would never know that NP Cox had died. It was clear to my colleague and I that NP Cox was very drunk and seemed unhinged. We were shocked by what we heard and how strange it sounded coming from NP Cox." *(Baca Affidavit, at p. 9)*

92.     Ms. Baca testified that "Swanke was not averse to being frank with me because he thought that I was his ally after I joined him in filing the 2015 charges against NST Hudson." *(Baca Affidavit, at p. 9)*

93.     Ms. Baca testified that in September 2016, months before NVP Keith Hill filed the December 2016 Trump email charges against NST Hudson, and just one month after President Cox stripped NST Hudson of most of his responsibilities as NST, Gerald Swanke told her that the "NEC was going to bring Hudson down." *(Baca Affidavit, at p. 11)*

*94.*     Ms. Baca testified that Swanke told her that "he knew that 'Hudson was going to be removed from office' because **he (Swanke) was going to be appointed to the Committee on Investigations that looked into the Hudson charges**." *(Baca Affidavit, at p. 9) (Emphasis Added)*

95.     Ms. Baca also testified that she attended an AFGE leadership meeting in Denver, Colorado at which Gerald Swanke and District 12 NVP George McCubbin told her and others that they were getting close to being able to "bring Hudson down" and that "Hudson has no idea what we have waiting for him." Ms. Baca stated:

"In approximately September 2016, Swanke and McCubbin held a leadership meeting in Denver, Colorado for Local Presidents and leaders in Districts 11 and 12, which I attended. The entire group was invited to discuss financial issues that were brought up by Mr. Hudson in, I believe, a letter that was sent to local presidents. The letter accused NP Cox and the NEC of extensive and severe financial mismanagement. NVP McCubbin and NVP Swanke used the room assigned for the meeting to discuss the financial issues. They stated several times they could not openly discuss all the issues they wanted to because it could be seen as using federation funds for election purposes.

"Then they interrupted the meeting and stated they would discuss the actual issues outside of the room so they could not be accused of any impropriety.  Several members were concerned about the allegations made by Mr. Hudson.

"NVP McCubbin and NVP Swanke did not address the allegations directly, but continued to state that they were getting close to being able to 'bring Hudson down' and that 'Hudson has no idea what we have waiting for him.' *(Baca Affidavit at pp.9-10)*

96.    Ms. Baca testified that eight months after the Denver leadership meeting, in May

2017,  Gerald Swanke won reelection and held a victory party in Washington State.

97.    Swanke told her during his victory party that "the NEC would be removing

Hudson "pretty soon, and he will not be getting off this time."

98.    Ms. Baca testified that at the same party, she heard NVP Gerald Swanke use the

racially offensive term "SMB" for the first time in referring to newly elected AFGE officer Taye

Davis, who is African American.

"I have heard Swanke use the phrase "SMB" on two separate occasions.  The first time I heard him use the phrase was at a private party held at Carrie Coleman's home in Washington State after the District 11 Caucus in May 2017… Most of the District 11 was there.  I attended the party with Local 1802 Treasurer Patrick Collins.  AFGE General Counsel John Thompson had flown in from Washington D.C. to oversee the  District 11 election on behalf of AFGE National.  Thompson was supposed to be neutral, but he came to Swanke's victory party.

"Taye Davis, who, rather unexpectedly, had won the second position of Fair Practices Coordinator in District 11 was not present at Swanke's victory party.  Ms. Davis is an African American woman.  She is also very new to AFGE leadership and representation.  Swanke was intoxicated when he came up to me, put his arm around my shoulder and stated: 'You know it's going to be me and you running the District, right?  I don't expect much of your counterpart.'

"I stated that I really didn't know Davis, but that I would be glad to help her in any way I could.  Swanke replied:  'This is an SMB situation.  You know that right?'  I looked at him confused, and he walked away.  I figured I misunderstood what he had said because I had no idea what "SMB" meant." *(Baca Affidavit at pp 12-13)*

99.     Ms. Baca testified that she heard Swanke and newly elected District 3 NVP Phil Glover  use the racially offensive term "SMB" to describe to NST Hudson during an NEC meeting at AFGE headquarters in Washington, D. C.

> "In December of 2017, I heard Swanke use the phrase again. It was during the December 2017 NEC meeting where Mr. Hudson had been reinstated by a federal court judge… There were a total of three newly elected NEC members in attendance, all of whom had been elected in May 2017.  They were:  District 3 NVP Phil Glover who replaced Keith Hill, after Hill chose not to run for reelection; District 8 NVP Gregory James who replaced Jane Nygaard, who also chose not to run for reelection, and District 4 NVP Danny Doyle who replaced Joe Flynn who chose not to run for reelection.
> As I spoke with Glover, Swanke passed us. He stopped to hug me and then patted Phil on the back and asked if Phil was ready.  Phil grinned and responded that he was.
> Swanke then walked to his seat and told Phil:  "SMB, Phil, SMB."  Phil grinned again and waved Swanke away.  *(Baca Affidavit at pp 14-15)*

100.     A reasonable jury could conclude that the use of the racist term "SMB" by Gerald Swanke and Phil Glover is evidence of the racial animus toward African Americans.

101.     A reasonable jury could conclude that when Gerald Swanke asked Phil Glover if he was "ready" and Glover grinned and responded that he was and the two men acknowledged the racist term "SMB" as referencing NST Hudson, that Swanke and Glover were part of a conspiracy to harass Mr. Hudson on the basis of his race.

102.     Since newly elected NVP Phil Glover, who had only been on the NEC for seven months, was aware of and acknowledged Swanke's use of the racial term "SMB",  a reasonable jury could conclude that other Caucasian members of the NEC, including President J. David Cox,  were also aware of and condoned the use of this racist code word to refer to their African American counterparts.

103.     Ms. Baca testified that after that J. David Cox reconvened the NEC meeting, he did not give NST Hudson an opportunity to give his report as NST.  Instead, the NEC voted not to consider NST Hudson's AFGE budget for 2018.

104.     Cox orchestrated the NEC's refusal to allow NST Hudson to give his budget report during the NEC meeting in violation of the AFGE Constitution.  This was clearly an effort by Cox to  harass and humiliate NST Hudson in the presence of AFGE members for racially motivated reasons.

105.     Ms. Baca testified that that President J. David Cox then moved his own budget, and the NEC approved it.

106.     Ms. Baca testified that NST Hudson again tried to give his report, and someone made a motion to adjourn the meeting.  Cox called the question, and the NEC meeting was adjourned without allowing NST Hudson to give his report. *(Baca Affidavit, at p. 13-18)* This sequence of events illustrates the extent to which Cox controlled the other NEC members.

107.     Based on Ms. Baca's sworn testimony, a reasonable jury could conclude that J. David Cox, Gerald Swanke, Phil Glover and George McCubbin held a racial animus against Mr. Hudson and took actions to prevent him from giving his 2017 annual budget report and to harass and humiliate him in front of the AFGE members and officers present for racially discriminatory reasons.

108.     A jury could further conclude that Ms. Baca's testimony is prima facie evidence of a racially hostile work environment for Mr. Hudson at AFGE.  AFGE offered no evidence in its motion for summary to rebut Mr. Hudson's prima facie case showing that there was a racially hostile working environment at AFGE.

109.     Ms. Baca testified that after the brief 45-minute NEC meeting, many people were outraged because they had traveled from different parts of the country to attend what was typically an all-day meeting.  *(Baca Affidavit, at p. 13-18)*

110.    In a sworn declaration, former AFGE employee Jocelynn Johnson attests that after the NEC meeting she wrote an email on behalf of AFGE headquarters staff objecting to NST Hudson's unfair treatment.  Ms. Johnson is the same employee who had filed the successful EEOC complaint in 2015 alleging employment discrimination at AFGE.  *(Exh. 2: Jocelynn Johnson Affidavit)*

111.     One year later, on January 12, 2018, J. David Cox terminated Ms. Johnson for allegedly donating $10 to Eugene Hudson's 2018 election campaign in violation of the AFGE No Politics Rule.   Ms. Johnson, who is African American, had worked for AFGE headquarters for 13 years.  The same day, January 12, 2018, Mr. Cox terminated Mr. Hudson, after this Court vacated the preliminary injunction in related case 17-1867.

112.    NST Eugene Hudson and Jocelyn Johnson, both of whom are African American, are the only two AFGE headquarters staff that AFGE has ever terminated for violating the AFGE "No Politics Rule."  To date, Mr. Cox and Jacque Simon, who are Caucasian, have not received any adverse employment actions as a result of their violation of the AFGE "No Politics" Rule.

113.    Plaintiff recently filed the declaration of Rocky Kabir, Confidential Secretary to J. David Cox in related case 17-1867,

114.    In his declaration, Mr. Kabir attests that just a few months after President Cox fired Ms. Johnson for purportedly donating $10 to Mr. Hudson's election campaign, Mr. Cox ordered Mr. Kabir and AFGE Policy Director Jacque Simon, who is Caucasian, to secretly work the Cox 2018 reelection from Mr. Cox's Silver Spring, Maryland apartment.  *(Exh. 1: Declaration of Rocky Kabir)*

115.    Mr. Kabir also testified that he designed, uploaded and maintained President Cox's campaign website, jdavidcox.com and designed, uploaded and maintained Mr. Cox's campaign GoFundMe page.  *(Exh. 1: Declaration of Rocky Kabir)*

116.    Mr. Kabir estimates the value of the in-kind services that he provided to J. David Cox at about $20,000.   Mr. Kabir testified that Jacque Simon drafted a handwritten letter which she gave to Cox who then gave to him to type and upload onto the Cox campaign site over the facsimile signatures of all of the NEC members who endorsed Mr. Cox's campaign. *(Exh. 1: Declaration of Rocky Kabir)*

117.    Ms. Baca testified that she did not understand what "SMB" meant when Swanke first used the term to refer to Taye Davis and to Mr. Hudson.  *(Ibid.)*

118.    Ms. Baca testified that she first learned the meaning of "SMB" when she attended a luncheon with her Council 220 colleagues and Mr. Hudson immediately following the December r2017 NEC meeting. *(Ibid.)*

119.    Ms. Baca testified that she and her Council 220 colleagues were discussing what had just occurred, and Ms. Baca mentioned that she had heard the exchange between Swanke and Glover in which the term SMB was mentioned.  *(Ibid.)*

> "I immediately noticed the glances between the individuals at the table.  It was then that I learned that "SMB" stood for "Simple Minded Blacks"  I recalled back to the May 2017 discussion when Swanke approached me and referred to the newly-elected African American AFGE Fair Practices Coordinator as an "SMB".  I consider the term "SMB" when applied to African-Americans as highly offensive and racially discriminating.  I think any reasonable person would view the term "SMB" as such."  *(Baca Affidavit, at pp. 17-18)*

119.    Based on Ms. Baca's testimony, a reasonable jury could conclude that the term "SMB" is commonly used by certain Caucasian AFGE officers to describe African Americans.

120.    Ms. Baca testified that "I was recently told by staff at AFGE (headquarters) that Swanke was telling racially insensitive jokes while at a staff watch party during the 2012 inauguration. These employees will not come forward because they fear for their jobs if they do." *(Baca Affidavit, at p. 11)*

121.    It is undisputed that J. David Cox appointed all members of all AFGE Committee. It is also undisputed that President Cox appointed NVP Gerald Swanke as Chair of the Committee of Investigation and all the other members of the COI that investigated the December 2017 Article XXIIL charges that Keith Hill charges filed against NST Hudson.

122.    When Cox appointed Swanke as Chair of the COI investigating the Keith Hill charges against NST Hudson, Cox was aware that Swanke and Baca had filed baseless charges against Mr. Hudson in the 2015 Witold "Nigger"-name calling incident.

123.    A jury could conclude that Ms. Baca's testimony establishes prima facie evidence that Mr. Hudson endured a racially hostile work environment at AFGE.

124.    AFGE offered no evidence in its motion for summary judgment to rebut Mr. Hudson's prima facie case showing Mr. Hudson endured a racially hostile working environment at AFGE

125.    In approximately January 2017, OPM issued an order giving all federal employees a salary increase 2.88 %. AFGE salaries are pegged to the OPM schedule.

126.    AFGE President Cox gave himself and Joseph P. Flynn, the NVP for District 4, who is Caucasian American, the full Cost of Living Adjustment 2.88%. However, over Plaintiff's objections, President Cox gave Plaintiff only a 2.48% increase.

127.     Plaintiff recommended a promotion for Willie Hope, an African American member of his staff and Special Assistant to the NST. Over NST Hudson's objection, Mr. Cox denied Plaintiff's request for Willie Hope's promotion.

128.     Mr. Hudson was the Chair of the Non-appropriated Fund Instrumentalities Committee ("NAFI"). In 2016, AFGE President J. David Cox removed Plaintiff from that chairmanship.

129.     In approximately March 2017, President Cox appointed a five-member Legal Rights Committee. The Legal Rights Committee is a subcommittee of the National Executive Council and is composed of members of the NEC.    The Legal Rights Committee appointed a Committee of Investigations ("COI"), composed of Chairman Gerald Swanke, NVP 11th District (who had previously filed charges against Plaintiff); Alma Lee, and Gabrielle Martin, EEOC Council President.  The COI was asked to consider five charges filed against Plaintiff by NVP Keith Hill.  In July 2017, the COI dismissed four of the five charges. Regarding the sole remaining charge, the COI found probable cause that a November 15, 2016 email that Eugene Hudson, Jr. sent to AFGE members concerning President Donald Trump's election constituted malfeasance under Article 23, Section 2 (f) of the AFGE Constitution because the email violated the Hatch Act.

130.     On July 19, 2017, President J. David Cox, Sr. sent a letter convening the NEC at the National Headquarters for the sole purpose of taking action on the COI report.

131.     In August 8, 2017, at a special NEC meeting in Washington, D.C., AFGE found NST Hudson guilty based on the single Hatch Act charge and removed him from Office effective immediately. His membership was not affected. AFGE assigned three Vice Presidents to follow NST Hudson to his office while he removed his belongings.  A month after NST Hudson's

removal, on September 5, 2017, the U.S. Office of Special Counsel issued a ruling which states that OSC reviewed the email and ruled:  "OSC has concluded that this activity [NST Hudson's sending of the email] would not have violated the Hatch Act.

Based on the foregoing undisputed material facts, Plaintiff opposes AFGE's motion for summary judgment and cross claims for summary judgment on all claims.

## PROCEDURAL ISSUES

Since 2012, AFGE President J. David Cox and his NEC allies harassed, retaliated against, and created a hostile work environment for Plaintiff on the basis of his race in violation of Title VII and 42 U.S.C. 1981.  In its motion for summary judgment AFGE cites evidence obtained in related case 17-1867.

AFGE also cites evidence obtained during Mr. Hudson's deposition when he was represented by AFGE Deputy General Counsel Gony Goldberg in the racial discrimination and sexual harassment case filed by African American contractor, Larry Burnett.  In that litigation Mr. Burnett claimed that AFGE and President J. David Cox discriminated against him on the basis of his race and that Mr. Cox sexually  harassed him.  Ms. Goldberg represented AFGE in the Burnett case – not Mr. Hudson.

 Ms. Goldberg improperly represented Mr. Hudson during the Burnett deposition without first advising him that she was not acting as his attorney -- but as AFGE's counsel.  Ms. Goldberg failed to advise Mr. Hudson that she was not representing him and that he should obtain his own legal counsel to represent him in the deposition.

Ms. Goldberg presented Mr. Hudson with some documents pertaining to the Burnett case and told him to be prepared to testify at the Burnett deposition. *(Hudson Affidavit)*

AFGE has only provided Plaintiff with the transcript of his deposition in the Burnett case. Having opened the door by referencing in its motion for summary judgment matters discussed by Mr. Hudson during his deposition in the Burnett case, Plaintiff has the right to obtain all of the Burnett documents, including the nondisclosure settlement agreement that AFGE entered into with Mr. Burnett. Plaintiff has requested those documents, and AFGE has refused to produce them. The Court should order their production and afford Mr. Hudson sufficient time to review them and supplement this opposition and cross motion within a reasonable period after receiving them.

Additionally, Plaintiff has twice attempted to amend his complaint in this case, mistakenly thinking that the Court had granted him leave to do so. Both times, the Court struck the amended complaint because undersigned counsel did not attach a motion for leave to amend the complaint. As it turns out, this was beneficial. Since October 2019, when he filed the first amended complaint for the second time, Plaintiff has discovered new, previously unavailable evidence that is material and relevant to both cases (17-2094 and 17-1867).

Plaintiff has obtained declarations under penalty of perjury from Rocky Kabir and from a second, previously unknown witness. Both witnesses, like Mr. Hudson, are of color. Both witnesses also attest that J. David Cox often referred to them as "boy" and "son"; that he did so in a racially discriminatory, demeaning and offensive manner and over their repeated and strong objections *(See Declaration of Rocky Kabir, dated January 21, 2020)*

Against the foregoing background of material facts not in dispute, Plaintiff opposes AFGE's motion for summary judgment and files this cross-motion for summary judgment.

## ARGUMENT

In its motion for summary judgment AFGE appears to argue that while Mr. Cox may have taken disparate actions against Mr. Hudson for political reasons, Cox had no racial animus toward Mr. Hudson -- and Cox's numerous adverse employment actions taken against Plaintiff were not racially motivated.  AFGE also appears to argue that although AFGE's work environment may have been politically hostile to Mr. Hudson because President Cox viewed him as a political rival, Mr. Hudson's work environment was not racially hostile.

AFGE cites  *Morris v. McCarthy*, 825 F.3d 658  (D. C. Cir. 2016).  In *Morris*, the Court reviewed a district court's grant of summary judgment de novo, *Hairston v. Vance–Cooks*, 773 F.3d 266, 271 (D.C. Cir. 2014), viewing the evidence in the light most favorable to Morris, drawing all reasonable inferences in her favor, and avoiding weighing the evidence or making credibility determinations, *Hamilton v. Geithner*, 666 F.3d 1344, 1351 (D.C. Cir. 2012). *Morris v. McCarthy*, 825 F.3d 658, 667 (D.C. Cir. 2016)

In *Morris*, the D. C. Circuit discussed the "familiar framework set out in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under this formula, an employee must first make out a prima facie case of retaliation or discrimination. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The employer must then come forward with a legitimate, nondiscriminatory or non-retaliatory reason for the challenged action. *See Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254–55, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

 If the employer meets this burden, the *McDonnell Douglas* framework falls away and the factfinder must decide the ultimate question: whether the employee has proven intentional

discrimination or retaliation. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510–12, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993).

The employee can survive summary judgment by providing enough evidence for a reasonable jury to find that the employer's proffered explanation was a pretext for retaliation or discrimination. *Hamilton*, 666 F.3d at 1351; *–see also Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008).*Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016)

Here, AFGE asserts that when he used the pejoratives "boy" and "son" when addressing NST Hudson,  J. David Cox was just being himself and was not exhibiting racial bias toward AFGE has not come forward with " a legitimate, nondiscriminatory or non-retaliatory reason" for the Mr. Cox's use of the racial slurs "boy" and "son."

AFGE does not explain Pam Baca's testimony that NVP;s Gerald Swanke and Phil Glover used the racial pejorative "SMB" or "Simple Minded Blacks" when referring to NST Hudson and District 11 official Taye Davis, both of whom are African-American.    The fact that Phil Glover, who had only been on the NEC for about six months, was familiar with the term "SMB" and "grinned" when Swanke used it during December 2017 NEC meeting following NST Hudson's reinstatement by this Court indicates that the slur was well known, at least among Caucasian NEC members.  Additionally, Mr. Hudson has testified that the day before he was removed the first time, on August 7, 2017, he was walking toward the elevator at the AFGE headquarters when he observed Swanke look at him and say "SMB" to Cox, loud enough for Mr. Hudson to hear it.

Evidence of such widespread use of the racially offensive term "SMB" both in J. David Cox's presence at the elevator with Swanke and during the December 2017 NEC meeting over which Cox presided tends to prove that Cox was not just using the pejorative terms "boy" and

"son", as AFGE contends, because that's just the way he spoke. Rather, a jury could reasonably conclude that Cox approved of the use of the racially discriminatory term "SMB" when used by Swanke and other NEC members in reference to Mr. Hudson and other African American AFGE employees and officers. AFGE offers the unconvincing explanation that Mr. Cox just talked that way and called a lot of people "son" and he didn't mean any harm when he called Mr. Hudson a "boy" . During his deposition, Mr. Cox offered the inexplicable justification for calling NST Hudson a "boy" on his observation that: "When you go into schools, you see 'boy' and 'girl' on the bathroom doors."

In a recently obtained declaration from Cox's Confidential Secretary, Mr. Kabir testifies that Cox also referred to him using the terms "boy" and "son" in manner that he found racially offensive and demeaning. Like Mr. Hudson, Mr. Kabir testifies that he often complained to Cox and asked him to stop, but Cox refused.

Mr. Kabir, who identifies as a person of color, testified that Cox also used crude, derogatory and demeaning statements about Jewish people, Muslims and women. This new evidence from Mr. Kabir considered alongside Pam Baca's affidavit testimony corroborates Mr. Hudson's deposition testimony that J. David Cox held a racial animus toward African Americans and people of color. In *Morris*, the Court wrote:

> "Evaluating whether an employee may proceed to trial, we ask whether a reasonable jury could infer discrimination or retaliation from "all the evidence, which includes not only the prima facie case but also the evidence the plaintiff offers to attack the employer's proffered explanation for its action and [any] other evidence." *Gaujacq v. EDF, Inc.*, 601 F.3d 565, 577 (D.C. Cir. 2010) (quoting *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009)).

Plaintiff has clearly made a showing of discriminatory statements or attitudes on the part of J. David Cox, Gerald Swanke and Phil Glover..

 "A jury may infer discrimination from, among other things, "evidence of discriminatory statements or attitudes on the part of the employer." *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1289 (D.C. Cir. 1998) (en banc). To avoid summary judgment, employees need not necessarily provide evidence beyond that rebutting the employer's stated explanation." *See Reeves*, 530 U.S. at 147–48, 120 S.Ct. 2097.*Morris v. McCarthy*, 825 F.3d 658, 668 (D.C. Cir. 2016)

We agree with AFGE that *Morris* makes it clear that in order to avert summary judgment, Mr. Hudson must be **able to point to record evidence** that would allow a reasonable jury to find that he has suffered **legally cognizable adverse employment actions and that Cox's alleged bias seeped into and infected those legally cognizable adverse employment actions**."

Plaintiff has surmounted that burden.  Much of the evidence that J. David Cox's bias "seeped into and infected legally cognizable adverse employment actions taken against Mr. Hudson, is already in the record; including, AFGE's admission that J. David Cox repeatedly addressed NST Hudson, an adult African American man and the second highest officer at AFGE, as "boy" and "son" over Mr. Hudson's repeated objections and the foregoing corroborating testimony of Pam Baca and Rocky Kabir.

Whether Cox was using the terms "son" and "boy" over Mr. Hudson's objections constitutes actionable racial bias is a material  issue in dispute for the jury to decide and not an issue that this Court may decide summarily.

### AFGE Continues To Discriminate Against Mr. Hudson On The Basis Of His Race; AFGE Recently Dropped His AFGE Membership For Nonpayment Of Dues After The U.S. Department of Labor Determined That His Dues Were Fully Paid

In the wake of an October 2019 Bloomberg News article reporting numerous sexual harassment complaints filed against him, Cox took a sudden, indefinite leave of absence as President of AFGE.  Shortly thereafter, AFGE retained Working Ideal, a law firm headed by former EEOC Chair, Jenny Yang, to investigate all discrimination complaints (including racial

discrimination complaints, sexual discrimination complaints and sexual harassment complaints) filed against J. David Cox.

During a November 2019 NEC meeting, Acting President Everett Kelley, who is African American, presided over the meeting in J. David Cox's absence.  Mr. Hudson, a 30-year AFGE member,  rose to speak and to exercise the same rights of other AFGE members.  Mr. Hudson's membership status is the subject of litigation in related case 19-2738 filed in September 2019.  In that case, Mr. Hudson filed a complaint against AFGE, its Local 1923 affiliate and the United States Department of Labor (DOL) asking this Court for injunctive relief; namely, to reinstate his 30-year AFGE membership and declare that he was eligible to run as a candidate in the upcoming DOL-supervised election.   AFGE claimed that it dropped Mr. Hudson's membership because he had not paid his annual retiree union dues of $50.  Because he was not a member in good standing, AFGE National argued, Mr. Hudson was ineligible to run for office in an upcoming DOL-supervised election.

After a two-week investigation, the DOL informed this Court that Mr. Hudson had, in fact,  timely and fully paid his dues to AFGE Local 1923;that he was eligible to run as a candidate and that  Mr. Hudson was entitled to all rights guaranteed by the LMRDA to any candidate for office.  Despite the DOL's ruling, AFGE and the AFGE Local 1923 President, with the approval of President J. David Cox, refused to reinstate Mr. Hudson's membership.

A month before the December 2019 election, Mr. Hudson attended the November AFGE NEC meeting.  Like any other member in good standing, Mr. Hudson rose and raised his hand requesting to speak during the meeting.  Acting President Kelley asked AFGE General Counsel David Borer for a legal opinion on whether he could allow Mr. Hudson to speak during the

meeting. Mr. Borer stated that Mr. Hudson could speak only if the NEC voted to permit him to speak.

AFGE admits, in its motion for summary judgment, that President Cox unilaterally transferred authority over the Human Resource Department and the IT Department from NST Hudson to himself. AFGE does not deny that Mr. Cox did so without first obtaining the approval of the AFGE National Executive Council ("NEC"). Yet, AFGE claims that Mr. Cox took away the departments for reasons unrelated to NST Hudson's race.

AFGE claims that Mr. Cox's unilateral decisions in the summer of 2016 to strip NST Hudson of two of his most important departments and to usurp NST Hudson's authority to review the expense vouchers of NEC members – one of the fundamental functions of the NST – have nothing to do with Mr. Hudson's race.

This is a material fact in dispute. Plaintiff contends that Cox took all these adverse employment actions (removing from his purview two of NST Hudson's largest departments and his stripping his authority to review expense vouchers) without NEC approval and in violation of the AFGE Constitution to undermine his authority as NST; render him powerless as the first African American elected to the second highest office at AFGE; humiliate and harass him and leave him as NST in name only.

Ample proof that Cox, Swanke, Glover, and McCubbin conspired to take these adverse actions against Mr. Hudson for racially motivated reasons in the summer of 2016 is found in Council 220 official Pam Baca's affidavit. For example, J. David Cox testified at his deposition that he appoints all members of all AFGE Committees. Cox appointed NVP Gerald Swanke as chair of the COI investigation the Keith Hill allegations and Swanke told Ms. Baca confidentially months before NST Hudson wrote the November 2016 Trump email, that he and

other NEC officials planned to take Hudson down". Ms. Baca also testified that Swanke often

referred to NST Hudson as an "SMB" or "Simple-Minded Black".

The record is clear – Cox was motivated by racial bias. Mr. Cox told Ms. Baca that he

feared Mr. Hudson – the Black National Secretary Treasurer who would become AFGE

President if anything happened to him. Cox shared that he had come up with a plan to deceive

the NEC in the event of his death – to keep Mr. Hudson from becoming president. Admittedly,

Cox had been drinking when he made the statement. Still, this evidence is admissible and a jury

could find that it is evidence of Cox's racial animus toward Mr. Hudson.

Ms. Baca testified that Swanke used the term "SMB" on two occasions, once in reference

to AFGE Fair Practices Coordinator Taye Davis and the other in reference to NST Hudson, both

of whom are African American. Ms. Baca testified that NVP Phil Glover, who had only been on

the NEC for seven months, was familiar and comfortable with the racist term, Simple Minded

Blacks.

In his opposition and cross claim for summary judgment, Plaintiff points to the following

evidence that will allow a reasonable jury to find that he has suffered legally cognizable adverse

employment actions; that Cox's bias seeped into and infected those legally cognizable adverse

employment actions; and  that, as a result, AFGE and its President J. David Cox harassed him,

discriminated against him and created a hostile work environment for him on the basis of his

race.

### AFGE President Jeffrey David Cox Often Called Mr. Hudson The Racially Pejorative Terms "Boy" and "Son" Over His Objections

In response to questioning, J. David Cox did not deny calling Mr. Hudson "boy". Mr.

Cox testified that he was not aware that NST Hudson objected to Cox referring to him as "boy".

*Plaintiff's April 25, 2019 Motion for Leave to Amend Complaint at page 17, ¶5 [ Cox*

*Deposition Transcript at p. 250, lines 13-15]* Mr. Cox's admission that he used the term "son" in addressing NST Hudson, the second highest ranking AFGE official and first African American elected to the position, claiming that he was not aware that Mr. Hudson objected to the pejorative. *[Cox Deposition Transcript at p. 248, lines 18-21]*

In its June 2019 motion for summary judgment, AFGE does not deny that AFGE President J. David Cox used the racially pejorative terms "boy" and "son" when addressing National Secretary Eugene Hudson over Mr. Hudson's repeated objections. Instead, AFGE suggests that the working relationship between the two AFGE leaders "was perfectly fine and cordial until the 2016-2017 time frame." Nothing could be further from the truth.

Plaintiff has provided the following evidence of Cox's racial animus toward African Americans. This evidence refutes Defendant's claim that everything was "perfectly fine and cordial until the 2016-2017 time frame and supports Plaintiff's opposition and cross motion for summary judgment.

### AFGE Has A History Of Condoning Racial Discrimination Against Its African American Employees

In 2001 Ulander Stone, an African American woman, filed suit against AFGE and AFGE Council 220. In the lawsuit, Ms. Stone asserted that she had filed a complaint with Council 220 President Witold Skwierczynski that a member of his staff had called her a "Nigger" on numerous occasions. Instead of taking disciplinary action against the offending staff member, Skwierczynski terminated Ms. Stone, who then filed a lawsuit in federal court. AFGE helped pay Council 220's legal fees in defending Stone's racial discrimination lawsuit. Council 220 ultimately settled the case by paying Ms. Stone for her damages, but Skwierczynski and the Council 220 official who repeatedly called Ms. Stone a "Nigger" were not disciplined.

The Cox deposition also established that Cox, General Counsel David Borer and other AFGE officials were aware of the 2001 Stone incident in 2011 and 2015 when NST Hudson complained that Witold had called him a "Nigger".  Ten years after firing Ms. Stone, Council 220 President Witold Skwierczynski angrily confronted then-National Vice President Eugene Hudson and called him a "Nigger" at an AFGE event.  Then-National Vice President (and current Acting President) Everett Kelley, who is African American, witnessed the event and gave a written statement confirming that  Skwierczynski started the disagreement and called Mr. Hudson a "Nigger".  Then-AFGE President John Gage,  NST J. David Cox was NST, General Counsel David Borer, and Chief of Staff Brian DeWyngaert,  all of whom are Caucasian American, were present during the incident but claimed they did not hear Skwierczynski use the epithet.  Mr. Hudson filed Article XXIII charges against Skwierczynski, and Gage appointed a COI to investigate the charges.

By the time the Skwierczynski charges reached the desk of the AFGE President in 2012, Gage had retired; J. David Cox was National President and Mr. Hudson was National Secretary Treasurer.  AFGE officials knew that ten years earlier, Skwierczynski had fired Ms. Stone after she complained about being called a Nigger and was now charged with hurling the same racist epithet at NVP Hudson -- an AFGE officer and member of the NEC.   Still, President Cox refused to take any disciplinary action against Skwierczynski and dismissed all charges against him on the condition that he write a letter of apology to Mr. Hudson.

Insinuating that Mr. Hudson somehow contributed to Skwierczynski's racist misconduct, which he clearly did not, Cox encouraged NST Hudson to enter into mediation with Skwierczynski based on their "longstanding history".  AFGE argues that the COI, not Cox, recommended Skwierczynski's slap on the wrist for calling Mr. Hudson a "Nigger" , and that

Cox was simply following his policy of not overruling the COI's recommendations.  There is
ample evidence in the record establishing that Cox does not follow the recommendations of the
COI – in fact, Cox does not follow the mandates of the AFGE National Constitution.  On more
than one occasion, Cox has unilaterally removed elected AFGE officials for far less egregious
reasons than those involving  Skwierczynski.  Whether Cox adhered to the COI's
recommendation or decided on his own not to discipline Skwierczynski is a material fact in
dispute that the jury should decide.

### Emeritus Officer Jane Nygaard Testified That AFGE President, J. David Cox Is "Autocratic, Unreasonable, Narcissistic And Demeaning To Anyone Who Opposes Him, Including Duly Elected Officers of AFGE"

When considering whether AFGE President J. David Cox adhered to a policy of
following the recommendations of the Committee of Investigations in  imposing discipline in
Skwierczynski's case, it is important to consider how J. David Cox ran AFGE.  NEC Emeritus
Officer Jane Nygaard who knew Cox for over 30 years and served with him on the NEC for over
a decade testified that "there was an atmosphere of fear that came with Cox.  He is autocratic,
unreasonable, narcissistic, and demeaning to anyone who opposes him, including duly elected
officers of AFGE."  *[Affidavit of Jane Nygaard, dated June 5, 2019 p.3, ¶1]*

### Council 220 Vice President Pam Baca Testified That AFGE National Vice President Jeremy Lannan Told Her That President, J. David Cox And AFGE General Counsel Told Him That If He Did Not Remove Ms. Baca From Office As Cox Directed, That Lannan Would Be Charged, Suspended From Office And Bodily Removed From The Building

Cox's dictatorial management style is evidenced in the affidavit of Council 220 official
Pam Baca, who is Hispanic. Ms. Baca testified that in the summer of 2018, after informing
District 11 NVP Gerald Swanke that she could not support an increase in the per capita if dues
money was going to be used to interfere with and harass autonomous locals, she told Swanke
that she was not going to support J. David Cox for National President and that she would support

Eugene Hudson.  Swanke exploded, stating that Baca was "throwing her support behind "a

thug",  and that "he would make sure that [she] regretted that decision.". *[Baca Affidavit, p. 21,*

*¶2]*  As Ms Baca was en route to speak on the AFGE Human Rights Committee's  PRIDE

conference, she testified:

> "I received a call from NVP Jeremy Lannan that I had been suspended from my position
> as District 11 Women's Coordinator and as Council 220 National Second Vice President.
> He stated that he just found out about my suspension from AFGE General Counsel David
> Borer.  NVP Lannan told me Borer instructed him to cancel my plane reservation to D.C.
> NVP Lannan was shocked and outraged at this and immediately went to Borer's office to
> discuss the situation.   When Lannan could not obtain answers from Borer, he went to J.
> David Cox's office and insisted upon waiting for Cox to speak with him.  …Lannan
> voiced his opposition and outrage to the suspension because it had nothing to do with my
> duties as an HRC Coordinator and was a Local issue involving me as a member only.
> Lannan stated he intended to support  me and continue to allow me to perform my duties
> as an HRC Coordinator.
>
> Upon his statement, he was told by Cox and Borer that if he did that he would be
> charged, suspended from office and bodily removed from the building.  He was so upset
> by this that he went back to his office and remained there until he was able to calm
> down…. NVP Lannan told me that he asked Swanke why he had not been informed.
> Swanke stated he couldn't trust NVP Lannan not to tell me what he was doing and he
> wanted to blindside me." *[Baca Affidavit, p. 29-30*]

After Swanke informed Cox that Pam Baca was not supporting his bid for reelection, J.

David Cox unilaterally removed Ms. Baca as District 11 Women's Coordinator and as Council

220 National Second Vice President without first charging her and appointing a COI as

mandated by the AFGE Constitution. Cox threatened National Vice President Lannan, a fellow

member of the AFGE governing body, the NEC, that Lannan "would be charged, suspended

from office and bodily removed from the building" if he allowed Ms. Baca to maintain her

position after Cox removed her.  A jury presented with this evidence could reasonably conclude

that AFGE President J. David Cox runs AFGE – by fiat – and not by following the COI's

recommendations.

Cox's threat to Lannan and his summary removal of Baca proves that he could care less about a Committee of Investigation if it gets in the way with what he wants. This evidence of Cox's self-centered, hard-charging, and dictatorial personality disproves AFGE's claim that Cox has a policy of going along with the recommendation of the Committee on Investigation in disciplinary cases. .

**In June 2015, AFGE President J. David Cox Signed An EEOC Settlement Agreement Promising To Refrain From Engaging In Employment Discrimination; Three Months After Signing The Agreement, Cox Again Refused To Discipline Skwierczynski After He Called NST Hudson A "Nigger" For The Second Time In Four Years**

In June 19, 2015, Jocelynn Johnson, an African-American woman, filed a charge with the United States Equal Employment Opportunity Commission charging AFGE with discriminating against her on the basis of her race, African American, sex, religion, and age. *(Exh. 2: Jocelynn Johnson Charge No. 870-2015-01506)* The EEOC found probable cause for Ms. Johnson's charges and AFGE entered into a Mediation Settlement Agreement with Ms. Johnson which President signed on behalf of AFGE.

In the agreement, AFGE agreed  to "provide EEO training to all of its managers at the National Office [including J. David Cox and the NEC members]  no later than December 31, 2015, and to advise the ADR Coordinator by email of its completion. The training will include discrimination covered by Title VII (race, sex, color, religion, national origin and retaliation), ADA and ADEA.  *(Exhibit 3:  Mediation Settlement Agreement between AFGE and Jocelynn Johnson, dated August 27, 2015)*   AFGE and President Cox further agreed that there shall be "no discrimination or retaliation of any kind against the Charging Party, Jocelynn Johnson, as a result of filing the charge or against any other person because of opposition to any practice deemed illegal under Title VII and other federal anti-discrimination statutes.

**AFGE And Cox Enforced The AFGE "No Politics Rule" In A Racially Discriminatory Manner – Only Two Employees In AFGE's History Were Terminated For Violating The Rule, And Both Are African-American**

On January 12, 2018Mr. Cox terminated Ms. Johnson, an African American with 13 years of service, for purportedly violating the AFGE "No Politics" Rule by donating $10 to the 2018 AFGE election campaign of Eugene Hudson – a charge she denied.

On the same date, January 12, 2018,  AFGE terminated NST Hudson after 29 years of service for violating the same AFGE "No Politics" Rule after the Court vacated the preliminary injunction in related case 17-1867.

**Only two AFGE employees in AFGE's history have ever been terminated for violating the "No Politics" Rule – Eugene Hudson, Jr. and Jocelynn Johnson, both of whom are African American.**

By contrast, AFGE Policy Director Jacque Simon, who is Caucasian and the public face of employee, violated the AFGE "No Politics" Rule when she worked on Cox's 2018 re-election campaign.

Based on the November 6, 2019 declaration of Confidential Secretary Rocky Kabir, on November 15, 2019, AFGE Emeritus Officers [Former AFGE National President] John Gage, Jim Davis, Jane Nygaard, and Kitty Petticord filed Article XXIII charges against Cox for directing Mr. Kabir and AFGE Policy Director Jacque Simon to secretly work on his 2018 re-election campaign from his Silver Spring apartment.  *(Kabir Declaration, November 6, 2019)* AFGE appointed a Committee of Investigations headed by NVP David Mollett to investigate the charges, and the COI investigation is currently pending.

The charges were filed two  months ago. To date, unlike Jocelynn Johnson and Eugene Hudson,  J. David Cox and Jacque Simon, who are Caucasian, have not been terminated for

violating the AFGE "No Politics" rule.  Ms. Simon still reports to work every day at AFGE.  J. David Cox is on leave of absence.   AFGE has taken no adverse employment actions against Cox or Simon.

### J. David Cox Has Been Accused Of Sexually Abusing Approximately A Dozen AFGE Employees And Engaging In Racial Discrimination By At Least Three; Yet, To Date, AFGE Has Taken No Adverse Employment Actions Against Him

Despite sexual harassment complaints filed against J. David Cox by Brett Copeland, former AFGE Communications Director, who is Caucasian, and approximately 10 other alleged victims of Cox's harassment, AFGE has taken **no adverse employment actions against Mr. Cox,** who, of course identifies as Caucasian.  Instead, AFGE and the NEC apparently allowed Mr. Cox to take a leave of absence with pay at AFGE members' expense.  By contrast, AFGE terminated Mr. Hudson for allegedly directing his staff member, Willie Hope, to send  a 2016 Trump email to AFGE members using AFGE resources, the total cos of which, by AFGE's admission, was less than $100.

In November 2019, after Bloomberg News broke the story about Cox's sexual predations, AFGE appointed NVP George McCubbin as chair of the Legal Rights Committee to investigate the sexual harassment complaints.  Mr. McCubbin is the **same** individual who, with Gerald Swanke, told Council 220 official Pam Baca that they were going to **"bring Hudson down"** in September 2016 – months **before** Mr. Hudson wrote the November 2016 Trump email.

In December 2017, Mr. McCubbin also filed Article XXIII charges accusing Mr. Hudson of exceeding his budget (something that McCubbin and Cox had also done without any adverse consequences).  The December 2017 McCubbin charges have never been served on Mr. Hudson and are currently pending before the NEC.  Plaintiff anticipates that AFGE will bring the charges, if needed, in the future to prevent Mr. Hudson from running for office.

Under McCubbins' leadership, the Legal Rights Committee agreed to pay approximately $100,000 of AFGE members' dues to retain the law firm, Working Ideal, to conduct an internal investigation into all discrimination charges filed against Cox (including racial discrimination, sex discrimination, sexual harassment and all other types of discrimination covered under Title VII). Working Ideal, which states on its website that it has an attorney client relationship with AFGE and the NEC interviewed Mr. Hudson, Ms. Johnson and Mr. Kabir last November 2019 and presumably has interviewed other witnesses. It is unclear whether Working Ideal represents J. David Cox. To date, Working Ideal has not yet issued a report on the its findings. Last week, Working Ideal conducted a discrimination training for AFGE headquarters staff.

### 6. Two Months After Signing The EEOC Discrimination Settlement Agreement, Skwierczynski Again Called NST Eugene Hudson A "Nigger" During The AFGE Convention; Cox Took No Disciplinary Action Against Skwierczynski; Instead, Cox Appointed A COI To Investigate NST Hudson

Two months after Cox signed the EEOC Mediation Settlement Agreement, in August 2015, Witold again called Mr. Hudson a "Nigger" and invited him to fight during an AFGE Convention. This time, Skwierczynski was careful to make the racist comment to NST Hudson outside the earshot of witnesses. NST Hudson walked away calmly. Later that same day, Cox inexplicably convened a meeting at Skwierczynski's request to discuss his complaints against NST Hudson. During the meeting, NST Hudson asked Cox why he had called a meeting to discuss him when, Skwierczynski had called him a "Nigger". AFGE Council 220 official Pam Baca (at the time, a close associate of Skwierczynski and a close and trusted confidante of NVP Gerald Swanke) was present during the meeting and describes what happened:

> "I do not recall what statements led to the confrontation between Witold and Mr. Hudson, but a confrontation arose between the two of them. Both men were standing up and were yelling at one another with several other people trying to calm them both down. I was sitting one person over from Witold and two people over from Mr. Hudson…. As both men stood up, their chairs hit the wall behind them. This was due more to the small size

of the room than the force with which the chairs were pushed.  Mr. Hudson stood up
before Witold did, but Witold did stand soon after Mr. Hudson did.   The men were
moving closer to one another were on the verge of touching one another, when members
of the NEC jumped up and began to make their way to M. Hudson to restrain him.

"Mr. Hudson was then led out of the room by NVP Everett Kelley and NVP George
McCubbin.  NVP Cheryl Eliano followed them out.  NST Hudson left the room, and the
meeting resumed.  Upon Mr. Hudson's departure, NP Cox turned to all of us and said,
"Now you see what we all go through on the NEC. This is constant with him. Now you
see what we all put up with from NST Hudson.  This behavior is common from him, and
we all have to endure it."  Several members of Council 220 asked why the NEC put up
with it and NP Cox shrugged his shoulders and shook his head.  It was then that NVP
Swanke stated that he was not putting up with Mr. Hudson's behavior any longer and that
he was filing charges against him. Swanke stated that if any member of Council 220 was
inclined to file charges, he would join with them on the charges and provide witness
testimony.  I agreed to do so because I am also from District 11. …Approximately a week
after the convention ended, Swanke contacted me to coordinate on the charges.  He did
not have much confidence in the charges being successful against Mr. Hudson… but that
… this was a "start."  *( Baca Affidavit, dated May 29, 2019, pp. 6-8)*

NVP Gerald Swanke and Pam Baca did not file charges against Witold for calling Mr. Hudson a

"Nigger" for the second time.   Egged on by Cox's false statement that "this is what we have to

endure with Hudson", Swanke and Baca filed charges against NST Hudson for "conduct

unbecoming an AFGE member" after his angry reaction to being called a "Nigger".   The COI

dismissed the baseless Swanke/Baca charges.

After a full investigation, the COI issued a February 2016 report finding:  "After

interviewing all the witnesses who were present during the incident, the Committee concluded:

"all agreed that no one from Council 2220 felt threatened, and NST Hudson "did **not** lay a hand

on the Council 220 President."

### J. David Cox Falsely Testified That He Observed NST Hudson "Aggressively Touch" Witold Skwiercyzynski During The August 2015 Incident

Cox and the other NEC members approved the COI report dismissing the charges against

Mr. Hudson.  Yet,  Cox, whom AFGE asserts has a policy of following the COI

recommendations,  gave false testimony, contradicted by Pam Baca's affidavit testimony and the

findings of the COI appointed to investigate the Swanke/Baca charges, that he observed "an altercation" between Hudson and Witold and "it looked like Mr. Hudson was trying to assault" Mr. Skwiercyzynski. *[Exh. 1: Cox Deposition at p. 88, 10-12]* Cox falsely testified that he saw Hudson "touch" Witold "in an aggressive mannerism". *[Exh 1: Cox Deposition, p. 101, 17 to 102, 2]* Cox also lied under oath when he testified that he observed NST Hudson "aggressively touch" Witold – testimony that was impeached by all of the other witnesses that the COI interviewed who were present during the 2015 incident.

Former AFGE NVP and NEC Emeritus Officer Jane Nygaard chaired the Committee on Investigations that investigated the 2015 Swanke/Baca charges filed against former NST Eugene Hudson for conduct unbecoming a member. Ms. Nygaard testified that the COI interviewed **all** of the witnesses who were present at the August 2015 AFGE convention when NST Hudson accused [Witold] of calling him the N-word for a second time just before the meeting when they were alone." Nygaard testified that all the witnesses testified that Eugene did not lay a hand on Witold. *[Affidavit of Jane Nygaard, dated May 31, 2019, p. 5, ¶3]*

The COI report concluded by faulting President Cox for convening the 2015 meeting to discuss Witold's complaint against NST Hudson because knew such a meeting could be potentially explosive given the two men's history.

Mr. Hudson clearly testified that he told Cox that Witold called him a "Nigger." Yet, J. David Cox testified during his deposition that he did **not** hear Hudson angrily announce to the group that Witold had called him a "Nigger" earlier that day.

For the most part, during his deposition Mr. Cox either refused to answer questions on the advice of his counsel, Devki Virk, or he claimed that could not recall other events that occurred as recently as 2017.

Yet, AFGE President Cox testified that four years earlier, in 2015, he specifically recalled seeing Mr. Hudson "touch Witold in an aggressive manner" but that he did **not** recall Hudson complaining to him that Witold had called him a "Nigger".    *(Transcript of J. David Cox)*

Cox's testimony contradicts that of all other eyewitnesses to the incident, according to the COI report. The Court should accord little credence to Mr. Cox's entire deposition testimony because it is unreliable and lacks credibility. As AFGE President and a member of the NEC that received the COI report on the Swanke/Baca charges, Mr. Cox was aware or should have been aware of the COI's findings. Cox certainly knew or should have known that his 2019 testimony that Mr. Hudson "aggressively touched" Witold during the AFGE 2015 convention was contradicted by the eyewitnesses testimony contained in the COI report.

Cox's selective amnesia regarding NST Hudson's complaint that Witold had called him a "Nigger" for the second time coupled with his purported clear recall that he observed Mr. Hudson aggressively touch Witold -- an allegation directly contracted by multiple eyewitnesses, is further evidence of his racial animus toward Mr. Hudson.

Despite AFGE's claims to the contrary, Cox's testimony on these points constitutes a glaring example of an important instance in which Cox did not follow the COI's recommendation. There is one instance in the record in which Cox adhered to the COI recommendation – when Mr. Cox appointed Gerald Swanke as Chair of the COI to investigate the Keith Hill charges that NST Hudson violated the use of AFGE resources rule when he directed Willie Hope to send the Trump email.

Swanke's COI recommended NST Hudson's removal, and Cox followed the recommendation to the letter. Still, even this Court discerned Swanke's bias against NST

Hudson and set aside Mr. Hudson's first removal, after concluding that Swanke's bias "infected" the NEC removal hearing.

While the Court did not find that Swanke's bias was racially motivated, new evidence not previously available establishes that fact by a preponderance of the evidence.

Ms. Baca testified that Swanke "was not averse to being frank with me because he thought that I was his ally after I joined him in filing the 2015 charges against NST Hudson" for responding angrily after Witold called him a "Nigger" for the second time. *[Baca Affidavit, dated May 29, 2019, p. 12, ¶1]* Ms. Baca testified that she "heard Swanke use the "highly offensive and racially discriminating" phrase "SMB" *[Ibid., p.. 16]* [the code word Baca described as used by Swanke and other Caucasian NEC members that means "Simple Minded Blacks"] on two separate occasions – once to describe African-American AFGE official Taye Davis. [*Ibid., p. 13, ¶¶2-4*]

Ms. Baca testified that she heard Swanke and Phil Glover use the term SMB again in 2017 to describe NST Hudson just before an NEC meeting at AFGE headquarters. *[Ibid, p. 14-16*

Ms. Baca testified: [Swanke] often showed open hate for Mr. Hudson and spoke regularly about bringing him down. He would laugh and smirk every time he spoke about Mr. Hudson." *[Baca Affidavit, p.11, ¶1]*

Ms. Baca testified that Swanke and NVP McCubbin said they "were getting close to being able to bring Hudson down" and that "Hudson has no idea what we have waiting for him. [Baca Affidavit, p. 10,¶1]. She testified that [Swanke] held a high level of disdain and antipathy for Mr. Hudson and spoke often about "bringing Hudson down". Swanke stated several times that he had spoken to the NEC and that they had plans to go after Mr. Hudson. It was clear to me

he was obsessed with his hate of Mr. Hudson.  He often showed open hate for Mr. Hudson and spoke regularly about "bringing him down." *[Baca Affidavit, pp. 10-11]*

Ms. Baca testified:  "As early as September 2016, months **before** Keith Hill filed the December 2016 Trump email charges against NST Hudson, Swanke told me on more than one occasion that the NEC was going to "bring Hudson down" and that he knew that he was going to be removed from office because he (Swanke) was going to be appointed to the Committee on Investigations that looked into the Hudson charges." *[Baca Affidavit, p. 11]*

Cox was aware that Gerald Swanke was biased toward NST Hudson. Yet, Cox appointed Swanke as Chair of the COI that investigated the Hill charges and recommended NST Hudson's removal.  Ms. Baca's testimony that Swanke told her that he would be appointed to the COI and that the NEC was going to "bring Hudson down", proves that Cox informed Swanke in advance to Chair the COI in order to ensure that the Committee recommended removal.  Plaintiff must be permitted to present this evidence to a jury – that Cox appointed Swanke as Chair of the COI when he knew or should have known, that Swanke held a racial bias toward Plaintiff.  Mr. Cox then rammed the Swanke-led, COI's removal recommendation through the NEC, over the strong objections of NVP Dorothy James.

Plaintiff offers this evidence not to show racial bias on the issue of removal (which the Court has dismissed on claims splitting grounds), but to establish a prima facie case showing that Mr. Hudson suffered racial harassment and endured a racially hostile work environment at the hands of J. David Cox, Gerald Swanke, George McCubbin, Phil Glover and possibly other NEC members whose vote was influenced by them.

**Based On Evidence Discovered After Plaintiff Filed His July 2017 EEOC Complaint And After Giving His Deposition In This Case,  A Jury Could Reasonably Conclude That J. David Cox Held A  Racial Animus And That Cox Stripped NST Hudson Of His Authority Over Two Important Departments – Human Resources and IT For Impermissible Racially Discriminatory Reasons**

AFGE argues that the Court should not allow a jury to decide whether J. David Cox stripped Mr. Hudson of his authority over two important departments, Human Resources and IT, for racially discriminatory reasons.  AFGE claims that Mr. "Hudson's "entire theory" and "stance" in this case is that the adverse employment actions alleged in Claims 4-5 were taken by Cox for political reasons and that political reasons that are "not illegal under the antidiscrimination laws." Therefore, AFGE argues, Hudson therefore cannot maintain Claims 4 & 5 under the antidiscrimination laws (Title VII and 42 U.S.C. § 1981) that he invokes.

AFGE bases this argument on statements selectively lifted from Mr. Hudson's deposition.  Yet,  AFGE omits the fact that Mr. Hudson filed an EEOC complaint in July 2017, legitimately claiming  that AFGE was discriminating against him on the basis of his race.

When he filed his July 2017 EEOC racial discrimination complaint, Mr. Hudson knew *only* that Mr. Cox had repeatedly referred to him as "boy" and "son" over his objection, refused to take disciplinary action against Council 220 President Skwierczynski, after he called Mr. Hudson a "Nigger" on two separate occasions in 2011 and 2015;  stripped NST Hudson of  two major departments, refused Hudson's increased salary request for  his African American staff assistant, Willie Hope,  and gutted his authority as the first African American National Secretary Treasurer,  to review and approve expense vouchers.

Since filing his EEOC complaint and testifying in his deposition in this case, Mr. Hudson has obtained additional evidence from new witnesses, Pam Baca, Jane Nygaard, Jocelynn

Johnson and Rocky Kabir,  that he was unaware of when he testified at his deposition in case 17-
2094.

Ready This newly discovered is contained in the affidavits of Council 220 Pam Baca, Emeritus
Officer Jane Nygaard and President Cox's Confidential Secretary, Rocky Kabir.  It proves that
President Cox, NVP Gerald Swanke, and NVP Phil Glover held a racial animus toward Mr.
Hudson.

Specifically, Pam Baca testified that in 2016, months before Mr. Hudson wrote the
November 2016 Trump email, Gerald Swanke told Ms. Baca that he and other NEC officials
were going to "bring Hudson down"; that Swanke referred to Taye Davis and Mr. Hudson as
"SMB's" or "Simple Minded Blacks"; that Swanke told Ms. Baca that he hated Hudson and was
going to bring him down; that after Keith Hill filed the Trump email charges against Mr.
Hudson, Swanke told Baca that he knew that  Cox would appoint him as Chair of the COI that
investigated the charges and that  Swanke's assured Ms. Baca that the NEC, in his words,  was
going "to take Hudson down and he had no idea what was coming".

When Mr. Hudson gave his deposition testimony in this case he was also unaware (but
later learned) that Cox confided in Council 220 official  Pam Baca that he feared Hudson and did
not want him to become president; that Cox told Baca that he and his Chief of Staff Brian
DeWyngaert had concocted a bizarre plan – should Cox become incapacitated or died,  that
DeWyngaert would conceal Cox's death and tell the NEC that Cox was in North Carolina in
order to prevent Mr. Hudson's ascension to the AFGE presidency.

Taken together this is strong evidence of a racial animus on the part of Cox and Swanke
who conspired with other NEC members, McCubbin and Glover, to remove  Mr. Hudson for

racially discriminatory reasons – evidence that Mr. Hudson did not discover until AFTER his deposition in this case.

Mr. Hudson was also unaware when he gave his deposition testimony in this case that Cox's Confidential Secretary Rocky Kabir testified that he observed that Cox use the terms "boy" and "son" when addressing him.  Mr. Kabir also testified that Cox often made crude, offensive comments about Jews, Muslims, women and lesbians.

All of the foregoing this evidence (which Mr. Hudson did not know when his deposition was taken) tends to prove that Cox was not acting solely for political reasons when he stripped Mr. Hudson of the two department.  The Court should not deprive Mr. Hudson the opportunity to present this evidence to a jury to determine whether, in fact, Cox took away the departments and engaged in the other adverse employment actions against Mr. Hudson based on racially biased motivations.   The Court should consider the motion for summary judgment, Plaintiff's opposition and the cross motion based on all of the currently available evidence – not just on excerpts selectively lifted by AFGE from Mr. Hudson's deposition.

## LEGAL STANDARD

"Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Holcomb v. Powell,* 433 F.3d 889, 895 (D.C.Cir.2006).   "A fact is 'material' if a dispute over it might affect the outcome of a suit under governing law; factual disputes that are 'irrelevant or unnecessary' do not affect the summary judgment determination." *Holcomb,* 433 F.3d at 895 (quoting *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505). An issue is "genuine" if the evidence is such that a reasonable jury could

return a verdict for the nonmoving party. *See Scott v. Harris,* 550 U.S. 372, 380, 127 S.Ct. 1769, 167 L.Ed.2d 686 (2007); *Liberty Lobby,* 477 U.S. at 248, 106 S.Ct. 2505; *Holcomb,* 433 F.3d at 895.  "The party seeking summary judgment bears the initial responsibility of demonstrating the absence of a genuine dispute of material fact. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party may successfully support its motion by identifying those portions of "the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials," that it believes demonstrate the absence of a genuine issue of material fact. *See* Fed.R.Civ.P. 56(c)(1)(A); *see Celotex,* 477 U.S. at 323, 106 S.Ct. 2548.

"When a motion for summary judgment is under consideration, "the evidence of the non-movant[s] is to be believed, and all justifiable inferences are to be drawn in [their] favor." *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505; *see also Mastro v. Potomac Electric Power Co.,* 447 F.3d 843, 849–50 (D.C.Cir.2006); *Aka v. Washington Hospital Center,* 156 F.3d 1284, 1288 (D.C.Cir.1998) (*en banc* ); *Washington Post Co. v. U.S. Dep't of Health and Human Services,* 865 F.2d 320, 325 (D.C.Cir.1989). On a motion for summary judgment, the Court must "eschew making credibility determinations or weighing the evidence." *Czekalski v. Peters,* 475 F.3d 360, 363 (D.C.Cir.2007)."The non-moving parties' opposition must consist of more than mere unsupported allegations or denials and must be supported by affidavits, declarations or other competent evidence, setting forth specific facts showing that there is a genuine issue for trial. *See* Fed.R.Civ.P. 56(c); *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548. They are required to provide evidence that would permit a reasonable jury to find in their favor. *See Laningham v. United States Navy,* 813 F.2d 1236, 1242 (D.C.Cir.1987). If the non-movants' evidence is

"merely colorable" or "not significantly probative," summary judgment may be granted. *Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. 2505; *see Scott v. Harris,* 550 U.S. at 380, 127 S.Ct. 1769 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is 'no genuine issue for trial.' ") (quoting *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).Morales v. Humphrey, 309 F.R.D. 44, 46 (D.D.C. 2015)

**The Record Is Filled With Evidence That Cox Harbored a Racial Bias Against African Americans That Seeped Into And Infected Cox's Adverse Employment Actions**.

In a status conference held one day after Cox's deposition, undersigned counsel informed the Court that Cox repeatedly claimed that he could not recall answers to questions about events that occurred over the past several years.  Undersigned counsel asked the Court to permit her to hold a Rule 30(b)(6) deposition to get the discovery to which Plaintiff is entitled.  The Court refused, but stated that at trial, Plaintiff could use Cox's failure to answer for impeachment purposes.   Plaintiff deserves an opportunity to present that evidence of Cox's repeated claims that he did not recall answers to the jury.  For that reason alone, Defendant's motion for summary judgment should be denied.

AFGE argues that "Hudson tries to avert summary judgment by seeking to portray Cox as someone who harbors a general bias against African Americans". AFGE points to Mr. Hudson's interrogatory answers and depositions in support of the claim that Cox is biased" as insufficient to "allow a reasonable jury to conclude that Cox harbors a general bias against African Americans."

> "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, Title VII is violated." *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993) (citations and

internal quotation marks omitted).*Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 78, 118 S. Ct. 998, 1001, 140 L. Ed. 2d 201 (1998)

The Court should reject the argument.  The following evidence, obtained after Mr. Hudson's deposition establishes that the AFGE workplace was permeated with racial bias and discrimination as exhibited by Cox, Swanke, Glover and McCubbin.

### I. Cox Repeatedly Used The Racial Pejoratives "Boy" And "Son"  In Addressing Mr. Hudson After Mr. Hudson Told Him That He Considered The Terms Racially Discriminatory And Offensive And Asked Him To Stop

Mr. Hudson testified that J. David Cox, who is from Kannapolis, North Carolina, often referred to him using the racially pejorative terms "boy" and "son" over his repeated, strong objections.  President Cox admitted during his deposition that he often referred to NST Hudson as "boy" and "son", but testified that he saw "boy" and "girl" on school bathrooms and for that reason,  he did not believe that it was racially offensive to refer to an adult African American man in those terms.  New evidence that was not available when Mr. Hudson was deposed includes a declaration from J. David Cox's Confidential Secretary, Rocky Kabir, who testified that President Cox regularly called him "boy" over his strong objections.   Mr. Kabir stated:  "I am not a boy.  As a person who grew up in New York in a predominantly African-American neighborhood, and many of my friends are African-American.  As a person of color, I found Cox's use of the term "boy" and "son" when referring to me extremely offensive, racist and demeaning, and I told him so.  Cox knew I strongly objected, but he did not stop calling me "boy."  Cox's repeated references to me as "boy" and "son" over my objections were demeaning and racist and created a racially hostile work environment for me."  (*Exh. 1: Rocky Kabir Affidavit)*  Like Mr. Hudson, Mr. Kabir also testified that J David Cox referred to him as a "son", again, over his objections:

"Cox often told me I was like "a son" to him.  He regularly said, "I treat you like my son."  I told him to cut it out, but Cox would continually say I was like his kid.  I am a grown man with my own children.  I found Cox's references to me in this way to be manipulative and a way of gaining emotional leverage over me because I initially looked up to him.  Despite my repeated objections, he did not stop calling me 'son.'" *(Ibid.)*

## II.  Cox Often Made Crude, Derogatory Statement About Jewish  People And Muslims

Mr. Kabir, who Is Muslim, testified that he often heard J. David Cox make crude, racist

statements about Jewish and Muslim people and women.  He testified:

"I also heard Cox make crude statements about Jewish people. I understand that sometimes people joke around about others' ethnicities.  However, when Cox made these derogatory statements about Jewish people, he was not kidding around or making a joke.  Cox was definitely not trying to be funny.  His use of such derogatory statements never came off as humorous.   Cox used these offensive, anti-Semitic references toward others and called me "boy" in a mean and derogatory way I found to be extremely offensive."

"Cox was hot and cold.  One minute he would say he" loved me like a son," and the next minute he spoke to me in the most offensive, derogatory and racist terms.  Cox regularly referred to me in a derogatory way and spoke down to me, saying:  "You Goddamn Muslim" or "You're the best Muslim I ever knew.  Cox often made negative comments about Muslims in my presence. Cox once asked for my membership card as a Muslim,  and I told him it didn't work that way."  *(Ibid.)*

## III.  Cox Stripped Hudson Of Much OF His Authority For Racially Discriminatory Reasons To Harass And Humiliate Him

Eugene Hudson is first African American duly elected to the position of National

Secretary Treasurer of the American Federal of Government Employees ("AFGE"), the nation's

largest federal employees.  AFGE President, J. David Cox, Sr., who is Caucasian American, was

the previous NST from August 2006 through August 2012 under then President John Gage.

Both men were elected to their positions in 2012 for a three year term.  As part of his

responsibilities as the former NST, Mr. Cox supervised the Finance Department, the Information

Services ("IT") Department with a budget of several million dollars and approximately 12-15

employees) and Human Services Department which has responsibility for receiving,

investigating and resolving all employment discrimination and sexual harassment complaints filed by AFGE employees.  When Mr. Gage retired as president in 2012, Mr. Cox ran for AFGE President and District 12 National Vice President Hudson ran against Cox's hand-picked successor for the position of NST.  Like  NST Cox before him, as NST, Mr. Hudson had oversight of the Human Resources, IT Department and Finance Departments.   Cox unilaterally stripped Mr. Hudson of those departments without a vote of the NEC. The AFGE Constitution requires a vote of the full governing body, the National Executive Council, to remove authority from the NST.  After NST Hudson's Finance Department staff questioned certain expense vouchers submitted by National Vice Presidents Everett Kelley and Eric Bunn for expensive gifts, trips to the Virgin Islands for themselves and their wives with AFGE funds. Everett Kelley complained bitterly to J. David Cox about the questions raised by NST Hudson and his staff concerning the expenditures and demanded that Cox confront Mr. Hudson.

In July 2016, Cox convened a secret NEC meeting in Philadelphia during which he, Kelley and other NEC members confronted Hudson and told him to get with the program and stop raising questions about their expense vouchers.  NST Hudson came prepared with reports from his staff documenting their concerns, and Kelley stood down.  Article 9, Section 1 of the AFGE National Constitution states: "The National President shall function as the CEO... **subject to the approval of the NEC**."  Article X Section 7 of the AFGE National Constitution states that "The National Secretary Treasurer "shall appoint, direct and have supervision of all employees of the Federation employed in the office of the NST**, such action to be subject to the approval of the NEC**." *(Emphasis added)*

A few days later, without first obtaining a vote of the NEC, Cox unilaterally stripped Plaintiff of his responsibility for reviewing expense vouchers for all NEC members, except his

own – essentially gutting his authority as NST. Plaintiff acknowledges that Cox took adverse actions for political reasons  and violated his rights under the LMRDA, and makes those arguments in related case 17-1867.

Here, Plaintiff claims that Cox's 2016 adverse employment actions taken against him were racially motivated and violative of Title VII and 42 U.S.C. 1981 – a claim bolstered by Pam Baca's testimony.  AFGE argues that Cox's 2016 adverse actions were taken against Mr. Hudson for solely political reasons because Hudson had announced plans to run against Cox for NP. However, Plaintiff argues that the AFGE presidential election was more than two years away from the date that Cox took the adverse employment actions in the summer of 2016.  Cox's adverse actions, therefore, were not politically motivated; they were racially motivated reasons. Whether plaintiff or defendant's argument prevails is a question for the jury to decide.  The Court should allow Mr. Hudson to present his evidence of racial discrimination to a jury of his peers.

### IV.  President Cox Conspired With NVP's Gerald Swanke, Phil Glover And George McCubbin To "Take Hudson Down", And Cox Appointed Swanke, Whom He Knew Held A Racial Bias Toward NST Hudson, As COI Chair To Accomplish That Purpose

Ms. Baca testified that she heard AFGE National Vice President Gerald Swanke use the "highly offensive and racially discriminating" phrase "SMB" *[Ibid., p.. 16]*  Ms. Baca testified that she later learned that the term "SMB" that she heard used by Swanke and Glover means "Simple Minded Blacks" and that she found the term racially offensive.  Ms. Back testified that she heard the terms SMB on two separate occasions – once to describe African-American AFGE official Taye Davis. *[Ibid., p. 13, ¶¶2-4]*  Ms. Baca testified that she heard Swanke and Phil Glover use the term "SMB" again in 2017 to describe NST Hudson just before an NEC meeting at AFGE headquarters. *[Ibid, p. 14-16]*

Ms. Baca testified:  [Swanke] often showed open hate for Mr. Hudson and spoke regularly about bringing him down.  He would laugh and smirk every time he spoke about Mr. Hudson." *[Baca Affidavit, p.*11, ¶1]

Ms. Baca attested in an affidavit that Swanke "was not averse to being frank with me because he thought that I was his ally after I joined him in filing the 2015 charges against NST Hudson"  [when Hudson responded angrily following the second incident in which Witold called him a "Nigger"].  *[Baca Affidavit, dated May 29, 2019, p. 12, ¶1]*

Ms. Baca testified:  "As early as September 2016, months **before** Keith Hill filed the December 2016 Trump email charges against NST Hudson, Swanke told me on more than one occasion that the NEC was going to "bring Hudson down" and that he knew that he was going to be removed from office because he (Swanke) was going to be appointed to the Committee on Investigations that looked into the Hudson charges." *[Baca Affidavit, p. 11]*

Ms. Baca testified that Swanke and McCubbin said they "were getting close to being able to bring Hudson down" and that "Hudson has no idea what we have waiting for him. *[Baca Affidavit, p. 10,¶1].* Ms. Baca testified:  "Swanke stated several times that he had spoken to the NEC and that they had plans to go after Mr. Hudson.  It was clear to me he was obsessed with his hate of Mr. Hudson.  He often showed open hate for Mr. Hudson and spoke regularly about "bringing him down."" *[Baca Affidavit, pp. 10-11]*

Ms. Baca testified that she received a cell phone text message from Gerald Swanke on the day Mr. Hudson was removed asking if I had read my email, and stating "We got him!" *(Baca Affidavit, dated May 29, 2019, p. 10)*

It is undisputed that  J. David Cox appointed Swanke, the man who referred to Mr. Hudson as an "SMB" and who had filed the baseless Article 23 charges against NST Hudson in

2015, to chair the first Committee on Investigation.  This Court ruled that Swanke's bias infected

the NEC and, for that reason, initially granted Mr. Hudson's motion for injunctive relief, set

aside Mr. Hudson's first removal and ordered his return to work.

**V.  Cox Applied The  Rules Prohibiting Officers From Using AFGE Resources For Political Purposes In A Racially Discriminatory Manner**

Similarly, when it came to the removal of officers for writing emails expressing their

opinions of Trump, Emeritus Officer Jane Nygaard, who is Caucasian, testified that she and

other NVP's wrote emails critical of Trump around the same time as NST Hudson, and they

suffered no adverse employment actions.  *(Jane Nygaard Affidavit)*  Yet, Mr. Hudson is the only

officer ever removed from office by vote of the NEC.

During the August 2017 NEC meeting at which Mr. Hudson's removal was discussed,

NVP Dorothy James argued out AFGE official John O'Grady,  who is Caucasian, sent an email

to AFGE members using AFGE resources that critical of the Obama Administration over her

objections and those of then- AFGE President John Gage.   Unlike Mr. Hudson, Mr. O'Grady, a

federal employee at the time he sent the email, clearly violated the Hatch Act.  AFGE took no

adverse actions against O'Grady.

As discussed below, Mr. Kabir testified that J. David Cox and his Policy Director Jacque

Simon, both of whom are Caucasian, violated the same rules that Cox and the NEC cited as the

basis for terminating Mr. Hudson and Jocelyn Johnson, both of whom of African American.

Cox's violation was far more egregious manner.   However, to date, AFGE has taken no adverse

employment actions against them.  This unrefuted evidence establishes a prima facie case that

AFGE applied and enforced the AFGE "No Politics" and "use of resources" rules in a racially

discriminatory manner.  Plaintiff, having established a prima facie case, the burden now shifts to

AFGE to provide a legitimate reason for the disparate treatment of Cox and Simon.

### 6.  J. David Cox  And Other NEC Members Regularly Discussed And Planned Strategies To Remove Mr. Hudson From Office And Circulated False Statements About NST Hudson To Justify His Removal

Pam Baca testified that as early as 2016, Swanke and McCubbin told her that the NEC was going to "bring Hudson down" and that "Hudson didn't know what was coming."

Mr. Kabir testified  that beginning around January 2017, he heard J. David Cox and certain National Vice Presidents (who are currently on the National Executive Council) regularly discussing strategies to remove AFGE National Secretary Treasurer Eugene Hudson from office. Mr. Kabir testified that Mr. Cox "circulated false statements about AFGE National Secretary Treasurer Eugene Hudson's performance around the time that Cox and these same National Vice Presidents and Cox were conspiring to make up reasons to remove NST Hudson from office." *(Rocky Kabir Affidavit)*

Mr. Kabir testified:  "I recall that the National Executive Council voted to remove NST Hudson from office in August 2017, but the federal court ordered NST Hudson's reinstatement a few months later.  Cox was very angry that NST Hudson had been reinstated by the court.  He told me that he was going to get Hudson out.  Shortly thereafter, in January 2018, NST Hudson was gone again, and Cox told me he was happy about it." *(Rocky Kabir Affidavit)*

It is undisputed that the only persons that J. David Cox ever terminated for violating the AFGE "No Politics" Rule were Eugene Hudson and Jocelynn Johnson, both of whom are African American.  Mr. Kabir testified that Cox enforced the AFGE "No Politics" Rule in a racially discriminatory manner and to further his own political agenda.

> "Around this same time in January 2018, the building was also buzzing because President Cox had also fired Jocelynn Johnson, a long-time AFGE employee, for violating AFGE's "no politics" rule by allegedly making a $10 donation to Eugene Hudson's campaign for AFGE President.  I thought that J. David Cox's decision to terminate NST Hudson and Jocelynn Johnson, both of whom are African-American, was very unfair because they are the only AFGE employees that I am aware of who were ever removed for violating the AFGE "no politics" rule.

> "President Cox committed a far more egregious violation of the same AFGE "no politics" rule when he directed me to work on his 2018 re-election campaign from his Silver Spring, Maryland apartment and ordered me not to tell anyone about it.  J. David also

ordered AFGE Policy Director Jacque Simon, who is Caucasian, to work with me on his campaign in clear violation of the AFGE "no politics" rule. Based on these facts, it seemed to me that J. David Cox applied the AFGE "no politics" rule in a racially discriminatory manner and to further his own political agenda. "(*Exh. 1: Rocky Kabir Affidavit)*

Cox's racially discriminatory enforcement of the "No Politics rule" is further evidence of his racial animus toward African Americans.

### RESPONSE TO AFGE'S ARGUMENTS FOR SUMMARY JUDGMENT

AFGE makes the following arguments: Cox's failure to discipline Skwierczynski (who is Caucasian) based on the 2011 incident does not tend to prove that Cox was motivated by racial animus because "it was not Cox who "convened a Committee on Investigation ('COI') to consider" Hudson's charges "[o]n February 22, 2013." Rather, as stated by the COI in its Report on the matter, the COI was convened by then-NP John Gage, nearly a year before Cox was elected to his first term as NP.

Yet, AFGE admits, that although Cox had no involvement in appointing the COI's members, by the time it came to discipline Skwierczynski Cox had been elected National President. Cox opted not to "remove Witold from office, suspend him or even issue a written reprimand. Instead, Cox directed Witold to write a letter of apology." Roth Decl., Exh. 2 (Interrog. Resp. No. 1) at 3-4.

AFGE argues that this statement is highly misleading, because it implies that Cox made an independent de novo determination of the appropriate remedy for Skwierczynski's racist behavior and prior racist misconduct. AFGE argues that that is not how Cox operates with respect to his review and consideration of COI recommendations. AFGE asserts that "since becoming NP in 2012, Cox has consistently maintained and followed a strong practice of deferring to a duly-appointed COI's factual findings and recommended disposition of a charge

based on those factual findings."    AFGE's self-serving statement about how Cox operates has

no evidentiary support in the record and, in fact, is disputed by the affidavit of Jane Nygaard.

The AFGE Emeritus officer testified that  Cox is autocratic, unreasonable, narcissistic,

and demeaning to anyone who opposes him, including duly elected officers of AFGE."

*[Affidavit of Jane Nygaard, dated June 5, 2019 p.3, ¶1]*    Such a person could care less about the

opinion of a Committee whose members he appointed.  Moreover, AFGE's description of Cox as

a man who abides by and follows the decisions of his subordinates is also disputed by the

testimony of Cox's Confidential Secretary Rocky Kabir:

> "President Cox firmly controls most of the National Vice Presidents who sit on the
> AFGE National Executive Council through a combination of financial incentives,
> political support and fear.  I know this because I was often in J. David's presence when
> he spoke with his National Vice Presidents on his cell phone or in person.  Additionally,
> if I was not present at the time,  J. David often shared with me his conversations with
> them.

> "For example, J. David told me that in August 2017, he was calling a meeting of the
> AFGE National Executive Council to remove National Secretary Treasurer Hudson from
> office, based on an allegation that Hudson had improperly used AFGE resources (his staff
> member Willie Hope) to send an email that Hudson had written to AFGE leaders
> explaining his concerns about the impact of President Trump's election on the union
> movement."  (*Exh. 1: Rocky Kabir Affidavit*)

We all know the outcome of the August 2017 NEC meeting – Cox got exactly what he

wanted – NST Hudson's removal.  Thus, Cox's assertion that he exhibits a "consistent practice

of deference towards COI findings and recommendations" rings hollow since the evidence in the

record shows precisely the opposite.  Factual determinations about Cox's management style are

disputed facts that the jury should be permitted to resolve.

### Cox's Racial Animus

AFGE asserts that Mr. Hudson's "case" that Cox harbors a racial bias rests simply on Mr.

Hudson's deposition testimony that, on certain occasions, Cox has addressed or referred to

Hudson, other African American AFGE officers or employees, and even former President

Obama, as "son" or "boy." Not true. Mr. Hudson's deposition testimony regarding Cox's racial

animus is fully corroborated by the affidavit testimony of Rocky Kabir  Pam Baca,  and AFGE

Emeritus Officer Jane Nygaard. According to Mr. Kabir, J. David Cox was an equal opportunity

bigot. Mr. Kabir testified that not only did Cox use the pejorative terms "son" or "boy" too

address or refer to African Americans, Cox also used offensive terms to describe persons who

are Jewish and Muslim and in reference to an individual's sexual identity.

In *Ash v. Tyson Foods, Inc.,* 546 U.S. 454, 456 (2006), the Supreme Court stated that

whether a speaker's use of a term such as "boy" is probative evidence of racially discriminatory

animus "may depend on various factors including context, inflection, tone of voice, local custom,

and historical usage."

Cox's testimony that in North Carolina, everyone calls  adult African American men

"boy" and "son" strains credulity. It is a material issue in dispute that should be decided by a

jury. Mr. Hudson testified regarding Cox's use of the terms "son" and "boy," that "I think that's

just normally how he talks." Hudson Tr. 103:4-5, 14-19.

In giving this testimony, Mr. Hudson does NOT state that Cox's use of the terms was not

racially offensive – it was- and Mr. Hudson testified that he told Cox so. Rather, Mr. Hudson

was simply saying that Cox knew that his use of the terms "son" and "boy" when addressing him

was racist and offensive to Mr. Hudson, but Cox just didn't care.

Mr. Cox also referred to Rocky Kabir as a "Goddamned Muslim" or "the best Muslim I

know." While AFGE may attribute Cox's speech patterns in this regard to Cox's upbringing, the

reason why Cox used racially offensive language to people of color is immaterial. The persons

on the receiving end of Cox's language found it racially offensive and its constant use created a racially hostile work environment.

AFGE then argues that "it appears that Hudson is claiming that Cox used terms like "son" or "boy" on a regular basis from 2006-2015, thereby offending Hudson and evincing in Hudson's mind a racially discriminatory attitude on Cox's part. Hudson Tr. 82:22-83:8, 104:12-15. AFGE claims that in December of 2015, Hudson gave deposition testimony in an employment discrimination lawsuit against AFGE that, since he had moved to Washington D.C. in 2012 to assume the NST position, he had not heard anybody working at AFGE make any statements that could be taken as racially discriminatory. AFGE is not being truthful with the Court. This is not the entirety of Mr. Hudson's deposition given in the Larry Burnett racial discrimination and sexual harassment case filed against AFGE.

AFGE blatantly misstates that when Cox stopped Hudson from reviewing NEC member expense vouchers in June 2016, Hudson had already announced that he would be running against Cox for the NP position at AFGE's 2018 Convention. This is simply false. Mr. Hudson did **not** announce that he was running for President until December 2016, *months after* Cox stripped him of the two departments and took away his authority to review expense vouchers.

Finally, there is nothing in the record and the newly discovered evidence discussed above to support AFGE's claim that Mr. Hudson and J. David Cox's **working relationship was perfectly fine and cordial until the 2016- 2017 time frame**. Of course it was not, AFGE does not deny that as of 2015, Witold had called NST Hudson a "Nigger" twice in four years, and J. David Cox and AFGE had taken no disciplinary action against him.

For all of the foregoing reasons, Plaintiff asks the Court to deny AFGE's motion for summary judgment. Plaintiff further asks the Court to grant his cross motion for summary judgment.

Respectfully submitted,


Marlene Morten, Counsel for Plaintiff
D. C. Bar 272575
Unfoldment Law Office
3825 South Capitol Street, S. W.
Washington, D. C. 20032
202-492-5963
kemimorten@gmail.com

DATE: January 22, 2020