EUGENE HUDSON, JR.,

     **Plaintiff,**

     **v.**                               Civil Action No.  17-2094 (JEB)

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES,

     **Defendant.**

## MEMORANDUM OPINION

This case is but another chapter in the seemingly intractable feud between Plaintiff

Eugene Hudson and his union, Defendant American Federation of Government Employees.  A

long-time official at the Union, Hudson became the first black person elected to serve as

National Secretary-Treasurer for AFGE in 2012.  He won another three-year term in 2015.

Despite his triumphs, Hudson had a tumultuous relationship with several Union leaders,

especially its President.  In Plaintiff's telling, his tenure was riddled with discrimination,

culminating in his removal from office.

With these grievances in mind, Hudson brought this suit against AFGE, alleging race-

based discrimination in violation of federal law.  After some of his claims survived a motion to

dismiss, the case proceeded to discovery on a narrowed Complaint.  Both sides have now moved

for summary judgment on what remains.  Finding that Hudson has submitted enough evidence to

keep some of his claims aloft, the Court will grant in part and deny in part the Union's Motion.

By contrast, Plaintiff's Motion mainly attempts to resurrect a number of counts that previously

foundered on the shoals of dismissal; as such, the Court will deny it.

# I. Background

## A. Factual History

The Court has previously recounted the facts underlying Hudson's ongoing battle with AFGE in considerable detail in Opinions in this and other related cases. See, e.g., Hudson v. AFGE, 318 F. Supp. 3d 7, 9–10 (D.D.C. 2018); Hudson v. AFGE, 308 F. Supp. 3d 388, 391–92 (D.D.C. 2018); Hudson v. AFGE, 281 F. Supp. 3d 11, 12–13 (D.D.C. 2017); Hudson v. AFGE, 2017 WL 4325681, at *1 (D.D.C. Sept. 27, 2017). Because the Court assumes the reader's familiarity, it sets out the history of this case only in broad strokes.

Plaintiff's gripe stems from his employment as an officer with AFGE — a national labor organization that represents north of 1000 federal and D.C. government employees. Hudson, 318 F. Supp. 3d at 9. As the structure of the organization is important for purposes of this suit, the Court spends a moment here. At the top of AFGE sits the National Executive Council, which consists of the National President, the National Secretary-Treasurer, the National Vice-President for Women and Fair Practices, and the National Vice-Presidents for the Union's 12 districts. Id. Within this governing body, the President and NST hold the top two positions. Id.

In 2012, Hudson was elected to serve as the NST. Id. He was re-elected three years later. Id. Throughout this time, J. David Cox served as Union President. Hudson, 308 F. Supp. 3d at 391. The relationship between the two, to say the least, was far from amicable. Id. Not only that, Plaintiff also clashed with several other individuals serving on the NEC. Id. According to Hudson, these disputes stemmed, in part, from racial discrimination against him. Id. at 391–92. His embittered tenure as NST culminated in his removal from office in August 2017. Id. at 392.

B.  Procedural History

Hudson's tenure as NST — the details of which will be made clear shortly — is the basis
of two of the multiple actions before this Court.  In the other lawsuit, filed on September 12,
2017, Hudson alleges that his discharge violated two federal statutes — the Labor-Management
Reporting and Disclosure Act and the Labor Management Relations Act.  See Hudson v. AFGE,
No. 17-1867.  That suit, which is still pending before this Court, makes no mention of racial
discrimination.

The instant suit does.  It comes to this Court following a series of administrative
proceedings.  On July 11, 2017, the Equal Employment Opportunity Commission issued Hudson
a right-to-sue letter after he filed a charge of discrimination and retaliation with the District of
Columbia Office of Human Rights.  See ECF No. 1 (Compl.), ¶ 9; id., Exh. 1 (EEOC Charge);
id., Exh. 2 (Right to Sue Letter).  About three months later, on October 10, Hudson brought this
action, alleging employment discrimination, retaliation, a hostile work environment, and
"pretextual discrimination."  Compl., ¶¶ 44–51.  In February 2018, the Union moved to dismiss
all counts.  See ECF No. 8 (Def. MTD).  Agreeing that Hudson could not split his claims
regarding termination between the two suits, the Court granted AFGE's request as to all but five
discrete acts of racial discrimination that occurred during his tenure — each asserted under Title
VII and 42 U.S.C. § 1981.  See Hudson, 308 F. Supp. 3d at 396.  It will lay out the particular
claims in more detail in the Analysis, infra.

Pressing ahead, Defendant has moved for summary judgment as to the entirety of
Hudson's narrowed Complaint.  See ECF No. 30 (Def. MSJ).  Plaintiff, for his part, filed a
Cross-Motion for Summary Judgment.  See ECF No. 47 (Pl. Opp. and Cross-Mot.).  In so doing,
he largely attempts to relitigate counts that this Court has already considered and rejected.  See,

e.g., id. at 19, 22, 32, 45, 51, 61 (spilling much ink on previously dismissed hostile-work-environment allegations). The Court, consequently, only examines those claims that have cleared the motion-to-dismiss bar.

## II.     Legal Standard

Summary judgment must be granted "if the movant shows that there is no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it can affect the substantive outcome of the litigation. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Holcomb v. Powell, 433 F.3d 889, 895 (D.C. Cir. 2006). A dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. See Scott v. Harris, 550 U.S. 372, 380 (2007); Holcomb, 433 F.3d at 895.

When a motion for summary judgment is under consideration, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Liberty Lobby, 477 U.S. at 255 (citing Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59 (1970)). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations. See Fed. R. Civ. P. 56(e); Celotex Corp. v. Catrett, 477 U.S. 317, 323–24 (1986). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion" by "citing to particular parts of materials in the record," such as affidavits, declarations, or other evidence. See Fed. R. Civ. P. 56(c)(1). If the non-movant's evidence is "merely colorable" or "not significantly probative," summary judgment may be granted. See Liberty Lobby, 477 U.S. at 249–50.

**III.    Analysis**

Before addressing Plaintiff's allegations of discrimination under Title VII and 42 U.S.C.

§ 1981, the Court will first set out the applicable legal framework.

A.  Legal Framework

Title VII makes it unlawful for an employer to "discriminate against any individual . . .

because of such individual's race."  42 U.S.C. § 2000e-2(a)(1).  Section 1981 likewise "prohibits

private employers from intentionally discriminating on the basis of race with respect to the

'benefits, privileges, terms, and conditions' of employment."  Ayissi-Etoh v. Fannie Mae, 712

F.3d 572, 576 (D.C. Cir. 2013) (quoting 42 U.S.C. § 1981).  Courts apply the same substantive

legal standards to analyze race-discrimination claims under both statutes.  Id.; Carter v. George

Wash. Univ., 387 F.3d 872, 878 (D.C. Cir. 2004).

Specifically, the Court must follow the three-part burden-shifting framework set forth in

McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973).  See Taylor v. Small, 350

F.3d 1286, 1292 (D.C. Cir. 2003).  Under this framework, the plaintiff caries the initial burden of

establishing a *prima facie* case of discrimination.  See McDonnell Douglas, 411 U.S. at 802.  To

pass that hurdle, she need only show that "(1) she is a member of a protected class; (2) she

suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference

of discrimination."  Czekalski v. Peters, 475 F.3d 360, 364 (D.C. Cir. 2007) (quoting Stella v.

Mineta, 284 F.3d 135, 145 (D.C. 2002)).

Next, the defendant may rebut that *prima facie* showing with evidence of a "'legitimate,

nondiscriminatory reason' for its action."  Chappell-Johnson v. Powell, 440 F.3d 484, 487 (D.C.

Cir. 2006) (quoting McDonnell Douglas, 411 U.S. at 802).  Finally, if the defendant has

produced such evidence, then the plaintiff must show that the "reasons offered by the defendant

were not its true reasons, but were a pretext for discrimination." Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000) (quoting Tex. Dep't of Cmty Affairs v. Burdine, 450 U.S. 248, 253 (1981)).

One additional point bears mention. This Circuit has emphasized that this framework falls away once an employer has come forward with a legitimate, non-discriminatory reason for its action. See Brady v. Office of Sergeant at Arms, 520 F.3d 490, 493–94 (D.C. Cir. 2008). At that point, courts "need not—and should not—decide whether the plaintiff actually made out a *prima facie* case" because it should focus only on the third part of the McDonnell Douglas analysis. Id. at 494. This so-called "Brady shortcut," however, only goes so far: courts should not "rush to the third prong" of the framework without engaging in "serious deliberation at the second prong." Figueroa v. Pompeo, 923 F.3d 1079, 1087 (D.C. Cir. 2019). With that legal backdrop in mind, the Court now moves on to Hudson's claims.

B. Discriminatory Acts

To make out his Title VII and § 1981 claims, Plaintiff must rely only on the five purportedly discriminatory acts that survived AFGE's Motion to Dismiss. See Hudson, 308 F. Supp. 3d at 393–95. These include his allegations that Cox unilaterally: (1) "denied [his] request" to promote a black member of his staff to Special Assistant; (2) "removed" him as the Chair of the Non-Appropriated Fund Instrumentalities Committee; (3) "gave" him a lower Cost of Living Adjustment as compared to other white executives; (4) stripped his authority to approve all NEC expense vouchers; and (5) took away his supervisory responsibilities for the Human Resources and Information Services Departments. See Compl., ¶¶ 23–35. For ease of analysis, the Court will assess each one in turn.

1. *Willie Hope Promotion*

First up is the claim that Cox denied Hudson's request to promote Willie Hope — a black member of his staff — to become his Special Assistant. Id., ¶¶ 28–29. This allegation stumbles right out of the gate, as it is belied by the record. The evidence shows that in February 2017, some eight months before Hudson filed this suit, Cox clearly <u>approved</u> his request. <u>See</u> ECF No. 30-2 (Def. Statement of Material Facts), ¶ 1 (citing ECF No. 30-3 (Declaration of J. David Cox), ¶ 24; <u>id.,</u> Exh. 9 (Feb. 16, 2017, Cox Memo)). Plaintiff admitted as much in his deposition. <u>See</u> ECF No. 30-5 (Declaration of Andrew Roth), Exh. 1 (Deposition of Eugene Hudson) at 22:17–23:6, 23:17–22. What is more, Hope accepted the promotion shortly after Cox's approval and continues to serve as a Special Assistant to this day. <u>See</u> Cox Decl., ¶ 25.

Despite all the evidence to the contrary, Plaintiff's Opposition mystifyingly regurgitates the allegation that Cox "denied" rather than approved the request for Hope's promotion. <u>See</u> ECF No. 47 (Pl. Opp.) at 23, ¶ 127. Our Circuit has made clear, however, that a party cannot survive summary judgment by simply repeating and resting on an assertion that no reasonable jury could accept as true based on the record evidence. <u>See</u> <u>Tarpley v. Greene</u>, 684 F.2d 1, 7 (D.C. Cir. 1982); <u>accord</u> <u>Dage v. Johnson</u>, 537 F. Supp. 2d 43, 52–54 (D.D.C. 2008). There is little doubt that AFGE is entitled to summary judgment on this claim.

Perhaps recognizing the writing on the wall, Plaintiff now seeks to repackage his promotion claim as a salary dispute. According to Hudson, Cox initially approved his decision to designate the Special Assistant's role as a grade 13/14 on the pay scale — a position that is promotion eligible. <u>See</u> Hudson Depo. at 206:17–207:1; <u>see also</u> Def. MSJ at 6 (noting that such designation makes employee eligible for G-13 to G-14 promotion). Plaintiff alleges that Cox changed his tune, however, after learning that a black man (Hope) was selected for the position.

<u>See</u> Hudson Depo. at 206:17–207:19.  Namely, Hudson maintains that Cox instructed him to designate the position purely as a grade 13 on the pay scale — *i.e.*, with no possibility of promotion.  <u>Id.</u>

Plaintiff's last-ditch effort here falls short for two separate reasons.  For one, he seeks to add a claim to his Complaint through his deposition testimony rather than via the appropriate procedural vehicle — namely, a <u>motion</u> to amend.  <u>See, e.g.,</u> <u>deLeon v. Wilkie</u>, No. 19-1250, 2020 WL 210089, at *4 (D.D.C. Jan. 14, 2020) (rejecting plaintiff's attempt to amend via improper mechanism).  On that basis alone, the Court could discard Hudson's claim.  <u>See, e.g.,</u> <u>Kangethe v. Dist. of Columbia</u>, 281 F. Supp. 3d 37, 42 (D.D.C. 2017); <u>Sloan *ex rel.* Juergens v. Urban Title Servs.</u>, 652 F. Supp. 2d 51, 62–63 (D.D.C. 2009).

Even if it turned a blind eye to procedure, Plaintiff would fare no better.  Assume for a moment that Cox did have a racially discriminatory change of heart.  The Court would nevertheless conclude that <u>Hudson</u> did not suffer an "objectively tangible [workplace] harm" necessary to support a finding of an adverse employment action.  <u>See</u> <u>Turner v. Shineski</u>, 824 F. Supp. 2d 99, 116 (D.D.C. 2011) (quoting <u>Forkkio v. Powell</u>, 306 F.3d 1127, 1131 (D.C. Cir. 2002)).  That is because there is no evidence that Hope turned down the role or left for a higher paying one later.  Had he done so during Hudson's tenure as NST, Plaintiff arguably would have experienced a harm in the form of losing out on his hand-picked assistant.  Nothing like that happened here, however.  The facts show that Hope not only accepted the promotion, but that he also continues to serve as a Special Assistant today.  <u>See</u> Def. SMF, ¶¶ 1–3.  Because Plaintiff has not suffered an adverse employment action, his new discriminatory theory fails as a matter of law.

## 2. *NAFI Chairman*

Next up is Hudson's claim that Cox "removed" him as Chairman of the NAFI Committee.  See Compl., ¶ 35.  AFGE challenges Plaintiff's account of the events.  Taking all of the relevant facts together, it maintains, the purported removal did not constitute an adverse employment action.  See Def. MSJ at 9; ECF No. 50 (Def. Reply) at 4–5.

Here are the details.  When Hudson was elected in 2012 to serve as NST, one of his responsibilities included chairing the NAFI Committee.  See Compl., ¶ 35.  That changed in November 2014, when Cox abolished it and transferred its functions to the Defense Conference (DEFCON) Committee.  See Cox Decl., ¶ 29; id., Exh. 11 (Nov. 5, 2014, Cox Memo) at AFGE_19.  At the same time, Cox, at Hudson's behest, selected him to helm the newly established Information Technology/Information Services Committee.  See Cox. Decl., ¶ 30; Nov. 2014 Cox Memo at AFGE_19; Hudson Depo. at 157:18–158:5 (noting that he was selected as chair after requesting establishment of "information services committee").  On these facts, AFGE argues, Plaintiff has not identified an objectively tangible harm.  See Def. MSJ at 9 (citing Turner, 824 F. Supp. 2d at 116).

Hudson, for his part, takes a head-in-the-sand approach.  Nowhere does he address the contextual facts chronicled above or Defendant's argument that no harm occurred.  Instead, he rests entirely on a verbatim repetition of the allegation in his Complaint that Cox "removed" him as Chair of the NAFI Committee because of his race.  Compare Pl. Opp. at 23, ¶ 128, with Compl., ¶ 35.

Because Hudson never offers evidence (or argument) why chairing the IT/IS Committee is somehow worse than chairing the NAFI Committee, he has, once again, not shown that he suffered an adverse employment action, thus warranting summary judgment.

### 3. *Cost of Living Adjustment*

The Court now turns to Plaintiff's beef with the COLA he received in 2017. See Compl., ¶¶ 22, 26–27. In January of that year, federal employees received a salary bump to reflect the increased cost of living. See ECF No. 30-4 (Declaration of Roselle Paraoan), ¶ 3; Executive Order 13756, "Adjustment of Certain Rates of Pay," 81 Fed. Reg. 97099, 2016 WL 7487746 (Dec. 27, 2016). In the wake of that directive, AFGE employees, who are pegged to the same scale, also received a raise. See Cox Decl., ¶ 5. Hudson's problem here is that Cox "gave" himself and another white NVP — Joseph Flynn — a "full" 2.88% COLA, whereas the Union President only "gave Plaintiff . . . a 2.48% increase." Compl., ¶¶ 22, 26–27.

As this is clearly an adverse employment action, see Hudson, 308 F. Supp. 3d at 393, the Court need not perform any further threshold analysis of whether he has established a *prima facie* case of discrimination. See Brady, 520 F.3d at 494. It will instead proceed to step two of the McDonell Douglas framework.

At that step, as the reader knows, courts evaluate whether the employer has provided a "legitimate, nondiscriminatory reason' for its action." Chappell-Johnson, 440 F.3d at 487. To do so, it considers four factors: (1) whether the employer produced evidence that is admissible at summary judgment or trial; (2) whether the factfinder, if it believes the evidence, could reasonably "find that the employer's action was motivated by a nondiscriminatory reason"; (3) whether the employer's explanation is "facially credible in light of the proffered evidence"; and (4) whether the evidence presents a "clear and reasonably specific explanation" such that the employee has "a full and fair opportunity to attack the explanation as pretextual." Figueroa, 923 F.3d at 1087–88 (internal quotation marks and citations omitted).

Here, AFGE maintains that its Constitution, and not race discrimination, was the reason for the COLA adjustments at issue. See Def. MSJ at 10–13. For support, the Union offers a trove of admissible evidence — e.g., declarations from Cox and Roselle Paraoan (an AFGE Human Resources Specialist), Hudson's deposition testimony, as well as a number of exhibits. Id.; Def. SMF, ¶¶ 20–35. The latter category includes AFGE's Constitution, internal memoranda, and relevant Office of Personnel Management salary tables. See Def. MSJ at 10–13.

After combing through this evidence, the Court gleans the following facts. Under Article VII Section 3 of the AFGE Constitution, the salaries of all officers are pegged to the OPM general schedule. See Cox Decl., ¶ 5. Although Cox reviews and "signs off on" salary increases, the Union's HR Department is responsible for calculating salary amounts for individual officers. Id., ¶ 6.

In 2017, that department implemented COLA increases based on Executive Order 13756. See 81 Fed. Reg. 97099; Paraoan Decl., ¶ 3. This directive provided an across-the-board 1% COLA, combined with an adjustment based on the federal employee's work location. Taking those two factors together yielded a total 2.88% COLA for most but not all employees in the D.C. area. See Paraoan Decl., ¶ 4.

Relevant here, the OPM Salary Table provides that employees in Steps 8 through 10 of the GS-15 salary grade are capped at a level that can yield a COLA of less than 2.88%. Id., ¶ 5; id., Exh. 1 (OPM 2017 Table for D.C.). Such was the case for Hudson, who, according to AFGE's Constitution, was at Step 8 of that GS-15 salary grade. See Paraoan Decl., ¶¶ 6, 8; id., Exh. 2 (AFGE Constitution) at AFGE_56; Hudson Depo. at 124:3–11 (acknowledging that Constitution sets out NST salary at GS-15). Hudson, AFGE contends, was given the highest

possible COLA (2.48%) for an employee at his pay-grade level that would not move him over the OPM cap. See Paraoan Decl., ¶ 9; OPM 2017 Table; Hudson Depo. at 126:2–128:1.

Unlike Plaintiff, NVPs are not subject to the cap that limited Hudson's COLA. See Paraoan Decl., ¶¶ 4–5; OPM 2017 Table. This is because they are paid at the lower GS-14 salary grade level. See AFGE Constitution at AFGE_56. As such, all three NVPs in D.C. — including one white and two black NVPs — received the 2.88% adjustment. See Paraoan Decl., ¶ 7 (NVPs include Joseph Flynn (white); Augusta Thomas (black); Eric Brunn (black)).

As for the President, the Union's Constitution pegs his salary to "Executive Level IV." AFGE Constitution at AFGE_56. In August 2009, three years before Cox was elected to his first term as President, the NEC voted in favor of an interpretation of the Constitution under which the President is entitled to receive the full COLA increase, regardless of any caps that might otherwise apply. See Cox Decl., ¶ 8; id., Exh. 2 (Oct. 14, 2009, Memo). Six years later, in December 2015, the NEC — which by that time included Plaintiff as a member — voted unanimously to reaffirm this interpretation. See Cox. Decl., ¶ 9; id., Exh. 3 (Dec. 2, 2015, Memo); id., Exh. 4 (Dec. 9, 2015, Vote) (14-0 vote in favor). It was on these grounds, the Union maintains, that Cox and the D.C. NVPs received the full COLA in 2017.

Putting all this together, Defendant has shouldered its burden at McDonnell Douglas's second step because it has met all four Figueroa factors. In short, a factfinder could reasonably conclude that the Union was motivated by a nondiscriminatory and credible reason — namely, simply following its own Constitution to calculate COLA rates. See Figueroa, 923 F.3d at 1087–88. This explanation, moreover, is sufficiently clear such that Plaintiff has a "full and fair opportunity to attack [it] as pretextual." Id. (quoting Lanphear v. Prokop, 703 F.2d 1311, 1316 (D.C. Cir. 1983)).

The burden, accordingly, shifts back to Hudson, who must demonstrate that the proffered reason was in fact merely a pretext for Defendant's actions. See Reeves, 530 U.S. at 143. Plainly, he has not done so here, once again failing to acknowledge AFGE's showing and merely repeating the factual allegations in his Complaint. Compare Pl. Opp. at 22, ¶ 126, with Compl., ¶¶ 22, 26–27. Because no evidence casts doubt on Defendant's reasoning, it is entitled to summary judgment on claim three.

4. *Expense Vouchers*

Although AFGE's Motion has paddled through fairly smooth water so far, the rapids increase substantially on the next two issues. Plaintiff next alleges that Cox took away his authority to approve NEC expense vouchers. See Compl., ¶¶ 30–34. Some background may prove useful. Under longstanding policy, the NST reviewed NEC members' expenditures of $5,000 or more. Id., ¶ 33; Cox Decl., Exh. 12 (Calibre Auditing Report) at AFGE_40. As such, no disbursements could be made without first obtaining his approval. See Calibre Rep. at AFGE_40. That all changed in August 2016, when Cox determined that the President, not the NST, should be the "authorized approver" for such expenditures. See Cox. Decl., Exh. 13 (Aug. 4, 2016, Cox Memo); see also id., Exh. 14 (Oct. 11, 2016, Cox Memo) (policy becomes permanent). Because diminishing an employee's responsibilities can constitute an adverse employment action, see Dreiband v. Nielsen, 319 F. Supp. 3d 314, 320 (D.D.C. 2018), the Court can move on to the sufficiency of AFGE's nondiscriminatory reason for removing Hudson's voucher-approval authority.

To support his decision, Cox relies on an annual report submitted by Calibre, an independent auditing firm. See Cox Decl., ¶¶ 33–35. Each year, this firm audits AFGE's financial statements and evaluates "whether there are any deficiencies in [its] internal controls

over financial reporting." Id., ¶ 33. It identified one such deficiency in 2015. See Calibre Rep. at AFGE_40–41; see also id. at AFGE_39 (report issued Aug. 3, 2016).

Specifically, it noted that the Union's policy regarding voucher-approval authority — namely, that it resided with the NST — ran afoul of its Constitution. Id. at AFGE_40–41; AFGE Constitution, Art. X, § 3 at AFGE_64 ("The NST shall disburse monies of AFGE in payment of obligations incurred on behalf of the Federation after such obligations are approved by the National President or his or her duly authorized agent."). Calibre thus advised AFGE to modify its disbursement authorization and approval policies. See Calibre Rep. at AFGE_40–41. Upon accepting this recommendation, Cox issued a memo in which he designated the President as the "authorized approver of all NEC members' vouchers." Cox Decl., ¶ 40; Aug. 4, 2016, Memo; Oct. 11, 2016, Memo. On this evidence, a factfinder could reasonably determine that AFGE has proffered a sufficiently clear, legitimate, and credible reason for its action. See Figueroa, 923 F.3d at 1087–88.

To survive summary judgment at this juncture, consequently, Plaintiff must present "evidence that the adverse employment decision was made for a discriminatory reason." Lathram v. Snow, 336 F.3d 1085, 1088 (D.C. Cir. 2003). To do so, he may adduce: (1) "evidence establishing [his] *prima facie* case"; (2) evidence "attack[ing] the employer's proffered explanation for its action"; and (3) other evidence of discrimination, "such as independent evidence of discriminatory statements or attitudes on the part of the employer." Holcomb, 433 F.3d at 897.

Here, Hudson trains his argument on the latter two categories. For starters, he maintains that Calibre has presented a number of proposals over the years that have never been enacted. See Hudson Depo. at 181:16–22, 182:1–5. In Plaintiff's view, it is telling that Cox adopted the

only recommendation that affected Plaintiff.  Id. at 182:1–4.  Heightening his skepticism is the

fact that no one questioned the longstanding policy when Cox was previously serving as NST.

Id. at 181:16-22.

Hudson, moreover, alleges that the manner in which Cox executed this policy change

provides some evidence of pretext.  See Pl. Opp. at 53.  To be specific, he notes that Cox,

contrary to Defendant's Constitution, took this step unilaterally.  See Alford v. Def. Intelligence

Agency, 908 F. Supp. 2d 164, 175 (D.D.C. 2012) ("In certain cases, an agency's failure to follow

its own regulations or established procedure can provide sufficient evidence of pretext to

withstand summary judgment.").  The proper course of action, Hudson says, would have been for

Cox to seek approval from the NEC before taking away Plaintiff's voucher-approval authority.

See AFGE Constitution Art. IX, § 1 at AFGE_58 ("The National President shall function as the

Chief Executive Officer of the Federation and shall exercise supervision of the affairs of the

Federation subject to the approval of the National Executive Council.").  To be sure, the Court

has some questions as to whether this provision is even operative here.  For one thing, if Cox is

correct that Article X, § 3 requires the NST to obtain approval from the President before

disbursing money, then it is not clear that the process set out in Article IX, § 1 would

additionally require the President to seek approval from the NEC.  Although Defendant has

steadfastly denied that "Cox had any obligation to obtain such approval," ECF No. 15 (Def.

Answer), ¶ 25, it has not spelled out its reasons in its Motion or Reply.  Despite the Court's

lingering concerns, not doing so has left Defendant's proffered justification susceptible to attack.

As for other evidence, Plaintiff also calls attention to Cox's purportedly discriminatory

statements and attitudes.  See Holcomb, 433 F.3d at 897.  To start, Hudson testified at his

deposition that Cox has referred to him as "son" and "boy."  Hudson Depo. at 101:2–119:10; see

also id. at 63:17–79:5, 81:21–100:5 (observing that Cox used those terms when discussing other black employees). Whether a speaker's use of these terms is probative evidence of racially discriminatory animus, according to the Supreme Court, depends on several factors — *e.g.*, "context, inflection, tone of voice, local custom, and historical usage." Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006).

Although no model of clarity, Hudson's deposition testimony contains evidence that he asked Cox to refrain from using those terms. See, e.g., Hudson Depo. at 102:5–6 ("I told him to stop calling me 'son,' and I definitely told him not to call me a 'boy' again."). That is because Plaintiff found them "insulting," "condescending," and "racist." Id. at 102:10–11; see also id. at 107:10–15 ("I told him, using sort of street language, I wasn't his boy because it sort of pissed me off, and I wanted him to know that I was pissed off and I didn't appreciate the term 'boy' because of the racial animosity and the racial history in this country."). Cox, in Hudson's telling, nevertheless used those terms "at least three to five times," id. at 107:7, after he asked him to stop doing so. Id. at 102:7–9 ("Q. And when did you tell him not to call you a boy? A. Probably as soon as he said it.").

Not surprisingly, Cox vehemently denies that his use of those terms shows that he harbors any animus. See Roth Decl., Exh. 3 (David Cox Deposition) at 247:7–249:1. On the contrary, he averred that he comes from a community in which those terms are commonly used to address persons of all races. Id. at 247:20–22 ("I refer to a lot of people as 'son.' It's probably a southern thing, and I've done it probably most of my life.").

A reasonable jury, to be sure, might well find that Cox's account carries the day. The Court's hands at this stage, however, are tied: it cannot make a credibility determination. See Czekalski v. Peters, 475 F.3d 360, 636 (D.C. Cir. 2007) (noting that courts must "eschew making

credibility determinations or weighing the evidence" at summary judgment). Instead, it must credit all of Hudson's evidence and draw all justifiable inferences in his favor. See Liberty Lobby, 477 U.S. at 255; see also Talavaera v. Shah, 638 F.3d 303, 308 (D.C. Cir. 2011) (must construe evidence in light most favorable to non-movant).

There is more. During a 2011 NEC meeting, Hudson became entangled in an imbroglio with AFGE Council 220 President Witold Skwierczynski. See Roth Decl., Exh. 2 (Interrog. Resp. No. 1) at 3–4. According to Plaintiff, Skwierczynski hurled a racial slur and physically threatened him in the presence of others. Id. at 3 (averring that local president used "N-word"). After the dust settled, Hudson filed internal charges against him, accusing him of engaging in conduct unbecoming of a union member. Id. at 3–4.

A committee was convened to investigate the altercation and issued a report in January 2013. See Cox Decl., ¶ 53. The committee there characterized Skwierczynski's behavior as "inappropriate" but stopped short of conclusively finding that he had used any slurs. See Def. MSJ at 19; ECF No. 11 (Pl. Opp. to MTD), Exh. 3 (Committee Report) at 457–58. On that basis, it suggested that he write an apology letter to Hudson and pledge not to engage in similar conduct in the future. See Committee Rep. at 458. As Union President, Cox was charged with approving these findings and recommendations. See Cox Decl., ¶ 54. He did so here. Id.

Dissatisfied, Hudson argues that an accusation of using racial slurs should have led to Skwierczynski's removal or suspension — even a written reprimand would have been a good start. See Pl. Opp. at 58. In Plaintiff's view, Cox's conduct was simply a slap on the wrist; it did not go far enough to address Hudson's grievance. Id. at 58–59. As a result, Hudson maintains that Cox's inaction evidences racial animus toward black employees.

Cox, for his part, vigorously denies this accusation. For one, the committee's report did not conclusively determine that Skwierczynski used <u>any</u> slurs at all. Cox, moreover, describes that he followed "a strong practice of deferring" to the committee's recommendation during his tenure as President. <u>See</u> Cox Decl., ¶ 54. Indeed, he does not recall a single time in which he rejected its proposals. <u>Id.</u> He therefore avers that his decision to refrain from doling out more severe punishment was not based on animus.

Although there are conflicting interpretations of Cox's decision, the Court, at this juncture, must accept Hudson's. <u>See</u> <u>Liberty Lobby</u>, 477 U.S. at 255. Taking all of the evidence together, it finds that he has met his burden — if just barely — of casting doubt on AFGE's race-neutral explanation. Plaintiff's fourth claim thus clears the summary-judgment hurdle.

### 5. *Oversight of HR/IS Departments*

Hudson's final claim makes out two separate adverse employment actions — namely, that Cox stripped his supervisory-authority responsibilities for both the HR and the IS Departments. <u>See</u> <u>Dreiband</u>, 319 F. Supp. 3d at 320; Compl., ¶¶ 23–25. For ease of analysis, the Court will address each action in turn under the all-too-familiar <u>McDonnell Douglas</u> framework. In so doing, it will begin by addressing the Union's justification for its decisions and then examine Plaintiff's rebuttal.

### a. HR

AFGE's position regarding the HR Department chiefly relies on Cox's declaration. As a general matter, Cox begins, the President has the authority to supervise every AFGE Department unless the Constitution says otherwise. <u>See</u> Cox Decl., ¶ 41. Over a decade ago, in 2007, then-President John Gage delegated the authority to supervise the HR Department to the NST. <u>Id.</u>, Exh. 15 (Feb. 9, 2007, Gage Memo) at AFGE_31. In 2015, however, some concerns arose. <u>See</u>

Cox Decl., ¶ 43 (noting that HR "was not functioning properly"). In October of that year, he sent Hudson a memo documenting those issues. Id., Exh. 16 (Oct. 16, 2015, Cox Memo) at AFGE_22–23. More concretely, he pointed out that: (1) "mistakes on personnel actions from [HR]" were "all too regular," id. at AFGE_22; and (2) the Department "was not timely completing critical tasks." Cox Decl., ¶¶ 45–46. Along with these purported infirmities, Cox believed that operational efficiency would improve if the President supervised that Department. Id., ¶ 47. That is because, he notes, the President already had oversight over the General Counsel's Office, which carries out several tasks in "close coordination" with HR. Id.; Cox Decl., Exh. 17 (July 15, 2016, Cox Memo) at AFGE_21. Given all these considerations, he realigned the Union's reporting structure, moving HR back under the supervision of the President's Office. See July 15, 2016, Cox Memo at AFGE_21.

Based on the evidence it presented, Defendant has satisfied step two of McDonnell Douglas by providing a legitimate, nondiscriminatory explanation for its action. See Figueroa, 923 F.3d at 1087–88. As a result, the burden shifts back to Plaintiff, who relies, in part, on the declaration of Jane Nygaard — a former NEC member. To begin, she thought it was "highly unusual" for Cox to have removed Plaintiff's authority. See ECF No. 48-1 (Declaration of Jane Nygaard) at 4. She believed that Hudson "was doing an excellent job" and was staffing HR with "competent people." Id. She told Cox as much and "outwardly questioned his actions" when he refused to restore Hudson's authority. Id.

To further call into question the Union's reasons, Plaintiff again indicates that Cox unilaterally stripped his authority, failing to keep to the Constitution's directive. See Pl. Opp. at 31; Section III.B.4, *supra*. This, along with the above evidence that Cox may have harbored racial animus, is just enough for Hudson's claim to survive summary judgment.

b. IS

As for its decision regarding the IS Department, the Union once again cites Cox's declaration to make its case. This department, Cox reports, had begun to work more closely with other parts of AFGE's operations that were supervised by the President. See Cox Decl., ¶ 48. Transferring that Department to the President's Office, he believed, would lead to widespread efficiency gains. Id.; see July 15, 2016, Cox Memo at AFGE_21 ("[A]n organizational change is needed in light of the evolving role of the [IS] Department. Advances in technology and in computer applications have meant that [IS] has become increasingly integrated into all of our union's other functions."). He charged ahead with his reorganization plans, notifying Hudson of his decision in mid-2016. See July 15, 2016, Cox Memo at AFGE_21. Here, too, the Court finds that Defendant has presented a legitimate justification for its decision at step two of McDonnell Douglas. See Figueroa, 923 F.3d at 1087–88.

To challenge Defendant's proffered reason, Plaintiff once more relies on Nygaard's declaration. She maintains that Hudson was also "doing an excellent job" when he had authority over the IS Department — mainly because he required mandatory IT training every year. See Nygaard Decl. at 4. Even if the Court accepts this characterization, however, it does not negate Defendant's rationalization that realignment was necessary to enhance operational efficiency.

That said, the Court finds that Hudson has mustered enough evidence to pass the summary-judgment threshold. Cox's failure to keep to the Constitution's directive, together with arguable evidence of racial animus, see Section III.B.4, raise enough questions as to the legitimacy of Defendant's race-neutral explanation.

## IV.    Conclusion

For these reasons, the Court will grant in part and deny in part Defendant's Motion for Summary Judgment and deny Plaintiff's Motion for Summary Judgment.  A separate Order consistent with this Opinion will be issued this day.

/s/ James E. Boasberg
JAMES E. BOASBERG
United States District Judge

Date:  March 17, 2020