# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **EUGENE HUDSON, JR.,** | |
| **Plaintiff,** | |
| v. | **Civil Action No. 17-2094 (JEB)** |
| **AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES,** | |
| **Defendant.** | |

## <u>MEMORANDUM OPINION</u>

Over 18 months ago, the Court wrote that "[t]his case is but another chapter in the seemingly intractable feud between Plaintiff Eugene Hudson and his union, Defendant American Federation of Government Employees." <u>Hudson v. AFGE</u>, No. 17-2094, 2020 WL 1275685, at *1 (D.D.C. Mar. 17, 2020). Since that time, the world has changed via a global pandemic, but the feud nonetheless drags on. In its most recent phase, the parties tried their case to a jury, which returned a verdict for Hudson on one of his two remaining race-discrimination claims and awarded him $100,000 in damages.

Defendant now moves for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) or, in the alternative, for involuntary dismissal of the lawsuit with prejudice under Rule 41(b). Concluding that AFGE has not met the high standards for setting aside a jury's verdict, the Court will deny both requests.

I.      **Background**

A.  Factual Background

In a number of prior Opinions in this and related cases, the Court has recited in detail the facts underlying Plaintiff's dispute with AFGE.  See, e.g., Hudson, 2020 WL 1275685, at *1; Hudson v. AFGE, 318 F. Supp. 3d 7, 9–10 (D.D.C. 2018); Hudson v. AFGE, 308 F. Supp. 3d 388, 391–92 (D.D.C. 2018); Hudson v. AFGE, 281 F. Supp. 3d 11, 12–13 (D.D.C. 2017); Hudson v. AFGE, No. 17-1447, 2017 WL 4325681, at *1 (D.D.C. Sept. 27, 2017).  The Court assumes the reader's familiarity with our *dramatis personae* and thus provides those facts at a high level.  It will also provide more detail about certain relevant facts, as they were testified to at trial, in the Analysis section, *infra*.

The dispute here stems from Plaintiff's employment as a high-ranking officer at AFGE, a national labor organization that represents over 1,000 federal and D.C. government employees. See Hudson, 318 F. Supp. 3d at 9.  At the top of AFGE's organizational hierarchy sits the National Executive Council, which consists of the National President, the National Secretary-Treasurer, the National Vice-President for Women and Fair Practices, and the National Vice-Presidents for the Union's 12 districts.  Id.  Within the Council, the President holds the top position, while the NST is second in command.  See Hudson, 308 F. Supp. 3d at 391.

Hudson, who is Black, was first elected to serve as the NST in 2012.  Hudson, 318 F. Supp. 3d at 9.  Three years later, he was re-elected to the office.  Id.  For the duration of Plaintiff's tenure as the NST, J. David Cox served as National President.  Hudson, 2020 WL 1275685, at *1.  The turbulent relationship between the two forms the backdrop of this lawsuit and others.  The gravamen of these suits is Plaintiff's allegation that AFGE, acting through Cox, took a number of adverse employment actions against him.  Id. at *1–2; see also Hudson v.

AFGE, No. 17-1867.  Here, Hudson alleges that his race led AFGE to discriminatorily strip his authority to approve all Executive Council expense vouchers, as well as his supervisory responsibilities over the Human Resources and Information Services Departments.  See Hudson, 2020 WL 1275685, at *3.  Plaintiff's embittered tenure as NST culminated in his removal from office in August 2017, although that removal was not at issue in this trial.  Id. at *1.

B.  Procedural History

This lawsuit arrived at the Court following a series of administrative proceedings.  On July 11, 2017, the Equal Employment Opportunity Commission issued Hudson a right-to-sue letter after he filed a charge of discrimination and retaliation with the District of Columbia Office of Human Rights.  See ECF No. 1 (Compl.), ¶ 9; id., Exh. 1 (EEOC Charge); id., Exh. 2 (Right-to-Sue Letter).  In October 2017, Plaintiff brought this action under Title VII and 42 U.S.C. § 1981, initially alleging discrimination, retaliation, a hostile work environment, and "pretextual discrimination."  Compl., ¶¶ 44–51.

In 2018, the Union moved to dismiss all counts.  See ECF No. 8 (Def. MTD).  Agreeing that Hudson could not split the claims regarding his removal between different pending lawsuits, the Court granted Defendant's request as to all but five discrete acts of alleged racial discrimination.  See Hudson, 308 F. Supp. 3d at 396.  Each of these remaining claims was brought under Title VII and § 1981.  In 2019, Defendant moved for summary judgment as to Hudson's narrowed Complaint, and the Court granted the motion in part and denied it in part.  See Hudson, 2020 WL 1275685, at *10.  More specifically, it permitted him to go to trial on only his claims that losing his authority over expense vouchers and oversight of the HR and IS Departments caused him emotional distress.  Id. at *3–10.  The Court later denied Defendant's

Motion for Reconsideration, expanding upon its reasoning as to why the claims that were still live could proceed to trial.  See ECF No. 63 (Reconsideration Order).

The Court presided over a six-day jury trial starting on June 7, 2021.  See Trial Tr. at 1–998.  On the afternoon of the fourth day, after Plaintiff rested, AFGE orally moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a).  Id. at 799–809.  It cited a number of grounds, including that Hudson's Title VII and § 1981 claims both suffered from threshold legal deficiencies, that no jury could find that the challenged actions were taken because of Hudson's race, and that the evidence was insufficient to support any award of emotional-distress damages.  Id.  The Court denied the motion "without prejudice in the event of [an] adverse verdict."  Id. at 799–809, 812–13, 899–900.

At the close of trial, the jury returned a verdict for Plaintiff on one of the two live claims. More specifically, it found that "Hudson proved by a preponderance of the evidence that AFGE discriminated against him on the basis of race when it [] removed the AFGE Human Resources and Information Services departments from his supervision."  ECF No. 112 (Verdict Form) at 1; see Trial Tr. at 994.  The jury concluded, however, that Plaintiff had not proved that AFGE discriminated against him when it "revoked his authority to approve the expense vouchers of AFGE National Executive Council members."  Verdict Form at 1; see Trial Tr. at 994.  The jury awarded Hudson $100,000 for "emotional distress and mental anguish caused by the above action(s)," and it declined to award any punitive damages.  See Verdict Form at 1–2; Trial Tr. at 994–95.

A month later, Defendant moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(b) or, in the alternative, for involuntary dismissal of the lawsuit with

prejudice under Rule 41(b).  <u>See</u> ECF No. 119-1 (JMOL Motion).  The Court now takes up that

Motion.

## II.    Legal Standard

Defendant first invokes Federal Rule of Civil Procedure 50, which provides that "[i]f a

party has been fully heard on an issue during a jury trial and the court finds that a reasonable jury

would not have a legally sufficient evidentiary basis to find for the party on that issue," the trial

court may enter judgment as a matter of law on that issue.  <u>See</u> Fed. R. Civ. P. 50(a).  Because

the Court denied AFGE's oral Rule 50(a) motion during trial, Defendant now moves under Rule

50(b), which states, "If the court does not grant a motion for judgment as a matter of law made

under Rule 50(a), the court is considered to have submitted the action to the jury subject to the

court's later deciding the legal questions raised by the motion."  "In ruling on the renewed

motion, the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order

a new trial; or (3) direct the entry of judgment as a matter of law."  <u>Id.</u>

In evaluating a Rule 50 motion, the court cannot "lightly disturb a jury verdict.  Judgment

as a matter of law is appropriate only if the evidence and all reasonable inferences that can be

drawn therefrom are so one-sided that reasonable men and women could not have reached a

verdict in plaintiff's favor."  <u>Muldrow v. Re-Direct, Inc.</u>, 493 F.3d 160, 165 (D.C. Cir. 2007)

(internal quotation marks and citation omitted).  This Court "cannot substitute its view for that of

the jury, and can assess neither the credibility nor weight of the evidence."  <u>Scott v. District of

Columbia</u>, 101 F.3d 748, 753 (D.C. Cir. 1996).

Federal Rule of Civil Procedure 41(b), meanwhile, provides in relevant part, "If the

plaintiff fails to prosecute or to comply with these rules or a court order, a defendant may move

to dismiss the action or any claim against it."  Unless stated otherwise, such a dismissal "operates

as an adjudication on the merits." Id. "A District Court may dismiss under Rule 41(b) 'only after less dire alternatives have been explored without success.'" Gardner v. United States, 211 F.3d 1305, 1308 (D.C. Cir. 2000) (quoting Trakas v. Quality Brands, Inc., 759 F.2d 185, 187 (D.C. Cir. 1985)). The D.C. Circuit has "made it clear that, 'under certain circumstances, dismissal may be an unduly severe sanction for a single episode of misconduct.'" Id. (quoting Bristol Petroleum Corp. v. Harris, 901 F.2d 165, 167 (D.C. Cir. 1990)). "Because disposition of claims on the merits is favored," moreover, "the harsh sanction of dismissal . . . is ordinarily limited to cases involving egregious conduct." Peterson v. Archstone Communities LLC, 637 F.3d 416, 418 (D.C. Cir. 2011) (quoting Noble v. U.S. Postal Serv., 71 Fed. Appx. 69, 69 (D.C. Cir. 2003)).

## III.   Analysis

In renewing its Rule 50 Motion, Defendant contends that it is entitled to judgment as a matter of law on multiple grounds. It argues that: (1) Hudson's Title VII claim is legally deficient because he failed to file an EEOC charge concerning his removal from supervising the HR and IS Departments within the applicable statutory deadline; (2) his § 1981 claim is also infirm because he did not allege or prove that he has a contractual right to oversee the Departments; (3) there was insufficient evidence to support a jury finding that the challenged actions were taken because of Plaintiff's race; and (4) there was insufficient evidence to support an award of any emotional-distress damages. See JMOL Motion at 2–22. AFGE separately urges the Court to dismiss the case with prejudice under Rule 41(b). Id. at 22–28.

The Court considers the arguments in turn, with one exception: it need not decide Defendant's contention concerning the timing of Hudson's EEOC charge. This is because, as explained in the analysis that follows, the Court concludes that Plaintiff properly alleged his

§ 1981 claim, which has no administrative- exhaustion requirement, and that there was sufficient

evidence for the jury to find in his favor and award him damages on that claim.  See Nat'l Harbor

GP, LLC v. Gov't of D.C., 121 F. Supp. 3d 11, 18 (D.D.C. 2015) (citations omitted) ("A

plaintiff . . . is not required to exhaust its administrative remedies as a prerequisite to bringing a

claim under . . . § 1981.").  The jury instructions and verdict form, moreover, did not distinguish

between the Title VII and § 1981 counts; indeed, the instructions did not even mention the two

statutes.  Rather, they stated:

> Under federal law, an employer may not discriminate against any
> employee because of that employee's race. . . . In order for Plaintiff
> to prevail on his claims, he must prove two elements by a
> preponderance of the evidence: 1) that Defendant took one or more
> of the[] [alleged] actions; and 2) that Defendant did so because of
> Plaintiff's race.  In other words, Plaintiff must prove that Defendant
> would not have taken these actions but for the fact that Plaintiff is
> Black.

ECF No. 109 (Jury Instructions) at 7; see Verdict Form at 1 ("Has Mr. Hudson proved by a

preponderance of the evidence that AFGE discriminated against him on the basis of race when it

1) removed the AFGE Human Resources and Information Services departments from his

supervision; or 2) revoked his authority to approve the expense vouchers of AFGE National

Executive Council members?").  The jury instructions similarly did not differentiate between the

claims for purposes of instructing the jury on how to award damages.  See Jury Instructions at 8–

9.

Those jury instructions were in keeping with the D.C. Circuit's counsel that, "[i]n Section

1981 and Title VII cases, courts use the same framework for determining whether unlawful

discrimination occurred."  Ayissi-Etoh v. Fannie Mae, 712 F.3d 572, 576 (D.C. Cir. 2013)

(citations omitted); see also Carter v. George Washington Univ., 387 F.3d 872, 878 (D.C. Cir.

2004).  Of course, "Title VII and Section 1981 differ in certain respects," but those differences

— such as which protected classes are covered by each statute — are immaterial for purposes of this race-discrimination case.  See Ayissi-Etoh, 712 F.3d at 576 n.1.  In sum, because the jury instructions and verdict form did not differentiate between Hudson's Title VII and § 1981 claims, he could prevail on either.  As the Court concludes that AFGE has presented no basis for vacating the jury's verdict and award of damages with respect to the § 1981 claim, it need not decide the merits of Defendant's argument concerning the timing of Hudson's Title VII claim. Cf. Kim v. Nash Finch Co., 123 F.3d 1046, 1064 (8th Cir. 1997) ("We are satisfied that, given the substantial identity of Title VII and § 1981 as theories of recovery, the jury's finding of intentional discrimination under Title VII also constituted a finding of intentional discrimination under § 1981.").

    A.  Legal Sufficiency of § 1981 Claim

    The Court first takes up AFGE's contention that Hudson's § 1981 claim is legally deficient because he did not allege or prove that he had a contractual right to oversee the HR or IS Departments.  See JMOL Motion at 5–12.  That argument, which Defendant could have raised prior to trial but did not, gains no purchase.

    Section 1981(a) states, as relevant here, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens."  In Patterson v. McLean Credit Union, 491 U.S. 164 (1989), the Supreme Court "focused upon § 1981's words 'to make and enforce contracts' and interpreted the phrase narrowly.  It wrote that the statutory phrase did not apply to 'conduct by the employer after the contract relation has been established, including breach of the terms of the contract or imposition of discriminatory

working conditions.'" CBOCS W., Inc. v. Humphries, 553 U.S. 442, 449 (2008) (emphasis omitted). Under Patterson, then, "§ 1981 did not encompass the claim of a black employee who charged that her employer had violated her employment contract by harassing her and failing to promote her, all because of her race." Id. In 1991, however, "Congress passed the Civil Rights Act of 1991, with the design to supersede Patterson." Id. at 450 (citations omitted). The new law amended § 1981 by adding a new subsection, (b), which states, "For purposes of this section, the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." Id. (quoting 42 U.S.C. § 1981(b)). The accompanying Senate Report explained that "the protections that subsection (b) provided, in 'the context of employment discrimination . . . would include, but not be limited to, claims of harassment, discharge, demotion, promotion, transfer, retaliation, and hiring.'" Id. (quoting S. Rep. No. 101-315, at 92 (1990)) (emphasis omitted).

Against that backdrop, AFGE contends that Hudson's § 1981 claim founders as he has not identified a specific contractual right to supervise the HR or IS Departments. In other words, Defendant does not dispute that stripping Plaintiff of his supervision duties constitutes a change in the privileges, terms, or conditions of his employment, but rather argues that the actions did not infringe on Hudson's enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship. See JMOL Motion at 5–12. The problem for AFGE, however, is that this position runs headlong into binding circuit precedent. In Ayissi-Etoh, the Court of Appeals explained that "[s]ection 1981 prohibits private employers from intentionally discriminating on the basis of race with respect to the 'benefits, privileges, terms, and conditions' of employment." 712 F.3d at 576. What is more, the Court of Appeals has repeated the identical language at least

twice more in recent years.  See Rassa v. Amtrak, 850 Fed. Appx. 1, 2 (D.C. Cir. 2021); DeJesus
v. WP Co., 841 F.3d 527, 532 (D.C. Cir. 2016).

      Defendant's attempts to circumvent this precedent do not succeed.  First, it urges the
Court to treat the quoted language from Ayissi-Etoh as stray *dicta* that cannot be reconciled with
§ 1981's text.  See JMOL Motion at 6–8.  Regardless of the merits of Defendant's qualms with
the Court of Appeals' decisions, district courts are duty-bound to follow circuit precedent.  See,
e.g., United States v. Torres, 115 F.3d 1033, 1036 (D.C. Cir. 1997).  Second, AFGE contends
that these appellate decisions are inconsistent with the Supreme Court's holding in Domino's
Pizza, Inc. v. McDonald, 546 U.S. 470 (2006).  Despite Defendant's assertion that "the Supreme
Court's explicit holding in Domino's Pizza could hardly be any clearer on this key point," JMOL
Motion at 9, the case is largely beside the point.  The issue in Domino's Pizza was "whether a
plaintiff who lacks any rights under an existing contractual relationship with the defendant, and
who has not been prevented from entering into such a contractual relationship, may bring suit
under . . . § 1981" on the ground that he was a shareholder in a corporation that had a contractual
relationship with the defendant.  See 546 U.S. at 472.  The Court answered in the negative,
making clear that "[s]ection 1981 plaintiffs must identify injuries flowing from a racially
motivated breach of their own contractual relationship, not of someone else's."  Id. at 480.
Because there is no dispute that Hudson alleges injuries flowing from his own contractual
relationship with AFGE — as opposed to somebody else's — Domino's Pizza sheds no
significant light on this issue.

      Before moving on, the Court briefly notes the wide-ranging implications of AFGE's
argument on this score.  At bottom, its contention is that in order to bring a § 1981 claim, a
plaintiff must have an enumerated contractual right addressing the allegedly discriminatory

conduct at issue.  If that were the case, countless race-based employment suits could not be

brought under § 1981 absent a hyper-specific employment contract.  Given the context of the

1991 amendment to the statute and the Supreme Court's instruction that "[s]ection 1981 offers

relief when racial discrimination . . . impairs an existing contractual relationship," id. at 476,

adoption of AFGE's argument would make little sense.  See Comcast Corp. v. Nat'l Ass'n of

Afr. Am.-Owned Media, 140 S. Ct. 1009, 1021 (2020) (Ginsburg, J., concurring in part and

concurring in the judgment) ("Postformation racial harassment violates § 1981 . . . because the

right to 'make and enforce' a contract includes the manner in which the contract is carried out.").

     B.  Sufficiency of Evidence of Discrimination

AFGE next asserts that Hudson put forth insufficient evidence to support the jury's

conclusion that he was stripped of his supervisory role over the Departments because of his race.

See JMOL Motion at 12–19.  This stance, however, largely rehashes arguments that the Court

already rejected at the summary-judgment stage.  See Hudson, 2020 WL 1275685, at *6–10; see

also ECF No. 30-1 (Def. MSJ) at 5–25.  Not only did the Court decline to grant summary

judgment to Defendant on the issue, but it also denied a Motion for Reconsideration on this

precise point.  See Reconsideration Order at 3–5.  AFGE thus faces an uphill battle, needing to

show that the evidence at trial departed significantly from what Plaintiff promised in the motion

briefing.

As at the summary-judgment stage, "the Court must follow the three-part burden-shifting

framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–05 (1973)."

Hudson, 2020 WL 1275685, at *2 (citing Taylor v. Small, 350 F.3d 1286, 1292 (D.C. Cir.

2003)).  While the Court assumes the reader's familiarity with that basic framework, it is worth

noting that "[a] jury may infer discrimination from, among other things, 'evidence of

discriminatory statements or attitudes on the part of the employer.'" Morris v. McCarthy, 825 F.3d 658, 668 (D.C. Cir. 2016) (quoting Aka v. Wash. Hosp. Ctr., 156 F.3d 1284, 1289 (D.C. Cir. 1998) (*en banc*)).

To start, the Court need not belabor the first step of the McDonnell Douglas analysis: Defendant does not dispute that Hudson, who is Black, made out a *prima facie* case of discrimination.  See JMOL Motion at 12–19; Hudson, 2020 WL 1275685, at *5–10; see also Brady v. Office of Sergeant at Arms, 520 F.3d 490, 493–94 (D.C. Cir. 2008).  The Court thus proceeds to the second step of the analysis.  In its first summary-judgment Opinion, the Court relied on Cox's Declaration to conclude that Defendant had satisfied its burden by explaining that it stripped Hudson of his supervisory duties because of concerns about operational efficiency and mistakes in the HR Department.  See Hudson, 2020 WL 1275685, at *9–10.  Then, in its Reconsideration Order, the Court rejected AFGE's argument that Hudson's own testimony showed that the roles were taken away "solely for political reasons" — *i.e.*, because of Cox's desire to consolidate his power within the Union.  See Reconsideration Order at 3–5.

In the instant Motion, Defendant argues both positions, contending that "Cox's actual stated justification was operational efficiency," while going on to state that it was "fatal[]" for Hudson that he "did nothing at trial to escape the legal consequences of his prior, unequivocal deposition testimony that Cox's true reasons for taking away his supervisory role over the HR and IT departments were to further Cox's own personal interests and political ambitions within AFGE."  JMOL Motion at 16–17.  As before, the Court is satisfied that the "stated justification" of "operational efficiency" suffices as a "a legitimate, nondiscriminatory explanation for [Defendant's] action."  Hudson, 2020 WL 1275685, at *9 (citing Figueroa v. Pompeo, 923 F.3d 1078, 1087–88 (D.C. Cir. 2019)).

The burden is therefore on Plaintiff to show, "based on all the evidence, including 'any evidence the plaintiff presents to attack the employer's proffered explanation for its actions' and 'any further evidence of discrimination that may be available to the plaintiff (such as independent evidence of discriminatory statements or attitudes on the part of the employer),'" Iyoha v. Architect of the Capitol, 927 F.3d 561, 566 (D.C. Cir. 2019) (quoting Salazar v. Wash. Metro. Transit Auth., 401 F.3d 504, 508 (D.C. Cir. 2005)), that "the evidence and all reasonable inferences that can be drawn therefrom are" not "so one-sided that reasonable men and women could not have reached a verdict in [P]laintiff's favor." Muldrow, 493 F.3d at 165. As explained in prior rulings in this case, the Court concludes that Hudson has met that burden.

Consider first the evidence concerning Cox's bias against Black individuals. At the summary-judgment stage, the Court found it significant that he had referred to Hudson as "son" and "boy" on multiple occasions, and that, after a local president used the "N-word" with Hudson, Cox approved the recommended discipline of an apology, which Plaintiff viewed as "a slap on the wrist." Hudson, 2020 WL 1275685, at *8–9. The evidence at trial bore out those allegations and then some. For instance, Hudson testified that Cox called him "boy" and "son" "a number of times, particularly starting in 2016." Trial Tr. at 552–53. Plaintiff also explained that "'Boy' and 'Son' became a — a real — a real bone of contention between the two of us." Id. at 552. Cox himself confirmed, "I'm sure that I have" "referred to [Hudson] using those terms," with the caveat that he had used the term "pretty generically all my life." Id. at 417.

The Supreme Court has cautioned that, while referring to a Black employee using the term "boy" "will not always be evidence of racial animus, it does not follow that the term, standing alone, is always benign." Ash v. Tyson Foods, Inc., 546 U.S. 454, 456 (2006). The Court explained that when using the term, "[t]he speaker's meaning may depend on various

factors including context, inflection, tone of voice, local custom, and historical usage."  Id.  At trial in this case, another non-white AFGE employee, Rocky Kabir, confirmed that Cox used the terms "son" and "boy," that he felt disrespected and offended by the way Cox did so, and that he had asked Cox to stop using the phrases, but to no avail.  See Trial Tr. at 267–68.  In light of Hudson and Kabir's testimony — and mindful of Ash's instruction about the contextual meaning of the phrase "boy" — the Court is loath to second guess any conclusion by the jury that Cox's use of the terms served as evidence of racial bias.

There is more.  Testimony at trial also bore out the incident in which Cox minimally disciplined AFGE Council 220 President Witold Skwierczynski, who called Hudson the N-word. Witness testimony confirmed that Skwierczynski directed that epithet at Plaintiff on two separate occasions.  Id. at 542–44; 556–57.  After Hudson filed an internal complaint, a committee investigated the incident and issued a report and recommendation.  Id. at 467–70.  It recommended that Skwierczynski apologize and not repeat similar acts in the future.  Id. at 470. Cox adopted the recommendation and Skwierczynski apologized to Hudson, which Hudson "didn't like," because he felt "as though there were [not] any consequences for calling [him] the N-word."  Id. at 548; see also id. at 470.  As for further evidence of racial bias on the part of Cox, Plaintiff testified about an incident in which he and Cox attended an event where then-President Obama spoke, during which Cox looked at Hudson and remarked, "That boy hasn't done nothing for us."  Id. at 590.  Plaintiff also testified that "there were many other occasions where [Cox] would denigrate African American managers in my presence and then look at me as though I was next."  Id. at 537.  Last, Hudson testified about an incident in which another AFGE officer, Gerald Swanke, said to Cox while Plaintiff was the only other person present, "SMB,

SMB" — an epithet that means "simple-minded Blacks."  Id. at 632.  According to Hudson, Cox "looked at me and snickered" in response.  Id.

"Of course, [Hudson] must show more than a general bias against [Black] employees; []he must also introduce enough evidence for a reasonable jury to find that h[is] [change in duties] was motivated by that bias."  Morris, 825 F.3d at 670.  Plaintiff points to enough evidence, however, to "cast[] doubt on the objective validity of the employer's explanation," id. at 671, especially considering the high bar for disrupting a jury verdict.  In addition to the above evidence of Cox's bias, as well as a specific targeting of Hudson, there was also evidence that a jury could view as contradicting AFGE's stated reason for removing Plaintiff's supervision of the HR and IS Departments.  For example, one National Vice President testified that Hudson was a capable leader of the HR Department and that he improved the Department during his tenure. See Trial Tr. at 149–50.  And former National Executive Council member Jane Nygaard explained that she had questioned why the Departments were taken away from Plaintiff because he handled the positions well.  Id. at 192–93.  Importantly, Nygaard explained that while Cox stated that the organizational change was done "to streamline the process," she thought that the change was "just a way to get back at NST Hudson."  Id. at 201.  Ultimately, when asked whether she believed, based on her experience, that Hudson's race "had anything to do with the fact that those departments were taken away from him," Nygaard answered, "I do believe it had a part of it, exactly."  Id. at 202–03.

Taken together — and mindful of the admonition that the Court "cannot substitute its view for that of the jury, and can assess neither the credibility nor weight of the evidence," Scott, 101 F.3d at 753 — the above evidence is sufficient to allow the jury to be "'quite suspicious' of the sincerity of" AFGE's proffered rationale and to conclude that it "was pretext for racial

discrimination." <u>Morris</u>, 825 F.3d at 671–72 (quoting <u>Evans v. Sebelius</u>, 716 F.3d 617, 622

(D.C. Cir. 2013)).  "Indeed, a reasonable jury could treat evidence of a decisionmaker's broad-

based racial animus or bias as corroborating evidence that such animus or bias infected a

particular employment decision; it is not unreasonable to doubt that an employer quarantines her

animus or bias to day-to-day treatment of colleagues." <u>DeJesus</u>, 841 F.3d at 536; <u>see also, e.g.</u>,

<u>Aka</u>, 156 F.3d at 1294 (quoting <u>St. Mary's Honor Center v. Hicks</u>, 509 U.S. 502, 511 (1993))

("If 'disbelief is accompanied by a suspicion of mendacity,' the likelihood of intentional

discrimination is increased, permitting the factfinder to infer discrimination more readily.").

    C.  <u>Sufficiency of Evidence of Damages</u>

Next up is AFGE's contention that there was insufficient evidence for the jury to award

any damages for emotional distress.  Once again, the Court declines to disrupt the verdict of the

jury, who witnessed a six-day trial and made the unanimous decision to award $100,000 to

Plaintiff.

"[I]t is well established that 'mental and emotional distress' are 'compensable under

§ 198[1],' even in the absence of physical injury." <u>Daskalea v. D.C.</u>, 227 F.3d 433, 443–44

(D.C. Cir. 2000) (quoting <u>Carey v. Piphus</u>, 435 U.S. 247, 264 (1978)); <u>see</u> <u>Carter v. Duncan-</u>

<u>Huggins, Ltd.</u>, 727 F.2d 1225, 1236–39 (D.C. Cir. 1984).  It is similarly accepted that, even if

expert testimony is commonly relied upon, a plaintiff's own testimony is sufficient to establish

emotional-distress damages.  <u>See</u> <u>Daskalea</u>, 227 F.3d at 444 ("[N]o expert testimony was

required to bolster that of Daskalea and her witnesses, or to show the causal link between her

treatment in prison and her injuries."); <u>Bryant v. Aiken Reg'l Med. Centers Inc.</u>, 333 F.3d 536,

546 (4th Cir. 2003) (explaining, in employment-discrimination case brought under § 1981, "We

have held that a plaintiff's testimony, standing alone, can support an award of compensatory

damages for emotional distress").  As for the type of testimony a plaintiff must offer, the D.C.

Circuit has reasoned that "[t]he mere fact that [the plaintiff] did not recite the specific terms

'emotional harm' or 'humiliation' while on the stand does not wash away the evidence of her

intangible injury.  To place a premium on conclusory terms such as these would distract

attention away from the central question of whether plaintiff established actual, but intangible

harm."  Carter, 727 F.2d at 1238.

Here, Hudson plainly testified about how he was injured by AFGE's racial

discrimination.  He told the jury that he was "just devastated by the fact that my departments had

been taken away from me."  Trial Tr. at 632.  Plaintiff went on to explain that losing his

supervisory duties over the Departments made him feel "as though I had been demoted for doing

a good job.  I felt as though I had been discriminated against by J. David [Cox]."  Id.  Hudson

then reiterated how demotion made him feel, as well its psychological effect on him, stating that

after he was stripped of the Departments, "the staff in the building would snicker when I got on

the elevators or went to the lunchroom.  There was always a little chatter or snicker about the

fact I was demoted.  It was embarrassed [sic] and humiliating."  Id.  Elsewhere in Hudson's

testimony, he told the jury that he had trouble remembering certain details about what happened

around the time he was notified about the Departments because it was "very, very stressful" for

him.  Id. at 597.  "These injuries are hardly surprising or unexpected in light of the" racial

discrimination that Plaintiff suffered.  See Daskalea, 227 F.3d at 444.  While it may have been

wise for Plaintiff to have other witnesses (perhaps including an expert) testify to his damages, "it

does not take an expert to confirm the jury's common sense with respect to both their existence

and cause."  Id.

AFGE's extensive reliance on two out-of-circuit cases — <u>Akouri v. State of Fla. Dep't of Transp.</u>, 408 F.3d 1338 (11th Cir. 2005), and <u>United States ex rel. Cody v. ManTech Int'l Corp.</u>, 746 Fed. Appx. 166, 183–85 (4th Cir. 2018) — does not move the needle. <u>See</u> JMOL Motion at 19–22. Contrary to its submission that there is "no in-circuit authority bearing on this issue," <u>id.</u> at 19, D.C. Circuit precedent points the way to a resolution. For instance, our Court of Appeals has explained, in the context of rejecting a challenge to a jury's award of emotional-distress damages in a § 1981 case, that the plaintiff's statements that she "felt isolated," that her "mind just flew out," and that she was "shocked" all "constitute the stuff of which a claim for humiliation and emotional harm is composed." <u>Carter</u>, 727 F.2d at 1238. Elsewhere, the D.C. Circuit looked to the plaintiff's testimony and common sense to reject the defendant's argument that "there was insufficient evidence to justify a compensatory award . . . because [the plaintiff] suffered no physical injury, because her damages evidence was limited to her own testimony, and because she did not establish a causal link between the unlawful acts and the harm she suffered." <u>Daskalea</u>, 227 F.3d at 443 (internal quotation marks omitted). In light of that reasoning, the Court has no need to look to out-of-circuit precedents to decide the issue.

In short, the Court's "thorough review of the record convinces [it] that [Hudson] here established [] a harm." <u>Carter</u>, 727 F.2d at 1238. That conclusion is fortified by the reminder that a "court must be especially hesitant to disturb a jury's determination of damages in cases involving intangible and non-economic injuries." <u>Daskalea</u>, 227 F.3d at 444 (quoting <u>Langevine v. District of Columbia</u>, 106 F.3d 1018, 1024 (D.C. Cir. 1997)).

   D.  <u>Rule 41(b)</u>

Having exhausted AFGE's Rule 50(b) arguments, the Court last takes up its request for involuntary dismissal of Plaintiff's lawsuit under Rule 41(b). <u>See</u> JMOL Motion at 22–27. On

this score, while Defendant is correct that Hudson and his counsel at times failed to comply with the Court's evidentiary instructions, this is not the rare case "involving egregious conduct" in which "the harsh sanction of dismissal" is warranted.  See Peterson, 637 F.3d at 418 (quotation marks and citation omitted).

"There are three basic justifications for dismissal because of attorney misconduct," and "[t]hese justifications are not easily met."  Gardner, 211 F.3d at 1309.  They are: "(1) prejudice to the other party; (2) failure of alternative sanctions to mitigate the severe burden that the misconduct has placed on the judicial system; and (3) deterrence of future misconduct."  Id. (citing Shea v. Donohoe Constr. Co., 795 F.2d 1071, 1074 (D.C. Cir. 1986)).  Although the Court of Appeals initially set out this framework in the context of attorney misconduct and delay, it has subsequently endorsed applying the standard in the context of a plaintiff and her attorney violating a court's evidentiary orders.  See Keys v. Washington Metro. Area Transit Auth., 523 Fed. Appx. 727, 728 (D.C. Cir. 2013).

Applying these criteria, the Court finds that dismissal is not warranted here.  First, while Defendant may have suffered some prejudice as a result of Hudson and his attorney's failure to comply with certain instructions, that prejudice is not "so severe[] as to make it unfair to require the other party to proceed with the case."  Gardner, 211 F.3d at 1309 (quoting Shea, 795 F.2d at 1074).  Critically, although AFGE points to several instances in which Plaintiff or his attorney mentioned potentially prejudicial topics that the Court had ruled out of bounds, in each instance the Court sustained objections before the jury heard prolonged testimony.  Consider, for instance, Hudson's attorney's questioning of Cox about instances of racial animus manifested by other AFGE personnel.  While Defendant is correct that asking Cox about those instances violated the Court's pretrial Order, see ECF No. 82 (In Limine Order) at 2, the Court swiftly sustained

objections to the questions before the witness could answer.  See Trial Tr. at 436–37.  It also

further ensured that any questions on the subject were rephrased in a manner that did not violate

the Order.  Id.  Similarly, Hudson's testimony about medical treatment he had received because

of his alleged injuries — testimony that came at the end of a lengthy and otherwise admissible

answer — was curtailed mid-sentence by a sustained objection.  Id. at 632.  That brief testimony,

which AFGE characterizes as "by far the most flagrant and deliberately damaging (to AFGE)

violation of the Court's Order," JMOL Motion at 24, did not even constitute a complete sentence

or coherent communication, thus minimizing the prejudicial effect.

      Other instances of "misconduct" identified by AFGE had even less prejudicial potential.

For example, it points out that Hudson's counsel improperly referenced the timeliness of

Plaintiff's EEOC charge in her closing argument.  See JMOL Motion at 25.  But because that

issue was not directly relevant to the jury's verdict or the Court's resolution of this Motion, it is

difficult to believe that the transgression caused AFGE significant prejudice.  The Court

similarly concludes that any improper questioning about the reasons for Cox's resignation were

not of central importance to the ultimate question of fact decided by the jury.  See Trial Tr. at

437.  Further, and in any event, the Court also sustained objections to such questioning before

Cox could answer.  Id.

      The Court, moreover, took ample steps to instruct the jury before it deliberated about the

evidence that it could and could not consider.  "A jury is presumed to follow its instructions."

Weeks v. Angelone, 528 U.S. 225, 234 (2000) (citing Richardson v. Marsh, 481 U.S. 200, 211

(1987)).  That includes the presumption that "the jury can follow instructions to disregard

testimony."  United States v. McLendon, 378 F.3d 1109, 1114 (D.C. Cir. 2004) (internal

quotation marks and citation omitted).  In this case, after the jury had heard all of the evidence,

the Court reiterated:

> During your deliberations, you may consider only the evidence or
> lack of evidence properly admitted in the trial. . . . If during the
> course of the trial I sustained an objection to a question, you should
> ignore the question and not speculate as to what the answer would
> have been.  If after a witness answered the question, I ruled the
> answer should be stricken, you should ignore both the question and
> the answer.  They should play no part in your deliberations.

Trial Tr. at 903–05.  The Court also made clear that "[s]tatements and arguments of the lawyers,

such as opening statements and closing arguments are not evidence. . . . The questions that either

side asks are not evidence.  A party's question that contains an assertion of fact, does not provide

evidence of that fact unless a witness answered the question in the affirmative."  Id. at 904.

Defendant provides no compelling reason to call into question the ordinary presumption

that the jury followed the Court's clear instructions.  Nor could it.  Instead, AFGE invites the

Court to tacitly ignore that presumption and conclude that the jury must have relied on excluded

testimony, despite the Court's repeated and explicit instructions to the contrary.  At bottom,

while the Court sympathizes with AFGE's complaints about Plaintiff and his counsel's failures

to comply with certain evidentiary rulings, it concludes that there was not such "repetitive and

cumulative . . . improper testimony" to hold that "the jury has been tainted, and it would

therefore be unfair to require [D]efendant to continue in this matter."  Keys v. Washington

Metro. Area Transit Auth., 272 F.R.D. 243, 247 (D.D.C. 2011), aff'd, 523 Fed. Appx. 727.

Turning to the second factor that can justify dismissal, the Court finds that alternative

sanctions successfully mitigated the burden that the conduct placed on the judicial system.  This

factor considers whether "the court [is required] to expend considerable judicial resources in the

future in addition to those it has already wasted, thereby inconveniencing many other innocent

litigants in the presentation of their cases." Gardner, 211 F.3d at 1309 (quoting Shea, 795 F.2d at 1075–76). This language does not readily seem to fit the circumstances of this case. In any event, in addition to the repeated sustained objections referenced above, the Court also gave Plaintiff and his attorney stern warnings about adhering to its instructions. See Trial Tr. at 442, 728. Those reprimands had some success in reining in future misconduct, even if they were not entirely successful. Id.; see also id. at 443. As for whether the Court will have to expend considerable judicial resources in the future to remedy past misconduct, Defendant has not demonstrated how or why this would occur, and the Court does not see how this factor tips in favor of disrupting the jury's verdict.

Third, the Court concludes that dismissal is not necessary to deter future misconduct. Deterrence "justifies dismissals when there is some indication that the client or attorney consciously fails to comply with a court order cognizant of the drastic ramifications." Gardner, 211 F.3d at 1309. Despite Hudson and his attorney's boundary-testing behavior, he persuasively argues that many of those mistakes were due to misunderstanding or negligence, rather than bad faith. See ECF No. 129 (Pl. Opp.) at 28–33. For example, with regard to Plaintiff's counsel's improper questioning about discriminatory animus manifested by other AFGE personnel, Plaintiff points to portions of the transcript in which his attorney expressed genuine misunderstanding about what she could and could not ask of whom. Id.; see also Trial Tr. at 436–43. While counsel no doubt should have had a better grasp on the Court's instructions and is by no means free of blame, that type of mistake does not constitute "calculated, deliberate disregard of the court's authority and the force of its orders." Martin–Trigona v. Gellis & Melinger, 830 F.2d 367, 369 (D.C. Cir. 1987). In short, there is not sufficient evidence of

"persistent bad faith" to conclude that this factor favors dismissal.  See Keys, 523 Fed. Appx. at 728.

\*        \*        \*

All told, "there are no perfect trials."  Brown v. United States, 411 U.S. 223, 231 (1973). This trial, while not as flawed as Defendant urges, is certainly no exception to that rule.  Taken together, however, Hudson and his counsel's violations of the Court's instructions — which the Court does not take lightly — were sufficiently addressed by alternate means and curative instructions, which the jury is presumed to have followed.  By the close of a six-day trial, the jury had heard ample properly admitted evidence to permit it to return a verdict in favor of Hudson.  The Court thus declines AFGE's attempt to set aside the verdict and dismiss Plaintiff's case after the bell has rung.

## IV.     Conclusion

For the foregoing reasons, the Court will deny Defendant's Motion.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
United States District Judge

Date:  November 2, 2021