**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **EUGENE HUDSON, JR.,**<br><br>**Plaintiff,**<br><br>v.<br><br>**AMERICAN FEDERATION OF**<br>**GOVERNMENT EMPLOYEES,**<br><br>**Defendant.** | Civil Action No. 17-2094 (JEB) |

<u>**MEMORANDUM OPINION**</u>

"[T]he original merits of the case have long disappeared from the face of the earth. . . . It's about nothing but costs now," bemoaned John Jarndyce, a long-suffering participant in <u>Bleak House</u>'s tale of the interminable lawsuit that bore his name. He could just as well have been speaking about this case. After half a decade of litigation, and with the merits resolved long ago, all that remains of the present dispute between Plaintiff Eugene Hudson and Defendant American Federation of Government Employees is Hudson's Motion for Attorney Fees and Costs. Hudson contends that his counsel, Marlene "Kemi" Morten, is entitled to over $1.4 million dollars in fees, plus costs; AFGE counters that her litigation misconduct warrants an outright denial of fees. The Court concludes that the proper award totals $313,855 and will accordingly grant the Motion in part and deny it in part.

**I.     Background**

The Court has told the tale of the parties' underlying dispute many times over. <u>See, e.g.</u>, <u>Hudson v. AFGE</u>, No. 17-2094, 2021 WL 5083436, at *1 (D.D.C. Nov. 2, 2021); <u>Hudson v. AFGE</u>, No. 17-2094, 2020 WL 1275685, at *1 (D.D.C. Mar. 17, 2020); <u>Hudson v. AFGE</u>, 318 F.

Supp. 3d 7, 9–10 (D.D.C. 2018); Hudson v. AFGE, 308 F. Supp. 3d 388, 391–92 (D.D.C. 2018);

Hudson v. AFGE, 281 F. Supp. 3d 11, 12–13 (D.D.C. 2017); Hudson v. AFGE, No. 17-1447,

2017 WL 4325681, at *1 (D.D.C. Sept. 27, 2017).  It will here offer an abridged narrative of the

key facts, focusing on the procedural history most relevant to this Motion.

Hudson, who is Black, was elected AFGE's National Secretary-Treasurer (NST) in 2012

and re-elected in 2015.  Hudson, 2021 WL 5083436, at *1.  He served under AFGE National

President J. David Cox.  Id.  Hudson's numerous lawsuits in this district concern his tumultuous

relationship with Cox.  In the present action, filed in October 2017, Plaintiff alleged that Cox

took several adverse actions against him because of his race.  Id.; ECF No. 1 (Compl.), ¶¶ 44–51

(bringing four Counts under Title VII and 42 U.S.C. §§ 1981 and 1983); see also ECF No. 1-2

(Civil Cover Sheet) at 2 (seeking $5,000,000 in damages).

On AFGE's motion, the Court in 2018 dismissed three of Hudson's four counts in full and

substantially narrowed the last.  Hudson, 308 F. Supp. 3d at 396.  In 2020, the Court granted in

part AFGE's Motion for Summary Judgment on the narrowed Complaint.  Hudson, 2020 WL

1275685, at *10.  Hudson thus went to trial on only his allegations that AFGE had

discriminatorily stripped him of authority over expense vouchers and of oversight of the Human

Resources and Information Services Departments.  Id. at *3–10.

The Court presided over a six-day jury trial starting on June 7, 2021.  Hudson, 2021 WL

5083436, at *2.  At the close of trial, the jury returned a verdict for Plaintiff on one of those two

remaining claims.  Id.; see also ECF No. 112 (Verdict Form) at 1.  It found that AFGE had

discriminated against Hudson when it removed the two departments from his supervision, but not

when it revoked his authority to approve expense vouchers.  The jury accordingly awarded

Hudson $100,000 for emotional distress and declined to award punitive damages.  Hudson, 2021 WL 5083436, at *2; see also Verdict Form at 1–2.

AFGE moved for judgment as a matter of law a month later, a motion the Court denied. Hudson, 2021 WL 5083436, at *2, 11.  AFGE appealed, and the Court of Appeals affirmed this Court's denial by unpublished judgment.  See Hudson v. AFGE, No. 21-7133, 2022 WL 15798719, at *1 (D.C. Cir. Oct. 28, 2022).  In the meantime, on July 14, 2021, Hudson filed his first Motion for Attorney's Fees and Costs, along with an attachment detailing them.  See ECF Nos. 120 (First Fee Motion); 120-2 (First Bill of Fees and Costs).  The Court stayed that Motion until the Court of Appeals' mandate issued.  See ECF No. 153 (Order Staying Fee Motion).

With the appellate process resolved, the Court held a status hearing on January 4, 2023. See ECF No. 161 (Transcript of Jan. 4, 2023, Status Hearing).  In that hearing, AFGE took issue with Hudson's thinly veiled threats that he had made in his original fee Motion that, "should litigation . . . be required" regarding that Motion, counsel "reserves the right to" seek a higher hourly rate and bill for additional hours that she had previously written off.  See First Fee Mot. at 9; ECF No. 120-1 (Affidavit of Attorney Kemi Morten), ¶¶ 34, 68, 80 (repeatedly emphasizing same); First Bill of Fees and Costs at 17 (same).  Indeed, in the parties' first Joint Status Report following the Court of Appeals' mandate, Hudson had followed through on that threat and noted that he "intends to file a revised [b]ill" adding fees that he had excluded from his original Motion.  See ECF No. 159 (Dec. 19, 2022, Joint Status Report) at 2.  The Court made clear during the January status conference that such adding would be improper:

> THE COURT: Now, the one thing that they [AFGE] raise and that I agree with them is that if you [Morten] file a revised motion, I'm not going to let you seek more fees prior to July 14th, 2021.  In other words, there's some intimation that you cut some fees –
>
> MS. MORTEN: Oh, no.

> THE COURT: -- that you wanted to bring back.  Okay, so that's just
> – I'm going to make that clear.

Tr. of Jan. 4, 2023, Hearing at 10:18–25.  The Court also emphasized to Morten that any revised

fee motion would be her final chance to offer evidence in support of her fees:

> THE COURT: But it's not going to be a question of my saying, well,
> you didn't really support this, I'll give you another chance to file
> something else.  If you don't support it fully, I'll cut fees.

Id. at 19:16–19.

The next month, on February 13, 2023, Hudson filed his revised Motion for Attorney's

Fees and Costs — the Motion at issue here.  See ECF No. 164 (Second Fee Motion).  He

contemporaneously emailed an Excel spreadsheet titled "REVISED Bill of Trial Fees and Costs"

to chambers and to counsel for AFGE.  See Email of Feb. 2, 2023; see also ECF No. 170 (AFGE

Opp.) at 1 ("Plaintiff's submission includes . . . (iii) an Excel spreadsheet emailed to Chambers

. . . .").  That Motion, which seeks over $1.4 million in trial and appellate fees and costs, is now

ripe.  See AFGE Opp. at 1 (describing Motion as combined "Motions for attorney's fees and

costs in this Court and attorney's fees and costs in the Court of Appeals").

## II.  Analysis

Not surprisingly, the parties here are far apart and their disputes are many.  The Court will

spend the bulk of its time with the request for attorney fees — which requires analyzing the

applicable rate, the number of hours, any adjustments, and hours expended on this litigation —

before finishing with costs.

### A.  Attorney Fees

Under the "American Rule," each party ordinarily bears its own attorney fees.  See

Alyeska Pipeline Serv. Co. v. Wilderness Soc'y, 421 U.S. 240, 245 (1975).  This default rule,

however, can be altered by express statutory authorization.  Id.  Section 1988 is one such statute.

See 42 U.S.C. § 1988(b).  It provides for an award of a "reasonable attorney's fee" to the

"prevailing party" of a suit brought to enforce certain civil-rights laws, including those at issue

here.  The goal of this provision is to "ensure 'effective access to the judicial process' for persons

with civil rights grievances."  Hensley v. Eckerhart, 461 U.S. 424, 429 (1983) (quoting H.R. Rep.

No. 94-1558, at 1 (1976)).  The awarded fee, accordingly, should be "sufficient to induce a

capable attorney to undertake the representation of a meritorious civil rights case."  Perdue v.

Kenny A. *ex rel.* Winn, 559 U.S. 542, 552 (2010).  It should not, however, "produce windfalls to

attorneys."  Blum v. Stenson, 465 U.S. 886, 897 (1984) (citation omitted).

      The basic framework governing a fees calculation is well settled.  "A court must: (1)

determine the 'number of hours reasonably expended in litigation'; (2) set the 'reasonable hourly

rate'; and (3) use multipliers as 'warranted.'"  Salazar *ex rel.* Salazar v. District of Columbia, 809

F.3d 58, 61 (D.C. Cir. 2015) (quoting Eley v. District of Columbia, 793 F.3d 97, 100 (D.C. Cir.

2015)).  The number arising from the multiplication of the first two prongs of this test is dubbed

the "lodestar" amount, which is awarded a presumption of reasonableness.  See Bd. of Trustees

of Hotel & Restaurant Emps. Local 25 v. JPR, Inc., 136 F.3d 794, 801 (D.C. Cir. 1998).  A court

may then employ a multiplier, either upward or downward, where compelling factors not

accounted for in the lodestar calculation require adjustment to render the fee reasonable.  See

Perdue, 559 U.S. at 552–53; see also Baylor v. Mitchell Rubenstein & Assocs., P.C., 857 F.3d

939, 957–60 (Henderson, J., concurring) (emphasizing district courts' discretion to reduce fees as

sanction for excessive fee request or other litigation misconduct).  The fee applicant — here,

Hudson — bears the burden at each step of this tripartite calculation.  See Covington v. District

of Columbia, 57 F.3d 1101, 1107 (D.C. Cir. 1995).

The Court begins with the applicable hourly rate and then turns to the number of hours reasonably expended.  It next considers whether any general reductions are warranted, and it concludes this Part by analyzing whether and to what extent Hudson is entitled to reimbursement for the time spent preparing this fees petition, known colloquially as "fees on fees."

    1.  *Rate*

The determination of a reasonable hourly rate itself turns on three factors, called the "Covington" factors.  They are: "(1) 'the attorneys' billing practices'; (2) 'the attorneys' skills, experience, and reputation'; and (3) 'the prevailing market rates in the relevant community.'"  Salazar, 809 F.3d at 62 (quoting Covington, 57 F.3d at 1107).  This rate does not differ based on whether an attorney is engaged in private or public practice.  See Blum, 465 U.S. at 894 ("It is also clear from the legislative history that Congress did not intend the calculation of fee awards to vary depending on whether plaintiff was represented by private counsel or by a nonprofit legal services organization.").  In rendering its calculation, the court is tasked with "fixing the prevailing hourly rate . . . with a fair degree of accuracy."  Covington, 57 F.3d at 1109 (internal quotation omitted).

At the outset, the Court notes a fundamental problem: Plaintiff's counsel has provided almost no evidence to support key inputs to the rate calculation.  Despite her lengthy briefing, her two declarations, see ECF Nos. 165 (First Declaration of Marlene "Kemi" Morten), 185-1 Exh. 4 (Second Declaration of Marlene "Kemi" Morten), and her revised spreadsheet, the Court is left guessing at many key facts relevant to counsel's fee request.  That is not for lack of opportunity or notice.  Indeed, the Court specifically warned counsel that she must offer support on each element of her fee request.  See Tr. of Jan. 4, 2023, Hearing at 19:16–19 (Court: "But it's not going to be a question of my saying, well, you didn't really support this, I'll give you

another chance to file something else.  If you don't support it fully, I'll cut fees.").  Determined to do its best with what it has, the Court will nonetheless march through the factors in turn.

      a.  Attorney's Billing Practices

Counsel submits no evidence regarding her typical business practices.  She has offered nothing to demonstrate what her standard rate is, in what range it falls, or whether she has no such established rate because cases typically come to her using alternative arrangements.  When Defendant pointed this out, Plaintiff filed a second declaration containing no further information about her standard rate.  See generally Second Morten Decl.  Counsel offers only a bald assertion that her "typical" hourly billing rate is $950 an hour, see First Fee Mot. at 8–9, but nothing to substantiate such a claim — not a single case she has worked on in which she commanded such rates, not even a single other case she has tried.  Cf. Covington, 57 F.3d at 1108 ("[T]he law was not written to subsidize attorneys who charge below-market rates because they cannot command anything more.").

Defendant, by contrast, offers evidence.  In a sworn declaration, AFGE's counsel avers that Hudson's attorney has in another case declared that she was charging that client $450 an hour.  See ECF No. 170-1 (Declaration of Devki K. Virk), ¶ 4; id., Exh. 2 (Morten claiming entitlement "to payment of my legal fees at the hourly rate of $450" in Doe #1 v. AFGE, No. 20-1558 (D.D.C.)).  As AFGE recognizes, this fact alone hardly constitutes conclusive proof that Morten charges that as her standard market rate.  See AFGE Opp. at 8.  Morten also emphasizes that in that case she sought fees at a higher rate and would accept $450 an hour only if the court did not award her such fees.  See ECF No. 185 (Reply) at 2.  Nonetheless, that rate is just about the only concrete information that the Court has to go on here, as Hudson has offered nothing in

his Reply to suggest that she typically commands a higher rate.  The Court thus takes that $450

number as a starting point.

    b. Attorney's Skill, Experience, and Reputation

  Hudson has similarly left the Court adrift with respect to evidence on Morten's skill,

experience, and reputation.  In the typical case, counsel's declarations discuss her years of

litigation practice, approximate total number of civil matters, number of jury trials or appellate

arguments, and the like.  See, e.g., Lewis v. D.C., No. 15-521, 2018 WL 6308722, at *4 (D.D.C.

Dec. 3, 2018).  Here, by contrast, counsel offers none of that.  Her first declaration attests that

she "has worked for the past 40 years for the Unfoldment Law Office" — and that is it.  See First

Morten Decl., ¶ 1.  That declaration does not describe her legal practice; offer any detail on the

number, type, or complexity of matters she has worked on; or even state that during that time she

ever tried a case.

  AFGE counters with evidence that during most of that time Unfoldment was not a law

office but a provider of drug rehabilitation and social services.  See AFGE Opp. at 9; see also,

e.g., United States v. Harrington, 808 F. Supp. 883, 886 (D.D.C. 1992) (referring to "Kemi

Morten, the Executive Director" of "the Unfoldment Program, a 48-week residential drug

treatment program at Lorton Penitentiary").  Indeed, it appears that Unfoldment had been a law

office only for seven years prior to the 2021 trial.  See AFGE Opp. at 9–10.  In response, Morten

submitted a second declaration, which seems to agree with AFGE's characterization of

Unfoldment.  See Second Morten Decl., ¶ 9 ("I developed and ran Unfoldment's prison-based

drug treatment program at Lorton Correctional Complex . . . .").  She justifies her 40-year figure,

however, with the threadbare assertion that she "maintained a private practice of law since 1979,

including a part-time law practice while working at the D.C. Council and for Unfoldment, Inc."

and that she "regularly provided prisoners in my program and their family members with no to

low cost [*sic*] as part of my private practice."  Id., ¶¶ 4, 11.  Morten offers nothing to substantiate

those claims that she has been continuously practicing law for the past 40 years.  As the burden

is hers, the Court thus cannot award her fees based on 40 years' experience; seven years appears

to be a more appropriate number of years on this record, but neither figure seems sufficiently

supported to justify moving upward from the $450 rate.

Regarding reputation, Morten offers no further specific details.  AFGE, by contrast,

provides a thorough accounting of numerous occasions on which Plaintiff's counsel has been

sanctioned by other judges in this district.  See AFGE Opp. at 11 (listing multiple examples in

past three years).  In one of those cases, a judge here held Morten in civil contempt for

repeatedly defying court orders with "utterly baseless" explanations and in "total disregard for

the Court's authority."  Hillman v. AFGE, No. 18-999, 2020 WL 5763580, at *4 (D.D.C. Sept.

28, 2020).  Indeed, during the pendency of this very Motion, AFGE submitted as supplemental

authority an April 20, 2023, decision in which another judge, Judge John Bates, dismissed with

prejudice a challenge Morten had brought against AFGE because counsel "has time and again

demonstrated what can only be described as disrespect and disregard for the Court's orders,"

with counsel's "flagrant transgressions" and the "breadth and import of the misconduct" grave

enough to warrant outright dismissal.  See ECF No. 172 (Supplemental Authority) at 12; Doe #1

v. AFGE, No. 20-1558, 2023 WL 3019876, at *6 (D.D.C. Apr. 20, 2023).  This Court itself has

chastised Morten for making "factual misrepresentations" in a related case on behalf of the same

client that "fall far short of the veracity and candor the Court expects of those appearing before

it."  Hudson v. AFGE, No. 17-1867, 2019 WL 3533602, at *1, 8 (D.D.C. Aug. 2, 2019); see also

Hudson v. AFGE, No. 17-1867, 2021 WL 4551794, at *1–2 (D.D.C. Oct. 5, 2021) (reiterating same).

In addition to this conduct, the Court emphasizes that counsel has not offered evidence to substantiate an argument that her skill, experience, and reputation warrant anything close to the hourly rate she seeks — an omission particularly glaring as she submitted a second supplemental declaration after AFGE's Opposition that added nothing on these points. This analysis further suggests the appropriateness of the $450 sum mentioned above, or even a downward deviation from it.

c. Prevailing Market Rates

Finally, the Court turns to the question of the prevailing market rate. Here, the applicant must "produce satisfactory evidence — in addition to the attorney's own affidavits — that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Eley, 793 F.3d at 100 (quoting Blum, 465 U.S. at 895 n.11). In performing such a task, courts in our district often rely on matrices that lay out litigation billing rates in the District of Columbia. These matrices serve as "one type of evidence" to which a fee applicant can point to satisfy its burden under this third prong and are commonly a "useful starting point" for the Court's ultimate determination. Id. (quoting Covington, 57 F.3d at 1109). But, as our Circuit recently instructed, "[B]ecause such matrices are somewhat crude, the matrix's proponent usually" should point to additional evidence of the prevailing market rate, which can include "affidavits reciting the precise fees that attorneys with similar qualifications have received from fee-paying clients in comparable cases [or] evidence of recent fees awarded by the courts or through settlement to attorneys with

comparable qualifications handling similar cases." DL v. Dist. of Columbia, 924 F.3d 585, 589 (D.C. Cir. 2019) (internal quotation marks omitted).

Plaintiff contends that the Court should employ what is known as the "LSI Laffey matrix," a table the Circuit recently approved for complex litigation. Id. at 591. Even using that matrix, however, Morten's roughly seven years of recent practice (a generous figure in light of her failure to show any litigation during that time period) would put her at the matrix's rate of $440 per hour when the case was filed and $508 per hour today. Regardless of what precise number of years the Court uses, the only hard evidence that it has in this matter regarding counsel's rates is the $450 figure mentioned above. Given the lack of evidence to support anything higher, this is the rate the Court will use. See also id. at 594 (citing "sparse affidavit" in refusing to provide sought fees).

### 2. *Hours Reasonably Expended*

Now that it has the rate, the Court needs the other component of the lodestar figure — the number of hours. Plaintiff bears the burden here, too. See Covington, 57 F.3d at 1107. As the first step in satisfying it, a party requesting fees must produce "supporting documentation . . . of sufficient detail and probative value to enable the court to determine with a high degree of certainty that [the number of] hours were actually and reasonably expended." Role Models Am., Inc. v. Brownlee, 353 F.3d 962, 970 (D.C. Cir. 2004) (internal quotation marks and citation omitted); see also Nat'l Ass'n of Concerned Veterans v. Sec'y of Def., 675 F.2d 1319, 1327 (D.C. Cir. 1982) (requiring "contemporaneous, complete and standardized time records which accurately reflect the work done by each attorney"). In so doing, it must exercise its "billing judgment" and exclude from its request hours that "are excessive, redundant, or otherwise unnecessary." Hensley, 461 U.S. at 434. The Supreme Court has instructed courts to take up

this mantle when a party fails to do so and "exclude from [the] fee calculation hours that were not 'reasonably expended.'" Id. (quoting S. Rep. No. 94-1011, at 6 (1976)).  District courts have "wide discretion to reduce individual fee entries."  Nat'l Venture Capital Ass'n v. Nielson, 318 F. Supp. 3d 145, 152 (D.D.C. 2018) (citation omitted).  The court's task in this analysis is not to become a "green-eyeshade accountant[]," sequentially weighing the propriety of each entry listed in the movant's request.  Fox v. Vice, 563 U.S. 826, 838 (2011).  The goal here is "rough justice," rather than engaging in hand-to-hand combat that is itself a "'second major litigation.'" Id. (quoting Hensley, 461 U.S. at 437).

The Court's analysis proceeds as follows.  In this Section, it subtracts from Morten's proposed hourly total — 1,458 hours — three specific types of hours for which she may not bill or must bill with substantial reductions.  In the next Section, the Court levies two across-the-board cuts: one for Plaintiff's lack of success, the other as a sanction for her timesheet and litigation misconduct.  Although it makes no mathematical difference, the Court follows precedent in cutting hours as the first reduction and then trimming the resultant lodestar amount as a penalty.  The Court finally adds in Plaintiff's request for fees incurred in filing this Motion — fees on fees — awarded in the same percentage as she received here on her merits fees.

### a.   Hours Improperly Added From Prior to July 14, 2021

First, in line with its instruction to Plaintiff's counsel, the Court will strike all hours that Plaintiff has newly added from prior to July 14, 2021.  See Tr. of Jan. 4, 2023, Hearing, 10:18–25 (Court instructing counsel that it was "not going to let you seek more fees prior to July 14th, 2021")  The purpose of that instruction was to prevent counsel from treating her fee motions as negotiating tools, adding additional sums if Defendant did not accede to her requests.  See Baylor, 857 F.3d at 959 (Henderson, J., concurring) (sanctionable for attorney to treat initial fee

request "as an opening bid" in a negotiation).  Plaintiff's latest fee request, however, does exactly

that: in flagrant disregard of this Court's directive, it adds fees prior to July 14, 2021.  AFGE

provides numerous examples of such additions across pages 31–33 of its brief, including

instances where counsel added back time she had previously written off and added many new

entries where none had existed before.  See, e.g., AFGE Opp. at 31–32 (citing as examples lines

21–23, 46–47, 53–54, 146, 238–39, 339–40, 342, 347, 726, 780, 787, 789, 791, 796, 801, and

807).

      In his Reply, Hudson essentially concedes that he has ignored the Court's instruction.  He

recognizes that the Court "told Plaintiff not to include any additional hours" from before July 14,

but argues that counsel was "entitled to bill" for those hours and so did.  See Pl. Reply at 4–5.

That is not how this works.  The Court, justifiably concerned that Plaintiff was threatening to

come up with additional fees if AFGE opposed his Motion, ordered that counsel could not add

new fees from before July 14.  The Court will now do what it said it would: cut those 209 added

hours.  See AFGE Opp. at 31 (identifying 209.3 new hours added from that period, a number

Plaintiff does not dispute).  It will also consider this behavior in determining a general reduction.

      b.   Hours Spent on Separate Matters

      Next up are hours that counsel billed here but in fact spent working on other matters.  She

represents Hudson in other suits against AFGE, including one before this Court, Case No. 17-

1867, and the Court has rejected her efforts to consolidate those cases.  See Hudson, 308 F.

Supp. 3d at 395; see also Hudson, 2019 WL 3533602, at *7–8.  Yet numerous entries in this case

are labeled with number 17-1867.  Some such entries plainly concern only that other case.  See,

e.g., Line 11 (conferring with opposing counsel about "add[ing] racial discrimination counts to

17-1867").  In others, counsel suggests that work performed on that case is billable here because

it concerned the same underlying conduct; such work was still performed on another case and so is not also billable here.  See, e.g., Line 463 ("Proposed Supplemental Mot for Ext of Discover in 17-1867 re: Cox discrim in 2094"); 502 ("Court Order Granting Plaintiff's Motion for Extension of Discovery in Case 17-1867 with implications for 2094").  The Court will strike all time that Morten performed on that case, totaling 15.7 hours.

Counsel also billed entries regarding preparation of discovery in November 2019.  She marks those entries in her spreadsheet as concerning this case, but discovery in this case closed in March 2019 — in Case No. 17-1867, however, Plaintiff served interrogatory and document responses on November 12 and 14, 2019.  Those entries clearly pertain to that other case and will be struck as well, totaling 17.15 hours.

Finally, a series of counsel's entries concern neither case at all.  As AFGE documents, Morten evidently billed for 2.4 hours expended on "negotiations with AFGE to permit EH to attend upcoming NEC meeting" and reading AFGE's notification that "EH will be permitted to attend upcoming NEC meeting."  Lines 471–73.  That work was not expended on this litigation. The Court will strike it and related matters, totaling 4.6 hours.

Plaintiff concedes that counsel seeks fees for work on other matters, rejoining only with the assertions that she should be able to bill for depositions "in related case 17-1867" and for matters "discussed following a status conference in this case."  Reply at 21–22.  That curious response, which would seem to allow counsel to doubly recover for any work in any case that shared a factual basis with this one, does not render those hours compensable here.

All told, the Court will strike a total of 37.5 hours as not appropriately billed to this case.

c. Hours Spent on Global Mediation

Finally, AFGE challenges counsel's roughly 50 hours spent on global settlement efforts with respect to all of Hudson's litigation.  Placing no weight on AFGE's intimation that counsel wasted time during such settlement, see AFGE Opp. at 24, the Court agrees that attributing 50 hours to this case alone is far too many given the multiple matters involved in the global settlement efforts and the mediation's lack of success.  Other courts in this district have held that hours spent on unsuccessful mediation are categorically non-compensable.  See Cobell v. Norton, 407 F. Supp. 2d 140, 156 (D.D.C. 2005).  Settlement, however, is a laudable goal and striking such hours would "have perverse effects on the incentives of parties to engage in good-faith settlement negotiations."  Lewis, 2018 WL 6308722, at *17.  The Court instead believes the more prudent course here is to cut half the hours, which balances the number of cases involved against the Court's interest in promoting settlement.  It will accordingly award 25 hours in this bucket and cut 25.

*   *   *

Let's review the bidding.  The Court has begun with counsel's sum total of proposed hours, set aside fees on fees (which will be treated later), and then subtracted hours based on the individual objections AFGE raised.  Such subtraction yields a total of 1059.5 hours.

|  | **Hours** |
|---|---|
| Total proposed hours | 1,458.0 |
| Set aside: Fees on Fees | - 126.7 |
| Subtract: Hours Prior to July 14, 2021 | - 209.3 |
| Subtract: Hours Spent on Separate Matters | - 37.5 |
| Subtract: Hours Spent on Global Mediation | - 25.0 |
| Remaining Total: | 1059.5 |

The Court's remaining tasks are to levy any global percentage-based cuts to those hours and then to add in proportionally scaled-down fees on fees.

### 3.   *General Reductions*

The Court begins with two across-the-board reductions: first to the total number of hours for Hudson's limited success, and second to the resulting lodestar amount as a sanction for counsel's deficient recordkeeping and inappropriate litigation conduct.  For narrative flow and as mentioned above, the Court analyzes both multipliers in this section.

### a.   Reduction for Limited Success

It is well established that a party may be entitled to a reduced award if its victory is incomplete.  "A plaintiff's overall success on the merits also must be considered in determining the reasonableness of a fee award."  Judicial Watch, Inc. v. U.S. Dep't of Commerce, 470 F.3d 363, 369 (D.C. Cir. 2006); see also Hensley, 461 U.S. at 436 (stating that "most critical factor" in determination of reasonable fee is "the degree of success obtained").  Here, too, a court is afforded discretion to "identify specific hours that should be eliminated" or, alternatively, to "simply reduce the award to account for the limited success."  Hensley, 461 U.S. at 436–37.

Hensley v. Eckerhart is the foundational case in this area.  There, the Supreme Court instructed that "where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained."  461 U.S. at 440. The D.C. Circuit has interpreted Hensley to establish a two-step inquiry: "First, did the plaintiff fail to prevail on claims that were unrelated to the claims on which he succeeded?  Second, did the plaintiff achieve a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award?"  George Hyman Const. Co. v. Brooks, 963 F.2d 1532, 1535 (D.C. Cir. 1992).  "In assessing the fees for related claims," however, "'a court is to skip the first Hensley inquiry and move to its second.'"  Goos v. Nat'l Ass'n of Realtors, 997 F.2d 1565, 1569 (D.C. Cir. 1993) (quoting Brooks, 963 F.2d at 1537).  That second inquiry requires "the factfinder [to] then consider whether the success obtained on the remaining claims is proportional to the efforts expended by counsel."  Brooks, 963 F.2d at 1535.

As an initial matter, the parties dispute whether Hudson's claims were related and thus whether the Court may skip step one.  At that first step, AFGE contends that Hudson's claims are unrelated and that, because he did not prevail at trial on all of them, counsel's hours should be cut on that basis.  See Verdict Form at 1–2.  Plaintiff counters that the claims share "a common core of facts based on related legal theories."  Pl. Mot. at 14.  On this score, the Court sides with Hudson.  Even if the factual bases for the allegations of discrimination differ in some ways, they are not "'distinctly different' in all respects, both legal and factual."  Williams v. First Gov't Mortg. & Invs. Corp., 225 F.3d 738, 746 (D.C. Cir. 2000) (quoting Morgan v. District of Columbia, 824 F.2d 1049, 1066 (D.C. Cir. 1987)).  Each claim involved Cox's treatment of Hudson during a common timeframe.  For this reason — and aided by the fact that most unsuccessful claims were dismissed early on in this saga — it would be nearly impossible for the

Court to "divide the hours expended on a claim-by-claim basis." Craig v. District of Columbia, 197 F. Supp. 3d 268, 283 (D.D.C. 2016) (citation omitted).  AFGE contradicts itself on this point when it contends that all of Hudson's original claims should be treated as related under the second Hensley prong.  See AFGE Opp. at 18–19 (emphasizing under second prong that "Plaintiff's myriad of claims clearly qualify as related to the extent that they all rest on the central factual allegation that Plaintiff's race was the decisive factor in the mistreatment he allegedly suffered").

The Court accordingly focuses its attention on the second Hensley inquiry, which considers whether Plaintiff's level of success warrants a full fee award.  See Goos, 997 F.2d at 1569.  Here, AFGE's arguments land with more force.  This Court, like others in this district, will consider Hudson's success in the full context of this entire litigation.  See, e.g., Radtke v. Caschetta, 254 F. Supp. 3d 163, 171 (D.D.C. 2017); Craig, 197 F. Supp. 3d at 284 & n.7.  And Plaintiff's success compared to his original litigating position is quite modest.  His Complaint made a series of sweeping allegations of race discrimination and retaliation, and on that basis sought millions of dollars in damages.  See Compl., ¶¶ 44–51; Civil Cover Sheet at 2.  The Court dismissed three of the four claims, including two significant ones: that Hudson was removed on the basis of race and that he was subject to a hostile work environment.  Hudson, 308 F. Supp. 3d at 396.  Notwithstanding that dismissal, Plaintiff repeatedly throughout the course of this litigation tried to revive those claims, and the Court repeatedly rejected those efforts.  See, e.g., Hudson v. AFGE, No. 17-1867, 2019 WL 3533602, at *1, 8 (D.D.C. Aug. 2, 2019) (chastising Plaintiff for trying to revive these claims by "filing a brief that relies on factual misrepresentations" and "trying to pull the wool over the Court's eyes"); see also Hudson v. AFGE, No. 17-1867, 2021 WL 4551794, at *1–2 (D.D.C. Oct. 5, 2021) (reiterating same).  The

same proved true in discovery and even up through trial, as Plaintiff repeatedly tried to broaden the scope of this litigation without success.  The upshot is that his success at trial was far more limited than what he initially sought (and what counsel billed hours for) over the sweep of the litigation.  The Court thus finds a 20% discount to counsel's hours properly accounts for this limited success, which the Court believes is a decidedly modest cut.

Plaintiff's counterarguments are unavailing.  He offers generalized statements about the verdict, see Reply at 8 ("Mr. Hudson's jury verdict against AFGE is a shining example of justice delayed but not denied."), contends that AFGE adopted new policies in response to the litigation, id. at 9–10, and emphasizes in particular that Defendant amended its national constitution following the jury verdict.  Id. at 10.  None of that explains how Plaintiff's limited $100,000 litigation victory justifies the full fees of a sprawling, multi-million-dollar original Complaint — which Plaintiff litigated at every turn, right up to trial, as though he were pursuing that full original set of claims.

All told, the Court in its discretion finds reasonable a 20% haircut based on lack of success, to account for the gap between Plaintiff's sought relief (and counsel's efforts towards that relief) and his final limited victory.

### b.   Reduction as Sanction

One more cut is in order, this one as a sanction for Plaintiff's deficient recordkeeping and litigation misconduct.  Begin with recordkeeping, a point on which the D.C. Circuit has been very clear: "Casual after-the-fact estimates of time expended on a case are insufficient to support an award of attorneys' fees."  Nat'l Ass'n of Concerned Veterans, 675 F.2d at 1327.  This Circuit "require[s] that fee applications include contemporaneous time records of hours worked and rates

claimed, plus a detailed description of the subject matter of the work with supporting documents, if any." In re Donovan, 877 F.2d 982, 994 (D.C. Cir. 1989) (emphasis added).

That court nonetheless has also appreciated that the "[t]otal denial of requested fees as a purely prophylactic measure . . . is a stringent sanction, to be reserved for only the most severe of situations, and appropriately invoked only in very limited circumstances." Jordan v. U.S. Dep't of Just., 691 F.2d 514, 518 (D.C. Cir. 1982). "Outright denial may be justified when the party seeking fees declines to proffer any substantiation in the form of affidavits, timesheets or the like, or when the application is grossly and intolerably exaggerated, or manifestly filed in bad faith." Id. Where counsel "merely failed to keep contemporaneous records," by contrast, courts have concluded "it would be unjust to preclude them from recovering any fees at all." Norden v. Clough, 674 F. Supp. 2d 126, 130 (D.D.C. 2009); see also New York v. Microsoft Corp., 297 F. Supp. 2d 15, 38–44 (D.D.C. 2003) (giving only 15% reduction where Plaintiff State of Massachusetts performed meticulous reconstruction of time records).

Here, counsel's statements to opposing counsel, as well as her submitted timesheet, evince after-the-fact reconstruction. Begin with her comment to opposing counsel in February 2023 that she "tied [her] fees to the greatest extent possible to emails exchanged between [counsel], to Plaintiff's documents filed on the Court docket, to AFGE's documents filed on the Court docket, to consultations with my Client, and to Judge Boasberg's Orders regarding status hearings and rulings on motions." Virk Decl., Exh. 7. Such efforts to "tie[]" fees to concrete documents would be necessary only if those fees were reconstructed after the fact. Indeed, the spreadsheet repeatedly states that various entries are "approximate" and "will be updated" in the future — a future that should have materialized before Plaintiff submitted his fee spreadsheet, as the Court warned in its January 2023 status hearing, and that further reveals after-the-fact

reconstruction.  AFGE furthermore identifies a blizzard of inconsistencies between counsel's latest spreadsheet and her previously submitted one that makes sense only if the times were just guesswork.  See AFGE Mot. at 26–27.  The metadata on Plaintiff's fee spreadsheet also reveals that it was created in June 2021, just before Plaintiff filed his original fee motion; despite repeated requests from AFGE, counsel has failed to produce any underlying records on which that spreadsheet was based.  Id. at 28; Virk Decl., ¶ 11.  Finally, the fact that Hudson billed over 100 hours to preparation of the fee motion suggests that such preparation required extensive reconstruction.  Those facts all collectively make clear that counsel failed to keep contemporaneous time records.

Plaintiff offers a wholly inadequate response.  Counsel generally maintains that "[t]hroughout her legal career, undersigned counsel has used Excel spreadsheets to contemporaneously record her billed legal hours as she did here . . . ."  Reply at 3.  But AFGE's charge is not that there is anything wrong with Excel; it is that many features of counsel's Excel spreadsheet and her communication more generally suggest that she did not in fact "contemporaneously record her billed legal hours."  Seeming to concede that fact, counsel switches gears in her conclusion: there, she says that her billing "confirms" her "clear statement in the revised bill that she was unable to access the original bill of costs while overseas."  Reply at 24 n.3.  She accordingly asks the Court for "an extension of time to provide additional supporting documentation."  Id. at 24.  The Court is stymied.  Recall that it told counsel before she filed her second revised bill of costs, in no uncertain terms, that this would be her final chance to support her fee request.  See Tr. of Jan. 4, 2023, Hearing at 19:16–19 (Court: "But it's not going to be a question of my saying, well, you didn't really support this, I'll give you another chance to file something else.  If you don't support it fully, I'll cut fees.").  As counsel has still

not done so, the Court must conclude that she has not based her fees on contemporaneous time records.

That failure to adequately track time would alone warrant a serious reduction as sanction. A second feature of the litigation, however, reinforces the need for a reduction here: the vexatious manner in which Plaintiff has conducted this litigation.  The Court has already referenced several respects in which counsel's conduct has fallen short of professional standards. Most seriously here, she "impermissibly treated" her initial fee request "as an opening bid" and then defied this Court's Order instructing her not to go back and add additional fees from that period.  See Baylor, 857 F.3d at 959 (Henderson, J., concurring) (emphasizing such conduct merits sanction).  She also repeatedly skirted the Court's rulings, including by misleading the Court regarding her attempts to consolidate this case with No. 18-1867 and by attempting to smuggle in evidence regarding those claims through in limine motions.  See Hudson, 2019 WL 3533602, at *7–8; ECF No. 82 (Order on Motions in limine) at 1 (noting that, notwithstanding Court's prior Order, Hudson "wishes to broaden the trial far beyond these race-discrimination claims").  No mere aggressive litigating, this behavior transgressed the Court's prior Orders and further recommends a sanction.

Taken together, counsel's post hoc fee reconstruction and her other litigation misconduct warrant a 25% fee reduction.  The Court is mindful that it could go much lower: Judge Henderson's concurrence admonishes district courts that their discretion to vary upward and downward includes dropping fees all the way down to zero or to the award that the plaintiff received.  See Baylor, 857 F.3d at 957–60 (Henderson, J., concurring) (suggesting these approaches and emphasizing that "[s]teep overbilling ought to come at a steep price"); see also

AFGE Opp. at 39–40.  The Court nonetheless believes that calculating a lodestar and then imposing a 25% sanction most fairly tethers the outcome to the facts of this case.

*   *   *

The billing now stands as follows.  The Court left off in Part II.A.2 with a figure of 1059.5 total billable hours.  To account for lack of success, the Court reduces that total by 20%; that yields a new base number of 847.6 hours.  Multiplying that number by the $450 hourly rate results in a lodestar of $381,420, which the Court cuts by 25% as a sanction.  The Court's total award thus now stands at $286,065.  The only remaining task is to add in fees on fees, a task it takes up now.

### 4.  *Fees on Fees*

Rounding out the billing is Plaintiff's request to recover for time expended on seeking attorney fees.  Courts in this district have concluded that awards of such "fees on fees" should be reduced to exclude the amount of time spent unsuccessfully defending fee requests denied by the court.  See, e.g., Nat'l Veterans Legal Servs. Program v. U.S. Dep't of Veterans Affairs, No. 96-1740, 1999 WL 33740260, at *5–6 (D.D.C. 1999); see also Commissioner, INS v. Jean, 496 U.S. 154, 163 n.10 (1990) ("[F]ees for fee litigation should be excluded to the extent that the applicant ultimately fails to prevail in such litigation.").  In other words, courts reduce fees on fees "by the same proportion" as they have reduced the total award.  Lewis, 2018 WL 6308722, at *17.

Plaintiff seeks to bill 126.7 hours in trial and appellate fees on fees at a $997 hourly rate, for a total sought fees-on-fees award of $126,320.  The Court must trim that total in proportion to counsel's overall success in this Motion.  Morten originally sought to bill 1331.3 hours of non-fees-on-fees time, which at her proposed hourly rate would have yielded a merits award of $1,327,306.  The Court, by contrast, has arrived at a merits award of $286,065.  That represents a

78% reduction.  The Court will accordingly reduce counsel's sought $126,320 fees-on-fees award by 78% for lack of success, resulting in $27,790 in fees on fees.

*   *   *

The Court's merits award of $286,065, plus its fees-on-fees award of $27,790, combine for a total award of $313,855.

B.  <u>Costs</u>

Last up is the issue of costs.  Plaintiff seeks roughly $49,582.10 in trial costs and $10,526.30 in appellate costs.  The Court will straight-out deny this request.  First, the lion's share of these costs are for support services variously labeled as "Admin Asst," "Investigators," and "Paralegal Assistants."  <u>See</u> Lines 1029–37.  Such clerical support is not reimbursable as costs under the caselaw.  <u>See</u> <u>Cobell</u>, 407 F. Supp. 2d at 156–57 (citing <u>Missouri v. Jenkins</u>, 491 U.S. 274, 288 n.10 (1989)).  Plaintiff additionally offers no support at all for those time entries, instead providing only the roughest conceivable time estimations.  <u>See, e.g.</u>, Lines 1030, 1031, 1033 (billing "Admin Asst" time as "1 year @ $20 per hour for 20 hours a week").  This rounding offers nowhere near the level of detail required to secure reimbursement.  <u>See</u> <u>Role Models Am., Inc.</u>, 353 F.3d at 971.

Plaintiff's assorted other cost entries meet the same fate.  Some are barred because, as the Court has previously informed him, they must be submitted to the Clerk under Local Rule 54.1, and Plaintiff has missed the necessary timeframe for so submitting.  <u>See</u> AFGE Mot. at 42 (quoting ECF No. 125-2 (Transcript of June 24, 2021, Hearing) at 11:19–20).  In any event, Hudson has offered no support at all for these fee requests.  Courts routinely deny such requests where counsel has failed to "provide any explanation, receipts, or documentation to justify the

24

reasonableness of the requested costs." <u>See, e.g.</u>, <u>Craig</u>, 197 F. Supp. 3d at 284–85.  Because

that is the case here, the Court will deny them in full.

Perhaps recognizing these deficiencies, Hudson requests leave to "assemble, scan, and

file certain trial cost receipts."  Reply at 25.  But enough is enough.  After years of litigation,

months of delay, and two unsupported fee requests, the Court does not see any reason to grant

additional time now.  The Court, moreover, already explained this all to counsel before she filed

her present Motion — she knew it was her last shot when she filed it.  <u>See</u> (yet again) Tr. of Jan.

4, 2023, Hearing at 19:16–19 (Court: "If you don't support it fully, I'll cut fees.").  The Court

believes this matter has run its course and will thus deny the request for costs in full.

\*   \*   \*

Fee disputes are "one of the least socially productive types of litigation imaginable."

<u>Hensley</u>, 461 U.S. at 442 (Brennan, J., concurring in part and dissenting in part).  This dispute

has proven that many times over.  With the dust settled, the Court concludes that a fee award of

$313,855 is the proper result here.  That award will compensate counsel for her time without

yielding the type of unjust windfall that Section 1988 seeks to guard against.

### III.    Conclusion

For the foregoing reasons, the Court will grant in part and deny in part Plaintiff's Second

Motion for Attorney Fees and Costs.  A separate Order so stating will issue this day.

/s/ *James E. Boasberg*
JAMES E. BOASBERG
Chief Judge

Date:  June 16, 2023